**JAN STIGLITZ (SBN 103815)**
**LAW OFFICE OF JAN STIGLITZ**
225 Cedar St.
San Diego, CA 92101
Tel.: (619) 525-1697
Fax: (619) 615-1497

**BRETT A. BOON (SBN 283225)**
brett@boonlawoffice.com
**BOON LAW**
411 Camino Del Rio S, Suite 106
San Diego, CA 92108
T: (619) 358-9949
F: (619) 365-4926

**CRAIG S. BENNER (SBN 283913)**
craig@bennerlawfirm.com
**BENNER LAW FIRM**
411 Camino Del Rio S, Suite 106
San Diego, CA 92108
T: (619) 595-6795
F: (619) 595-6796

**ALEXANDER J. SIMPSON (SBN 235533)**
ajs@cwsl.edu
225 Cedar St.
San Diego, CA 92101
T: (619) 515-1525
F: (619) 615-1425

Attorneys for Plaintiff LUIS LORENZO VARGAS

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| **LUIS LORENZO VARGAS,**<br><br>Plaintiff,<br><br>v.<br><br>**CITY OF LOS ANGELES; LOS ANGELES POLICE DEPARTMENT;** ~~COUNTY OF LOS ANGELES; OFFICE OF THE LOS ANGELES DISTRICT ATTORNEY; LOS ANGELES SHERIFF'S DEPARTMENT;~~ **MONICA QUIJANO;** ~~RICHARD TAMEZ;~~ **SCOTT SMITH; AND DOES 1-10 INCLUSIVE,**<br><br>Defendants. | Case No.  2:16-cv-08684-SVW-AFM<br><br>**DECLARATION OF BRETT BOON, Esq. IN SUPPOT OF PLAINTIFF'S MOTION TO PERMIT EXPERT TESTIMONY AND OPINION**<br><br>**HON. STEPHEN V. WILSON**<br>CTRM 10A<br><br>**Date:** **June 10, 2019**<br>**Time:** **1:30 pm**<br>**Complaint Filed:** November 12, 2016<br>**Trial Date:** June 25, 2019 |

---

**I, BRETT A. BOON, declare and state as follows:**

1. I am over the age of 21 and not a party to this action. I am one of the attorneys of record representing Plaintiff LUIS LORENZO VARGAS.

2. I make this declaration based on my personal knowledge. For those matters which I lack personal knowledge, I make them based on information and belief. If called to testify, I would competently testify to each matter set forth herein.

3. Attached hereto as Exhibit 1 is a true and correct copy of Plaintiff's retained expert Mr. Roger Clark's expert report in this Action.

4. Attached hereto as Exhibit 2 is a true and correct copy of Plaintiff's retained expert Mr. Kurt David Hermansen, Esq.'s expert report in this Action.

5. For the Court's convenience, attached hereto as Exhibit 3 is a true and correct copy of the Ninth Circuit's ruling in the matter of *Susan Mellen v. Marcella Winn*, 9th Cir. Case No. 17-55116 at Dkt. No. 43-1 (9th Cir. 2018).

    I declare under penalty of perjury under the laws of the state of California that the foregoing is true and correct.  Executed on May 13, 2019 in San Diego, California.

*/s/ Brett A. Boon*
Brett A. Boon, Esq.

# EXHIBIT 1

# Roger Clark

## Police Procedures Consultant, Inc.

10207 Molino Road.  Santee, CA 92071
Phone: (208) 351-2458,  Fax: (619) 258-0045
rclark9314@aol.com

April 22, 2019

Jan Stiglitz, Esq.
Law Office of Jan Stiglitz
225 Cedar Street
San Diego, CA 92101

Brett Boon, Esq.
Craig Benner, Esq.
Benner & Boon, LLP
1516 Front Street
San Diego, CA 92101

**Regarding:    *Luis Lorenzo Vargas vs. City of City of Los Angeles; Los Angeles Police
Department; Monica Quijano; Scott Smith; et al., Case No.:
2:16-cv-08684-SVW-AFM.***

Dear Counsel:

Thank you for retaining me to analyze and render opinions regarding the July 21, 1998
wrongful arrest and June 15, 1999 wrongful conviction (including 16 years in prison) of
Mr. Luis Vargas (Mr. Vargas) by Los Angeles Police Department (LAPD) Detectives.
Including Detectives Monica Quijano (Detective Quijano) and Scott Smith (Detective
Smith).  Pursuant to the requirements of Rule 26, I have studied the reports, transcripts,
and other material provided to me (as listed below) regarding this case.  Please be advised
that if/when any further information is provided, it is likely that a supplementary report
will be necessary.  I cannot state at this time what the effect of any additional data and/or
documents would be on my opinions.

It is also necessary to state at the beginning of my report that I have not made credibility
determinations in expressing my opinions.  That is, where there are differences in the

events proffered by the Defendants and/or other witnesses and Mr. Vargas and/or other witnesses, I do not opine for the trier of fact regarding who is the more believable witness. I consider that the resolution of any such conflicts will be in the purview of a jury to decide.

**<u>Materials Provided and Reviewed Thus Far</u>:**

1.  Second Amended Complaint for Damages.

2.  In Chambers Order Granting In Part Motion for Summary Judgement and Requesting Further Briefing [47].

3.  In Chambers Order Denying Defendants' Motion for Summary Judgement[47].

4.  Defendant Monica Quijano's Objections and Response To Plaintiff's Statement Of Additional Disputed Material Facts.

5.  Defendant Monica Quijano's Supplemental Response To The Court's Order Dated March (Pacer No. 109); Of Points And Authorities; Declaration Of Surekha A. Shepherd; In-Camera Exhibit.

6.  Declaration Of Brett A. Boon In Support Of Plaintiff Luis Vargas' Second Supplemental Brief In Opposition To Defendants' Motion For Summary Judgment.

7.  Plaintiff's Response To Defendants' Supplemental Statement Of Uncontroverted Facts And Conclusion And Law In Further Opposition To Defendants' Motion For Summary Judgment.

8.  Declaration of Kurt David Hermansen.

9.  Plaintiff's Further Supplemental Briefing And Points And Authorities In Support Of Opposition To Defendants' Motion For Summary Judgment.

10. Deposition Transcripts:
    a.   Luis Lorenzo Vargas (Plaintiff), September 5, 2017.

    b.     Detective Sharlene Johnson, October 4, 2017.

    c.     Frank D. Rorie, Esq. (Represented Mr. Vargas in 1998), October 10, 2017.

    d.     Detective Dan Jenks (Person Most Knowledgeable), October 12, 2017.

    e.     Detective Monica Quijano (Defendant Detective), October 18, 2017.

    f.     Detective Scott Smith (Defendant Detective), February 13, 2018.

11.    POST Learning Domains:

    a.     #1: "Leadership, Professionalism & Ethics."

    b.     #2: "Criminal Justice System."

    c.     #3: "Policing in the Community."

    d.     #5: "Introduction to Criminal Law."

    e.     #15: "Laws of Arrest."

    f.     #16: "Search and Seizure."

    g.     #17: "Presentation of Evidence."

    h.     #18: "Investigative Report Writing."

    i.     #30: "Preliminary Investigation."

    j.     #36: "Information Systems."

12.    *Criminal Investigations*, Internal Association of Chiefs of Police, Kendall/Hunt Publishing, Dubuque, Iowa, 1998.

13.    Brady v. Maryland, 373 U.S. 83 (1963).

**<u>Brief Overview of Events and Commentary:</u>**

*Introduction:*

Between February of 1998 and June of 1998 Karen P., Edith G., and Teresa R. were accosted and sexually assaulted.  Following their sexual assaults, Mr. Vargas was identified as the assailant, incarcerated, and eventually found guilty and sentenced to 55 years, to life, in prison.  Recently, scientific analysis of DNA evidence has conclusively established that Mr. Vargas did not commit the crimes and was wrongly convicted and incarcerated.  I have been asked to analyze how this occurred.

Accordingly, my analysis of the original investigation is that it was significantly and

unforgivably flawed and that if the basic investigative procedures required from every
detective and their supervisors occurred, Mr. Vargas would have been eliminated as a
suspect and if the Brady requirements had been followed, it is likely that he would not
have been convicted if taken to trial.

Significant to my opinion is the fact that since 1963, detectives and their respective
supervisors knew that, pursuant to *Brady v. Maryland* they were obligated to provide all
relevant findings - including exculpatory facts - to the District Attorney and defense
counsel before trial.  In this case, several significant facts (as indicated below) were
excluded.  In my opinion they would have raised suspicion and doubt to any competent
investigator about Mr. Vargas' alleged role in the sexual assaults - and would have
precluded his conviction and incarceration.  The following pages briefly recounts the
original investigation and comments on the failures of the LAPD detectives and those in
their chain of command who were responsible for their investigatory oversight.

*Brief Overview:*

Karen P. was attacked on 40th Street and S. Avalon Boulevard in Los Angeles, California.
The Detective Bureau assigned at the Newton Division of the Los Angeles Police
Department initially investigated Karen P.'s case.

Edith G. was attacked on 55th Street and Figueroa Street in Los Angeles, California.
Teresa R. was attacked on Avalon Boulevard and 40th Place in Los Angeles, California.
The Detective Bureau assigned at the 77th Division of the Los Angeles Police Department
originally investigated these two attacks.  The attacks of Edith G. and Teresa R. occurred
on a Saturday morning around 6:00 a.m. (However, in May and June of 1998, Mr. Vargas
worked in Hollywood at 5:00 a.m. or earlier every Saturday.)

During the investigation into the rapes of Edith G. and Teresa R., Detectives Quijano and
Smith began researching other rapes in the area to see if any other rapes were connected.
The detectives were looking for similarities in the descriptions of the perpetrators or in
the modus operandi of the crimes.  Ultimately, detectives identified eight other sexual
assaults in the Los Angeles area that were similar to the assaults on Edith G. and Teresa
R. These assaults dated back as far as 1996, two years before the Edith G. and Teresa R.
assaults.  Detective Smith compiled the documents and information relating to these other
sexual assaults into a binder titled the "Serial Rapist Book."

Despite the fact the attacks on Karen P., Edith G., and Teresa R. were all substantially
similar - either in description, location, or *modus operandi* - to the other rapes detailed in

the "Serial Rapist Book," no law enforcement agency or individual actor disclosed the book to the Vargas defense at any time.

I have noted that the sex crime departments at the Newton Division and the 77th Division met once a month and compared relevant sex crimes information (a routine process).

In May of 1998, Detective Monica was working in the Sex Crimes unit at the 77th Street Division, which operates under the major assault crimes unit.  Detective Quijano investigated Teresa R.'s case, as well as Edith G.'s case.  Detective Scott Smith was Quijano's partner in May of 1998, and was also assigned to investigate the assaults on Teresa R. and Edith G.

One of the names found in the "Serial Rapist Book" - Deborah H. - appears in the District Attorney's file and was disclosed to the defense.  However, the fact LAPD investigators believed this rape was connected to the crimes for which Vargas was convicted, or that investigators believed it was connected to other crimes in the "Serial Rapist Book," was never meaningfully disclosed.  Crimes in the Newton Division, Detective Richard Tamez investigated Karen P.'s case.

Quijano, Smith, and Tamez concluded the same person committed all three attacks.  This conclusion arose from the undeniable similarities all three crimes shared.  Including the fact that the victims were all women between the ages of fifteen and twenty four.  They were all attacked at or near a bus stop, as each was walking down the street alone at 6:00 a.m.  Each victim was approached by a man who initiated a conversation, held a knife to her body, relocated her to a secondary location, and either assaulted or attempted to assault her before being scared off.  Quijano and Tamez were confident all three attacks were committed by the same perpetrator due to the similarities in the attacks and the descriptions of the suspect.

After law enforcement concluded all three crimes were committed by the same person, the LAPD consolidated all three assaults in its investigation.

Based on the description of the perpetrator given by two of the victims - Hispanic man with a teardrop tattoo - investigators honed in on Vargas as a suspect.  Quijano, Smith, and Tamez noted that two of the victims described some sort of tattoo under the perpetrator's eye.  Vargas has a faded teardrop tattoo under his eye.  Because of this, the detectives believed Vargas was the perpetrator.

Detective Quijano provided Detective Tamez with a photograph of Vargas.  Detective Tamez used that picture in the photo array he showed at least one of the victims, Karen P.

More than a month and a half after the attack, on July 16, 1998, Detective Quijano showed Edith G. a six-pack photo lineup with Vargas in the lineup. Edith G. identified Vargas, but said that unlike Vargas's photo, her attacker had no hair and was heavier than Vargas. Specifically, Edith G. noted number 6 (Vargas) "should be without hair and the person is a bit [skinny]." A few days later, on July 21, 1998, Edith G. identified Vargas in a second photo lineup, but was not 100 percent certain of her identification.

More than one month after the crime, on July 16, 1998, Teresa R. identified Vargas from a six-pack photo lineup. She identified him by the one teardrop below his left eye and believed his eyes and mouth were the same as those of her assailant. However, Teresa R. said Vargas's nose was different than her attacker's.

On July 21, 1998, Teresa R. identified Vargas as her attacker in a second photo lineup, which depicted a more recent photograph of Vargas. She noted that her attacker looked older than Vargas looked in the photograph.

Based on the tentative identifications of the victims, on July 21, 1998, law enforcement arrested Luis Vargas for these crimes.

It must be noted here that between 1996 and 2012, Los Angeles was terrorized by an unknown perpetrator commonly referred to as the "Teardrop Rapist." Finally, through DNA testing, the actual "Teardrop Rapist" has been linked to approximately 39 sexual assaults and include the sexual assaults for which the Teardrop Rapist is responsible are identical to those for which Vargas was convicted. During his long series of attacks the Teardrop Rapist left his DNA on at least 10 of these attacks. As noted, these attacks began before Vargas was even a suspect in this case, and they continued well after his arrest, conviction, and sentence.

Further, and as noted above, *Detectives Quijano and Smith were aware of other similar rapes in the area, and collected the information regarding these other rapes into a document entitled the "Serial Rapist Book.*" (Emphasis added.)

In addition, LAPD investigators had information regarding other rapes - similar to the rapes of Edith G., Teresa R., and Karen P., in either geographic location, perpetrator description, or *modus operandi* - and *these other rapes were also documented during the time of the Vargas case.* (Emphasis added.)

    Q.    Typically, and I understand it may vary based on staffing, number of crimes being committed on a given day or weekend, various other

factors, but typically how long does·that process take from the point
in which an initial report·is generated by a patrol officer to the point
where·Detective McCauley assigns it, if it were a sexual
assault·within the 77th to a detective on the MAC Table?

A.      Ideally within two days.··Could be longer.··But·for instance, if you
have an outside division -- because·77th is so busy, Southeast comes
in and handles the 77th ·report - they are going to go back to
Southeast and·complete that report.··They'll turn it in to their
Records·Department, he or she will see this is a 77th occurrence,·still
input it into the system and then it could get·gray-mailed to 77th and
show up four days later.··Who knows?

Q.      And I'm going to assume that the objective is to·try to initiate the
investigation as soon after the crime is·committed as possible; right?

A.      Yes.

Q.      That gives detectives such as yourself the best·opportunity to have a
successful investigation; correct?

A.      Yes.

Q.      So this report dated February 13th 1999 ideally ·would have hit the
table of the assigned detective within·the MAC Unit within two days
of that date, but if there's·some extraneous circumstances it certainly
would have hit·the MAC Table with an assignment to a detective
from·Detective McCauley within a week at most of the date of
the·incident; is that correct?

MS. PESSIS:      Objection; lacks foundation as to·"McCauley," calls
                 for speculation.  Go ahead.

THE WITNESS:     Yes.

Q.      (By Mr. Boon) So another detective within·the MAC Table would
have been assigned this·particular investigation no later than
February 20th of 1999, give or take, and ideally by February 15th
·1999; is that correct?

MS. PESSIS:      Objection; calls for speculation.

THE WITNESS:     Ideally.

Q.      (By Mr. Boon) And you were assigned to the·MAC Table within the
77th throughout the month of·February into the month of March of
1999; is that·correct?

MS. PESSIS:      Asked and answered.

THE WITNESS:     To some point in March, yes.

Q.      (By Mr. Boon) And you've testified earlier·that if another detective
on the MAC Table came·across a report of a sexual assault that

had·similarities of those that you were including in the·serial rapist book, you would hope that they should·bring that to your attention.··Is that consistent·with what you've testified to?

MS. PESSIS:        Objection; misstates the testimony.

THE WITNESS:        I would like to have seen it even·though it's after the date of arrest.

Q.        (By Mr. Boon) So ideally this report·should have been brought to your attention when you·were on the MAC Table through February and into·March of '99?

MS. PESSIS:        Objection; misstates the law, lacks·foundation, calls for speculation.  You can answer.

THE WITNESS:        I'd say no.

Q.        (By Mr. Boon) Why?

A.        Pardon?

Q.        Why?

A.        Again, I would like it to have been brought to my·attention, but it's very easily that this could not have·been brought to my attention again because of everyone doing their own thing, if you will.

Q.        Why do you say you would like it to have been·brought to your attention?··Why would you have liked it to·have been brought to your attention?

A.        Well, if it was brought to my attention after·Mr. Vargas was arrested, that might bring into question:·Did, in fact, Mr. Vargas do these crimes or could it have·been this individual?

Q.        So it could be evidence of, quote, unquote,·"third-party culpability"; correct?

MS. PESSIS:        Objection; calls for a legal·conclusion.  You can answer.

THE WITNESS:        It would mean to me that given·everything here, with the exception of there was a weapon·used, a handgun used in this one, it could be one and the·same as Mr. Vargas.

Q.        (By Mr. Boon) So if that was brought to·your attention, it could have been one and the same·as Mr. Vargas, as you stated, would it have caused·you to raise a concern or a question as to whether·Mr. Vargas was, in fact, responsible for the sexual·assaults for which he was being prosecuted?

MS. PESSIS:        Objection; misstates the law, calls·for a legal conclusion, lacks foundation and calls for·speculation.  You can answer.

Page 8 of  28

THE WITNESS:        *If this report was brought to my·attention, I would have looked into it, yes, as it relates·to Mr. Vargas.*

Q.        (By Mr. Boon) As you understand·obligations under the Brady v. Maryland case, and we·all understand the Brady allegation, do you believe·this would have qualified as something you may have·been obligated to disclose --

MS. PESSIS:        Objection.

Q.        (By Mr. Boon) -- or at least make efforts·to ensure that it was disclosed to Mr. Vargas if it·could call into question his responsibilities for·the sexual assaults for which he was being·prosecuted?

MS. PESSIS:        Misstates the law as to the·disclosure; calls for a legal conclusion.  You can answer.

THE WITNESS:        If I was made aware of this, like I·stated, I would definitely have taken a look at it as it·relates to Mr. Vargas, taken it to my DIII and then notified·the DA's Office, yes.  (Detective Smith Deposition, Pages 100-104.  Emphasis added.)

The table on the following page documents the attacks committed by the Teardrop Rapist, the attacks found within the "Serial Rapist Book," and other, similar rapes known to LAPD investigators during the Vargas case, along with significant dates occurring in Vargas's case for reference:

| Date | Event | Victim Info (If Known) | DR # (If Known) | TDR "Attacker Series" | Serial Rapist Book | Other LAPD Discovery | Division (If Known) |
|---|---|---|---|---|---|---|---|
| 4/20/1996 | Rape | Maria E. | 96-03-15096 | ✓ | | | Southwest |
| 7/29/1996 | Rape | Luz. Q. | 96-12-24163 | | ✓ | | 77th |
| 9/11/1996 | Rape | Justy C. | 96-12-28126 | | ✓ | | 77th |
| 11/2/1996 | Rape | Yanet C. | 96-03-34417 | ✓ | | ✓ | |
| 2/3/1997 | Rape | | 97-03-06865 | | ✓ | | Southwest |
| 6/30/1997 | Rape | Nikki A. | 97-02-23753 | | ✓ | | Rampart |
| 7/2/1997 | Rape | | 97-13-20235 | | ✓ | | Newton |
| 11/12/1997 | Rape | Tiffany C. | 97-12-31516 | | | ✓ | 77th |
| ??/??/1998 | Rape | | 98-13-00607 | | ✓ | | |
| 1/24/1998 | Rape | Debora H. | 98-13-05978 | | ✓ | ✓ | Newton |
| 2/3/1998 | Rape | Karen P. | 98-13-06902 | ✓ | | | Newton |
| 2/5/1998 | Rape | Monica A. | 98-12-07797 | | ✓ | | 77th |
| 4/29/1998 | Rape | Dania V. | 98-06-14590 | | | ✓ | Hollywood |
| 5/30/1998 | Rape | Edith G. | 98-12-17638 | ✓ | | | 77th |
| 6/6/1998 | Rape | Teresa R. | 98-12-18198 | ✓ | | | 77th |
| 6/22/1998 | Rape | Shonte S. | 98-12-19700 | ✓ | | ✓ | 77th |
| 7/14/1998 | Rape | Nancy E. | 98-02-25430 | ✓ | | ✓ | |
| 7/21/1998 | Vargas Arrested | | | | | | |
| 7/24/1998 | Rape | | | ✓ | | | |
| 10/17/1998 | Rape | Ernastine L. | 98-02-33657 | | | ✓ | Rampart |
| 11/6/1998 | Rape | Maria G. | 98-02-35661 | | | ✓ | Rampart |
| 2/13/1999 | Rape | Anngani N. | 99-13-07989 | ✓ | | ✓ | 77th |
| 5/15/1999 | Rape | Andrea L. | 99-1216105 | ✓ | | ✓ | 77th |
| 7/22/1999 | Vargas Convicted | | | | | | |
| 9/10/1999 | Rape | Maria D. | 99-13-22894 | ✓ | | ✓ | Newton |
| 6/26/2000 | Conviction Affirmed | | | | | | |
| 7/17/2000 | Rape | | | ✓ | | | |
| 8/7/2000 | Rape | | | ✓ | | | |
| 9/25/2000 | Rape | | | ✓ | | | |
| 11/7/2000 | Rape | | | ✓ | | | |
| 11/13/2000 | Rape | | | ✓ | | | |
| 12/29/2000 | Rape | | | ✓ | | | |
| 2/13/2001 | Rape | | | ✓ | | | |
| 3/8/2001 | Rape | | | ✓ | | | |
| 5/14/2001 | Rape | | | ✓ | | | |
| 5/14/2001 | Rape | | | ✓ | | | |
| 7/8/2001 | Rape | | | ✓ | | | |
| 10/13/2001 | Rape | | | ✓ | | | |
| 11/26/2001 | Rape | | | ✓ | | | |
| 1/18/2002 | Rape | | | ✓ | | | |
| 4/13/2002 | Rape | | | ✓ | | | |
| 6/27/2002 | Rape | | | ✓ | | | |
| 8/30/2002 | Rape | | | ✓ | | | |
| 9/7/2002 | Rape | | | ✓ | | | |
| 1/11/2003 | Rape | | | ✓ | | | |
| 1/22/2003 | Rape | | | ✓ | | | |
| 6/20/2003 | Rape | | | ✓ | | | |
| 10/29/2005 | Rape | | | ✓ | | | |
| 11/10/2011 | Rape | | | ✓ | | | |
| 6/25/2012 | Rape | | | ✓ | | | |

As shown in the table, by the time Luis Vargas had been arrested for the sexual assaults in the instant case, the Teardrop Rapist had committed at least four other sexual assaults in the same area, one of which occurred only a week before LAPD investigators arrested Vargas.  At least one of these rapes was committed in 77th Division, and was investigated by the same division to which Quijano and Smith were assigned.  *None of these rapes were ever disclosed to the defense.*  (Emphasis added.)

As noted above, the "Serial Rapist Book," created by Detective Smith and Detective Quijano, also included other similar sexual assaults; by the time Vargas had been arrested, eight other sexual assaults had been committed in the same area. Three of these were committed in 77th Division, and thus were investigated by the same division to which Quijano and Smith were assigned.  Quijano and Smith dutifully recorded and documented these other rapes but they never disclosed them to the defense.  *The other four rapes were known to and investigated by LAPD, but were never disclosed to the defense.*  (Emphasis added.)

Further, as shown in the table, LAPD was aware of and had investigated four other substantially similar sexual assaults by the time Vargas had been arrested.  Two of these were committed in 77th Division, and thus were investigated by the same division to which Quijano and Smith were assigned. Confusingly, the two other assaults not committed in 77th Division—the rapes of Debora H. and Dania V.—were the ones disclosed to the defense.  *Neither of the rapes which occurred in 77th Division were disclosed to the defense*.  (Emphasis added.)

After Vargas was arrested and in custody, and before Vargas was convicted, the Teardrop Rapist committed at least another three rapes, again in the same area, in the same manner as those with which Vargas had been charged. One of the Teardrop Rapist attacks occurred three days after Vargas had been arrested.  Perhaps most disturbingly, the other two rapes were, again, investigated by 77th Division, the same division to which Detectives Quijano and Smith were assigned.  Nobody from the Los Angeles Police Department - including Quijano and Smith - disclosed this exculpatory information at any time.

Further, LAPD investigators were aware of two other sexual assaults from across Los Angeles—occurring after Vargas's arrest but before his conviction - that had similarities to the crimes for which Vargas was convicted.  *The information relating to these rapes were collected by the LAPD but never disclosed to the defense*.  (Emphasis added.)

Finally, after Vargas was convicted but before his conviction became final, the Teardrop Rapist committed yet another rape.  As with the other rapes, this information was

dutifully collected by the LAPD, *but never disclosed to the defense*.  (Emphasis added.)

All told, LAPD investigators were aware of at least twenty other rapes with similarities to the crimes for which Vargas was convicted before Vargas's conviction became final.  *At least seven of these sexual assaults were investigated by 77th Division.*  (Emphasis added.)

Other important information was similarly withheld.  According to the FBI's description, the attacks which occurred in Vargas's case matched with the Teardrop Rapist's *modus operandi* perfectly:

> The suspect typically approaches women who are alone and on their way to school or work, or are waiting at a bus stop, between the hours of 5:15 AM and 8:00 AM. The suspect converses with the victim, then threatens to kill the victim with a handgun or a knife. The suspect then forces the victim from the sidewalk to a secondary location, where he sexually assaults her.

The fact the attacks on Karen P., Edith G., and Teresa R. are carbon copies of the Teardrop Rapist's modus operandi was a fact never disclosed by any actor or agency in case, including the Los Angeles Police Department, Detective Quijano, or Detective Smith.

Further, as can be seen on the chart on the next page - a chart prepared by the Los Angeles Police Department - many of the Teardrop Rapist's attacks occurred in close proximity to the attacks for which Vargas was convicted:



The map seen on the following page combines the rapes committed by the Teardrop Rapist, the rapes found in the "Serial Rapist Book" created by Detectives Quijano and Smith, and the other substantially similar rapes investigated by the LAPD during this time period:



Despi fact Attac Kare Edith

te the the ks on n P., G., and

Teresa R. all occurred within miles of the other attacks committed by the Teardrop Rapist, within miles of the other attacks documented in the "Serial Rapist Book," and within miles of the other, substantially similar attacks investigated by law enforcement at the time, no law enforcement agency or individual actor disclosed any information regarding the Teardrop Rapist or the vast majority of the other attacks at any time to Vargas.

Almost six months after the attack, and less than a week after arresting Vargas, on July 27, 1998, Detective Tamez sat down with Karen P. to show her a six-pack photo lineup with Vargas's photo included.  Tamez had obtained the photo from Detective Quijano. Karen P. identified Luis Vargas from the six-pack photo lineup.  She was 85 percent sure Vargas was the perpetrator "because of the bump on his nose."

Ten months after the attack, on November 4, 1998, law enforcement brought Karen P. to the station to view Vargas in a live lineup. Karen P. thought her perpetrator was either Vargas or another male.  She then rejected her other choice, but was only 70 percent sure about her identification of Vargas. Karen P. said in her 2014 interview that after the live lineup, officers reassured her that she selected the right person.

Also at a live lineup, Teresa R. tentatively identified Vargas, but equivocated significantly.  This lineup viewing was the third time Teresa R. saw Vargas, either in a photo or in person.  To make sure the witnesses selected Vargas, Los Angeles Police Department officers arranged the photo arrays and lineups so that the only person who was the same person in the lineup or in the arrays was Luis Vargas.

On February 16, 1999, law enforcement brought Edith G. to the station to view Vargas in a live lineup.  Like Teresa R., this was the third time Edith G. saw Vargas, either in a photo or in person.  Each time, Los Angeles Police Department officers had ensured the only person who was the same person in the lineup or in the arrays was Luis Vargas. Even despite the repeated showings, Edith G. could only tentatively identify Vargas in a photograph of a live lineup, stating "I am not too sure, I believe I recognize his face."

At trial, Karen P. described her attacker as a Latino male, approximately five foot, six inches tall, approximately 140 pounds, with a medium build.  She remembered her attacker's nose having a distinct shape with a bump.  She recalled no facial tattoos or a mustache.  At trial, with only Vargas sitting in the defendant's chair, she said she was 100 percent sure Vargas was her attacker.

In court, after the prosecutor stood behind Vargas, Edith G. identified him as her attacker. Edith G. said it took a long time for her to identify Vargas in court because she was afraid.

Teresa R. testified she was more certain of her identification at the live lineup than with
the photo lineup.  In court, Teresa R. was certain that Vargas was her attacker.

Vargas presented the testimony of Julio Arias and Enrique Lopez to support and
corroborate his alibi that he was at work at the time of the attacks.  In addition, Vargas
presented witnesses to explain how Vargas did not match the description of the
perpetrator.

Julio Arias testified he had always noticed a scar on Vargas's face and one teardrop tattoo
under his left eye, which was inconsistent with the descriptions given by all three victims.
Enrique Lopez and fellow co-worker Margarita Aparicio also testified they only noticed
Vargas had one teardrop tattoo.   Arias, Lopez, and Aparicio all testified Vargas had
always had facial hair and had facial hair during the period the sexual assaults were
committed, which was inconsistent with the descriptions given by the victims.

Despite the significant problems with the identifications in the case, the prosecution
proceeded with the case, relying on the strength of the in-court identifications and the
theory that all of the crimes had to have been committed by the same person.  In closing
argument, the prosecution reiterated the theme:

> . . . the trademark features of these cases, each one of them
> are so similar that they were obviously committed by the same
> individual.  The time of day, the location, the type of victim,
> the manner of attack, the use of the same type of weapon, the
> language, all of it remarkably similar.  They are signature
> crimes.

The jury convicted Vargas on July 22, 1999, one year and one day after he was falsely
arrested for the three attacks.

*DNA and Misidentification Statistics Generally:*

DNA testing has become the foremost technique for conclusively identifying and
excluding criminal suspects in cases where biological material is left at a crime scene.
DNA stands in stark contrast to other kinds of evidence, such as eyewitness identification.

The use of DNA in the post-conviction context has, to date, led to the exoneration of
hundreds of innocent people from the nation's prisons and death rows, including twenty
in California alone.  Of the first 325 post-conviction DNA exonerations, DNA testing led
to the identification of the true perpetrator in approximately half of the cases. DNA
testing identified the true perpetrator in 158 of the 325 cases.

*Post-Conviction DNA Testing in Vargas's Case*:

Pursuant to a joint stipulation between the Los Angeles District Attorney's Office and the California Innocence Project, Orchid Cellmark, Inc. (Cellmark) conducted DNA testing on numerous items of evidence collected in the Teresa R. investigation. The tested items included the vaginal swabs collected from Teresa R., the jean shorts Teresa R. was wearing at the time of the attack, the panties Teresa R. was wearing at the time of the attack, buccal swab samples from Luis Vargas, and buccal swab samples from Teresa R. Because the police did not collect physical evidence relating to the attacks of Karen P. and Edith G., no testing had been performed on anything from these attacks.

In April 2014, Cellmark completed its testing on the vaginal swabs and clothing and issued a report. In June 2014, Cellmark completed its testing on the buccal swab samples from Luis Vargas and Teresa R. The results of the testing definitively showed that Luis Vargas **was not** the perpetrator of the rapes and sexual assaults for which he was convicted, and that the Teardrop Rapist was that actual perpetrator of these crimes.

*Problems Inherent with the Eyewitness Identifications in Vargas's Case*

Since the time of Vargas's conviction, significant research and study has been devoted to the science of eyewitness identifications. Thus, research has called into significant question the nature of eyewitness identification testimony, as well as the often misleading relationship between a witness's confidence in the identification and its accuracy.

Misidentifications - whether offered in good faith or perjured—are, without a doubt, one of the primary causes of wrongful convictions in the United States criminal justice system.[10] Studies have shown that eyewitnesses select nonsuspects from photo and live lineups around 20% of the time. In fact, both the California Supreme Court and the United State Supreme Court have agreed with the numerous studies showing that eyewitness identifications are often unreliable. The United States Supreme Court has stated that "[t]he vagaries of eyewitness identification are well known and the annals of criminal law are rife with instances of mistaken identifications."

*State v. Henderson:*

State v. Henderson: is a Case that changed the landscape of eyewitness identification evidence in New Jersey, and even when such was considered in a reliability analysis, that consideration was limited to the five factors set forth by the United States Supreme Court in Manson v. Brathwaite, 432 U.S.98, 114 (1977). There the court determined that the court (and I would stress detectives evaluating witness identifications) must determine:

(1)    if the identification procedure was impermissibly suggestive and

(2)    if so, whether the procedure resulted in a "very substantial likelihood of irreparable misidentification.

In the second part of the test, the court (and detectives) must consider:

(1)    witness' opportunity to view the person at the time of the crime,

(2)    witness' degree of attention,

(3)    accuracy of the witness' prior description,

(4)    level of certainty at the time of the confrontation, and

(5)    time between the crime and confrontation.

The Henderson court explored all of the scientific data and research regarding witness perception and memory in order to determine the reliability of eyewitness identification evidence and found a "troubling lack of reliability in eyewitness identifications" and that the possibility of mistaken identification is a very real problem in our legal system.  The current scientific research supports the position that the human memory is malleable and that an array of variables can affect memory and lead to misidentifications.

The scientific literature has divided those variables into two categories: (1) system variables (factors such as lineup procedures that are within the control of the criminal justice system); and (2) estimator variables (factors related to the witness, the perpetrator, or the event itself - i.e., distance, lighting, or stress - over which the legal system has no control.)

With respect to system variables, the Henderson court found, in relevant part, there is an increased likelihood of misidentification where: (1) the eyewitness views more than one photo of the suspect because successive views of the same person can make it difficult to know whether the later identification stems from a memory of the original event or a memory of the earlier identification procedure; (2) the identification procedure is administered by someone who knows the identity of the suspect because even the best-intentioned, non-blind administrator can act in a way that inadvertently sways an eyewitness trying to identify a suspect; and (3) either pre- or post-identification feedback is given to the witness by administrators because it can falsely enhance the witnesses recollection of the suspect.

In Vargas's case, detectives intentionally exposed the victims to Vargas's photo multiple times before trial.  Edith G. viewed two photo lineups, each displaying Vargas. Edith G. again had an opportunity to see Vargas at the live lineup.  It was not until she viewed Vargas three separate times that Edith G. became positive that Vargas was the perpetrator.

Similarly, Teresa R. had three opportunities before trial to see Vargas - twice in two separate photo line ups and once in a live lineup.  Again, Teresa R.'s confidence increased at trial, after viewing Vargas on three separate occasions.

Karen P. viewed one photo lineup and the live line up before testifying at trial that she was certain Vargas was the perpetrator.  Karen P. expressed confidence in her identification again in 2014 stating, "going through the proceedings, seeing the individual, it just jarred [her] memory a little bit more."

**Obligation to Disclose Evidence (Brady Disclosure):**

In *Brady v. Maryland*, the Supreme Court held that withholding exculpatory evidence violates due process "where the evidence is material either to guilt or to punishment," and the court determined that under Maryland state law the withheld evidence could not have exculpated the defendant but was material to the level of punishment he would be given. Hence the Maryland Court of Appeals' ruling was affirmed.  (Brady v. Maryland, 373 U.S. 83 (1963).

A defendant's request for "Brady disclosure" refers to the holding of the Brady case, and the numerous state and federal cases that interpret its requirement that the prosecution disclose material exculpatory evidence to the defense.  Exculpatory evidence is "material" if "there is a reasonable probability that his conviction or sentence would have been different had these materials been disclosed."  Brady evidence includes statements of witnesses or physical evidence that conflicts with the prosecution's witnesses, and evidence that could allow the defense to impeach the credibility of a prosecution witness. Every Detective since the decision was handed down is trained regarding, "The Brady Rule."

As indicated above, documentation of evidence is required and crucial because unless it is included into the detective's investigative file it will not be made available to the District Attorney, and thus it will not be turned over to the defense and a constitutional rights violation will occur.  Detectives are trained to document all evidence.  Accordingly, the totality of the "Serial Rapist Book," should have been provided to the defense in the Vargas case.  If facts are important enough for detectives (such as the Defendant Detectives) to similar crimes in the course of the investigation, that information should be documented and placed into the investigative file.  Here, there were monthly meetings and contacts and a specific "Serial Rapist Book."  These facts demonstrate Brady requirements.

*Concluding Remarks:*

It is now uncontested that Mr. Vargas was wrongfully convicted of the sexual assaults. It is uncontested that the court found Mr. Vargas to be factually innocent. Due to the maleficence, Mr Vargas spent 16 years incarcerated for a crime he did not commit.

I am very critical of the fact that there were rapes that were reported and investigated, which fit the description of the attacker of the three women whom Mr. Vargas was accused of attacking, and that no intra-department communication or coordination was pursued, and that the information was either deliberately withheld from the District Attorney or erroneously and negligently withheld from the District Attorney.

It cannot be overstated that this incident would likely not have resulted in the 16-year incarceration of Mr. Vargas, had the information been dutifully forwarded to the District Attorney:

## **My Opinions Thus Far:**

1.   As a former police detective and commander of detective units, I can attest to the latitude and discretion placed into the hands of investigators to follow leads and solve crimes. Detectives must have investigative authority to be effective, but it is a public trust necessarily linked to the oath offered at trials to provide only "the truth, the whole truth, and nothing but the truth." Thus, detectives are trained that criminal investigations must, above all, be an honest search for the truth – this is the moral obligation required and implicit in the detective assignment. The practical, legal and moral impediments to an honest investigation range from simple incompetence to deliberately illegal and immoral acts that contaminate the core of the investigation itself. These deliberate acts can include statements from witnesses that are extracted through mental coercion, and/or physical force, the manipulation of the evidence to favor a predetermined point of view, and hiding reports of exculpatory facts discovered during the investigation that would be important to the defendant. According to the record, a number of these acts occurred in this case.

2.   The detective investigation resulting in the arrest, booking and prosecution of Mr. Luis Vargas was grossly deficient and did not meet the legal and professional standards and procedures required

from every POST certified officer and which are taught at every Basic POST Academy and which are also required by State and Federal Law (as taught by POST).

3.      The facts in the record document an inexcusably misleading investigation by Detectives Ouijano and Smith in particular. It cannot be overstated that they were trained investigators allegedly versed in the detective skills and who, by virtue of their training and experience, would be expected to know what was required in an investigation of this type.

4.      Detectives are trained that they have a sworn duty to follow the basic investigative procedures that protect the constitutional rights of citizens and must act with lawful authority.  The Defendant Detectives appear here to have disregarded their duty to conduct the necessary investigation that would have prevented Mr. Vargas' conviction.  In Particular, this includes their failures to vet witnesses and their failure to consider the alleged crimes in the context to other obvious similar crimes he could not have committed and to include all exculpatory evidence to the District Attorney.  Their failures in this regard are obvious, and they are a reckless abuse of their police powers.

5.      Los Angeles Police Department Chain of Command appears to have endorsed the unconstitutional and out-of-policy investigative acts that are connected to this incident.  As such, their collective approval of these actions puts the citizens they serve at unnecessary future risk from Detectives Smith and Quijano and other detectives who have been, or are now, similarly trained and/or supervised.

**<u>My Qualifications To Review This Case:</u>**

My opinions are based in part on my training, professional experience and education.  I am a twenty seven year veteran of the Los Angeles County Sheriff's Department (LASD). I was hired on December 1, 1965, and I retired from active service on March 31, 1993. My career included six years at the rank of Deputy Sheriff, six years as a Sergeant, and fifteen years as a Lieutenant.  I retired holding a California Peace Officer Standards and Training (POST) Advanced Certificate, and I am a graduate of the POST Command College (class #5, 1988).  The POST Command College was a Masters level two-year

course of study requiring a thesis, in Police Administration, with the diploma awarded by
the California Department of Justice (and not the California University system).

During the course of my service with the department, I had a wide range of duties.  Those
duties included an 18 month assignment as a staff jail deputy and two years as an
Administrator/Lieutenant in the same jail facility (Men's Central Jail).  I also served on
the department as a patrol officer, field supervisor, jail watch commander and
administrator, station watch commander, and commanding officer of investigative units.
I was a field training officer while assigned as a patrol deputy, and I trained new officers
in POST and department approved patrol procedures, field investigations, apprehension
techniques, and emergency procedures.

I was a Station Detective and, as such, reviewed and assessed cases passed on to me by
the patrol officers.  Those cases included possible complaints relating to both
misdemeanor and felony crimes.  They frequently required follow up investigations and
interviews before the exact nature of the case could be determined.  As a field officer and
detective, I was trained in interview and interrogation methods and subsequently trained
other officers.

Among other assignments as a Sergeant, I supervised field officers and station detectives
as they took complaints and conducted preliminary investigations regarding criminal and
administrative matters.

As a Sergeant and as a Lieutenant, I served on the training staff of the Los Angeles
County Sheriff's Department's Patrol School which taught the POST accepted patrol
tactics, and investigation and apprehension methods.

As a Watch Commander and as a Lieutenant, I responded to, investigated, and reported
on the use of force and officer-involved shootings. I was also assigned by my Department
to sit as a member of Departmental review committees regarding the reasonable or
unreasonable use of force and tactics.

As stated above, during my career I was assigned to the Los Angeles County Men's
Central Jail (MCJ) for a period of 18 months as a line officer.  Upon my subsequent
promotion to Lieutenant, I returned to the same facility approximately 10 years later.
During that time, I was assigned as a Jail Watch Commander, and as the Facility Training
and Logistics Administrator.  At the time of my assignment, the MCJ held a daily
population in excess of 7,000 inmates, including a hospital, which was serviced by a staff
of more than 900 sworn and civilian personnel.

During my assignment as the Administrative Lieutenant of the Department's Reserve Forces Bureau, I worked closely with the State of California Peace Officer Standards and Training in revamping our Reserve Academy to bring it into state compliance.  This process gave me an expertise in the POST Basic curriculum.  I also supervised the training of cadets at our Reserve Training Academy.  They were taught proper investigation, interview, and apprehension procedures.  Among other topics, I lectured the Reserve Academy on the POST syllabus: "The Legal and Moral Use of Force and Firearms."

During the 1984 Olympics held in Los Angeles, I was assigned and served as the Department's Intelligence Officer at the Los Angeles Olympics Emergency Operations Center.

During the last five and one half years of my career, I commanded a specialized unit known as the North Regional Surveillance and Apprehension Team (N.O.R.S.A.T.), which was created to investigate, locate, observe and arrest major (career) criminals.  I held this position until my retirement from the Department on March 31, 1993.

Criminals investigated and arrested by N.O.R.S.A.T. included suspects involved with homicide, robbery, kidnaping, extortion, burglary, major narcotics violations and police corruption.  The majority of our cases were homicide cases, including the murder of police officers.  Arrests frequently occurred in dynamic circumstances including crimes in progress.

My unit also conducted major narcotics investigations including undercover narcotics buys, buy busts, and reverse stings.  We frequently deployed at the request of investigative units, such as Narcotics, which provided the initial investigative leads for our operations.  These narcotics cases usually involved multiple kilogram quantities of drugs and amounts of money ranging from one hundred thousand to more than one million dollars.

Approximately 80% of cases assigned to N.O.R.S.A.T. were active Homicide investigations.  In that regard, the unit processed, under my command and supervision, various aspects (depending on the complexity of the cases involved) of approximately 1,000 Homicides ranging from deaths of police officers to serial homicide suspects.

Additionally, the majority of the over 1750 cases for which I have been retained as a consultant (since 1993) have involved injuries or deaths connected with some aspect of force during either apprehension or while in police custody.

During the first three months of my command of N.O.R.S.A.T., the unit had three
justifiable shooting incidents.  From that time, and over the next five years of my
command, N.O.R.S.A.T. established a remarkable record of more than two thousand
arrests of career criminals without a single shot fired – either by my officers or by the
suspects whom we arrested.

Many of these suspects were armed and considered to be very dangerous.  Some were
apprehended during the course of their crimes and were very prone to use firearms to
escape apprehension.  This record of excellence was accomplished through the use of
proper tactics, management and supervision of personnel, training in correct apprehension
methods, and adherence to the moral and ethical standards endorsed by California POST
and my Department.  These methods and principles are also embraced by every state
training commission of which I am aware, as well as the national standards established by
the U.S. Department of Justice.

As a result of my position and record as the commanding officer of N.O.R.S.A.T., I was
assigned to author Field Operations Directive 89-3, "Tactical Operations Involving
Detective Personnel."  This order remained in force 20 years (until September 30, 2009),
and included the basic standards and considerations with which investigative officers
must comply in the event of a tactical deployment such as the dynamic entry into a
building for the purpose of an arrest and/or seizure of evidence.

Since my retirement, I have testified as an expert on use of force, jail procedures and jail
administration, investigations, police procedures, police tactics, investigative procedures,
shooting scene reconstruction, and police administration in Arizona State Courts,
California State Courts, Washington State Courts and Federal Courts in Arizona,
California, Colorado, Florida, Illinois, Indiana, Louisiana, Missouri, Nevada, Ohio,
Oregon, Pennsylvania, Texas, Utah, Washington, New Mexico, New York and
Wisconsin.  I have testified before the Los Angeles Police Department Board of Rights
and the Los Angeles County Civil Service Commission.  I have testified before the Harris
County (Texas) Grand Jury and the Cleveland Grand Jury.  I have also submitted written
opinions in matters before Alaska, Delaware, Idaho, Montana, North Carolina, New
York, Oregon, Kentucky, and Wyoming Federal and State Courts.  I was selected
(January 20, 2007) to present on the topic of: "Police Experts" at the National Police
Accountability Project held at Loyola Law School, Los Angeles, California.  I was
selected (September 23, 2010) to present on the topic of: "Using POST Modules to
Establish Police Officer' Standard of Care" at the National Police Accountability Project,
National Lawyers Guild Convention, in New Orleans, Louisiana.  I was selected (March
30, 2012) to present to the Kern County Public Defenders in Bakersfield, California, on
the topics of "Ethics, Police Investigations, the California POST Curriculum, and the

M26 and X26 Taser weapons." On August 7, 2013 I was invited and presented to the Texas Civil Rights Project (TCRP) 2013 Annual Legal Summit in Austin, Texas on the topic: "Ethically Working with Experts from the Prospective of a Police Expert." On October 15, 2015 I was the invited presenter at a Community Forum in Victorville, California on the topics of Police Procedures, Community Policing, Use of Force, and features of the M26, X26 and X2 Taser weapons.

I have worked on several projects with the Paso Del Norte (El Paso, Texas) Civil Rights Project and the Texas Civil Rights Project (Austin, Texas). As a result of my expert testimony in *Border Network, et al. v. Otero County, et al.*, Case No. 07-cv-01045 (D.N.M. 2008), a federal court issued a temporary injunction to stop the illegal and widespread immigration raids in Chaparral, New Mexico, implemented pursuant to Operation Stonegarden. The case resulted in the adoption of a model policy for inquiring into a person's immigration status, which has been adopted nationwide and has also been presented to the United States Senate, the Secretary of Homeland Security, and other government officials seeking to reform immigration enforcement.

I have been recognized, and my expert report was quoted by the USDC in *Burns v. City of Redwood City*, 737 F.Supp2nd.1047. I have been recognized, and my expert report was quoted by, the United States Court of Appeals for the Ninth Circuit as an expert in Police Administration and Use of Force in *Blankenhorn v. City of Orange, et al.*, 485 F.3d 463, 485 (9th Cir. 2007). The Ninth Circuit also drew from my expert report in a second published case involving Police Detective Investigations. *Torres, et al. v. City of Los Angeles, et al.*, 540 F.3d 1031, 1042-43 (9th Cir. 2008). The *Torres* case was appealed to the U.S. Supreme Court and returned for trial. I provided the expert opinion in *Chavies Hoskin v. City of Milwaukee, et al.* (USDC Case No. 13-cv-0920), regarding field strip and cavity searches, hiring, training, discipline and supervision, and which resulted in significant policy changes within the MPD. My opinions supported argument in the Ninth Circuit case: *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1102 (9th Cir. 2014). The Ninth Circuit also drew from my expert reports regarding credible threats justifying the use of force, *Hayes v. County of San Diego*, 658 F.3d 867 (9th Cir. 2011), and *Young v. County of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011). The Ninth Circuit also drew from my expert reports regarding Jail Administration and Administrative Responsibilities, *Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011). The Ninth Circuit also drew from my expert reports regarding an officer's violation of the 14th Amendment if an officer kills a suspect when acting with the purpose to harm, unrelated to a legitimate law enforcement objective, in *AD v. California Highway Patrol*, 712 F. 3d 446 (9th Cir. 2013). The Fifth Circuit drew from my expert report regarding search and seizure, investigations and no-knock requirements in *Bishop et al. v. Arcuri et al.*, 674 F.3d 456 (5th Cir. 2012). The Ninth Circuit also drew from my expert report regarding the use of impact weapons

(PepperBall) on civilians in *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012).  I was the expert in the Ninth Circuit opinion regarding the allegations proffered by police officers and their use/display of firearms against civilians in *Green v. City and County of San Francisco*, 751 F. 3d 1039 (9th Cir. 2014).  Most recently, I was the expert in an important Ninth Circuit opinion regarding the allegations proffered by police officers and their use of lethal force against unarmed persons in *Jennifer Cruz, et al., v. City of Anaheim, et al.*, 765 F.3d 1076 (9th Cir. 2014).  I was the expert at trial in the Ninth Circuit opinion regarding the order of evidence at trial in *Estate of Manuel Diaz, v. City of Anaheim*, et al., No. 14-55644.  My opinion is quoted in the Ninth Circuit opinion regarding the use of lethal force in *A.K.H. a minor, et al, v. City of Tustin, et al.*, No. 14-55184.  My opinions supported argument in the Ninth Circuit case: *Estate of Angel Lopez, et al., v. Kristopher Michael Walb*, No. 14-57007 (not for publication) wherein the Ninth Circuit Affirmed the Denial of Summary Judgement by the District Court.  My opinions supported argument in the Ninth Circuit case: *Estate of Shakina Ortega, et al., v. City of San Diego, et al.*  No. 14-56824 (not for publication) wherein the Ninth Circuit Affirmed the Denial of Summary Judgement by the District Court.  My opinions supported argument in the Ninth Circuit case: *Jerry Newmaker, et al., v. City of Fortuna, et al.*  No. 14-15098 (for publication).  My opinions supported argument in the Ninth Circuit Case: *Tonya E. Shirar, v. Miguel Guerrero, et al.* regarding use of lethal force and "suicide by cop," No. 15-55029 (not for publication).  My opinions supported argument in the Ninth Circuit Case *Angel Mendez; Jennifer Lynn Garcia, v County of Los Angeles, et al.,* Nos. 13-56686, and 13-57072 (for publication) and which was settled before the Supreme Court, No. 16-369, regarding the use of lethal force and searches.  My opinions supported argument in the Ninth Circuit case: *Chien Van Bui, et al, v City and County of San Francisco, et al*, No. 14-16585 (not for publication), regarding the use of lethal force.  My opinions supported argument in the Sixth Circuit opinion, Case No. 16-5322, *Carey Woodcock v. City of Bowling Green, et al,* Originating Case No. 1:13-cv-00124 regarding the use of lethal force.  My opinions supported argument in the Ninth Circuit opinion, Case No. No. 14-17388 (for publication), *Johnathan Jones, et al v. Las Vegas Metropolitan Police Department, et al,* Originating Case No. 2:12-cv-01636- regarding the use of lethal force and Taser weapons.  My opinions supported argument in the Ninth Circuit opinion, Case No. 16-15606 (for publication), *Christian Longoria, et al v. Pinal County, et al,* Originating Case No. 2:15-cv-00043, PHX SRB, regarding the use of lethal force after a vehicle pursuit.  My opinions supported argument in the Ninth Circuit case: *S. B. v. County of San Diego,* 864 F.3rd 1010 (9th Cir. 2017), (for publication) regarding issues of qualified immunity.  My opinions supported argument in the Tenth Circuit case: *Russell Tenorio v. Brian Pitzer,* Case No. 2012-CV-01295 (U.S. Supreme Court No. 15-795) regarding issues of qualified immunity and use of deadly force.  I participated as a retained expert in the USDC Fifth District case, Stephen McCollum et al., v. Texas Department of Criminal Justice, et al., Case No.3:12-CV-02037 regarding in-custody

hyperthermia deaths.  My opinions supported argument (and I was cited by name) in the Ninth Circuit opinion, Case No. 17-55116 (for publication), *Susan Mellen, et al v. Marcella Winn, et al,* D.C. Case No. 2:15-cv-03006, GW AJW, regarding Detective Investigations and Qualified Immunity.

The California Court of Appeal (Second Appellate District) drew in part from my expert report regarding search warrant service, *Macias v. County of Los Angeles*, 144 Cal. App.4th 313, 50 Cal. Rptr.3d 364 (2006).  The California Supreme Court drew in part from my expert opinion regarding police tactics and the use of deadly force, *Hayes et al. v. County of San Diego et al.*, 57 Cal.4th 622 (2013).  I was quoted by the California Appellate Court (Second Appellate District, Division Three) in *B.B., a Minor, etc., et al., v. County of Los Angeles, et al., Case No. B264946 Super. Ct. Nos. TC027341, TC027438, BC505918* regarding positional asphyxia issues.

On February 10, 1989, I was personally commended at the Los Angeles County Hall of Administration by United States Attorney General, the Honorable Edwin Meese III, for my work to establish California Penal Code Section 311.11 (forbidding the Possession of Child Pornography).  On February 22, 1993 (at the time of my retirement), Mr. Meese presented a second personal commendation for the success of this critical five-year effort to bring this law into effect.  California Penal Code Section 311.11 is required training for all Law Enforcement Officers in California and taught extensively in the POST Basic Learning Domain #9: "Crimes Against Children,"pages 1-18 to pages 1-21.

On December 7, 2015 I was requested by the Cleveland District Attorney to present my opinions to the Cleveland Grand Jury regarding the November 22, 2014 shooting death of Tamir Rice by City of Cleveland police officers.  In March, 2016 I was requested by the Delaware Attorney General to review and provide my opinions regarding the shooting death of Jeremy McDole.  The AG report was published May 12, 2016.

I have been found competent by both Federal and State Courts to render opinions as to responsibilities as occurred in this case.  A number of my cases have involved law enforcement officers as civil plaintiffs and as criminal defendants.

Since my retirement, I have become an expert in the features and the use of TASER International's products, including the Model M26, Model X26 and Model X2 ECDs.  I own each, along with the download software.  I have reviewed all the TASER training materials and am familiar with the risks and tactics associated with these potentially lethal devices.  I have qualified as an expert on TASER products and testified both in deposition and before juries on their usage.  Two published examples are *Lee v. Nashville*, 596 F. Supp. 2d 1101, 1121-22 (M.D. Tenn. 2009), and *Heston v. City of Salinas*, 2007 U.S.

Dist. LEXIS 98433, *25-*26 (E.D. Cal. 2007).  My most recent Federal acceptance/certifications as an expert in the general use and deployment of the TASER weapon (including Taser International product warnings/bulletins sent to every agency using the Taser weapon) occurred in Los Angles, California on November 7, 2017 in *William Mears, et al., v. City of Los Angeles, et al,* USDC Case No.: CV 15-08441 JAK (AJWx) and on February 22, 2018 in *Maria Hernandez; A.J., Jr., et al, v. City of Los Angeles, et al,* USDC Case No. 2:16-c-02689 AB (JEMx), and on May 3, 2018 in Heleine Tchayou, et al. v. City of Los Angeles, et al., Case No. 16-cv-06073-TJH-MRW.  There are many others.

Attached as Exhibit A is a statement listing my law enforcement qualifications and experience; Exhibit B is my fee schedule; Exhibit C is a listing of matters in which I have testified in the last four years as an expert.

I reserve the right to modify my opinions to the extent additional information is provided.

I declare under penalty of perjury that the foregoing is true and correct.  Executed April 22, 2019 at Santee, CA.

Roger A. Clark

# EXHIBIT A

**ROGER A. CLARK**

*10207 Molino Road • Santee CA 92071 • Telephone: (208) 351-2458.  Fax: (619) 258-0045.*

EXPERIENCE

**Police Procedures Consultant (self employed)**
April 1, 1993 to Present.................................................................. **26 years**

I have been certified by Federal and State courts as expert in jail and police
procedures in Federal and State Courts.  I select my cases carefully and have
consulted in approximately 1800 cases thus far since my retirement from the
Los Angeles County Sheriff's Department.

**Substitute Teacher, Madison School District**
August 1994 to 2003........................................................................ **9 years**

I substitute teach at all levels in the school district (elementary to high school).
As a volunteer, I wrote and managed a $85,000.00 federal grant for our
Central High School.  This grant is in its sixth year and has generated
$510,000.00 for the school.

**District Liaison, State of Idaho Department of Juvenile Corrections**
August 1, 1995 to March 1, 1997.........................................**1 year, 7 months**

I represented the new Department of Juvenile Corrections to the ten counties
in the Seventh Judicial District.  As such, I worked closely with Probation
Officers, County Commissioners, Judges, other state agencies, private care
providers, etc. in the implementation of the new Idaho Juvenile Corrections
Act of 1995.  I wrote or participated in the writing of several federal grants for
the District.  I conducted training - both formal and informal - and developed a
series of new therapy programs for juveniles with private care providers.  I
also served as the Director of the Detention Center and the State Placement
Coordinator during this time.

-1-

**Los Angeles County Sheriff's Department**
December 1, 1965 to March 31, 1993................................**27 years 4 months**

**Note:**  In 1993 the Los Angeles County Sheriff's Department had 7,000 sworn and 3,000 civilian personnel and a daily County Jail inmate population of 23,000.


**Service as a Lieutenant (15 Years, 0 Months):**


1.  **Field Operations Region I**
    **NORSAT**                    11/15/87 to 3/31/93   **64 months**

I commanded a specialized unit created to investigate, locate, observe and arrest major (career) criminal offenders.  This unit was designed as a multijurisdictional effort for the cities in the northern region of Los Angeles County.  The command consisted of four (4) Sergeants, seventeen (17) Deputies, four (4) Police Officers, twenty five (25) Reserves, and three (3) civilian employees.  The 1992 budget set at $1.5 million.  The arrest rate averaged 500 career criminal arrests per year with a 97% conviction rate and no shots fired (on either side) for 61 consecutive months.


Significant contributions while assigned at this Bureau were:

- Increase in participating police agencies.
- Direct participation with corporate (private) agencies.
- Formation of a reserve and volunteer unit.
- Establishment of NORSAT Foundation private funding.
- Computerization of the unit.
- Promotion of fourteen personnel.
- Fleet expansion from 13 to 28 vehicles (donated).
- Formation of the DEA Valley Task Force.
- Field Operations Directive 89-3.


2.      **Executive Offices**
        **Reserve Forces Bureau**      05/01/84 to 11/15/87  **42 months**

I was the administrative officer to a specialized bureau responsible for coordinating the activities of 1,000 sworn reserve personnel, 900 civilian

volunteers, and 450 law enforcement explorer scouts.  The Bureau identifies programs for their effective utilization throughout the Department; develops and tracks training programs; sponsors activities designed to promote growth and keep morale at high levels.

Significant contributions while assigned at this bureau are:

• Total restructure of the Academy training process for reserve Deputies.
• Implementation of upgrade programs to move lower level reserves to level I status.
• Departmental Reserve Certification procedures.
• Annual leadership seminar.
• The Reserve News, a nationally recognized police magazine.
• Computerization of the Bureau.


3.   **Field Operations Region I**
     **Crescenta Valley Station**     04/01/80 to 05/01/84  **49 months**

Crescenta Valley Station is a full service police facility of 100 personnel serving a population of 50,000 (including the Contract City of La Canada-Flintridge) and a total area of 250 square miles. During my four years service at this facility I served in every management role:

• **Nine months** as the Station Commander during an extended absence by the Captain (08/01/83 TO 05/01/84).
• **Sixteen months** as the Operations Lieutenant (03/01/82 TO 08/01/83).
• **Twelve months** as the station Detective Bureau Commander (03/01/81 to 01/01/82).
• **Twelve months** as a Watch Commander (04/01/80 to 03/01/81).

Significant contributions while assigned at this command are:

• Negotiation of an enhanced city contract (at a savings to the City).
• Formation of a volunteer community support group.
• Development and implementation of an integrated community emergency response plan.
• High School undercover narcotics operation.
• Restructure of the Station Detective Bureau.
• The annual station picnic, which was effective in boosting station morale.

4.      **Custody Division**
        **Central Jail**          04/01/78 to 04/01/80  **24 months**

The Los Angeles County Central Jail is the largest jail facility in the State of California, with a daily inmate population of seven thousand (7,000), an assigned staff of six hundred (600), and two hundred (200) civilian personnel. My service at this command was equally divided into two major assignments:

•       Training and Logistics Lieutenant (04/01/79 to 04/01/80).
•       Watch Commander (04/01/78 to 04/01/79).

Significant contributions while assigned at this command are:

•       "Hot Fire" Training program, which is now a State (POST) mandated training module for all custody personnel throughout California.
•       The "Defend in Place" fire safety operational plan for jail facilities.
•       New fire safety specifications for jail bedding and mattresses.
•       The development of fire safe jail mattress material.
•       The development of a facility emergency response plan.
•       The computerization of training, timekeeping, and scheduling for the facility (800 sworn and 200 civilian personnel).
•       "Spouse day at CJ"--A program for spouses of employees.


**Service as a Sergeant (6 Years, 4 Months):**


5.      **Administrative Division**
        **Federal Surplus Property**   01/12/76 to 04/01/78  **27 months**

This program was entirely my idea and developed while I was assigned at my previous assignment (Emergency Operations Bureau).  The unit provides millions of dollars in free federal excess and surplus food and property from clothing to heavy equipment and aircraft to the department each year.  I am very proud of this contribution to the Department.


6.      **Patrol Division**
        **Emergency Operations**   02/01/74 to 01/12/76  **23 months**

I was among the original personnel that formed this unit which blended the activities of the Department's planning   unit with emergency operations planning and preparation.  I was assigned as the Personnel and Logistics Sergeant.

-4-

Significant contributions while assigned at this command are:

•       Formation of a new County Emergency Operations Center.
•       Participation in the 1974 Federal earthquake studies of Los Angeles County.
•       Development of the Department's specialized Field Command Post equipment.
•       Development of the Department's Field Booking Team.

**7.     Patrol Division**
         **Civil Defense Bureau**      12/01/73 to 02/01/74  **02 months**

I was assigned to this unit to facilitate the orderly transition into the new Emergency Operations Bureau.

**8.     Patrol Division**
         **San Dimas Station**       12/12/72 to 12/01/73  **12 months**

I performed all the duties of a Watch and Patrol Sergeant.  I also frequently served as the Watch Commander.

**9.     Technical Serviced Division**
         **Communications Bureau**   12/01/71 to 12/12/72  **12 months**

I served as the Watch Commander in The Sheriff's Department's old radio room located at the Hall of Justice, and assisted in the transition to the existing communications facility.

**Service as a Deputy (6 Years, 0 Months):**

**10.    Patrol Division**
         **San Dimas Station**
         **Detective Bureau**      01/01/70 to 12/01/71  **23 months**

I served as a Station Detective assigned to the evening watch.  I handled the first response to all crimes requiring investigations.  I processed all evening juvenile matters, prepared criminal complaints and juvenile petitions.

-5-

11.    **Patrol Division**
        **San Dimas Station Patrol**    01/29/68 to 01/01/70  **24 months**

I performed all duties assigned to Station Patrol:  Jailer, Desk, Watch Deputy, Patrol, and Traffic.

12.    **Technical Services Division**
        **Transportation Bureau**     11/01/67 to 01/29/68  **02 months**

I was temporarily assigned to the Beverly Hills Municipal Court pending my assignment to a Patrol Station.

13.    **Custody Division**
        **Central Jail**             05/06/66 to 11/01/67  **18 months**

I returned to my previous assignment at the Central Jail after graduation from the Academy.  I performed all aspects of a Custody Deputy i.e. Module Officer, Prowler, Control Booth, High Power, etc.

14.    **Administrative Division**
        **Academy**             01/17/66 to 05/06/66  **04 months**

I was a Sheriff's trainee assigned to Class #110.

15.    **Custody Division**
        **Central Jail**             12/01/65 to 01/17/66  **01 month**

I was a pre-academy Custody Deputy assigned to the Central Jail as an "off the street" Deputy Sheriff.

## DEGREES AND CERTIFICATION

| | | |
|---|---|---|
| P.O.S.T. Command College (Class #5) | POST | 1988 |
| Management Certification | POST | 1980 |
| Advanced Certification | POST | 1975 |
| Associate of Science Degree | Chaffey College | 1971 |

# EXHIBIT B

# Roger A. Clark

## Police Procedures Consultant, Inc.

10207 Molino Road.  Santee, CA 92071
Phone: (208) 351-2458,  Fax: (619) 258-0045
rclark9314@aol.com

April 21, 2019

Jan Stiglitz, Esq.
Law Office of Jan Stiglitz
225 Cedar Street
San Diego, CA 92101

Brett Boon, Esq.
Craig Benner, Esq.
Benner & Boon, LLP
1516 Front Street
San Diego, CA 92101

**Regarding:**   *Luis Lorenzo Vargas vs. City of City of Los Angeles; Los Angeles Police Department; Monica Quijano; Scott Smith; et al., Case No.: 2:16-cv-08684-SVW-AFM.*

Dear Counsel:

My fee schedule is as follows:

- Travel time at the rate of $50.00 per hour.
- (Travel via automobile to and from San Diego to Los Angeles 8 hours $400.00)
- All case review, consulting, and writing of expert opinions (such as Rule 26 reports) at $250.00 per hour.
- All testimony (either at trial or deposition) at $350.00 per hour, with a two hour minimum required.
- A retainer fee of $3,500.00 when initially retained will be used against the above listed fees.  Subsequent billings at the rates specified.
- A "rush fee" of $500.00 for work required less than three weeks from notice/retention.
- An invoice will be submitted periodically upon request reflecting the activities and charges associated with the account.  Payment is due upon receipt of the invoice.

There is no formal contract required.  My Federal Tax ID Number is **72-1576857.**

Sincerely,

Roger A. Clark

Page 1 of  1

# EXHIBIT C

# Roger Clark

## Police Procedures Consultant, Inc.

10207 Molino Road.  Santee, CA 92071
Phone: (208) 351-2458,  Fax: (619) 258-0045
rclark9314@aol.com

**UPDATED LIST OF SWORN TESTIMONY FOR RULE 26**

**April 14, 2015 to April 15, 2019**
(Revised April 15, 2019)

**Deposition.**  April 14, 2015.  Jose Gutierrez, v. United States Customs and Border Protection, USDC Case No. 2:13-CV-00585 DGC.

**Trial.**  April 16, 2015.  Nagy Salib, v. City of Riverside, et al.  Case No. EDCV 13-1682  MWF (OPX)**.**

**Trial**.  April 15 and 17, 2015.  Jim Maxwell et al. v. San Diego County, et al.  USDC Case No. 07-cv-2385 JAH (Wmc).

**Trial.**  April 20 & 21, 2015.  Naji Muhammad (Jackson), et al., v. Frank Pawlowski, et al.  USDC (Pennsylvania) Case No. 2:11.

**Deposition.**  April 22, 2015.  Robert J. Reese, Jr. v. County of Sacramento, et al., Case No. 2:13-cv-00559 JAM DAD.

**Deposition**.  April 24, 2015.  Guillermo Ramirez, et al. v. City of Oxnard, et al., USDC Case No.: CV 13-01615 MWF AN.

**Deposition**.  April 28, 2015.  Idalia J. Morgutia-Johnson,  v. City of Fresno, et al.  USDC Case No.  1:14-CV-000127 LJO-SKO.

**Trial.**  April 29, 2015.  Sara Valtierra, and Javier Arrazola, v. City of Los Angeles, et al.  USDC Case No. CV 13-07562-CAS (Ex).

**Trial.**  May 6 & 7, 2015.  Brian Reed, et al., v. City of Modesto, et al.  USDC Case No. 1:11-CV-01083-GSA.

**Deposition.**  May 11, 2015.  Carey Woodcock, et al. v. City of Bowling Green, Kentucky, et al.  USDC Case No. 1-13-CV-00124-JHM.

**Deposition.**  May 18, 2015.  Kimberly Deen, et al, v. City of Redding, et al.  USDC Case No. 2:13-CV-01569 KJM-CMK**.**

**Trial.**  May 20, 2015.  John Warner Stephens, v. County of San Diego, et al.  USDC Case No.,
11cv2832 AJB (KSC).

**Deposition:**  May 26, 2015.  Joshua Chavez v. City of Hayward et al., Case No.:C-14-00470
DMR ADR.

**Deposition:**  May 27, 2015.  Edward Monroe, v. City of Richmond, et al., Case No.: 3:14 CV
00795 WHO.

**Trial:**  May 28, 2015.  Merricks Prudhomme, v. City of Orange, et al.  Superior Court (Orange
County) Case No. 30-2013 00654570.

**Deposition:**  May 29, 2015.  Jonathan Meister, v. City of Hawthorne, et al. USDC C.D. Cal.
Case No. CV 14-1096-MWF (SHx).

**Deposition:**  June 1, 2015.  Cash Jerome Ferguson-Cassidy, v. City of Los Angeles, et al., USDC
Case No. CV14-06768 SVW (JPRx).

**Trial**:  June 8, 2015  Harrison Orr, v. California Highway Patrol, el al., Case No. 2:14-cv-00585-
WBS-EFB.

**Trial:**  June 11, 2015.  Idalia J. Morgutia-Johnson,  v. City of Fresno, et al.  USDC Case No.
1:14-CV-000127 LJO-SKO.

**Deposition:**  June 15, 2015.  Juan Herrera, v. City of Los Angeles, et al.  USDC Case No. 2:13-
cv-08831-ABC AS.

**Trial:**  June 23, 2015.  Guillermo Ramirez, et al. v. City of Oxnard, et al., USDC Case No.: CV
13-01615 MWF AN.

**Deposition**: June 26, 2015.  C.E.W. a minor, et al., v City of Hayward, et al., Case No.: C 13-
04516 LB.

**Trial:**  July 1 & 2, 2015.  Juan Herrera, v. City of Los Angeles, et al.  USDC Case No. 2:13-cv-
08831-ABC AS.

**Deposition:**  July 10, 2015.  Perla Carr, v. Montgomery County, Texas, et al., Case No.: 4:13-cv-
2795.

**Deposition:**  July 13, 2015.  Stephanie Bruno, et al, v. Donald Hubbard, et al., Circuit Court,
Jackson County (Missouri), Case No. 1416-CV 18501.

**Deposition:**  July 16, 2015.  Donna Lancaster, v. Kansas City Board of Police Commissioners, et al., Case No.:4:14-cv-00171-SOW.

**Deposition:** July 23, 2015.  Sharam Borjkhani, et al. v. CHP, et al.  Superior Court, State of California (Los Angeles County).  Case No.  BC487580.

**Deposition:** July 27, 2015.  Michael Fulton v. Brian Thayer, et al., Case No.: CV10-00137-JCG.

**Deposition:** July 29, 2015.  Orly Vered, et al., v County of Los Angeles, et al., Case No.: CV14-9559 MWF (MANx).

**Trial:**  August 6, 2015  Oscar Morales v. City of Los Angeles, et al.  USDC Case No. CV 11-04757 SVW (Shx).

**Deposition.**  August 11, 2015  Kimberly Mitchell, et al, v. Muhlenberg Community Hospital, et al.  Muhlenberg Circuit Court, Commonwealth of Kentucky Case No. 12

**Deposition:**  August 12, 2015.  Russell Martinez v. Joseph Salazar, et al., D.N.M. Case No. 14-cv-00534 KG/WPL.

**Deposition**.  August 17, 2015.  Dr. Gary D. Frakes, v. Sergeant William R. (Billy) Masden and Captain Dustin Ott. USDC (Texas) Case No. 4:14-cv-1753.

**Deposition.**  August 20, 2015.  Emmanuel Bracy, v. City of Los Angeles, et al.  Case No. C13-09350 (JC).

**Deposition.**  August 24, 2015.  Porfirio Santos-Lopez, an Individual v. City of Long Beach et al., Case No.: CV14-05781-FMO-AS.

**Deposition:**  August 26, 2015.  Aaron Vincent Arde Catacutan, v. City of San Jose, et al. Superior Court, State of California (Santa Clara County) Case No. 113 CV 254501.

**Deposition:**  August 31, 2015.  Sammy Sanchez, et al v. City of Tucson, et al.  USDC Case No. 72-1576857.

**Trial:**  September 8, 2015.  Cash Jerome Ferguson-Cassidy, v. City of Los Angeles, et al., USDC Case No. CV14-06768 SVW (JPRx).

**Deposition:**  September 10, 2015.  Juventino Rodarte, v. Alameda County, et al.  USDC Case No. 4:14-cv-00468-KAW.

**Deposition:**  October 2, 2015.  Brennan Colbert, v. County of Kern, et al., Case No.: 1:13-cv-01589-JLT.

**Trial:**  October 7, 2015.  Michael Fulton v. Brian Thayer, et al., Case No.: CV10-00137-JCG.

**Trial:**   October 16, 2015.  Kristy Beets, et al, v. County of Los Angeles, et al.  Superior Court, State of California (County of Los Angeles) Case No. KC 057667.

**Trial:**  October 19, 2015 & October 20, 2015.  Christopher J. Windsor, v. Chris Eaves, et al., Case No. 5:13-CV-00038.

**Deposition:** October 27, 2015.  Francisco Arrieta, et al., v. County of Kern, et al., Case No.:1:14-CV-00401-LJO-JLT.

**Deposition:**  October 28, 2015.  Lorenzo Adamson, an individual, v. City of San Francisco, et al., Case No.: 4:13-cv-05233-DMR.

**Trial.**  October 29, 2015.  Robert J. Reese, Jr. v. County of Sacramento, et al., Case No. 2:13-cv-00559 JAM DAD.

**Trial.**  November 3, 2015.  Lance Ricotta, v. City of Imperial, Ca, et al., Case No.: 13CV1454 DMS WVG.

**Deposition.**  November 9, 2015.  Dorothy Jean Sams, et al, v. City of Los Angeles, et al, Superior Court (Los Angeles County) Case No. BC537879.

**Trial**.  November 10 & 11, 2015.  People v. Former Webster Police Officer D. Bassett.  339th District Court, Harris County, Texas, Cause No. 1411316.

**Trial**.  November 12, 2015.  People v. Marcus Stewart, Superior Court (Santa Clara County), State of California Case No. C1370824.

**Trial**.  November 13, 2015.  Lorenzo Adamson, an individual, v. City of San Francisco, et al., Case No.: 4:13-cv-05233-DMR.

**Deposition:**  November 18, 2015.  Miguela Nuila, v. City of Los Angeles, e al.  USDC Case No. CASE NO. CV 14-9160 DDP (PJWx).

**Deposition:**  November 18, 2015.  Damion Russell et al., v. City of Los Angeles, et al., Case No.: CV-14-09433-JFW (Ex).

**Deposition:**  November 20, 2015.  Raymond Newberry et al. v. County of San Bernardino, ED-CV14-02298 JGB (SPx)

**Deposition:**  November 23, 2015.  Robert Barron, v. City of Redding, et al., USDC Case No.: 2-14-CV-01107 MCE-CMK.

**Deposition:**  December 2, 2015.  Sukhwinder Kaur, et al, v. City of Lodi, et al.  USDC Case No. 2:14-cv-00828 GEB-AC.

**Deposition:**  December 3, 2015.  Isaiah Salvadore Zepeda, te al, v, County of Los Angeles, et al. Superior Court (Los Angeles County) Case No. BC450200.

**Grand Jury Testimony:**  December 7, 2015.  People v. Officer Timothy Loehman and Officer Fran Garmback, Cuyahoga County (Ohio) Grand Jury. [Civil Case No: 14 Civ. 02670.]

**Trial:**  December 9 & 10, 2015.  Superior Court, State of California (Los Angeles County), People v. Ugene Park & Sarah DeLeon, Case No. 5SY03653, DR No. 15-1087.

**Trial:**  December 15, 2015.  Alejandra Ruiz, et al., v. City of Medford, et al.  Circuit Court, State of Oregon (Jackson County), Case No. 13CV07663.

**Trial:**  December 17, 2015.  Isaiah Salvadore Zepeda, et al, v, County of Los Angeles, et al. Superior Court (Los Angeles County) Case No. BC450200.

**Deposition:**  December 22, 2015.  Jordan Edward Branscum, v. San Ramon Police Department, et at. Case No. Case No.: C11-04137 LB.

**Deposition**:  December 28, 2015.  Susan Rush, v. City of Santa Monica, et al.  USDC Case No. BC568815.

**Preliminary Hearing & Motion to Suppress:**  January 5, 2016.  People v. Gregory Williams, Superior Court, State of California (Solano County), Case No. VCR223119.

**Preliminary Hearing & Motion to Suppress:**  January 5, 2016.  People v. Gregory Williams, Superior Court, State of California (Solano County), Case No. VCR223119.

**Deposition:**  January 8, 2016.  Doris Ray Knox v. City of Fresno, et al.  USDC Case No. 1:14–CV–00799 EPG.

**Deposition:**  January 11, 2016.  Refugio Nieto, et al., v. City and County of San Francisco, et al., Case No.: C14-03823-NC.

**Deposition:**  January 12, 2016.  Garry Bradley, v. County of Los Angeles, et al. Superior Court, State of California (Los Angeles County), Case No. BC473200.

**Deposition:**  January 13, 2016.  Jesse Trevino, v. Bakersfield Police Department, et al., Case No. 1:14-CV-01873 JLT.

**Deposition:**  January 21, 2016.  Richard A. Collender, et al., v. City of Brea, et al.  USDC Case

No. SACV 11000530 AIJ-MLGx.

**Deposition:** January 26, 2016.  The Estate of Cecil Elkins, Jr., et al., v. California Highway
Patrol, et al., Case No.: 1:13-CV-01483-AWI-SAB.

**Trial:**  February 2 and 3, 2016.  Dorothy Jean Sams, et al, v. City of Los Angeles, et al.  Superior
Court, State of California (Los Angeles County), Case No. BC537879

**Deposition:**  February 4, 2016.  Rayven Vinson, et al, v. City of Los Angeles, et al. USDC Case
No.: CV 14-4488-PLA.

**Deposition:**  February 10, 2016.  V.W., a minor, et al., v. Robert Nichelini, et al., Case No.:
2:12-CV-01629-LKK-AC.

**Deposition:**  February 12, 2016.  Maria Del Carmen Rivas, et al., v. City of Los Angeles, et al.,
Case No.:2:15-CV-000456-JFW-JEM.

**Trial:**  February 19, 2016.  Esperanza Booke, et al, v. City of Sanger, et al., Case No.: 1:13-cv-
00586-AWISAB.

**Deposition**:  February 22, 2016.  Fernando Del Castillo, et al., v. City of Tempe, et al., Case No.:
CV-214-1945-PHX-DLR.

**Deposition:**  February 29, 2016.  J.A.L., a Minor, et al, v. Mike Santo, et al.  USDC Case No.:
CV-15-00355.

**Trial:**  March 2, 2016.  Richard A. Collender, et al., v. City of Brea, et al.  USDC Case No.
SACV 11000530 AIJ-MLGx.

**Deposition:**  March 3, 2016.  Michael A. Storms, v. City of Clarkston, et al., Case No.: 2:14 CV
000254 TOR.

**Trial:**  March 7, 2016.  Refugio Nieto, et al., v. City and County of San Francisco, et al., Case
No.: C14-03823-NC.

**Deposition:**  March 15, 2016.  J.J.D. v. City of Torrance, et at.  USDC Case No.
CV14-07463-BRO-MRW.

**Trial:**  March 17, 2016,  People v. Mark Cappello, Superior Court, State of California (Sonoma
County).  Case No. SCR-630974.

**Deposition:**  March 23, 2016.  Ioana Aronovici, v. City of Anaheim, et al., Orange County
Superior Court Case No. 30-2014-00762502 CU-PA-CJC.

**Deposition:**  March 25, 2016.  Reynalda Molina, et al, v. City of Visalia, et al.  CASE NO. 1:13-CV-01991-LJO-SAB.

**Deposition:**  April 4, 2016.  Ayounna McClinton (Estate of Duane Strong), v. City of Tallahassee, et al., Case No.: 4:15-CV-278-RH/CAS.

**Trial:** April 1 & 5, 2016.  K.C.R. (Rivera) a minor, et al, v. County of Los Angeles, et al.  USDC Case No. CV 13-03806 PSG (SSx).

**Trial:**  April 5, 2016.  J.J.D. (Dolak) v. City of Torrance, et al.  USDC Case No. CV14-07463 BRO-MRW.

**Trial**:  April 6, 2016. Garry Bradley, v. County of Los Angeles, et al.  Superior Court, State of California (Los Angeles County) Case No. BC473200.

**Trial:**  April 12, 2016.  Jesse Michael Espinoza, v. City of Mesa, et al.  USDC (Arizona) Case No. CV2013-092842.

**Deposition:**  April 14, 2016.  The Estate of Anthony Agustin Banta, et al. v. City of Walnut Creek, et al.  USDC Case No. C13-00342 CRB.

**Deposition:**  April 18, 2016.  Stephen McCollum et al., v. Texas Department of Criminal Justice, et al.  Case No.3:12-CV-02037.

**Deposition:**  April 27, 2016.  Tan Lam v. City of Los Banos, et al.  Case No. 2:15-cv-00531 MCE, KJN

**Deposition:**  May 2, 2016.  Edsell Ford, et al. v City of Los Angeles, et al.  USDC Case No. CV14-7268 JFW - MAN.

**Deposition:**  May 4, 2016.  Susan Mellen, et al. v. City of Los Angeles, et al., Case No. CV15-03006 GW (AJWx).

**Deposition:**  May 10, 2016.  Dennis Mitchell Mueller, v. Deputy Manuel Cruz, County of Orange, et al.  USDC Case No. CV 13-01274 CJC (JCGx).

**Deposition:**  May 13, 2016.  Robert Jackson III, v. County of San Bernardino, et al.  USDC Case No. EDCV 13-01650-JGB (DTBx).

**Trial:**  May 17, 2016.  Gordon v. Harris County et al.,USDC Case No. 4:14-cv-03463, S.D. of Texas (Houston).

**Deposition:**  May 27, 2016.  Oscar Ramirez, Sr. v. County of Los Angeles; Bryan Moreno, et.

al.U.S. District Court Case No.:  CV 15-03062 AB (PLAx).

**Deposition:**  June 6, 2016.  Brett Lewis, v. Café Club Fais Do Do, et al., Superior Court, State of California  (Los Angeles County), Case No. BC 468234.

**Trial:**  June 13, 2016.  Rayven Vinson, et al, v. City of Los Angeles, et al. USDC Case No.: CV 14-4488-PLA.

**Deposition:**  June 14, 2016.  Edin S. Castellanos, v. State of California, et al., Case No.: 4:15-cv-00272-JSW.

**Deposition:**  June 20, 2016.  Lance McClain, et al, v. City of Eureka, et al. Case No. 3:15-cv-02070 WHO.

**Deposition:**  June 21, 2016.  Moises Palacios, Victoria et al., v. City of Los Angeles, et al., Case No.: 14-cv-09639-MJF (AJWx).

**Trial:**  June 24, 2016.  Brett Lewis, v. Café Club Fais Do Do, et al., Superior Court, State of California  (Los Angeles County), Case No. BC 468234.

**Deposition:**  June 29, 2016.  Terence Wyatt, v. Gary Colbert, et al., USDC Case No. 5:15-cv-586.

**Deposition:**  June 30, 2016.  Sergio Pina v. City of Los Angeles, et al. USDC Case No. 13-CV-04989-FMO-MRW.

**Deposition:**  July 8, 2016.  R.R.R., et al. v. City of Banning, et al., USDC Case No. 5:14-cv-01430-CAS-FFM.

**Deposition:**  July 13, 2016.  Justin L. Palmer, v. City of Santa Monica, el al., Case No.: 2:15-cv-06183-SJO-JC.

**Trial:**  July 14, 2016.  Robert Jackson III, v. County of San Bernardino, et al.  USDC Case No. EDCV 13-01650-JGB (DTBx).

**Trial:**  July 18, 2016.  Edin S. Castellanos, v. State of California, et al., Case No.: 4:15-cv-00272-JSW.

**Deposition:**  July 21, 2016.  Arthur Scott, v. City of San Diego, et al.  Superior Court, State of California (San Diego County), 37-2015-00001940 CU-OE-CTL.

**Deposition:**  July 28, 2016.  1506.  Gladis Herrera, et al. v. City of Ontario, et al.  Case No. 5:15-cv-01370.

**Deposition:**  August 1, 2016.  Estate of Andrea Naharro (Barnard), et al., vs. County of Santa Clara, et al., Case No.: 14-04570.

**Trial:** August 3 & 4, 2016.  Dennis Mitchell Mueller, v. Deputy Manuel Cruz, County of Orange, et al.  USDC Case No. CV 13-01274 CJC (JCGx).

**Deposition:**  August 5, 2016.  Sarai Urdez Navarro, et al., v. County of Riverside, et al. USDC Case No. ED CV14-01201 GHK (PLAx).

**Trial:**  August 11, 2016.  Daniel L. Kloberdanz, v. Joseph M. Arpaio, et al., USDC Case No.: 2:13-cv-02182-PHX-JWS.

**Deposition:**  August 17, 2016.  Catherine Smith, et al., v. County of Butte, et al.  USDC Case No. 2:15-CV-00988 GEB-CMK.

**Deposition:**  August 25, 2016.  Joshua Osorio, et al. v. State of California (CHP) et al.  Superior Court State of California (San Diego County) Case No. 37-2013-0072536 CU-CR-CTL

**Deposition:**  August 26, 2016.  J.L.D. (Douchet), et al, v. City of Los Angeles, et al.  USDC Case No. CV11-03141 SVW - MAN.

**Trial**:  August 29, 2016.  People v. Gabrielle Lemos.  Superior Court, State of California, Sonoma County Case No. SCR-674200.

**Trial:** August 31, 2016.  Justin L. Palmer, v. City of Santa Monica, el al., Case No.: 2:15-cv-06183-SJO-JC.

**Deposition:**  September 2, 2016.  Maria Teresa Abrego, et al, v. City of Los Angeles, et al.  Case No. CV15-00039 BRO (JEMx).

**Trial:**  September 9, 2016.  1518.  J.L.D. (Douchet), et al, v. City of Los Angeles, et al. Superior Court Case No. CV11-03141 SVW - MAN.

**Trial:**  September 15, 2016.  The Estate of Anthony Agustin Banta, et al. v. City of Walnut Creek, et al.  USDC Case No. C13-00342 CRB.

**Deposition:**  October 7, 2016.  Teresita Garcia, et al, v. County of Los Angeles, et al.  State of California, Superior Court (Los Angeles County), Case No. BC553204.

**Deposition:**  October 17, 2016.  Robert Zambrano, et al, v. Redondo Beach, et al.  State of California, Superior Court (Los Angeles County), Case No. BC566142.

**Deposition:** October 18, 2016.  Nyla Moujaes v. San Francisco Police Department Officer David Wasserman and Sergeant Gary Buckner, Case No.: 3:15-cv-03129 DMR.
Client Attorney:

**Deposition:**  October 19, 2016.  Richard Vos, et al, v. City of Newport Beach, et al., Case No.: 8:15-cv-00768-JCG.

**Deposition:**  November 1, 2016  Darren Donald Liess, et al. (Darren) v. City of Los Angeles, et al.  Superior Court Case No. BC541691.

**Trial:** November 3, 2016.  1506.  Gladis Herrera, et al. v. City of Ontario, et al.  Case No. 5:15-cv-01370.

**Deposition:**  November 7, 2016.  Adolfo Garcia, et al v. William Davidson, et al.  Superior Court (San Diego County) Case N0. 37-2014-00021070 CU-CR-CTL.

**Deposition:**  November 15, 2016.  1546.  Keivon Young v. County of San Bernardino, et al. Case No. 5:15-CV-01102 JGB-SP.

**Trial:**  November 17, 2016.  Lance McClain, et al, v. City of Eureka, et al. Case No. 3:15-cv-02070 WHO.

**Deposition:**  November 21, 2016.  Mark Covert, v. City of San Diego, et al, USDC Case No.: 15cv2097 AJB (WVG).

**Trial:**  November 23, 2016 and November 28, 2016.  Emmanuel Bracy, v. City of Los Angeles, et al.  Case No. C13-09350 (JC).

**Trial:**  December 1, 2016.  Keivon Young v. County of San Bernardino, et al.   Case No. 5:15-CV-01102 JGB-SP.

**Trial:**  December 2, 2016.  Terence Wyatt, v. Gary Colbert, et al., USDC Case No. 5:15-cv-586.

**Trial:**  December 8, 2016.  People v. George Clayton Maurer II.  Superior Court, State of California (Los Angeles County) Case No. 5JB09210.

**Trial:**  December 9 & 12, 2016.  Darren Donald Liess, et al. (Darren) v. City of Los Angeles, et al.  Superior Court, State of California (Los Angeles County) Case No. BC541691.

**Trial:**  December 16, 2016.  Nyla Moujaes v. San Francisco Police Department Officer David Wasserman and Sergeant Gary Buckner, Case No.: 3:15-cv-03129 DMR.

**Deposition:**  December 21, 2016.  Anthony T. Baker, v. City of Glendale, et al., Case No.: 2:15-

cv-02432-DLR.

**Deposition:** January 3, 2017. Wilmer Deckard and Nicol Deckard, v. City of Anaheim, et al., Superior Court, State of California (Los Angeles County), Case No 30-2015-00819021 CU-CR-CJC

**Deposition:** January 4, 2017. The Estate of Julian Ramirez-Galindo, et al., v. Untied States of America, et al., Case No.: 15-CV-1694 W(NLS).

**Deposition:** January 5, 2017. Karen Fusilier, v. County of San Bernardino. Superior Court, State of California (San Bernardino County), Case No. CIVDS1313206.

**Deposition:** January 11, 2017. I.A. and C.S., et al., vs. City of Emeryville, et al., Case No.: 4:15-cv-04973-DMR.

**Deposition:** January 13, 2017. The Estate of Ashley DiPiazza, et al., v. City of Madison, and Justin Bailey, Gary Pihlaja, and Carey Leerek, Case No.: 16cv060.

**Trial:** January 18, 2017. Arthur Scott, v. City of San Diego, et al. Superior Court, State of California, (San Diego County). Case No. 37-2015-00001940 CU-OE-CTL

**Deposition:** January 24, 2017. William Mears, et al., v. City of Los Angeles, Case No.: CV 15-08441 JAK (AJWx).

**Deposition:** January 27, 2017, Sylvia Perkins, as Personal Representative of the Estate of Bobby Moore, III, Deceased, vs. Joshua Hastings, et al., Case No.: 4:14-CV-310-BSM.

**Deposition**: January 31, 2017. Ian Medjes v. City of Los Angeles, et al. Case No. CD Cal. 2:14-cv-5377-DDP-RZ.

**Deposition:** February 3, 2017. S.R. Nehad (Rawshaneehad), et al v. City of San Diego, et al. Case No. 15-cv-1386-WQH-NLS

**Deposition:** February 21, 2017. Osvaldo Ureta, et al. v. County of Los Angeles, et al. Superior Court, State of California (Los Angeles County), Case No. BC501051.

**Trial:** February 22, 2017. Maria Teresa Abrego, et al, v. City of Los Angeles, et al. Case No. CV15-00039 BRO (JEMx).

**Trial:** February 28, 2017. 1428. Alice Smithen, v. United States of America (U.S. Marshall), et al. Case No. CV 09-0414 GW (PJWx).

**Trial:** March 1, 2017. Wilmer Deckard and Nicol Deckard, v. City of Anaheim, et al., Superior

Court, State of California (Los Angeles County), Case No 30-2015-00819021 CU-CR-CJC.

**Trial:**  March 6, 2017.  Regarding: Russell Martinez v. Joseph Salazar, et al., D.N.M. Case No. 14-cv-00534 KG/WPL (Albuquerque, NM.)

**Deposition:**  March 9, 2017.  Maria Delores Ramirez, v. City of Los Angeles, et. al.  USDC Case No: CV 15-02179 MWF (FFMx).

**Deposition:**  March 17, 2017.  Lisa Lopez, et. al., v. County of Los Angeles, et al., USDC Case No.: CV 16-00098-AB-KS

**Deposition:**  March 24, 2017.  Monica Ramirez, et al, v. City of Los Angeles, et al.  Superior Court State of California (Los Angeles County), Case No. BC597276.

**Deposition:**  March 27, 2017.  Sheronda A. Byrd-Givens, et al, v. Stephen E. Asch, et al., Case No. 2 :16-cv-00410-MHW-KAJ D.

**Trial:**  March 28, 2017.  Maria Delores Ramirez, v. City of Los Angeles, et. al.  USDC Case No: CV 15-02179 MWF (FFMx).

**Deposition:**  April 3, 2017.  Walter Deleon, et al., vs. City of Los Angeles, et al., Case No.: 2:16-cv-03721-FMO-RAO. 1595

**Trial:**  April 5, 2017.  Joshua Osorio, et al. v. State of California (CHP) et al.  Superior Court State of California (San Diego County) Case No. 37-2013-0072536 CU-CR-CTL

**Deposition**  April 7, 2017.  Channel Centeno, et al., v. City of Fresno, et al., Case No.: 1:16-CV-00653-DAD-SAB.

**Deposition:**  April 10, 2017.  Allen B. Shay v. County of Los Angeles – Case No. 15-CV-4607 CAS (RAO).

**Deposition:**  April 14, 2017.  Eliel Paulino, v. Marco Cruz, et al., Case No. CV16-02642-NC.

**Trial:**  April 20, 2017.  Marius Mitchell v. Neal A. Robertson, Case No.: 2:16.

**Deposition:**  April 24, 2017.  Mercedes Hernandez, v. Department of Motor Vehicles, et al. Superior Court Case No. BC588742.

**Deposition:**  April 26, 2017.  Daniel Smith v. City of Anaheim, et al.  Case No. SACV15-1776 CJC (DFMx).

**Trial:**  April 27 &28, 2017.  Ray Webb, v. Officer J. Ackerman, (Long Beach) et al., Case No.:

CV013-09112.

**Deposition:**  May 8, 2017.  Ethan Morse vs. County of Merced, et al., Case No.: 1:16-CV-00142-DAD-SKO.

**Deposition:**  May 10, 2017.  Dyrone Leake, Sr. v. City of Los Angeles, et al.  Superior Court Case No. BC 606819.

**Deposition:**  May 22, 2017.  Isabel Bel Montez, et al., v. City of Stockton, et al., Case No.: 2:10-cv-03149 MCE FEB.

**Deposition:**  May 26, 2017.  Antonio Ortiz, Luiz Ortiz, vs. City of Fullerton, et al., Case No.: CV-16-01499 DOC (DFMx).

**Deposition:**  May 30, 2017.  Estate of Derek Williams Jr., et al., vs. City of Milwaukee, et al., Case No.: 2:16-cv-00869.

**Deposition:**  June 5, 2017.  Lee Darnell Watson, vs. City of San Jose, et al., Case No.: 3:15-cv-04054.

**Deposition:**  June 12, 2017.  Estate of Gustavo Najera, et al. v. City of Anaheim, et al., Case No. 8:16-CV-01243 JLS (JCG).

**Deposition:**  June 15, 2017.  Estate of Danny Cecil Jones, et al., vs. City of Spokane, et al., Case No.: 2:16-cv-00325.

**Trial:**  June 16 & 19, 2017.  People v. Robert Branch, Superior Court, State of California, (San Diego County)  Case No. CD264516.

**Deposition:**  June 20 &26, 2017.  Kierra Williamson, Princeton Williamson, and Michael Williamson, vs. Chicago Police Officer Wilfredo Ortiz, et al., Case No.: 14 CV 6397.

**Deposition:**  June 27, 2017.  Doyma Vanessa Michel, v. United States of America.  Case No. Case No.16-CV-0277 GBC-RBB.

**Trial:**  July 12, 2017.  The Estate of Ashley DiPiazza, et al., v. City of Madison, and Justin Bailey, Gary Pihlaja, and Carey Leerek, Case No.: 16cv060.

**Deposition:**  July 21, 2017.  Graciela Lopez Franco, et al, v. United States, et al.  Case No. 15-cv-2626 - JM (RBB).

**Trial:**  July 24, 2017.  Maria Del Carmen Rivas, et al., v. City of Los Angeles, et al., Case No.:2:15-CV-000456-JFW-JEM.

**Trial:**  July 31, 2017.  People v Amanda Christine Jaramillo.  Superior Court, Orange County, Case CHPW 14-1404

**Deposition:**  August 1, 2017.  Randy Conan v. City of Fontana, et. al. Case No. 15:16-cv-01261.

**Trial:**  August 4, 2017.  Shirar et al, v. CHP Officer Miguel Guerrero, et al,   USDC Case No. EDCV 13 - 0906 JGB (OPx).

**Deposition:**  August 14, 2017.  Breanna Cooke, et al., vs. City of Stockton et al, Case No. 2:14-cv-00908-KJM-KJN.

**Deposition:**  August 15, 2017. Marcus Vaughn, et al. v. City of Los Angeles, et al.  Case No. 2:16-cv-03086 AB-AJW.

**Deposition:**  August 17, 2017.  Shawna Brown, et al., vs. City of Stockton, et al., Case No. 2:13-CV-01007-KJM-KJN.

**Deposition:**  August 21, 2017.  Sandra Salazar, et al., vs. Deputy Shandon Deasey, et al., Case No. 5:16-cv-01103-JFW-KK.

**Deposition:**  August 21, 2017.  Sufle v. City of Gardena, et al., Case No. CV 16-00384-GW-MRWx

**Deposition:**  August 22, 2017.  Andrew Jeremy Garcia v. City of Garden Grove, et al.  Case No. 8:16-cv-00154 DOC (KESx).

**Trial:**  August 28, 2017.  The Estate of Angel Lopez, et al., v. City of San Diego, et al.  Case No.: 13CV2240 GPC BGS.

**Deposition:**  September 7, 2017.  Arthur Moore, et al, v. City of Berkeley et al, Case No.: 14-cv-000669 CRB.

**Deposition:**  September 8, 2017.  Estate of Ruben Nunez, et al v. County of San Diego, et al., Case 3:16-cv-01412-BEN-MDD.

**Trial.**  September 11, & 12, 2017.  Kierra Williamson, Princeton Williamson, and Michael Williamson, vs. Chicago Police Officer Wilfredo Ortiz, et al., Case No.: 14 CV 6397.

**Trial.**  September 15, & 18, 2017.  Lee Darnell Watson, vs. City of San Jose, et al., Case No.: 3:15-cv-04054.

**Deposition:**  September 20, 2017.  Aubrey Williams vs. City of Birmingham, et al., Case No.: 2:16-cv-00650-JEO.

**Deposition:**  September 25, 2017, Douglas Cruse and Iveta Cruse, v. Jacob Emory Swigger, and Signal Hill Police Department, et al.  Superior Court (Los Angeles County) Case No. BC602211.

**Deposition:**  September 27, 2017.  Lastenia Marizol Rodriguez, vs. City of Fontana, et al., Case No. 5:16-cv-01903 JGB-KK.

**Deposition:**  September 28, 2017.  Herbert O. Allen v. City of Santa Monica, et al, USDC Case No. 2:11-cv-10139 R-GJS

**Trial:**  October 5, 2017.  Graciela Herrera, et. al., v. City of Los Angeles, et al., USDC Case No.:2:16-cv-02719-DSF-SK.

**Deposition:**  October 9, 2017.  Dionne Smith-Downs, et al v. City of Stockton, et al.  Case No. 2:10-cv-02495 MCE-GGH.

**Deposition:**  October 12, 2017.  Evangelina Gonzalez and Victor Gonzalez vs. County of Los Angeles, Deputies Adrian Dominguez, Steven Velasquez, et al., Case No.: 2:16-cv-07018

**Deposition:**  October 13, 2017, & December 15, 2017.  Felipe Navarro, et al., vs. State of New Mexico, et al., Case No.: 2:16-cv-01180 MCA/CG.

**Trial:**  October 17, 2017.  Mayumi Donaldson, et al. v. Deputy U.S. Marshal Michael Hall, et al. Case No. 3:15-cv-00908 BAS-KSC.

**Deposition:**  October 19, 2017.  Giselle Genesis Lopez, et al v. City of Inglewood, et al. Superior Court (Los Angles County) Case No. Case No. BC563203.

**Trial.**  October 25, 2017.Randy Conan v. City of Fontana, et. al. Case No. 15:16-cv-01261.

**Trial.**  October 27, 2017.  Estate of Manuel Diaz, Genevieve Huizar, v. City of Anaheim, et al. USDC Case No. 12-01897 JVS (RNBx).

**Trial.**  November 7, 2017.  William Mears, et al., v. City of Los Angeles, Case No.: CV 15-08441 JAK (AJWx).

**Trial:**  November 15, 2017.  Shellabarger et al, v. Dicharry et al, Case No. 13-cv-00188-TLN-CMK.

**Deposition:**  November 21, Heleine Tchayou, et al. v. City of Los Angeles, et al., Case No., 16-cv-06073-TJH-MRW

**Deposition:** November 27, 2017.  Monica Ortiz, et al. v. City of Rialto, et al., Case No. 5:16-cv-01384-JGB. (KSx).

**Deposition:**  December 1, 2017.  C.R. Co-Successor-in-Interest to Decedent Rakeem Rucks, et al., vs. City of Antioch, et al., Case No.: C16-03742 JST.

**Trial:**  December 8, 2017, Sammy Sanchez, et al v. City of Tucson, et al.  USDC Case No. 72-1576857.

**Deposition:**  December 11, 2017.  Estate of Roshad McIntosh, v. City of Chicago, et al. USDC Case No. 1:15-cv-01920

**Deposition:**  December 14, 2017.  Taylor Swift vs. David Woo, Vera Hicks, et al.  USDC Case No.: 3:17-cv-00866-VC.

**Deposition:**  December 18, 2017.  Domingo Davis, Jr., vs. City of Santa Clara and Cuong Phan, Case No. 5:15-CV-05603-EJD.

**Deposition:**  December 27, 2017.  Estate of Pierre Loury v. City of Chicago, et al.  USDC Case No. 1:16-C-04452.

**Trial:**  January 11, 2018.  Giselle Genesis Lopez, et al v. City of Inglewood, et al. Superior Court (Los Angles County) Case No. Case No. BC563203.

**Deposition:**  January 12, 2018.  Filiberto Valencia, Sr., et al., vs. City of Stockton, et al., Case No.: 2:16-cv-02081-JAM-AC.

**Deposition:**  January 16, 2018.  Edmon Washington v. City of Los Angeles, et al., Case No. 2:17-02829-PA (FFMx)

**Deposition:**  January 22, 2018.  Shainie Lindsey, et al., vs. City of Pasadena, et al., Case No.: CV 16-8602 SJO (RAOx).

**Trial:**  January 24, 2018.  Penelope Armstrong, v. County of Los Angeles, et al., Superior Court Case No.:BC528453

**Deposition:**  January 30, 2018.  Joe Robles and Elvira Robles vs. Aransas County, Texas: Matthew Campbell Individually, Civil Action No.: 2:15.

**Trial:**  February 1, 2018.  S.B. a minor, et al (Brown), v. County of San Diego, et al., Case No. 14CV0072, JAH KSC.

**Deposition:**  February 1, 2018.. Jenny Tucker, et al., v. The County of Riverside, et al., Case No.: 5:16-CV-02275-JGB (DTBx).

**Trial:**  February 7, 2018.  People v. Gilberto Fajardo.  Superior Court, State of California, (Kern County). Case No. BF160536A

**Deposition:**  February 8, 2018.  Archibald et al. v. County of San Bernardino et al. USDC Case No. CV 16-01128 AB (SPx). Mr. Dale K. Galipo

**Deposition:**  February 12, 2018.  Estate of Johnny Martinez, et al. v. County of Los Angeles, et al., Superior Court, State of California, (Los Angeles County), Case No. BC579140 MPL (Dept 34).

**Deposition:**  February 14, 2018.  Maria Hernandez; A.J., Jr., et al, . City of Los Angeles, et al Case No. 2:16-c-02689 AB (JEMx).

**Deposition:**  February 15, 2018.  Marc Alan Corbin, v. County of Los Angeles, et al., Superior Court, State of California (Los Angeles County), Case No. BC 512036

**Trial:**  February 22, 2018.  Maria Hernandez; A.J., Jr., et al, v. City of Los Angeles, et al. Case No. 2:16-c-02689 AB (JEMx).

**Deposition:**  February 23, 2018.  Robert Ayala, vs. Aransas County, Texas and Anthony Ciarletta, In The United States District Court For The Southern District of Texas Corpus Christi Division, Case No. 1:15

**Hearing:**  March 7, 2018.  People v. Michael David Suyssman, Superior Court, State of California (Los Angeles County), Case No. M232634DV.

**Trial:**  March 13, 2018:  April 10, 2014.  Chien Van Bui, et al, vs. City and County of San Francisco, et al.  USDC Case No. CV 11-04189 LB.

**Deposition:**  March 19, 2018.  Kevin Foy vs. Pulaski County, Arkansas, Austin Callahan, et al., Case No.: 4:17-cv-358-BSM.

**Deposition:**  March 23, 2018.  Anthony Wilson, et al., vs. City of Douglasville, GA, et al.., Case No.: 1:17-cv-00634-ELR.

**Trial:**  March 26, 2018.  Adolfo Garcia, et al v. William Davidson, et al.  Superior Court (San Diego County) Case N0. 37-2014-00021070 CU-CR-CTL.

**Deposition:**  March 27, 2018.  Jane Doe vs. County of Fresno, et al.  Superior Court State of California, (Fresno County) Case No. 16CECG03273

**Deposition:**  March 28, 2018.  Phillip Murry v. North Las Vegas Police Department, etal. Case No.: 2:17-cv-00157-APG-CWH.

Page 17 of  24

**Deposition:**  April 5, 2018.  Alma Ramirez, et al, v. City of Gilroy, et al.  Case No. 5:17-cv-00625 HRL

**Deposition:**  April 12, 2018.  Melane Jackson v. City of Los Angeles, et al., Superior Court, State of California (Los Angeles County) Case No. BC609513.

**Deposition:**  April 17, 2018.1701.  Leticia Solis, et al, v. City of City of Los Angeles, et al.  Case No. 2:17-cv-02352, AB-PJW

**Deposition:**  April 19, 2018.  Jesse Sanchez, v. City of Stockton, et al.  Superior Court State of California (San Joaquin County), Case No. CV-2015-0006499.

**Trial:** April 20, 2018.  Ethan Morse vs. County of Merced, et al., Case No.: 1:16-CV-00142-DAD-SKO

**Deposition:**  April 26, 2018.  Marco A. Figueroa vs. City of Casa Grande, et al., Case No: 2: 16-CV-03275-ROS

**Deposition:**  April 27, 2018.  Tanya A., et al., v. City of San Diego, et al.,  Case No.: 3:14-cv-01942-L-RBB, and Jane Doe, v. City of San Diego, et al.  Case No.  14cv1941-L-AGS.

**Trial:** April 30, 2018. Melane Jackson v. City of Los Angeles, et al., Superior Court, State of California (Los Angeles County) Case No. BC609513.

**Trial:**  May 1, 2018.  Estate of Gustavo Najera, et al. v. City of Anaheim, et al., Case No. 8:16-CV-01243 JLS (JCG).

**Trial:**  May 3, 2018.  Heleine Tchayou, et al. v. City of Los Angeles, et al., Case No., 16-cv-06073-TJH-MRW.

**Deposition:**  May 8, 2018.  Amber Wallisa, v. City of Hesperia, et al., Case No.: 5:16-cv-2638.

**Trial:**  May 10, 2018.  The People of the State of California v. Michael David Sussman.  Case No. M232634DV.

**Deposition:**  May 11, 2018.  Rosamanda Flores vs. The City of Concord, et al., Case No.: 4:15-cv-05244-PJH, and Rosamanda Flores vs. The City of Concord, et al., Case No.: 4:17-cv-05810-PJH (Combined by the Court).

**Deposition:**  May 18, 2018.  Estrella Lysandra Zayas vs. State of California, et al., Case No.: 3:17-CV-02739-EMC.

**Deposition:**  May 22, 2018.  Denise Garcia vs. Harris County, Texas, et al., Case No.: 4:16-cv-

Page 18 of  24

2134.

**Trial:** May 24, 2018.  Graciela Lopez Franco, et al, v. United States, et al.  Case No. 15-cv-2626 - JM (RBB).

**Deposition:** May 29, 2018.  Royce Belcher vs. Williamson County, Texas Deputy Jeremy Ellison, individually, and Deputy Gauna, Individually, Case No.: 1:17-cv-00153-SS.

**Deposition:** June 4, 2018.  Cynthia Briones, et al., v. City of Ontario et al., Case No.: 5:17-cv-00590-DMG-JPR.

**Deposition:** June 5, 2018.  E.H., (Martin Hurtado deceased) et al. v. City of Long Beach, et al. Case No. 2:16-v-09641-SJO (KSx).

**Deposition:** June 6, 2018.  R.J. v. City of Los Angeles, et al., Case No. 2:16-CV-07232 CBM (Skx).

**Deposition**: June 11, 2018.  Chandra Jacquez individually, and as successor-in-interest to Richard Jacquez (deceased), v. City of San Jose, et al.  Case No. 5:16-CV-5343. NC.

**Deposition:** June 12, 2018.  Kelly Carter vs. County of Alameda, et al., Case No.: 3:16-cv-05132-WHO.

**Trial:** June 14, 2018. Leticia Solis, et al, v. City of City of Los Angeles, et al. Case No. 2:17-cv-02352, AB-PJW

**Trial:** June 14, 2018, Alma Rosa Godinez, v. San Diego County, et al. Case No. 3:16-cv-00236 BAS-NLS.

**Trial**: June 19, 2018. Floyde Armbrester, v. City of Berkeley et al. Case No. 3:16-cv-04615.

**Deposition:** June 20, 2018. Ashley Lauren Watts vs. City of Newport Beach, Christine Maroney, Monica Aguilar, et al., Case No.: 8:17-cv-01099-AG (Skx).

**Deposition:** June 25, 2018. Matthew Francois, v. The City of San Diego, et al. Superior Court, State of California (San Diego County), Case No. 37-2016-00003251.

**Deposition:** July 12, 2018. Maurice Lallemand v. County of Los Angeles, et al., Case No. CV17-00781 JAK (SS)

**Trial:** July 19, 2018. Matthew Francois, v. The City of San Diego, et al. Superior Court, State of California (San Diego County), Case No. 37-2016-00003251, CU-OB-CTL.

**Deposition:** July 24, 2018.  Cesar Cuellar, Sr. et al. v. City of Laredo (Texas), et al. USDC Case No. 5:17-cv-00076.

**Trial**: July 26, 2018. Jesse Sanchez, v. City of Stockton, et al. Superior Court State of California (San Joaquin County), Case No. CV-2015-0006499.

**Trial:**  August 7, 2018. Tan Lam v. City of Los Banos, et al.  Case No. 2:15-cv-00531 MCE, KJN.

**Deposition:**  August 8, 2018.  Dane Zeen, v. County of Sonoma, et al, Case No. Case No:  3:17-cv-02056-LB

**Deposition:** August 9, 2018.  Aram Tagmazyan, Angela Tagmazyan, v. City of Los Angeles, et al.  Superior Court (Los Angeles County) Case No. BC561908.

**Deposition**  August 13, 2018.  Marina Borawick, v. City of  Los Angeles, et al.  Case No. 2:17-cv-02036 BRO-JC

**Trial:**  August 20, 2018.  Dane Zeen, v. County of Sonoma, et al, Case No. Case No:  3:17-cv-02056-LB.

**Trial:**  August 24, 2018.  Gina Best and Shaun Lowrance, et al., vs. Virginia Beach Police Officers Ferreira, Roys, Thorson, and Ziemer, Case No.: CL17-1137.

**Trial:**  August 29, 2018.  People v, Jon Luthuli Larson, Superior Court State of California (Napa County), Case No. CR

**Deposition:**  August 30, 2018.  Wilson Ramos, As Administrator of the Estate of Jose A. Maldonado, v. Town of East Hartford, et al. Case No. 3:16-cv-00166 VLB

**Deposition:**  September 5, 2018.  Teresa Dominguez, et al, vs. City of Los Angeles, et al.  Case No.: CV 17-04557 DMG (PLAx).

**Trial:** September 6, 2018.  Chandra Jacquez individually, and as successor-in-interest to Richard Jacquez (deceased), v. City of San Jose, et al.  Case No. 5:16-CV-5343. NC.

**Deposition:**  September 7, 2018.  Teresa Todero, as Special Administrator of the Estate of Charles Todero vs. City of Greenwood, Brian Blackwell, Renee Elliott, and Elizabeth Laut, Case No. 1:17-cv-01698-TWP-MJD.

**Deposition:** September 14, 2018.  David P. Demarest vs. The City of Vallejo, et al.  Case No.: 2:16-cv-0227-GEB-KJN.

**Deposition:**  September 21, 2018.  Taina Rozier, et al (Okwera Olango, deceased), v. City of El Cajon, et al. USDC Case No. 17-cv-347-BAS-NLS, and Case No. 3:17-cv-00089 BAS-NLS, and Lucy Olango, v. City of El Cajon, et al., Superior Court Case No. 37-2017-00005331 CU-PO-CTL

**Deposition:**  October 9, 2018.  Joseph Earl Wheeler vs. Graves County Kentucky and Graves County Sheriff's Department and Dewayne Redmon, et al., Case No.: 5:17-cv-38-TBR.

**Deposition:**  October 11, 2018.  Jimmy Brooks vs. City of Vallejo, et al., Case No.: 2:16-cv-02376-WBS - EFB.

**Trial:**  October 19, 2018 and October 23, 2018.  People v. Steve Rodriguez, San Bernardino Case No: MWV1507990.

**Trial:**  October 31, 2018 and November 1, 2018, Alma Rosa Godinez, v. San Diego County, et al. Case No. 3:16-cv-00236 BAS-NLS.

**Trial:**  November 2, 2018.  Jenny Tucker, et al., v. The County of Riverside, et al., Case No.: 5:16-CV-02275-JGB (DTBx).

**Deposition:**  November 6, 2018.  Ramon Cortesluna, v. City of Union City Police Officer Manuel Leon, et al, Case No.: 3:17-cv-05133-JSC.

**Deposition:**  November 7, 2018.  Estate of Kevin Matthews, et al., vs. City of Dearborn (Michigan), et al.  Case No. 2:16-cv-13763  GCS-SDD

**Deposition:**  November 8, 2018.  D.F., M.F., A.F., N.F., (Minors), Panfilo Flores, and Yolanda Flores, v. City of Anaheim, et al. Case No. 8:17-cv-01194 AG-JCG.

**Trial:**  November 14, 2018:  Estrella Lysandra Zayas vs. State of California, et al., Case No.: 3:17-CV-02739-EMC.

**Trial:**  November 15, 2018.  Teresa Dominguez, et al, vs. City of Los Angeles, et al. Case No.: CV 17-04557 DMG (PLAx).

**Deposition:**  November 16, 2018.  Roy Nelson III, Successor-in-Interest to Decedent Roy Nelson; Orenell Stevens, Individually, v. City of Hayward, et al. USDC Case No. 3:16-cv-7222

**Deposition:**  November 20, 2018.  Neftali Monzon, et al. v. City of Murrieta, et al.  Case No. 2:17-cv-01371 ODW (Skx)

**Deposition:**  November 21, 2018.  Leticia Barron vs. State of California, Case No.: 8:17-cv-01275-JVS-KES.

**Deposition:** November 27, 2018.  Estate of Juan Manuel Avila, JR., et al.  v. City of Long Beach, et al. Case No. 2:17-CV-05067 AB JPR.

**Deposition:** November 29, 2018.  Chris Mathis, v. Nicholas Stevens and Edward Black.  USDC (Texas) Case No. 3:17-cv-1835-S.

**Deposition:** November 30, 2018.  Trinidad Brown vs. Eddie Diaz, Eric Howard, Laertis Moraitis, and Daniel Villalobos, Case No.: 2:17-cv-01157-KJM-AC.

**Trial:** December 3, 2018 and December 4, 2018.  Donna Lancaster, v. Kansas City Board of Police Commissioners, et al., Case No.:4:14-cv-00171-SOW.

**Deposition:** December 5, 2018.  Ryan M. Larson vs. John L. Sander, et al., Case No.: 0:17-cv-00063.

**Deposition:** December 11, 2018.  Leslie A. Merritt, Jr. vs. State of Arizona, et al.,  United States District Court, District of Arizona, Case No. CV17-4540-PHX-DGC

**Trial:** December 13, 2018.  Leticia Barron vs. State of California, Case No.: 8:17-cv-01275-JVS-KES.

**Deposition:** December 14, 2018.  Estate of Joseph Valverde (Isabelle Padilla), et al, v. Justin Dodge, and the City and County of Denver, Colorado, Case No. 1:16-cv-01703 MSK-KMT.

**Trial:** December 19, 2018.  People v. Anthony J. McGaff.  Superior Court, San Diago County, California, Case No. SCE379648, DA NO. MBQ014.

**Trial:** January 17, 2019.  L. Alicia Rascon, individually, et al., vs. Clinton H. Brookins, et al. Case No.: 2:14-cv-00749-PHX-JJT.

**Deposition:** January 30, 2019.. Xaime Casillas v. City of Los Angeles, et al.  USDC Case No. 2:16-cv-09606-TJH-GJS

**Deposition:** January 31, 2019.  Tony Nunez, et al. v. City of San Jose, et al.  Case No. 17-cv-03860 LHK.

**Deposition:** February 4, 2019,  Kathryn Green (individually and as a representative of the Estate of Patrick Green, Deceased), David Green, vs. Harris County, Texas, Former Harris County Sheriff, et al., Case No.: 4:16-cv-00893.

**Deposition:** February 6, 2019.  Sofia Valenzuela (Jose Romero), et al, v. City of Long Beach, et

al.  Superior Court Case No. BC672993.

**Deposition:**  February 7, 2019.  Rubia Rosaura Serna, et al. v. City of Bakersfield and Reagan Selman U.S. Dist. Court, Eastern District of CA - Case No. 1:17-CV-01290-LJO-JLT.

**Deposition:**  February 11, 2019.  Annice Evans (aka Ramos), et al. v. City of Vallejo, et al. Case No:  2:17-cv-01619-TLN-AC.

**Depositoin:**  February 15, 2019  L.M., et al., vs. City of Redding, et al., Case No.: 2:14-CV-00767 MCE-AC.

**Trial:**  February 20, 2019.  Akrem Azzam vs. City of Houston, Texas, et al., Case No.: 4:17-cv-1242.

**Trial:**  February 22, 2019.  Moises Palacios, Victoria et al., v. City of Los Angeles, et al., Case No.: 14-cv-09639-MJF (AJWx).

**Trial:**  February 27, 2019.  Russell Tenorio v. Brian Pitzer, et al., Case No.: 2012-CV-01295 LH/KBM.

**Trial:**  March 4, 2019.  Sofia Valenzuela (Jose Romero), et al, v. City of Long Beach, et al. Superior Court Case No. BC672993.

**Deposition:**  March 5, 2019.  Puente, an Arizona Nonprofit Corporation, et al, v. City of Phoenix, et al., Case No. 2:18-cv-02778-JJT.

**Deposition:**  March 8, 2019.  Lawrence, et al. v. Las Vegas Metropolitan Police Department, et al. (USDC Case No. 2:16-cv-03039-JCM-NJK)

**Deposition:**  March 12, 2019.  Estate of Omar Gonzalez, et al. vs . City of Los Angeles, Officer Eden Medina, et al., Case No.: BC660356.

**Deposition:**  March 14, 2019.  Jasmin Salcido, et al., vs. City of Whittier, et al., Case No.: 2:17-cv-8819-CBM (Asx).

**Deposition:**  March 19, 2019.  L.F., a minor, by and through Danisha Brown, and K.F., a minor, by and through Danisha Brown, vs. City of Stockton, et al.  Case No.: 2:17-cv-01648-KJM-DB.

**Deposition:**  March 25, 2019.  Kevin DeCarlo, et al. v. City of Vallejo, et al. Case No. 4:18-cv-00109 JSW.

**Deposition:**  April 5, 2019.  Jacob Gorsky, and Olesya Gorsky, v. Harris County, Texas, et al. Case No; 4:16-cv-2877

**Trial:**  April 11, 2019, &April 12, 2019.  Estate of Omar Gonzalez, et al. vs . City of Los Angeles, Officer Eden Medina, et al., Case No.: BC660356.

**Trial:**  April 15, 2019.  The State of Arizona vs. John David Rothrock, Case No.: CR2016-137374-001.

# EXHIBIT 2

Law Office of

# Kurt David Hermansen

Board Certified Criminal Law Specialist
California State Bar's Board of Legal Specialization

| | |
|---|---|
| 501 West Broadway, Suite 1510 | Tel 619.236.8300 |
| San Diego, California 92101 | Cell 619.436.8117 |
| www.KurtDavidHermansen.com | KDH@KurtDavidHermansen.com |

May 5, 2019

**To:**

Jan Stiglitz
Law Office of Jan Stigliz
225 Cedar Street
San Diego, CA 92101

Craig S. Benner
Benner Law Firm
411 Camino Del Rioe S. Suite 106
San Diego, CA 92108

Brett A. Boon
Boon Law
411 Camino Del Rioe S. Suite 106
San Diego, CA 92108

Alexander J. Simpson
225 Cedar St.
San Diego, CA 92101

**Re:   Luis Lorenzo Vargas Case No. 2:16-cv-08684-SVW-AFM**

As this report indicates, I've concluded that Defendants possessed — and should have disclosed to Vargas — compelling third-party-culpability evidence. And if such evidence had been disclosed, Vargas's wrongful conviction and consequent 16 years of incarceration would have been avoided. Given the initially weak eyewitness identifications, and Vargas's alibi evidence, no reasonable jury would have found Vargas guilty of the "signature" sexual assaults if they had been informed of the other similar assaults that Defendants did not attribute to Vargas. The Defendants' suppression of *Brady* evidence undeniably resulted in the conviction of an innocent man. Here, the term "suppression" refers to Defendants' failure to disclose evidence that was favorable to Vargas, despite their duty to so disclose.

1

# Table of Contents                                    Page

1.    My qualifications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

2.    No prior testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

3.    Compensation to be paid for the report . . . . . . . . . . . . . . . . . . . 11

4.    Documents reviewed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

5.    Analytical introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

6.    Call of the question and answer . . . . . . . . . . . . . . . . . . . . . . . . . . 15

7.    Teardrop Rapist's profile according to LAPD press releases. . . . 16

8.    Quijano was aware of similar sexual assaults . . . . . . . . . . . . . . . 16

9.    Smith was aware of similar sexual assaults . . . . . . . . . . . . . . . . 19

10.   *Brady* standard and applicable case law . . . . . . . . . . . . . . . . . . . 22

11.   Suppression . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

12.   Favorable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

14.   Right to present a complete defense. . . . . . . . . . . . . . . . . . . . . . . . 26

15.   Third-party-culpability evidence is material, powerfully so . . . . 29

16.   The relevance of third-party-culpability evidence here . . . . . . . . 29

17.   Material evidence was suppressed . . . . . . . . . . . . . . . . . . . . . . . . . 34

1.    **My qualifications.**

I am an attorney licensed to practice law in the State of California, in all the United States District Courts in California, in the United States Court of Appeals for the Ninth Circuit, and in the United States Supreme Court.

I've practiced law since 1993, almost exclusively criminal law.

My law degree is from Loyola Law School in Los Angeles (where I served as Chief Note and Comment Editor on the Loyola Law Review), and my undergraduate degree is from UCLA. While at Loyola Law School, I gained 230 hours of in-court experience as a certified law student in the Los Angeles County District Attorney's offices in the downtown criminal courts building and in the Compton courthouse.

After law school, I worked as a criminal research attorney for the San Diego Superior Court for about two years. There, I drafted bench memoranda and dispositive orders for criminal law and motion judges, the criminal presiding judge, and the criminal habeas corpus writs panel judges. I then worked for about five years for the United States District Court for the Southern District of California as a Pro Se (Habeas Corpus) Law Clerk. There, I provided judges and law clerks with advice on habeas corpus law and procedure; assisted chambers in managing over two hundred non-capital habeas corpus cases annually, from initial screening through final disposition; researched law; reviewed pleadings and transcripts; drafted orders for district judges and reports and recommendations for magistrate judges; advised judges during evidentiary hearings; and maintained an outline on habeas corpus law and procedure.

For my first seven years as a lawyer, I helped state and federal judges adjudicate habeas petitions, which necessitated reviewing thousands of pages of trial transcripts. After reviewing transcripts from hundreds of trials during those seven years, I became a criminal defense trial attorney and have been one for more than 18 years.

From December 2000 to December 2005, I worked as a trial attorney for Federal Defenders of San Diego, Inc., where I represented clients in federal court from initial court appearance through trial in the United States District Court for the Southern District of California, and on appeal in the Ninth Circuit Court of Appeals, against felony criminal charges involving mostly border-related crimes such as drug smuggling, people smuggling, and illegal entry after deportation. I also represented clients

3

charged with bank robbery, fraud, aggravated assault, narcotics distribution, firearms, multi-defendant conspiracies, and sex crimes.

In 2006, I obtained the reversal of my client's conviction because the Ninth Circuit agreed, in the published opinion in *United States v. Bahamonde*, 445 F.3d 1225 (9th Cir. 2006), that reversal was required where the government suppressed third-party-culpability evidence by preventing the case agent from testifying. I sought to show at trial that the case agent failed to investigate possible third-party culpability, but the trial court prevented me from cross-examining the case agent. *Id.* at 1232. In reversing the conviction, *Bahamonde* cited *United States v. Sager*, 227 F.3d 1138, 1145 (9th Cir. 2000). which noted "the legitimacy and importance of a defense of failure to investigate properly." *Bahamonde*, 445 F.3d at 1232. And *Bahamonde* cited *United States v. Crosby*, 75 F.3d 1343, 1349 (9th Cir. 1996), which noted the importance and legitimacy of a "third-party culpability defense." *Bahamonde*, 445 F.3d at 1232.

In December 2005, I opened the Law Office of Kurt David Hermansen. My firm focuses on state and federal criminal trials, appeals, and habeas corpus. I've been recognized as a Super Lawyer in criminal law in San Diego every year from 2008 to the present. In addition to representing criminal defendants at state and federal felony jury trials, I frequently argue before the Ninth Circuit Court of Appeals and the California Court of Appeal. I've also argued before the United States Supreme Court, the California Supreme Court, and en banc in the Ninth Circuit Court of Appeals.

I served as a Lawyer Representative to United States District Court for the Southern District of California (2009–12).

As a criminal defense attorney, I've briefed more than 100 state appeals, briefed more than 100 federal appeals, represented hundreds (if not thousands) of criminal defendants, and completed over 40 serious felony trials.

I've had numerous cased dismissed because of third-party culpability evidence or shoddy law enforcement investigation, in both state and federal court. Recent cases include: (a) Patrick Heard, 3:17cr1028-BTM, which was dismissed because evidence eventually showed that someone else possessed the gun; (b) Gerardo Alain Rodriguez-Gomez, 17cr2076-BAS, which had drug charges dismissed because of third-party culpability evidence; and (c) Joshua Zamora, SCD260442, which was dismissed once faulty eyewitness testimony was debunked pretrial.

4

Of the cases that went to trial (a) despite third-party-culpability evidence, (b) despite the case agent's lack of investigation regarding "speculative" third-party-culpability evidence, or (c) despite problems with eyewitness identifications, these were the results:

(1)   acquittal (Joaquin Corbala-Aldama, 3:03cr1926-JM);

(2)   guilty verdict, but stipulated reversal (because the trial court prevented me from cross-examining the case agent about his shoddy investigation of other possible suspects) and remand for lesser charge (Leandro Moya-Angulo, 3:03cr0070-BTM; 9th Cir. No. 03–50489);

(3)   guilty verdict, but reversed (because the trial court prevented me from cross-examining the case agent about his shoddy investigation of other possible suspects); dismissed on remand (Louis Joseph Bahamonde, 3:04cr0463-JAH; 9th Cir. No. 04–50618);

(4)   acquittal (Victor Manuel Perea, 3:04cr3185-WQH);

(5)   acquittal (Laura Zaragoza, 3:05cr2300-W);

(6)   acquittal (Sylvia Gallegos, 06cr2644-W);

(7)   acquittal (Bernard Lee Hamilton, Jr., SCD209853);

(8)   acquittal (Jose Garcia-Leal, 3:14cr1043-CAB);

(9)   dismissed seven days before trial at motion-to-compel-discovery hearing concerning faulty eyewitness identifications of another co-defendant who had a solid alibi (Joshua Zamora, SCD260442); and

(10)  hung jury; mistrial; dismissal with prejudice (Roberto Lopez Figueroa, 15cr3151-LAB).

In addition to the reversal I garnered in *Bahamonde*, discussed above, my opening brief in *United States v. Moya-Angulo*, 03-50489, resulted in a stipulated reversal because the trial judge would not let me impeach the case agent regarding his shoddy investigation of third-party-culpability evidence.

Beyond practicing law, I've also taught as an adjunct professor at California Western School of Law where I prepared LL.M. candidates for federal criminal trial practice, by training them on everything from writing and arguing motions to conducting two mock trials. The LL.M. program courses combined classroom instruction on substantive federal criminal law, trial skills training, and client representation in a federal

5

defender or Criminal Justice Act attorney's office. I have taught both the Trial Skills and Motion Practice courses.

I've been a Board Certified Criminal Law Specialist by the California State Bar Board of Legal Specialization since March 2009.

In 2018-2019, the California State Bar hired me to write 50 multiple choice questions for the Criminal Law Specialist examination.

I've served on the Criminal Law Advisory Commission to the California State Bar's Board of Legal Specialization. Chair (2014–15), Commissioner (Oct. 2011 to Oct. 2015). Commissioners review, grade, and develop the State Bar's criminal law specialist exam. They also review certified-specialist applications and recommend that the Board of Legal Specialization either approve or reject applications.

In April 2016, the Board of Directors of Federal Defenders of San Diego, Inc., and Appellate Defenders, Inc. awarded me the E. Stanley Conant Award for benefitting the San Diego legal community and demonstrating exceptional and unselfish devotion to protecting the rights of the indigent accused.

I served on the Criminal Law Section Executive Committee to the California State Bar. I was appointed by the State Bar Board of Trustees to serve from October 2, 2016 to September 15, 2019. The committee is comprised of an equal number of prosecutors and criminal defense attorneys.

My publications are as follows: **(1)** Kurt D. Hermansen, Editor, *Habeas Corpus: Scope of the Writ*, Ch. 9, in APPEALS AND WRITS IN CRIMINAL CASES (CEB University of California 2018 and 2019 forthcoming). **(2)** Kurt Hermansen, *1996 Habeas Corpus Reform*, *in* NEW DEVELOPMENTS IN THE FED. LAW OF HABEAS CORPUS (Matthew Bender, pub. for Fed. Jud. Ctr. Sept. 1996). **(3)** Kurt D. Hermansen, Comment, *Analyzing The Military's Justifications For Its Exclusionary Policy: Fifty Years Without A Rational Basis*, 26 LOY. L.A. L. REV. 151 (1992). Comment cited for its "particularly thorough and insightful analysis," *Meinhold v. United States Dep't of Defense*, 808 F. Supp. 1455 (C.D. Cal. 1993), and cited in over thirty law review articles.

My published opinions include the following:

*People v. Flores*, No. D073215, 2019 Cal. App. LEXIS 341, 2019 WL 1577743, ___ Cal. App. 5th ___ (April 12, 2019) (reversing attempted murder and assault weapons convictions and expanding *McCoy v. Louisiana*, 138 S.Ct. 1500 (2018) to the noncapital context)

*People v. Diaz*, 21 Cal. App. 5th 538 (2018) (conditionally remanding to the juvenile court for a transfer hearing, and for a hearing under *People v. Franklin* (2016) 63 Cal.4th 261).

*United States v. John Doe*, 870 F.3d 991, 1002 (9th Cir. 2017) (reversing the denial of Doe's motion to seal or strike docket-entry text mentioning § 5K1.1 where publicly revealing Doe's cooperation would endanger Doe's life and his family members' lives)

*United States v. Castillo-Mendez*, 868 F.3d 830, 839 (9th Cir. 2017) (reversing conviction; finding "the district court's legally erroneous and confusing supplemental instruction was prejudicial" in an attempted-illegal entry case, which requires proof of specific intent to enter free from official restraint)

*Taylor v. Cate*, (9th Cir.2014) 772 F.3d 842, 848 (9th Cir. 2014) (reversing conviction on federal habeas review; "Resentencing Taylor for a criminal role on which the jury was instructed, but did not find, violates his Sixth Amendment right to be tried and convicted by a jury.")

> *reh'g en banc granted by* 787 F.3d 1241 (9th Cir. 2015)

> *reversed by Taylor v. Beard*, 811 F.3d 326, 335 (9th Cir. 2016) (en banc) (finding no constitutional violation)

○ *Williams v. Cavazos*, 646 F.3d 626 (9th Cir. 2011) (reversing conviction on federal habeas — under a de novo review standard — because a holdout juror was dismissed mid-deliberations)

> *rev'd by Johnson v. Williams*, 133 S.Ct. 1088 (2013) (holding that an adjudication-on-the-merits presumption applies to reasoned opinions and finding the presumption was not rebutted)

> *granting cert. and remanding* 134 S.Ct. 2659, 573 U.S. ___ (2014) (remanding for merits determination under deferential § 2254(d) standard)

> 824 F.3d 814 (9th Cir. 2016) (finding relief unavailable on remand absent clearly established Supreme Court law regarding juror removal).

> *In re Tara S. Williams*, No. B280379 (Cal. Ct. App. Aug. 31, 2017) (reversing LWOP sentence by retroactively applying *People v. Banks*, 61 Cal.4th 788 (2015) and finding insufficient evidence of the reckless-indifference-to-human-life special circumstance where Williams was a robbery-felony-murder getaway driver, not a "major participant").

*In re Heard*, 223 Cal.App.4th 115 (2014) (reversing Heard's sentence of 23 years and 80 years to life and remanding for a resentencing hearing at which the court is to focus on the differences between adult offenders and juvenile offenders), *review granted*, 323 P.3d 1, *remanded*, 381 P.3d 221 (2016) (ordering Court of Appeal to remand to trial court to make a record of mitigating evidence associated with youth)

*People v. Bernal*, 222 Cal.App.4th 512, 520 (2013) (concluding "that forceful resistance of an officer by itself gives rise to a violation of section 69, even without proof that force was directed toward or used on any officer)

*People v. Woodall*, 216 Cal.App.4th 1221, 1238 (2013) (rejecting facial and as-applied constitutional challenges to the probation revocation procedures set forth in section 1203.2; "constru[ing] section 1203.2 to impliedly require a probable cause hearing if there is any significant delay between the probationer's arrest and a final revocation hearing.")

*People v. Perez*, 214 Cal.App.4th 49, 59–60 (2013) (upholding sixteen-year-old Perez's 30-years to life sentence for a one-strike sex offense and finding the sentence is not cruel or unusual)

*United States v. Rodriguez-Castro*, 641 F.3d 1189, 1193 (9th Cir. 2011) ("The district court did not clearly err in finding that Rodriguez did not meet his burden to prove he had a minor role in the offense, and it did not abuse its discretion in declining to award Rodriguez the minor-role reduction under § 3B1.2(b).")

*Roberts v. Marshall*, 627 F.3d 768, 773 (9th Cir. 2010) (finding that the district court did not abuse its discretion by denying Roberts an evidentiary hearing, and affirming the denial of equitable tolling of the AEDPA's statute of limitations despite some evidence of mental incompetence)

*Slovik v. Yates*, 556 F.3d 747, 755 (9th Cir. 2009) (reversing conviction [and life sentence] on federal habeas because "the trial court's limit on Slovik's ability to cross-examine Featherstone had a substantial and injurious effect or influence in determining the jury's verdict.")

*People v. Hernandez*, 180 Cal.App.4th 337, 345–46, 348–50 (2009) (acknowledging that appellate courts may review any instruction given, refused or modified, even where no objection was made below, but finding that *Mayberry* and unanimity instructions were unwarranted)

*In re Jose C.*, 45 Cal.4th 534, 547–50 (Cal. 2009) (finding that juvenile wardship proceedings that entail adjudication of whether a federal criminal statute has been violated are not expressly preempted by 18 U.S.C. § 3231; finding that 8 U.S.C. § 1329 poses no jurisdictional preemption; finding that 8 U.S.C. § 1324 does not preempt states from substantively regulating immigration matters)

*In re Angel R.*, 163 Cal.App.4th 905, 911–15 (2008) (finding that stickers are "marking substances" (i.e., graffiti tools) proscribed by section 594.2(c)(2); construing the plain language of section 654k, which defines when a knife becomes a proscribed switchblade)

*Woods v. Carey*, 525 F.3d 886, 890 (9th Cir. 2008) (reversing district court's dismissal of Woods's petition for being barred as successive under 28 U.S.C. § 2244(b) because the district court should have construed Woods's pro se petition as a motion to amend the habeas petition that was still pending before the district court when the new petition was filed)

*Harrison v. Ollison*, 519 F.3d 952, 958 (9th Cir. 2008) (concluding that appellate courts cannot require that a habeas petitioner obtain a certificate of appealability following the denial of a petition under 28 U.S.C. § 2241 where such a petition qualifies for § 2255's escape hatch)

*Estrada v. Scribner*, 512 F.3d 1227, 1237 (9th Cir. 2008) ("Although 'having to ignore the most direct evidence of prejudice — [i.e., the jurors'] testimony that [a juror] relied on the extrinsic information — lends an 'Alice in Wonderland' quality to the discussion … the weight of authority and sound policy reasons support this view [of Fed. R. Evid. 606(b)].")

*United States v. Zepeda-Martinez*, 470 F.3d 909 (9th Cir. 2006) (concluding "that the *Apprendi* error committed by the district court was harmless" under *Neder v. United States*, 527 U.S. 1 (1999))

> *United States v. Bahamonde*, 445 F.3d 1225 (9th Cir. 2006) (reversing conviction; finding that 6 C.F.R. § 545(a), "as applied in this criminal prosecution, violates due process by failing to provide reciprocal discovery" as required by *Wardius v. Oregon*, 412 U.S. 470, 472 (1973); finding that the district court failed to weigh countervailing interests before excluding agent Rodmel's testimony; finding that Bahamonde "need not reveal the nature of his anticipated defense testimony [from agent Rodmel] in order to challenge the regulation that improperly requires him to reveal such testimony.")

> *United States v. Mays*, 430 F.3d 963, 965–60 (9th Cir. 2005) (finding that district courts have jurisdiction to impose post-judgment garnishment orders on criminal defendants even after supervised release is terminated if the defendant fails to pay a judgment of restitution imposed by the court)

My relevant, recent continuing legal education presentations include:

○— (Jan. 26, 2019) Joining the Brady Bunch: Getting What You Need, by Kurt Hermansen and Bridget Kennedy. Community Defenders, Inc., and University of San Diego School of Law.

○— (Aug. 28, 2018) Coached and trained military Judge Advocates at the San Diego Marine Corps Recruit Depot on how to litigate sexual assault cases; the training included plenary lectures and small group learn-by-doing breakout sessions.

## 2.   No prior testimony.

Plaintiff has retained me as an expert consultant based on my training, experience, and qualifications. Although I've been retained to assist other attorneys with criminal cases, I've not served as an expert in a civil case, have never been deposed, and have never testified as an expert.

## 3.   Compensation to be paid for the report.

My hourly fee for preparing this report is $250. I worked a total of 6.5 compensable hours on this report. My total fee of $1,625 is not

contingent whatsoever on rendering a specific opinion. Rather, my fee is for my time, regardless of the opinions I render.

**4.    Documents reviewed.**

I've reviewed at least the following relevant documents, which serve as the basis for my opinion as stated in this declaration:

a.    The 123-page transcript of Defendant Detective Scott Smith's February 13, 2018 deposition.

b.    Relevant documents from Luis Lorenzo Vargas's conviction in Los Angeles Superior Court Case No. BA171718.

c.    The closing arguments from the trial in *People v. Vargas*, Case No. BA171718.

d.    The state appellate opinion in *People v. Vargas*, Case No. B133822.

e.    The March 15, 2016 Petition for Writ of Habeas Corpus filed in the Los Angeles Superior Court, which successfully challenged Vargas's conviction in BA171718.

f.    Exhibits A-F from the March 15, 2016 habeas petition.

g.    A draft of the proposed Second Amended Complaint in *Vargas v. City of Los Angeles, et al.*, in the U.S. District Court for the Central District of California, Western Division, Case No. 16-cv-8684.

h.    Various relevant pleadings and orders in this case, 16-cv-8684.

i.    VARGAS-LAPD discovery pages 1-399 produced in 16-cv-8684, which include documents from the "Serial Rapist Book" and documents regarding the Teardrop Rapist.[1]

j.    A rough draft of the transcript for Defendant Quijana's October 18, 2017 Deposition Testimony.

k.    The docket and pleadings in *O'Connell, et al. v. J.D. Smith, et al.*, (U.S. Dist. Ct. Central Dist. Cal. Case No. 13-cv-1905) in which Los Angeles County agreed to pay a $15 million settlement based on *Brady* violations, *Monell* liability, fabricated evidence, and alleged suggestive eyewitness identifications.

---

[1]    Specifics from the discovery documents are not recounted here because a watermark ("Confidential Material Subject to Protective Order") on the discovery documents indicates they are under a protective order.

l.   The International Association of Chiefs of Police's Model Policy on *Brady* Disclosure Requirements.

m.   The International Association of Chiefs of Police National Law Enforcement Policy Center's Concepts and Issues Paper regarding *Brady* Disclosure Requirements (August 2008).

n.   Various LAPD press releases and media interviews regarding the Teardrop Rapist, who has terrorized women in Los Angeles from February 1996 to 2012.

## 5.   Analytical introduction.

From my courtroom and appellate experience, from trial advocacy books and courses, from teaching trial advocacy, and from observing and talking with stellar trial attorney colleagues, I've learned that what convinces jurors to vote a certain way usually comes down to one thing — a compelling narrative; and the side with the most compelling narrative usually wins.

Crucial at Vargas's trial was the prosecutor's false but compelling narrative: the rapist had a signature modus operandi that was so specific only one person (i.e., Vargas) could have committed all three sexual assaults.

Without adequate discovery of similar sexual assaults, defense counsel could not counter that compelling narrative.

DNA evidence has since exonerated Vargas and proven that Quijano's, Smith's, and the prosecutor's theory was wrong, created from too-small a sample size based on selective criteria.

Any similar sexual assaults known to the Smith-Quijano partnership team and other Defendants should have been disclosed to the prosecutor and Vargas.

The evidence at Vargas's trial did not point unerringly to one assailant because Karen P. did not see a teardrop tattoo.

If the jury had been presented with evidence regarding other similar sexual assaults, in conjunction with the victims' inconsistent descriptions of their assailants, the police-prosecution's theory would have been debunked or at least severely undermined. There is a reasonable probability there would have been a hung jury or an acquittal.

The sexual assaults in discovery each contain elements of the Teardrop Rapist's signature. It is logical to infer that a serial rapist might not follow the exact same modus operandi every time. If the other similar

13

sexual assaults had been disclosed, Vargas's defense attorney could have cross-examined Quijano about the similarities and differences and thereby debunked the prosecution's narrow theory.

Because the prosecutor was able to narrowly focus on three very similar assaults, the jury was only presented with a narrow, unrealistic universe of facts.

Rather than seeing only three of a kind, Vargas should have been given access to all the similar sexual assaults known to the Smith-Quijano partnership team and other Defendants.

Third-party-culpability evidence does not have to point unerringly to a specific person to raise reasonable doubts in a juror's minds. In fact, third-party-culpability evidence can point to a "mystery man" whom the police should have investigated. I know many attorneys and defendants who have received acquittals or hung juries after presenting a mystery-man defense.

I'm certainly not the only attorney who has obtained six acquittals based on a mystery-man theory. I know many attorneys who have achieved similar results. In some cases, we presented evidence of an uncle, a son, a friend, or a lookalike who might have committed the crime. For other acquittals, we presented a theory that a stranger was responsible. We never proved the mystery man was responsible. But that was not the defense's burden. In each acquittal, however, we showed reasonable doubt. When interviewed after each acquittal, jurors expressly referenced the beyond-a-reasonable doubt burden as the reason they voted not guilty.

The lesson I've drawn from my trial experiences and from discussing trials with colleagues and from studying real-world trial advocacy, is that a compelling narrative is crucial to winning at trial. And the corollary is also true. A compelling defense narrative is usually needed for reasonable doubt to combat a prosecution's compelling narrative.

But at Vargas's trial he was deprived of presenting evidence to show the fallacy underlying the police-prosecutor's compelling narrative.

Because the police-prosecution team allegedly did not disclose evidence regarding similar sexual assaults, Vargas could not show the jury the flaws in the police-prosecution theory.

14

6.     **Call of the question and answer.**

**Qustion.** I've been retained as an expert by Plaintiff and asked to issue an opinion regarding whether Defendants Monica Quijano and Scott Smith failed to comply with their obligations under the *Brady v. Maryland* 373 U.S. 83 (1963) line of case.

**Conclusion.** If Quijano and Smith were aware of, and failed to disclose, the Serial Rapist Book or Teardrop-Rapist evidence to Vargas's prosecutor, Quijano and Smith violated their duties under *Brady* and its progeny.

Quijano and Smith should have disclosed to Vargas's prosecutor any evidence of similar sexual assaults when Quijano and Smith brought three sexual assaults to the prosecutor, which they grouped together because of factual similarities and victim identifications, despite a lack of physical evidence tying Vargas to the three "signature" sexual assaults.

Assuming Quijano and Smith failed to give Vargas's prosecutor the Serial Rapist Book, that failure was a *Brady* violation. Quijano helped Smith create the Serial Rapist Book, possessed it at trial, and had access to it at the MAC[2/] Unit's sexual assault "table" at LAPD's 77th Division.

And to the extent Quijano and Smith also knew of Teardrop-Rapist evidence, failing to disclose that evidence to the prosecution also violated *Brady*.

With the contents of the Serial Rapist Book or evidence of other Teardrop Rapist assaults, defense counsel could have presented a compelling narrative to debunk the police-prosecutor's narrow modus-operandi theory, which was based on cherry picking similar assaults even though similar sexual assaults preceded and followed Vargas's arrest but did not fit a narrowly constructed signature.

Vargas's jury was willing to convict Vargas by overlooking the fact that victim Karen P. did not see a teardrop tattoo. But if the jury had also heard about other teardrop sexual assaults that occurred while Vargas was in custody — that Smith-Quijano did not attribute to Vargas because they did not fit their selective criteria — it is my conclusion that reasonable doubt would have resulted in a hung jury or an acquittal.

---

[2/]     *See* Feb. 13, 2018 Smith Deposition (hereafter Smith Depo.) at 15–16 (stating that "MAC" stands for the Major Assault Crimes unit, which included a sexual assault table staffed by detective partners Smith, Quijano, and others).

## 7.    Teardrop Rapist's profile according to LAPD press releases.

LAPD has identified at least 35–47 similar incidents of sexual assault that occurred between February 1996 and 2012. Eleven of the sexual assaults have been linked with a DNA match, and the remaining 25–36 assaults have been linked through the suspect's distinct modus operandi.

All of the crimes occurred in the early morning hours **between 5 a.m. and 8 a.m.** The suspect typically walked up to each victim and engaged them in conversation before producing a **knife** or **firearm**. He would then **walk them** to a secluded area and sexually assault them. The victims ranged from 14 to 41 years of age.

The Teardrop Rapist is a male Hispanic, and since 1996 he's been described as 27-to-40-years old, with brown eyes and brown hair. He stands between 5 feet 2 inches and 6 feet tall and weighs between 130 and 200 pounds. He's been described as having a light complexion, a possible teardrop tattoo(s) or scar(s) below one of his eyes and clean shaven or with a mustache. He may also have attempted to remove his teardrop tattoo. He's been seen wearing a beanie, a baseball cap, a hooded sweatshirt, and bandana.

## 8.    Quijano was aware of similar sexual assaults.

At least seventeen sexual assaults attributed to the Teardrop Rapist occurred before Vargas's arrest, with the remaining sexual assaults (about 30) occurring after Vargas's arrest.

Quijano testified at Vargas's trial.[3] According to Quijano's October 18, 2017 deposition testimony, Smith was her senior partner in 1998, and they were each equally responsible for the Vargas case.[4] Quijano was an LAPD Detective I, Scott Smith was a Detective II, and Richard McCauley (their supervisor) was a Detective III.[5]

According to Quijano, she or Smith initially created the Serial Rapist Book.[6] (According to Smith, he created the Serial Rapist Book.)[7]

---

[3]    Oct. 18, 2017 Quijano Deposition (rough draft) at 40 (hereafter Quijano Depo.).

[4]    Quijano Depo. at 41.

[5]    *Id.* at 8, 12, 13.

[6]    *Id.* at 19.

[7]    Smith Depo. at 42–43, 48, 50, 51, 53, .

The assigned detectives on the Serial Rapist Book are listed as S. Smith and M. Quijano.[8]

Smith's handwriting appears mostly on pages 15–22 and on various other pages of the Serial Rapist Book.[9]

Quijano's handwriting also appears in the Serial Rapist Book on various pages.[10]

Smith and Quijano would have discussed organizing the notebook in a three-ring binder with dividers.[11] It has a table of contents.[12]

If reports were part of the investigation, they would have been included in the Serial Rapist Book.[13]

A Crime Analysis Detail (CAD) report might have been included in the book.[14] A CAD report can, for example, list specific crimes committed in a certain area.[15]

A Penal Code section 290 sex-offender-registration report from the parole department was probably included in the Serial Rapist Book.[16]

Unless Quijano was using the Serial Rapist Book for court purposes, the book was maintained at the 77th Division.[17]

Quijano and Smith worked the Teresa R. case together.[18]

Any reports Quijano wrote she shared with Smith.[19]

Although Smith probably created the Serial Rapist Book, Quijano provided documents for the book.[20]

------

[8]    Quijano Depo. at 27.

[9]    *Id.* at 28, 36.

[10]    *Id.* at 28, 35–36.

[11]    *Id.* at 28, 30.

[12]    *Id.* at 44.

[13]    *Id.* at 69.

[14]    *Id.* at 71.

[15]    *Id.* at 73.

[16]    *Id.* at 72.

[17]    *Id.* at 62-63.

[18]    *Id.* at 29.

[19]    *Id.* at 29.

[20]    *Id.* at 33.

McCauley's name appears in the book on documents that indicate "similar in nature."[21]

Two sexual assaults from Newton Division ended up in the Serial Rapist Book even though Quijano and Smith were assigned to the 77th Division.[22] They were included in the book because they "believe[d] they were all related."[23] Smith and Quijano had gone to Newton Division to look for sex registrants and gang books.[24]

Anything that would further the investigation could go in the Serial Rapist Book. If a report discussed an assailant who matched the suspect's description, that could go in the book.[25] If the manner of the assault (modus operandi) matched, that information could go in the book.[26] Other criteria for including information in the book included: (1) the crime's location; (2) the nature of the crime; (3) race; (4) identifying marks; (5) height and weight; and (6) things the assailant said or did.[27]

Mario Contreras was identified as a suspect in the book.[28]

Quijano used the Serial Rapist Book for Vargas's trial.[29] At the time of trial, Quijano had the Serial Rapist Book in a three-ring binder with everything in it.[30]

VARGAS-LAPD discovery pages 15–28 were part of the Serial Rapist Book,[31] but it might not be possible to reconstruct the Serial Rapist Book today.

Quijano attended a live line-up procedure on November 4, 1998, in which Vargas was in position #1. At that live line-up, victim Teresa R. indicated on her statement form: "It looks like Number 1 but I don't know

---

[21]    *Id.* at 65.

[22]    *Id.* at 37.

[23]    *Id.* at 37.

[24]    *Id.* at 38.

[25]    *Id.* at 46.

[26]    *Id.* at 46.

[27]    *Id.* at 62–63.

[28]    *Id.* at 47.

[29]    *Id.* at 31.

[30]    *Id.* at 31.

[31]    *Id.* at 31.

18

a (sic) couldn't really tell because the other one had 2 drops on his left eye."

## 9.   Smith was aware of similar sexual assaults.

Smith's deposition testimony mirrors Quijano's in many respects.

When Smith worked with Quijano in the MAC unit, assigned to the sexual assault table, Smith (a Detective II) was partners with Monica Quijano (whom he calls "Monica" throughout his deposition testimony). Because Quijano was a Detective I at the time, Smith was her superior officer.[32] But Smith viewed her as his partner with whom he collaborated on the Vargas prosecution.[33] They investigated "cases together as part-ners."[34] Their decisions were "mutual."[35]

After noting similarities among sexual assaults, Smith created a Serial Rapist Book, which included reports and information that matched identified modus operandi factors, crime locations, suspect descriptions, and things of that nature.[36] Smith created the Serial Rapist Book to keep the investigatory material together and organized with tabs.[37] Smith and Quijano collectively decided which materials to include in the book.[38] McCauley was not involved in decisions about what to include in the Serial Rapist Book.[39]

The Serial-Rapist-Book investigation was assigned to Smith and Quijano as partners.[40]

At the 77th Division, Quijano investigated two of the three sexual assaults for which Vargas was wrongly convicted, and the third assault Detective Tamez investigated at the Newton Division.[41]

---

[32]     Smith Depo. at 20, 24.

[33]     *Id.* at 25–26.

[34]     *Id.* at 26.

[35]     *Id.* at 27.

[36]     *Id.* at 50.

[37]     *Id.* at 68.

[38]     *Id.* at 72.

[39]     *Id.*

[40]     *Id.* at 39.

[41]     *Id.* at 78.

Apparently unconcerned about Vargas's alibi defense and the initially weak victim identifications, once Vargas was arrested, Smith did not continue to run queries for the Teardrop Rapist criteria despite similar, unsolved assaults in Smith's Serial Rapist Book.[42/] The detectives had even "eliminated" Vargas as a suspect "in some of those other DR numbers" in the Serial Rapist Book.[43/] Yet, Vargas remained on the hook for trial. And Smith's "investigation" "pretty much" ended "once the case was filed" against Vargas.[44/]

Because of the apparent serial nature of the sexual assaults, the Serial Rapist Book investigation was a "Category 1," (i.e., top priority) investigation. That meant Smith and Quijano would have kept their supervisor, McCauley, apprised throughout the investigation.[45/]

Although Smith and Quijano collectively decided to include numerous sexual assault DR numbers that reference teardrop tattoos in the Serial Rapist Book, Vargas was not arrested, charged, or convicted for those sexual assaults.[46/]

At LAPD bates number 20, Smith noted that the victim reiterated that her assailant had "two teardrops."[47/] On the next page, Smith noted that for two crimes the suspects described the assailant as having two teardrops under the left eye.[48/] Smith acknowledged ordering three sexual assault reports that listed the suspect as a male Hispanic with a teardrop tattoo. Two reports were from the Newton Division, and one report was from the Rampart Division.[49/] Smith and Quijano reviewed and included reports that listed the suspect with one, two, or no teardrop tattoos.[50/]

At LAPD bates number 21, from the Serial Rapist Book, a report describes a sexual assault by a suspect with a teardrop tattoo.[51/]

---

[42/]   *Id.* at 32.

[43/]   *Id.* at 79. "DR" stands for District Reporting. *Id.* at 98–99.

[44/]   *Id.* at 98.

[45/]   *Id.* at 38–39.

[46/]   *Id.* at 80.

[47/]   *Id.* at 55.

[48/]   *Id.* at 56.

[49/]   *Id.* at 57.

[50/]   *Id.* at 58.

[51/]   *Id.* at 51–52.

At LAPD bates number 22, a report describes a sexual assault by a suspect with a teardrop tattoo, which Smith included in the Serial Rapist Book.[52]

At LAPD bates number 26, a report describes a sexual assault by a suspect with a teardrop tattoo, which Smith included in the Serial Rapist Book.[53] Page 26 also accurately notes, according to Smith, that Smith and Quijano both attended a life lineup on November 4, 1998, which was after Quijano had left the 77th Division.[54] And although Smith left the 77th Division in March of 1999, the last entry in the Serial Rapist Book — dated May 19, 1999 — was Smith's entry.[55] That entry shows that Smith was continuing to work with the prosecutor at least up to May 19, 1999, by providing lineup photos, crime reports, and six-pack photos based on the contents and the investigation conducted within the Serial Rapist Book.[56]

Smith, Quijano, and McCauley collectively decided to bring selective sexual assaults from the Serial Rapist Book to the district attorney for charges against Vargas.[57] Although Smith and Quijano did not need McCauley's approval before arresting Vargas, they would not have arrested Vargas without letting McCauley know.[58]

Notably, if Smith had known of a February 13, 1999 sexual assault within the 77th Division involving a suspect with two teardrop tattoos, Smith would have included it in the Serial Rapist Book because the suspect was a male Hispanic and the victim was a female Hispanic attacked in the early morning hours.[59] So, although that assault involved a handgun, Smith would have included it in the book.[60] Although that assault occurred while Smith was assigned to the 77th Division MAC Unit's sexual assault table, the investigating detective (Al Contreras) ap-

---

[52]     *Id.* at 53.

[53]     *Id.* at 54, 62.

[54]     *Id.* at 63.

[55]     *Id.* at 64, 84.

[56]     *Id.* at 65.

[57]     *Id.* at 61.

[58]     *Id.* at 62.

[59]     *Id.* at 89, 95.

[60]     *Id.*

parently failed to bring it to Smith's attention, despite a follow-up investigation DR dated March 25, 1999.[61] Smith "would like to have seen" the reports and flyer concerning the February 13, 1999 assault "even though it's after the date of [Vargas's] arrest."[62] "[I]f it was brought to [Smith's] attention after Mr. Vargas was arrested, that might bring into question: Did, in fact, Mr. Vargas do these crimes or could it have been this [other] individual?"[63] Smith "would definitely have taken a look at it as it relates to Mr. Vargas, taken it to [his] DIII and then notified the DA's Office, yes."[64]

In addition, the sexual assault that occurred on May 15, 1999, which was investigated in the 77th Division involved a suspect description of a teardrop tattoo by the right eye.[65] Like the February 13, 1999 sexual assault, the May 15, 1999 sexual assault should have been brought to Smith's attention given the Category 1 importance of the Serial Rapist Book's contents, and the timing and circumstances of the assault.[66] Like the February 13, 1999 assault, the May 15, 1999 assault would have called into question the validity of Varga's arrest and prosecution.[67]

## 10.   *Brady* standard and applicable case law.

Since 1963, *Brady v. Maryland* 373 U.S. 83 (1963) has clearly established the requirement that police and prosecutors must disclosure to the accused any evidence that is favorable to the defense concerning guilt or punishment. And the Supreme Court has found that the state has a continuing obligation to disclose *Brady* violations that have already occurred. *See, generally, e.g.*, *Banks v. Dretke*, 540 U.S. 668, 675–76 (2004); *see also Tennison v. City & Cty of San Francisco*, 570 F.3d 1078 (9th Cir. 2009). *But see DA's Office v. Osborne*, 557 U.S. 52, 68 (2009).

Until a criminal conviction is final, the state has a duty under *Brady* to produce exculpatory evidence to a defendant. And state law and ethical

---

[61]     *Id.* at 90–98.

[62]     *Id.* at 101–102.

[63]     *Id.* at 103.

[64]     *Id.* at 104.

[65]     *Id.* at 108–109.

[66]     *Id.* at 109–110.

[67]     *Id.* at 110.

duties may compel prosecutors to disclose exculpatory evidence any time they learn of it, even after a conviction is final. *Runningeagle v. Ryan*, 686 F.3d 758, 772 n.6 (9th Cir. 2012).

After a conviction, the prosecutor is bound by the ethics of her office to inform the appropriate authority of information that casts doubt upon the conviction's correctness. *Imbler v. Pachtman*, 424 U.S. 409, 427 n.25 (1976); *People v. Gonzalez*, 51 Cal.3d 1179, 1261 (citing Cal. Rules of Prof. Conduct, rule 5-220; ABA Model Code Prof. Responsibility, DR 7–103(B), EC 7–13; ABA Model Rules Prof. Conduct, rule 3.8(d).)

*Brady* disclosure requirements extend to the police. *United States v. Blanco*, 392 F.3d 382, 388 (9th Cir. 2004); *Youngblood v. West Virginia*, 547 U.S. 867, 869–70 (2006).

To prevail on a *Brady*-disclosure-violation claim, Vargas must show (a) defendant suppressed materials (b) that were favorable to Vargas and (c) that suppression prejudiced Vargas. *See Comstock v. Humphries*, 786 F.3d 701, 708 (9th Cir. 2015).

## 11.   Suppression.

Evidence is "suppressed" where the responsible state actor knows or possesses material information and fails to disclose it to the criminal defendant. *Comstock v. Humphries*, 786 F.3d 701, 709 (9th Cir. 2015).

To satisfy *Brady* obligations, responsible state actors "must disclose evidence known to the prosecutor as well as evidence 'known only to the police investigators and not to the prosecutor.'" *Id.* (quoting *Stickler v. Greene*, 527 U.S. 263, 281–82 (1999)).

In 1995, about three years before Vargas's arrest, the Supreme Court made crystal clear in *Kyles v. Whitley*, 514 U.S. 419, 438 (1995) that responsible state actors must turn over favorable information to the defense even when it is the police — and not the prosecutor — who have failed to disclose the favorable information. *See id.* at 437–41.

Notably, Vargas is not burdened with a "diligence" requirement to make out a successful *Brady* claim. *See, e.g.*, *Amado v. Gonzalez*, 758 F.3d 1119, 1135 (9th Cir. 2014). In other words, *Brady* obligations are "not excused by a [criminal] defense counsel's failure to exercise diligence" regarding "suppressed evidence." *Id.* A witness's availability to the defense does not remove the police-prosecution's duty to disclose exculpatory or impeachment evidence. *See Benn v. Lambert*, 283 F.3d 1040 1061–62 (9th

Cir. 2002). A contrary rule would essentially require the police-prosecution team to turn over only the names of witnesses, and nothing else so long as the defense had the opportunity to interview those witnesses. Such a rule "is not tenable in a system constitutionally bound to accord defendants due process." *Banks v. Dretke*, 540 U.S. 668, 696 (2004).

Assuming the allegations concerning suppression (i.e., non-disclosure) in the Second Amended Complaint are true, any rational person would conclude that *Brady* information was suppressed.

In part, the Second Amended Complaint alleges:

—  LAPD Officers Quijano, Smith, and McCauley connected eight other sexual assaults to the assaults of Edith G. and Teresa R., but failed to disclose those connections even though they had combined the assaults into a "Serial Rapist Book." Vargas's arrest was July 21, 1998, for three sexual assaults that occurred from February 3, 1998, through June 6, 1998. The Serial Rapist Book contains eight similar sexual assaults that occurred from July 29, 1996, through February 5, 1998.

—  Assuming the Serial Rapist Book was not disclosed to Vargas, defendants suppressed it.

—  LAPD Officers Quijano, Smith, McCauley, and Tamez concluded that the assaults on Karen P., Teresa R., and Edith G. were connected as described in paragraph 69 of the Second Amended Complaint. Given that conclusion, the Serial Rapist Book should have been disclosed to the defense, but Vargas alleges it was not.[68]

—  According to the Second Amended Complaint, 20 other sexual assaults were committed in the area and investigated by LAPD detectives, but investigators did not disclose the connections to Vargas. Ten Teardrop Rapist assaults were committed before Vargas was convicted, and ten other similar LAPD-investigated sexual assaults have now been turned over as part of Vargas's § 1983 lawsuit. (Specifics from the discovery documents are not recounted here because a watermark on the discovery documents indicates they are under a protective order.)

---

[68]  Second Amended Complaint ¶¶ 60–61.

Assuming the table that appears at page 19 of the Second Amended Complaint is accurate, it represents a compelling *Brady* violation chronology.

First, the "Serial Rapist Book" was possessed by Quijano (and the LAPD in general) before Vargas was arrested, and it should have been disclosed given its obvious exculpatory nature.

Second, the Teardrop Rapist evidence was possessed by the LAPD (a) before Vargas's arrest, (b) after Varga's arrest, but before his conviction, (c) after his conviction but before it became final, and (d) after his conviction became final, but before his stipulated (actual innocence) exoneration.[69]

In sum, assuming the the Second Amended Complaint's allegations concerning suppression are true, I conclude that the *Brady* information was suppressed.

## 12. **Favorable.**

There can be no meaningful dispute that the third-party-culpability *Brady* materials should have been produced to Vargas because they would have been favorable to the defense.

Based on the third-party-culpability nature of almost 400 pages of VARGAS-LAPD discovery, I conclude that the materials would have been favorable to the defense and that they potentially represent the tip of the iceberg.

The defense would have investigated and requested discovery to see who was suspected or convicted of those sexual assaults. Yet discovery regarding those assaults was allegedly not produced to Vargas, until this lawsuit.[70]

## 13. **Material.**

Information is material if admitting it at trial would have created a "reasonable probability of a different result." *Kyles*, 514 U.S. at 434.

That reasonable probability is shown when the suppressed evidence "undermines confidence in the outcome of the trial.'" *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)).

---

[69]   Second Amended Complaint ¶¶ 82–91.

[70]   *Id.*

"Defendants need only show 'that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *United States v. Jernigan*, 492 F.3d 1050, 1054 n.7 (9th Cir. 2007) (en banc) (quoting *Kyles*, 514 U.S. at 435).

Prejudice results if just one juror's decision might have changed. In 2009, in *Cone v. Bell*, the Supreme Court "remand[ed] the case to the District Court to determine in the first instance whether there is a reasonable probability that the withheld evidence would have altered *at least one juror's assessment* of the appropriate penalty for Cone's crimes." 556 U.S. 449, 453 (2009) (emphasis added). *Cone v. Bell* involved the death penalty and garnered remand because the lower courts failed to "fully consider[ ] whether the suppressed evidence [of Bell's drug use] might have persuaded *one or more jurors* that Cone's drug addiction — especially if attributable to honorable service of his country in Vietnam — was sufficiently serious to justify a decision to imprison him for life rather than sentence him to death." *Id.* at 475.

The Ninth Circuit follows *Cone v. Bell*. For example, in 2009, in *United States v. Price*, 566 F.3d 900, 914 (9th Cir. 2009) the Ninth Circuit reversed based on *Brady* error. Quoting *Cone v. Bell*, *Price* found that "[h]ad the evidence of Phillips' past conduct been disclosed, 'there is a reasonable probability that the withheld evidence would have altered at least one juror's assessment' regarding Price's possession of the gun." *Id.*

Thus, "reasonable probability" is a low bar. "A defendant need not show that she 'would more likely than not have received a different verdict with the [suppressed] evidence." *Id.* at 1054 (quoting *Kyles*, 514 U.S. at 434). The suppressed evidence must be analyzed 'in the context of the entire record." *United States v. Agurs*, 427 U.S. 97, 112 (1976).

## 14.   Right to present a complete defense.

The Fifth and Sixth Amendments provide criminal defendants with the constitutional right to present witnesses and evidence. Moreover, evidence rules "may not be applied mechanistically" to preclude the defense from compelling a case agent's testimony at trial regarding his or her shoddy, rush-to-judgment, jump-to-conclusions investigation.

The Sixth Amendment's Compulsory Process Clause embodies a substantive right to present criminal defense evidence to a jury. *Pennsylvania v. Ritchie,* 480 U.S. 39, 56 (1987).

26

"The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies." *Washington v. Texas,* 388 U.S. 14, 19 (1967). A criminal defendant's "compulsory process right is paramount to all objections and arguments urged against it, and cannot be burdened in its exercise by unauthorized and unreasonable conditions precedent." Milton Hirsch *"The Voice of Adjuration": The Sixth Amendment Right to Compulsory Process Fifty Years After* United States ex Rel. Touhy v. Ragen, 30 Fla. St. U. L. Rev. 81, 111 (2002).

Criminal defendants have "the right to put before a jury evidence that might influence the determination of guilt." *Ritchie*, 480 U.S. at 56.

"The defendant's right to compulsory process is itself designed to vindicate the principle that the 'ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts.'" *Taylor v. Illinois*, 484 U.S. 400, 411 (1988) (quoting *United States v. Nixon*, 418 U.S. 683, 709 (1974) (unanimous).

The Due Process Clause, in turn, creates a substantive limitation on excluding criminal defense evidence based on the plain terms of the Compulsory Process Clause. *See Chambers v. Mississippi*, 410 U.S. 284, 298–302 (1973); *Rock v. Arkansas,* 483 U.S. 44, 51 (1987); *Crane v. Kentucky,* 476 U.S. 683, 690-91 (1986).

Due process requires "'a meaningful opportunity to present a complete defense.'" *Crane*, 476 U.S. at 690-91 (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). *See also Trombetta*, 467 U.S. at 485 (concluding that fundamental fairness requires "that criminal defendants be afforded a meaningful opportunity to present a complete defense").

Together, the guarantees of the Confrontation, Compulsory Process, and Due Process Clauses require that courts conduct a searching substantive inquiry whenever the government seeks to exclude criminal defense evidence because the exclusion of such evidence undermines the central truth-seeking function of our criminal justice system. *See United States v. Nixon*, 418 U.S. 683, 709 (1974).

"It is the manifest duty of the courts to vindicate those guarantees, and to accomplish that it is essential that all relevant and admissible evidence be produced." *Id.* at 711.

27

Excluding reliable defense evidence distorts the record, which risks misleading the jury into convicting an innocent person. *See Buford v. State*, 282 S.E.2d 134 (1981)  (reversing the conviction where the state successfully quashed a subpoena duces tecum based on a violation of 28 C.F.R. § 16.21).

As Justice Black explained, a defendant's "right to his day in court [is] basic in our system of jurisprudence [and includes] . . . a right . . . to offer testimony . . . ." *In re Oliver*, 333 U.S. 257, 273 (1948). *See also Nixon*, 418 U.S. at 709 (stating that the availability of compulsory process is "imperative to the function of courts"); *Rock*, 483 U.S. at 55-56 (concluding that a court can constitutionally enforce a rule restricting the right to present criminal defense evidence only if the rule accommodates other legitimate interests in the criminal trial process and is not arbitrary or disproportionate to the purposes it is designed to serve); *Chambers*, 410 U.S. at 294 (noting that the right to call defense witnesses has "long been recognized as essential to due process"); *Webb v. Texas*, 409 U.S. 95, 98 (1972) (per curium) (reversing the conviction where the trial judge's admonition about perjury dissuaded a defense witness from testifying in violation of the right to present a defense and offer witness testimony); *Jencks v. United States*, 353 U.S. 657, 671 (1957) ("It is unconscionable to allow [the government] to undertake prosecution and then invoke it's governmental privileges to deprive the accused of anything which might be material to his defense . . .").

Under the Supreme Court's decision in *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986) a defendant's constitutional rights are violated when evidence is prohibited that might have led a reasonable jury to receive a significantly different impression of a witness's credibility. That is, a Defendant's rights have been violated when he is "prohibited from engaging in otherwise appropriate cross-examination ... 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'" *Id.* (quoting *Davis v. Alaska*, 415 U.S. 308, 318 (1974)). The burden of showing a violation is met when a reasonable jury might have received a significantly different impression of a witness's credibility had counsel been permitted to pursue his proposed line of cross-examination. *Id.*

**15.   Third-party-culpability evidence is material, powerfully so.**

Evidence of third party culpability is powerful. *See, e.g. United States v. Vallejo*, 237 F.3d 1008, 1022–24 (9th Cir. 2001), *amended on other grounds*, 246 F.3d 1150 (9th Cir. 2001).

In *United States v. Vallejo* the Ninth Circuit reversed Vallejo's conviction because the trial court erroneously excluded third-party-culpability evidence. *Id.* at 1024. *See also People v. Hall*, 41 Cal.3d 826, 831–34 (1986) (holding that third-party-culpability evidence is treated like any other evidence — it is admissible if relevant under Evidence Code § 350 and not substantially more prejudicial than probative under § 352).

In determining that the district court erred, the Ninth Circuit wrote "[fundamental standards of relevancy … require admission of testimony which tends to prove that a person other than the defendant committed the crime that is charged." *Vallejo*, 237 F.3d at 1023 (quoting *United States v. Crosby*, 75 F.3d 1343, 1347 (9th Cir. 1996)).

The Ninth Circuit recognized that the jury would want to know "[i]f the defendant didn't commit the crime then who did?" *Vallejo*, 237 F.3d at 1023 (quoting *Crosby*, 75 F.3d at 1347).

Without discovery regarding other similar sexual assaults, Vargas's attorney could not even begin to investigate other suspects.

Notably, the standard for admission of third party culpability is low. Even if the defense theory is purely speculative … the evidence would be relevant." *Vallejo*, 237 F.3d at 1023. The standard for admissibility is simply any evidence that would cause a jury to doubt whether the defendant committed the charged crime. *Id.* (quoting 1A John Henry Wigmore, Evidence in Trials at Common Law § 139 (Tillers rev. ed 1983)). Therefore, *Vallejo* determined that a defendant should be afforded every opportunity to create doubt in the jurors' minds. *Id.* Unlike in *People v. Littleton*, 7 Cal.App.4th 906, 911 (1992), Vargas has a solid alibi for crimes committed while he was in jail. So, he needn't solve the other crimes that he could not have committed. Moreover, *Littleton* does not restrict impeaching a shoddy investigation. Denial of that opportunity here was *Brady* error.

**16.   The relevance of third-party-culpability evidence here.**

Creating doubt through third-party-culpability evidence is relevant here for at least two reasons.

29

First, the Serial Rapist Book and Teardrop Rapist materials could have served as a starting point for investigating third-party-culpability evidence to show that a third party was responsible for the charged crimes.

Second, third-party-culprit evidence is also relevant to impeach the credibility of the investigating detectives, as the Ninth Circuit found in *United States v. Crosby*, 75 F.3d 1343, 1349 (9th Cir. 1996).

The lack of investigation is a ripe and fertile ground for cross-examination. Questioning a case agent about his or her lack of investigation into third-party culpability can be an effective way of undermining the government's case. *Id.* A common, and often successful trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the defendant, as the Ninth Circuit recognized in *United States v. Howell*, 231 F.3d 615, 625 (9th Cir. 2000). And as the Supreme Court recognized in *Kyles v. Whitley*, 514 U.S. 419, 443 (1995) the defendant must have an opportunity to attack the thoroughness and even good faith of the investigation.

Trial courts should not curtail inquiry into the quality of the government's investigation, as the Ninth Circuit recognized in 2000, in *United States v. Sager*, 227 F.3d 1138, 1145 (9th Cir. 2000).

Therefore, Vargas's attorney could have sought to use the suppressed evidence to impeach the police-prosecution's signature-rapist theory, and to attack the shoddy investigation tactics and credibility of Quijana (and Smith) and other investigating detectives involved in Vargas's prosecution. For example, the defense could have cross-examined Quijano or Smith on each similarity of each sexual assault in the Serial Rapist Book to impeach the Smith-Quijano partnership's myopic investigation, to sow seeds of doubt, and to show the artificially narrow grouping of three similar sexual assaults.

The evidence shows that the Teardrop Rapist used either a gun or a knife, but the Smith-Quijano partnership team apparently focused on the use of knife.

The following table contains some details, many of which the Smith-Quijano partnership team certainly possessed since they possessed the Serial Rapist Book. Others they should have had access to since they were in the 77th Division. Still others they should have known of since victim Karen P. was from the Newton division and the Smith-Quijano partnership team included Karen P. in Vargas's prosecution.

30

| When | What | Who | DR# | Teardrop Rapist | Serial Rapist Book | Div. |
|---|---|---|---|---|---|---|
| 04/20/96 | Rape | Maria E | 96-03-15096 | ✓ | ? | SW |
| 07/29/96 | Rape[71/] bus stop, knife, moved victim, description | Luz Q | 96-12-24163 | | ✓ | 77th |
| 09/11/96 | Rape | Justy C | 96-12-28126 | | ✓ | 77th |
| 11/02/96 | Rape | Yant C | 96-03-34417 | ✓ | ? | |
| Mid 1997 | assigned to sex crimes | **Det. Smith** | — | — | — | 77th |
| 02/03/97 | Rape | | 97-03-06865 | | ✓ | SW |
| 06/30/97 | Rape | Nikki A | 97-02-23753 | | ✓ | Rampart |
| 07/02/97 | Rap | | 97-13-20235 | | ✓ | Newton |
| 08/03/97 | transferred to 77th division | **Det. Quijana** | n/a | | ✓ | 77th |
| 11/12/97 | Rape, bus stop, knife | Tiffany C | 97-12-31516 | | ? | 77th |
| 01/01/98 | assigned to sex crimes | **Det. Quijana** | — | — | — | 77th |
| __/__/98 | Rape | | 98-13-00607 | | ✓ | |
| 01/24/98 | Rape, knife, moved victim | Deborah H | 98-13-05978 | | ✓ | Newton |
| 02/03/98 | Sex Assault **NO** teardrop | Karen P | 98-13-06902 | ✓ | ✓ | Newton |
| 02/05/98 | Rape, teardrop | Monica A | 98-12-07797 | | ✓ | 77th Quijano |
| 04/29/98 | Rape, 25-years old, knife, bus stop | Dania V | 98-06-14590 | | ? | Hollywood |

---

[71/]      Most pleadings I've reviewed in this case use the word "rape" imprecisely as a short-hand for sexual assault, attempted sexual assault, or actual rape, so I also use the word "rape" imprecisely in this table. But for clarity regarding the true nature of the crimes in this case, the term sexual "assault" is used for victims Karen P. and Edith G. since they were not raped.

31

| 05/30/98 | Sex Assault Teardrops | Edith G | 98-12-17638 | ✓ | ✓ | 77th |
|---|---|---|---|---|---|---|
| 06/06/98 | Rape Teardrops First in Qujano's SRB | Teresa R | 98-12-18195 | ✓ | ✓ | 77th Quijano |
| 06/22/98 | Rape, 7a.m., teardrop rapist, moved victim to alley, fled on foot | Shonte S | 98-12-19700 | ✓ | ? | 77th |
| 07/14/98 | Rape | Nancy E | 98-02-25430 | ✓ | ? | |
| 07/02/98 | **Arrested** | **Vargas** | — | — | — | — |
| 07/24/98 | Rape, bus stop, teardrop, knife, moved victim | | | ✓ | ? | |
| 09/27/98 | assigned to juvenile 77th | **Det. Quijano** | — | — | — | 77th |
| 10/17/98 | Rape, bus stop, gun | Ernastine L | 98-02-33657 | | ? | Rampart |
| 11/06/98 | Rape, gun | Maria G | 98-02-35661 | | ? | Rampart |
| 11/14/98 | live line-up Dania V present | **Vargas** | — | — | — | — |
| 02/13/99 | Rape, two teardrops, moved victim, gun | Anaguni N. | 99-12-07939 | ✓ | ? | 77th |
| March 1999 | transfers from 77th to Hollenbeck division | **Det. Smith** | — | — | — | Moved[72] |

---

[72]       Smith Depo. at 17, 60, 84.

| 05/15/99 | attempted rape, startled by noise & flees on foot, gun, bus stop, alley, moved victim, teardrop; "suspect description and MO are nearly identical," to 2/13/99 assault | Andrea | 99-12-16105 | ✓ | ? | 77th |
|---|---|---|---|---|---|---|
| 05/19/99 | Smith gave DA lineup photos, crime reports, & six-pack photos from Serial Rapist Book | **Det. Smith** | — | — | — | had left 77th in March |
| 06/99 | testified at trial with Serial Rapist Book | **Det. Quijano** | — | — | — | |
| 07/22/99 | **Convicted** | **Vargas** | | | | Quijano had SRB at trial |

Another (full-page landscape) table is appended to this report, along with an abbreviations key. That landscape table summarizes some of the common characteristics of the sexual assaults, revealing patterns and differences, which could have been used as a tool to debunk the prosecution's theory and thereby sow seeds of reasonable doubt at trial. Notably, the tables were created based on incomplete (mostly preliminary) investigative reports, not full disclosure.

## 17.  Material evidence was suppressed.

Here, as the Ninth Circuit said in *Jernigan*, "the suppressed evidence substantially erodes the already questionable value of the eyewitness identifications."[73] That is, viewed in the context of all the documents listed above under Paragraph 4, I conclude that the suppressed evidence is "material" since there is more than a reasonable probability that admitting the suppressed evidence at trial would have undermined confidence in the verdict by debunking the police-prosecutor's signature-rapist theory, which myopically and unjustly focused exclusively on Vargas.

Reviewing closing arguments from the trial shows that the entire prosecution case rested on the similarity of the sexual assaults and on faulty eyewitness identifications. No physical evidence inculpated Vargas, who presented alibi evidence and evidence that he had a mustache during the time of the assaults, which supported his actual-innocence defense at trial since all three victims described the assailant as clean shaven.

*Jernigan* is illustrative. There, the Ninth Circuit recognized the persuasive power of third-party-culpability evidence. That power is enhanced in a case like Vargas's, which is founded on faulty eyewitness identifications and no physical evidence connecting Vargas to the crimes. *Jernigan*, 492 F.3d at 1054–55. In *Jernigan*, as here, police suppressed third-party-culpability evidence. The en banc court found that suppression unconstitutional: "Withholding knowledge of a second suspect conflicts with the Supreme Court's directive that 'the criminal trial, as distinct from the prosecutor's private deliberations, [be preserved] as the chosen forum for ascertaining the truth about criminal accusations.'" *Id.* at 1056 (quoting *Kyles*, 514 U.S. at 1057).

In addition to *Jernigan*, I find further support for this "materiality" conclusion in *Kyles*, 514 U.S. at 444–45, and the 2015 Ninth Circuit opinion in *Carrillo v. County of Los Angeles*, *Carrillo v. County of Los Angeles*, 798 F.3d 1210, 1226 (9th Cir. 2015), both of which show that evidence that undermines credibility of confident eyewitness testimony is "material."

And I further conclude that two findings from *Carrillo* hold true here.

---

[73]    *Jernigan*, 492 F.3d at 1054.

34

First, "the law at the time of the investigations clearly established that police officers had to disclose material, exculpatory evidence under *Brady*." *Id.* at 1213.

Second, "any reasonable officer would have understood that *Brady* required the disclosure of the specific evidence allegedly withheld." *Id. Carrillo* recognized: "Any reasonable police officer in 1984 would have understood that evidence potentially inculpating another person fell within *Brady*'s scope." *Id.* at 1226.

Here, the *Brady* materials would have empowered defense counsel with the ability to attack, if not wholly decimate, the prosecution's theory that the three sexual assaults were so similar that one perpetrator — Vargas — was the culprit for all three. If the suppressed third-party-culpability evidence had been disclosed to the defense, there is more than a reasonable probability the verdict would have been undermined because such evidence would have been admitted in state court to debunk the police-prosecutor's signature-rapist theory. *See People v. Andrade*, 238 Cal.App.4th 1274, 1289 (2015); *People v. Suff*, 85 Cal.4th 1013, 1063 (2014).

The suppressed evidence would have undermined the jury's confidence in the quality of the investigation. Vargas could have revealed fundamental flaws in the detective's narrowly focused determination that Vargas was on the hook for three sexual assaults, but not similar assaults.

As the Supreme Court recognized in *Kyles*,[74] evidence's probative force depends on how the police obtain it.[75] "Indications of conscientious police work will enhance probative force...."[76] But, "slovenly work will diminish it."[77]

Here, the Smith-Quijano partnership team apparently reduced its sample size of cases based on selective similarities. For example, the three charged cases all had knives, so the Smith-Quijano partnership team focused on them even though the Teardrop Rapist used a handgun or a knife. And the Smith-Quijano partnership team apparently discounted the

---

[74]   514 U.S. 446 n. 15.

[75]   *Id.*

[76]   *Id.*

[77]   *Id. see also id.* at 442 n. 13 (discussing the utility of attacking police investigations as "shoddy").

fact that Karen P. did not see a teardrop or teardrops on her assailant's face. Further, the Smith-Quijano partnership's team discounted the fact that Teresa R. described her assailant as having two teardrops under his left eye.

Accordingly, I conclude that the third-party-culpability evidence that was allegedly suppressed rather than disclosed to Vargas was material. And, failing to disclose it prejudiced Vargas, resulting in his wrongful conviction.

| Column Heading Abbreviation Key | | Table Content Abbreviation Key |
|---|---|---|
| Date . . . . . . . . . . . . . . . . . . . . Date | ➜ | MMDDYY + Weekday (eg. 060998 M) (M, Tu, W, Th, F, Sa, Su) |
| Time . . . . . . . . . . . . . . . . . . . Time | ➜ | Military Time (eg. 1400 = 2 PM) |
| Victim . . . . . . . . . . . . . . . . . Victim | ➜ | First name & Last Initial (e.g., Maria E) |
| **Vic Desc =** . . . . . Victim Description | ➜ | **F** = Female, **H** = Hispanic, **BLK** = Black, **BWN** = Brown |
| **Div** = . . . . . . . . . . . . . . . . Division | ➜ | **77** = 77th, **RAM** = Rampart, **NEW** = Newton, **HY** = Hollywood |
| **E=** . . . . . . . . . . . . . . . . . . . . . Event | ➜ | **R** = Rape; **SA** = Sexual Assault |
| **W** = . . . . . . . . . . . . . . . . . . . Weapon | ➜ | **G** = Gun, **BG** = blue steel gun; **K** = Knife |
| **M** = . . . . . . . . . . . . . Moved Victim | ➜ | ✓ = Yes |
| **BS** = . . . . . . . . . . . . . . . . . Bus Stop | ➜ | ✓ = Yes |
| **B** =. . . . . . . . . . . . . . . . . . . . . Beanie | ➜ | ✓ = Yes |
| **SD** = . . . . . . . . . Suspect Description | ➜ | **M** = Male, **H** = Hispanic, **BLK** = Black, **BWN** = Brown **Gry** = Gray **HZL** |
| **HWA** = . . . . . . . . Height Weight Age | ➜ | 5'6" 150 40 |
| **FH** = . . . . . . . . . . . . . . . Facial Hair | ➜ | **CS** = Clean Shaven, **MS** = Mustache |
| **TT** = . . . . . . . . . . . Teardrop Tattoo | ➜ | **1R** = 1 Teardrop Right, **1L** = 1 Teardrop Left, **2R** = 2 Teardrops Right, **2L** = 2 Teardrops Left, **1U** = Teardrop Unknown location, **2U** = 2 Teardrops Unknown location |
| **DR** = . . . . . . . . . . . . . . . . . . Report | ➜ | **DR** report number (eg. 960315096) |

| Date | Time | Victim | Vic Desc | Div | E | W | M | BS | B | SD | H W A | FH | TT | DR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 042096 Sa | 0600 | Maria E | — | SW | SA | K | ✓ | ✓ | | M H BWN BWN | 5'6"140-150 | — | — | 960315096 |
| 072996 M | 0630 | Luz Q | F H 26 | 77 | SA | K | ✓ | ✓ | | M H BWN BWN | UK 140-150 25-30 | — | 1L | 961224163 |
| 091196 W | 0715 | Justy C | F H 20 | 77 | SA | BG | ✓ | | | M H BWN HZL | 5'0" 130 35-40 | — | 2L | 961228126 |
| 110296 M | | Yanet C | — | — | | | | | | | | | | 960334417 |
| 020397 M | 0745 | — | F BLK 14 | SW | SA | K | ✓ | | | M H BLK | 5'6" 140 30-35 | — | 1L | 970306865 |
| 063097 M | | Nikki A | F H 19 | RAM | SA | | ✓ | | | Group assault | Group assault | — | 2U | 970223753 |
| 070297 W | 0630 | — | — | NEW | R | | | | | Group assault | Group assault | MS | 2L | 971320235 |
| 111297 W | 0605 | Tiffany C | F BLK 15 | 77 | SA | K | ✓ | ✓ | | M H BWN GRY | 5'8"-10" 180-190 33-38 | — | 1L | 971231516 |
| — '98 | — | — | — | — | — | — | | | | M H | | — | 1U | 981300607 |
| 012498 Sa | 0700 | Debora H | F H 24 | NEW | R | K | ✓ | ✓ | ✓ | M H BWN | 5'10" 140 25 | CS | 2L | 981305978 |
| 020398 Tu | 0600 | Karen P | F H | NEW | SA | K | ✓ | ✓ | ✓ | M H BLK BWN | 5'10" 160 25-30 | CS | No | 981306902 |
| 020598 Th | — | Monica A | F H 17 | 77 | R | BG | | | | Group assault | Group assault | — | | 981207797 |
| 042998 W | 0230 | Dania V | F H 21 | HY | SA | K | | ✓ | | M H BWN BWN | 5' 2" 130 25 | — | | 980614590 |
| 053098 Sa | 0635 | Edith G | — | 77 | SA | K | ✓ | ✓ | ✓ | M H | 5'5" 140 25-30 | — | 2L | 981217638 |
| 060698 Sa | 0628 | Teresa R | 15 | 77 | R | K | ✓ | ✓ | ✓ | M H BWN | 5'6"-8" 180 35-40 | — | 2L | 981218195 |
| 062298 M | 0700 | Shonte S | F BLK 17 | 77 | R | G | ✓ | | ✓ | M H BLK | 5'2" 120 26-34 | MS | No | 981219700 |
| 071498 F | 0600 | Nancy E | F H 24 | 77 | SA | K | ✓ | ✓ | ✓ | M H BLK BWN | 5'7" 140 35-40 | MS | 1U | 980225430 |
| 072498 Sa | — | — | — | — | | | | | | — | | | | |
| 101798 Sa | 0620 | Ernastine L | F H 23 | — | SA | BG | | ✓ | ✓ | M H BLK BWN | 5'6"-7" 150-160 25-30 | — | | 980233657 |
| 110698 F | 0605 | Maria G | F H 29 | RAM | SA | BG | | | | M H BLK BWN | 5'10" 160 30-35 | — | | 980235661 |
| 021399 Sa | 0745 | Anaguni N | F H 19 | 77 | SA | BG | ✓ | | | M H UK BWN | 5'6" 140 30-35 | — | 2L | 991207939 |
| 051599 Sa | 0615 | Andrea L | — | 77 | SA | BG | ✓ | ✓ | | M H BWN BWN | 5'6"-5'10" 160 30s | — | 1R | 991216105 |

# EXHIBIT 3

FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| SUSAN MELLEN; JULIE CARROLL; JESSICA CURCIO; DONALD BESCH, *Plaintiffs-Appellants*, <br><br> v. <br><br> MARCELLA WINN, *Defendant-Appellee.* | No. 17-55116 <br><br> D.C. No. 2:15-cv-03006-GW-AJW <br><br><br> OPINION |

Appeal from the United States District Court
for the Central District of California
George H. Wu, District Judge, Presiding

Argued and Submitted May 18, 2018
Pasadena, California

Filed August 17, 2018

Before:  Kim McLane Wardlaw, Jacqueline H. Nguyen,
and John B. Owens, Circuit Judges.

Opinion by Judge Wardlaw

# SUMMARY[*]

## Civil Rights / Qualified Immunity

The panel reversed the district court's summary judgment in favor of Detective Marcella Winn on qualified immunity grounds in a 42 U.S.C. § 1983 action.

Plaintiff Susan Mellen was wrongly imprisoned for seventeen years before securing habeas relief in October 2014, and she and her children brought this civil rights action against Detective Winn based on her failure to disclose evidence.

The panel held that the record demonstrated as a matter of law that Detective Winn withheld material impeachment evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972), and raised a genuine issue of material fact as to whether Detective Winn acted with deliberate indifference or reckless disregard for plaintiff's due process rights.

The panel held that the law at the time of 1997–98 investigation clearly established that police officers investigating a criminal case were required to disclose material, impeachment evidence to the defense.

The panel concluded that the district court abused its discretion by striking the declaration of Mellen's police practices expert, Roger Clark.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel reversed summary judgment on qualified immunity grounds and the order striking Clark's declaration, and remanded to the district court for further proceedings.

## COUNSEL

Anna Benvenutti Hoffmann (argued), Rick Sawyer, and Nick Brustin, Neufeld Scheck & Brustin LLP, New York, New York; Deirdre Lynn O'Connor, Seamus Law APC, Torrance, California; for Plaintiffs-Appellants.

Calvin House (argued), Gutierrez Preciado & House LLP, Pasadena, California; Laura E. Inlow, Collinson Law, Torrance, California; for Defendant-Appellee.

## OPINION

WARDLAW, Circuit Judge:

Susan Mellen was wrongly imprisoned for seventeen years before securing habeas relief in October 2014. After release from prison, Mellen and her three children, Julie Carroll, Jessica Curcio, and Donald Besch, brought suit under 42 U.S.C. § 1983 against Detective Marcella Winn,[1] arguing that Detective Winn failed to disclose evidence that would have cast serious doubt on the testimony of June Patti,

---

[1] Mellen's complaint also named the City of Los Angeles and Richard Hoffman, Detective Winn's supervisor, as defendants. Mellen voluntarily dismissed Hoffman from this case on March 23, 2016, and she voluntarily dismissed the City and her claims under *Monell v. Department of Social Services*, 436 U.S. 658, 690 (1978), on April 1, 2016.

4                    MELLEN V. WINN

the star prosecution witness in Mellen's trial.  Detective Winn asserted qualified immunity, arguing there was no genuine dispute of material fact as to whether the withheld evidence was material or as to whether Detective Winn acted with deliberate indifference or reckless disregard for Mellen's due process rights, and that the law at the time of the investigation did not clearly establish that police officers were required to disclose material, impeachment evidence. The district court granted summary judgment in Detective Winn's favor.

We conclude, first, that the record demonstrates as a matter of law that Detective Winn withheld material impeachment evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972) (extending *Brady* to impeachment evidence), and raises a genuine issue of material fact as to whether Detective Winn acted with deliberate indifference or reckless disregard for Mellen's due process rights.  Second, we conclude that the law at the time of the 1997–98 investigation clearly established that police officers investigating a criminal case were required to disclose material, impeachment evidence to the defense.  Finally, we conclude that the district court abused its discretion by striking the declaration of Mellen's police practices expert, Roger Clark.  We reverse the grant of summary judgment on qualified immunity grounds and the order striking Clark's declaration, and remand to the district court for further proceedings consistent with this opinion.

## I.

Susan Mellen was convicted of first-degree murder in June 1998, based largely on the testimony of June Patti (Patti).  Mellen contends that Detective Winn wrongfully withheld a statement that June Patti's sister, Laura Patti

(Laura), made to Detective Winn before trial. Laura, who was a Torrance police officer at the time of the investigation, told Detective Winn that her sister, June Patti, was "the biggest liar" that she had "ever met" in her life and that she did not "believe anything [Patti] says."

Laura said that she based this conclusion on her personal experiences with her sister, who, since the age of four or five, "had a habit of not telling the truth." Laura also explained that her sister had filed more than twenty complaints against Laura with the Torrance Police Department, all unsubstantiated, and that Patti "constant[ly]" lied to Laura's colleagues. At her deposition, Laura also said that she believed that Patti had been a "certified informant" with the Torrance Police Department in the early 1990s.

Laura stated that her conversation with Detective Winn was brief, and Detective Winn did not inquire into why Laura believed her sister was a liar. But it turned out that Laura was right about her sister. Patti was deemed an "unreliable informant" by the Torrance Police Department five years before Mellen's trial. And in a fourteen-year span between 1988 and 2002, Patti had more than 800 contacts with law enforcement, where she was known to exaggerate or outright lie to police officers to protect or advance her own interests.

Although the revelations about Patti proved the loose thread that unraveled Mellen's wrongful conviction, Detective Winn contends that no reasonable officer would have understood that *Brady*/*Giglio* required the disclosure of Laura's statements.[2]     Because the Supreme Court has

---

[2] Detective Winn now also disputes that she ever spoke with Laura Patti about her sister. She argues, in the alternative, that if the statements

instructed that *Brady*/*Giglio* requires a "fact-intensive" inquiry into whether "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different," *Turner v. United States*, 137 S. Ct. 1885, 1888, 1893 (2017) (citations omitted), we turn to a close examination of the investigation and the trial that resulted in Mellen's wrongful conviction.

A.  The Investigation

Rick Daly's body was found burned near a dumpster in San Pedro, California, on July 21, 1997.  After two weeks while police officers struggled to identify the body, calls flooded into the Los Angeles Police Department's (LAPD) South Bureau Homicide Unit, and filtered to Detective Winn, who had taken responsibility for the case.  The first tips would later prove the most accurate: a caller told detectives that Daly was killed by three members of "Lawndale 13," a gang that congregated around the "Mellen Patch," a duplex in Torrance, California, owned by members of the Mellen family and frequented by methamphetamine users.  Detectives also heard that Daly was killed in the back house of the Mellen Patch, where Susan Mellen had lived before February 1997,[3] and that Daly's body was transported in Scott "Skip" Kimball's car to San Pedro where the three men set Daly on fire.

On August 12, 1997, Detective Winn prepared a search warrant for the Mellen Patch and arrest warrants for Lester

were made, she would have communicated them to the prosecutor, undermining her argument that no reasonable officer would have known she was required to do so.

[3] Mellen moved out of her family home at the Mellen Patch to live with her boyfriend, Thomas Schenkelberg, and her two children.

"Wicked" Monllor, Chad "Ghost" Landrum, and Santo "Payaso" Alvarez, the three men identified in the caller's tip and corroborating reports. The LAPD executed the search warrant at the Mellen Patch early in the morning the next day. The warrant yielded several potential witnesses and residents of the Mellen Patch, including Monllor's mother and sister, Mellen's sister-in-law, niece, and nephew, and two other people from the neighborhood. Detective Winn later learned that Monllor, Landrum, and Alvarez were in custody on unrelated charges. Detective Winn had also earlier spoken with Scott Kimball, who was also in jail on unrelated charges, and who told Detective Winn that he had lent his car to his friends on the night of the murder.

The evening after the LAPD executed the search warrant at the Mellen Patch, June Patti contacted Detective Winn for the first time, leaving a voicemail message that indicated that Patti had information about the Daly murder. The next morning, Patti appeared at Monllor's arraignment, along with Monllor's mother. And two days after Monllor's arraignment, Patti directed Detective Winn's attention to Susan Mellen, Daly's ex-girlfriend, and a long-time Mellen Patch resident.[4]

Patti gave her first oral statement to Detective Winn on August 15, 1997. At the time, she told Detective Winn that, on the same night that the LAPD executed the arrest warrant at the Mellen Patch, Patti called Mellen and Mellen's

---

[4] Detective Winn interviewed a second witness, Cynthia Sanchez, who also implicated Mellen, but Sanchez told Detective Winn that she had learned what she knew from June Patti. Sanchez also stated that Monllor's mother had asked about whether bleach would "remove blood from linoleum," and had cleaned the back of the house—leads that officers did not follow.

boyfriend, Tom Schenkelberg (Tom), to buy "speed."
Because Patti was purportedly a paralegal at the courthouse
(she was not), and came from a family of police officers,
Mellen asked to meet Patti at the motel where Patti was
staying to talk about the Daly murder.

It was at the Travelodge motel that Mellen allegedly
confessed her involvement in Daly's murder to Patti. Patti
said that Mellen told her that she and Tom, with help from
Chad Landrum, killed Daly because Daly "kept going in
[Mellen's mother's house] and stealing all her things, their
speed, their pips [sic]." Patti said that Mellen had told her
that Tom and Landrum kicked Daly and taped his mouth
shut, that Landrum pulled out a knife and threatened to stab
Daly, and that Tom and Landrum set fire to Daly in Mellen's
mother's house.[5] Mellen allegedly told Patti that she pulled
back Daly's head with his bandana, kicked Daly, and got
high while Tom and Landrum beat Daly. Patti also said that
a fourth, unnamed person came over from next door to tell
Mellen, Tom, and Landrum to be quiet, and that this person
was already in custody.[6] Patti said that Mellen and Landrum
put Daly in the back of Mellen's car and "dropped him off"
in San Pedro because "Tom didn't want to go."

---

[5] Patti also told Detective Winn that Tom and Landrum set fire to
the back house of the Mellen Patch that night. In fact, however, the back
house was not burned until ten days after police discovered Daly's body.

[6] Patti ended her oral statement to Detective Winn by stating that she
had previously helped a Lomita detective named "Marshall" arrest
someone named "Trigger" for murder. Neither this statement nor Patti's
role as a paid informant was investigated.

At the end of the August 15, 1997 recorded oral statement,[7] Detective Winn prepared a written statement for Patti's signature. The written statement adds more detail to Patti's oral statement, detail that Detective Winn was aware of from the police investigation thus far. Notably, the written statement mentioned that the fourth, unnamed person acted as a lookout for Mellen, Tom, and Landrum. Patti's written statement also added that Landrum set Daly on fire again in San Pedro, and that Patti and Tom had left Daly's body near a trash can in an alley with a chain link fence because "only Mexicans live there and they won[']t say anything"—details that did not come from Patti's oral statement. The written statement also added that Mellen and Landrum dumped the body in San Pedro around "8:30 or 9:00 P.M.," when Patti previously told Detective Winn only that Landrum and Tom started beating Daly "during the daytime."

Relying on Patti's written statement, Detective Winn presented the case against Mellen to district attorney Steven Schreiner, who, in turn, filed one count of first-degree murder against Mellen.[8] Mellen was arrested on August 25, 1997, and in an interview with Detective Winn, insisted that she had nothing to do with Daly's murder. Mellen told Detective Winn that she and Cory Valdez, Daly's then-girlfriend, had learned from a woman named Ginger

---

[7] The transcript of Patti's oral statement is undated. It is therefore unclear whether Patti's defense counsel had the benefit of the transcript at Patti's criminal trial or whether Patti's habeas counsel transcribed the oral statement as part of the habeas proceedings.

[8] The district attorney's office filed separate murder charges against Landrum and Monllor, but never filed charges against Tom or Alvarez. In fact, Alvarez told Innocence Matters investigators that he was never even questioned about the Daly murder.

Wilborn that Landrum, Monllor, and Alvarez had murdered Daly, and had wrapped his body in a blanket to transport him to San Pedro. Mellen also told Detective Winn that she had returned to the Mellen Patch with her children on the evening of the murder, but that she had stayed in the area for only ten to fifteen minutes. Mellen said that while she was there, she saw Daly alive, and he must have been murdered after she left. Detective Winn told Mellen that she did not believe her.

The preliminary hearing in Mellen's criminal case, where she was charged alongside co-defendants Monllor and Landrum, took place on November 13, 1997. Mellen was represented by Lewis Notrica, a private family law attorney whom Mellen had previously asked to handle her divorce. The government was represented by Valerie Rose, a deputy district attorney who had prosecuted cases since 1991.

Patti testified at the preliminary hearing. She again said that Mellen had confessed her involvement in Daly's murder to Patti at the Travelodge motel, reiterating that Mellen and Tom recruited Landrum from next door to beat up Daly for stealing Mellen's things. This time, however, when defense counsel questioned Patti about the involvement of a fourth person, Patti insisted that the fourth person had only banged on the window and said "shut the fuck up," but otherwise had nothing to do with the murder. When defense counsel pressed Patti about the inconsistencies between her written statement and her preliminary hearing testimony as to this fourth person, Patti said that Detective Winn made up the details of the story. Patti testified that she told Detective Winn that she was "not signing" the written statement because Detective Winn "wrote something to the [effect] that the person in jail was a lookout" when that was not true. Patti also testified that Detective Winn told her that "the person was in jail and she wanted him to be blamed for it,

and he didn't do it, and he wasn't around when it happened."
Patti said that Detective Winn was "pissed off" when Patti
told her "four or five times" that the written statement did
not reflect what Mellen had said, but Patti ultimately signed
it because she was pressed to get to the airport.

This is the most notable inconsistency between Patti's
earlier oral and written statements and her preliminary
hearing testimony, but there are others.  In her oral
statement, Patti said that she called Mellen to buy speed, and
that the "motel receipt" would show the phone number to
which the call had been placed.  Patti initially testified that
she had "dial privileges" from her room, but when pressed
by Mellen's counsel about how she paid for the phone call,
Patti changed her story: "Actually," she testified, "we didn't
call from the room.  We called from downstairs at the pay
phone, because it was a pager, and my dad paid for the calls
and I didn't want him to find out I was paging people for
speed."  And for the first time at the preliminary hearing,
Patti testified that she was on speed the night that she talked
to Mellen at the hotel.  Patti's preliminary hearing testimony
did not mention whether anyone else had been present with
her at the hotel, whether Daly's attackers had used a hammer
or a knife, or any other detail about how they had allegedly
kept Daly quiet or transported his body to San Pedro.

B.  Pre-Trial Matters

As Mellen's case approached trial in May 1998, several
events, in addition to the alleged telephone call between
Laura Patti and Detective Winn, shed further light on Patti's
unreliability as the star government witness.

In a letter dated February 25, 1998, Patti wrote to District
Attorney Rose explaining that she could not return to
California to testify at Mellen's murder trial because Patti's

sister, Laura, had threatened to arrest her.  Patti sent the letter
to the prosecutor while living with her boyfriend in
Washington State.   In the letter, Patti said that she was
writing to notify District Attorney Rose that she had
outstanding warrants for traffic tickets and for an incident
where she used her "sister Serina Patti [sic] name after [she]
hit a women's car in a [sic] accident."   Patti said that her
sister, Laura, a Torrance police officer, had warned Patti that
if she returned to California she would be arrested on those
warrants.  Patti also recounted numerous incidents where she
had lied to police to evade arrest warrants, had impersonated
her sister, Serina Patti, and had otherwise interacted with law
enforcement.  She asked the district attorney to "contact the
Torrance D.A." to get the ticket "dismissed in the interest of
justice."

The district court found that Patti's February 1998 letter
was placed in the "murder book," a dossier that was
supposed to contain all of the investigatory information
about the Daly murder and which was turned over to defense
counsel on October 1, 1997.  But the record demonstrates
that the district attorney's office received Patti's letter after
the murder book had already been turned over to the defense,
and it is not clear from the record that defense counsel had
access to the letter.  District Attorney Rose's own declaration
suggests that she would not have turned over the letter
because she was "unaware of any legal authority which
provided that sibling rivalry . . . was *Brady* evidence."

Rose replied to Patti's letter on April 16, 1998, two and
a half weeks before Mellen's criminal trial would start on
May 4, 1998, in a letter intended "to memorialize [a]
telephone conversation regarding [Patti's February 1998]
letter."  It advised "[n]either your sister nor any other officer
can serve you or arrest you for anything that happened in this

state prior to the date that you came into . . . the state in order to comply with the subpoena." The letter then concluded, "I will send a copy of this letter to your sister, as well as to the defense attorneys on the criminal case of *People v. Monllor, Mellen & Landrum*."

Patti's credibility was also at issue in a hearing on the morning before trial, where the parties argued pending motions in limine. District Attorney Rose asserted that it would be inappropriate "to ask about [Patti's] arrests and a misdemeanor." Patti had two prior misdemeanor convictions for forgery and for harassment of her sister Laura, and Patti had numerous prior arrests for drug-related charges. The trial court opined that Patti's prior "misdemeanor conviction[s]" and arrests were "not admissible," and Notrica, Mellen's defense counsel, replied "I [have] no quarrel with that."

Rose then discussed Patti's testimony that she had stabbed Mellen's prior boyfriend because he had grabbed her breast, and an allegation that Patti had stolen Mellen's brother's vehicle because Mellen's brother killed one of Patti's dogs. As to the first incident, Notrica replied, "I don't even know where I got the information." When the trial court asked whether Notrica intended to use the information at trial, he said "no." As to the second incident, Notrica said, "I don't have [Mellen's brother] under subpoena," so "[testimony about] it is not going to happen."

The parties also discussed whether Patti was a paid informant. Notrica had suggested to the district attorney that Patti might be a paid informant because she "appears to have a lot of arrests, but no convictions." In reply, district attorney Rose said that she had "no knowledge of such," and she argued that raising Patti's potential role as a paid informant would be "inappropriate" at trial. At the time,

Patti had, in fact, enrolled as a paid informant with the El
Segundo and Redondo Beach police departments, and the
Torrance Police Department deemed Patti an "unreliable
informant" in 1993 for providing exaggerated and untruthful
information to law-enforcement officers.     The court,
however, agreed with the prosecutor, concluding that
"absent some good faith basis," it would not be
"appropriate" for the defense to ask whether Patti had
worked as a paid informant.  The case then proceeded to trial.

## C.  The Trial

Opening statements began on May 4, 1998.  There, the
prosecution offered its theory of the case, which relied
entirely on June Patti's preliminary hearing testimony.  The
prosecution suggested that, on the night of Daly's murder,
Mellen instructed Tom and Landrum to kill Daly, who had
previously dated Mellen, because Daly had stolen from
Mellen's mother's house.  The district attorney stated that
Mellen and Tom had returned to Mellen's mother's
abandoned house on the night of the murder and found Daly
sleeping there.  This allegedly made Tom angry and led him
to convince a neighbor, Landrum, to help beat up Daly in
exchange for a "quarter ounce of speed."   The district
attorney told the jury that Mellen gagged and kicked Daly,
and, after he was set on fire, drove his body to San Pedro and
dumped it in an alley.

Patti took the witness stand on May 6, 1998.  At trial,
Patti changed her testimony significantly from her
preliminary hearing testimony, offering an entirely new
motive for Daly's murder and details that she had never
before offered to anyone.  Patti testified that, on that night at
the Travelodge motel, Mellen confessed that she had been
giving oral sex to Daly when Tom "kind of caught her with
her pants down."  Patti testified that Daly and Mellen had a

child together and that Mellen "loved" Daly even though
Daly had been stealing from Mellen, and Mellen had started
a new relationship with Tom. She testified that Tom became
angry when he figured out what had happened, and started
beating Daly on the head with a hammer that Tom had taken
from Daly's bicycle.

Patti then testified that "somebody from next-door"
(Landrum) came over to help Tom beat up Daly. Tom
allegedly convinced Landrum to help him beat up Daly and
Mellen in exchange for "a quarter ounce of dope." Patti
testified that Tom left, and Landrum continued to beat up
Daly. When Tom returned, Mellen gagged Daly with his
own bandana by stuffing it down his throat and supergluing
and taping his mouth shut. Patti said that, after hearing
Mellen's confession, she avowed to tell her sister, who was
a Torrance police officer.

At the end of Patti's direct examination and, evidently
recognizing that Patti's testimony contradicted much of her
prior testimony—and the prosecution's opening statement—
Rose prompted Patti to admit that she had not told the whole
truth at the preliminary hearing. Patti said that she lied at the
preliminary hearing because, she said, "I don't want Susie
[Mellen] to go to jail." Patti also admitted that she had never
previously told anyone that Mellen had given Daly oral sex
on the night of the murder:

> Q. Did you indicate anything about the
>    motivation behind the killing, Tom
>    walking in on this sexual act?
>
> A. Did I tell anybody about that before?
>    Absolutely not. It was something she told
>    me in private.

The prosecutor later returned to this topic:

> Q. Why, today, are you telling us this
> additional information regarding motive,
> regarding the additional activity?
>
> A. Because since I have been here for the last
> two days, I heard that Susan [Mellen] has
> had people come and try to lie against my
> character; and one of her brothers, which
> I don't know, said he killed a dog of mine.
>
> That is the law. If she is going to lie
> against me, I am going to tell the truth of
> what she said.

The prosecutor also asked Patti about the super glue, another
fact that Patti had never previously disclosed:

> Q. You had indicated — was there any
> changes in your testimony regarding the
> movement of the body or the movement
> of Rick [Daly] to San Pedro?
>
> A. No.
>
> Q. Now, you had indicated something about
> the super glue on the mouth.
>
> A. Yes.
>
> Q. Was she — did she do that or did
> [Landrum] do that, or did they both do it
> together?

A. She did that.

After this questioning, Mellen's counsel cross-examined Patti. Notrica pointed out that Patti's testimony was inconsistent with her testimony at the preliminary hearing:

> Q. You have gone out of your way to embellish your testimony, haven't you?
>
> A. No, I have not.
>
> Q. Well, you were under oath when you testified in November of 1997, weren't you?
>
> A. I told the truth. I just didn't tell the complete truth.
>
> Q. You hid some facts from Ms. Mellen, as well as her counsel.
>
> A. No, I hid the facts from the police that Ms. Mellen had told me because I didn't want to crucify her.
>
> . . .
>
> Q. Ms. Patti, you said that Susan [Mellen] and Rick [Daly] were engaged in a sex act in their house when Tom walked in.
>
> A. That is what she told me.
>
> Q. You never testified to that before, though.

    A. I didn't want people to know she was a cock-sucker. No, I did not. It was a private conversation between her and I.

Notrica also pointed out that Patti had not told the police the fact about the "super glue." On cross-examination, the defense asked:

    Q. Are we getting the whole truth today?

    A. Probably not because I don't want to crucify her. I told you what you need to know.

The day after cross-examination, the prosecution re-opened Patti's direct examination. Patti then testified that she saw Mellen driving Kimball's green BMW away from the Travelodge motel on August 13, 1997. She further testified that Mellen had told her that she used Kimball's car to drive Daly's body to San Pedro. When the prosecutor asked Patti why she had not offered this testimony the day before during her first direct examination, Patti said, "I wasn't asked." During her second cross-examination, Patti admitted that she had "never discussed" Mellen driving Kimball's car "with anybody until yesterday."

Detective Winn took the stand days after Patti's testimony. Detective Winn admitted that Patti had not mentioned the "sexual contact" between Mellen and Daly until the other day in court.

The only other rebuttal of Patti came from Mellen herself. Mellen testified that Patti was "a lier [sic]," "a snitch," "a thief," and "something I would never want to call my friend." Mellen testified that Patti had called her at 2 A.M. one morning at the beginning of August, but that

Mellen had told her "don't call back here" and had hung up
without finding out why Patti had called.  Mellen also stated
that she never went to the Travelodge motel to meet Patti.

At closing argument, defense counsel argued that Patti
was a liar and framed the trial as a contest between the
credibility of June Patti and Susan Mellen.  He said:

> But what she said was full of misstatements,
> and she said them under oath.  And she was
> quick to tell this court, this jury, that: when I
> testified the first time, I didn't tell the whole
> truth.
>
> Why didn't she tell the whole truth?  Well, I
> was trying — I felt sorry for Susan.  Well,
> what she said was enough to, quote, hang her
> anyway.  So she came back the second time
> and the next day which is the third time and
> embellished her statement.
>
> Now, she is telling the whole truth.  She had
> to get everything out.  Why couldn't she get
> everything out the first time when we had a
> chance to cross-examine her.  I can't answer
> that question.  I'm just saying I believe she
> lied for whatever reason and she lied so well
> that Ms. Mellen was arrested for homicide.
>
> . . .
>
> So the issues are simple.  I submit,
> respectfully, that it's between June Patti and
> Susan Mellen.

The jury returned a guilty verdict, and the judge sentenced Mellen to life imprisonment without the possibility of parole on June 5, 1998.  Speaking at her sentencing hearing, Mellen said, "I don't understand why I'm being put in the fire, why this woman lied and told the things that she said that are so evil.  I'm totally innocent. . . . With God's hands upon me now, I'm innocent."

### D.  Habeas Proceedings

Nearly two decades later, Mellen's case came to the attention of Innocence Matters, a non-profit legal organization whose mission is to secure habeas relief for people with valid innocence claims.   As part of its investigation, Innocence Matters spoke with Laura Patti, who told them that she had spoken with Detective Winn in advance of Mellen's trial and had then shared her belief that her sister was not to be trusted.  Laura also admitted that she had never been present for one of her sister's lies to law enforcement, and had no personal information about whether her sister lied as part of the Daly murder investigation.  And she offered her own belief that Detective Winn reasonably relied on June Patti's statements because, she remembered, Detective Winn had told her that her sister offered details about the murder that were not publicly available.  After Innocence Matters contacted her, Laura called Detective Winn to let her know that she had been contacted as part of Mellen's habeas proceedings.

In addition to speaking with Laura Patti, Innocence Matters contacted numerous others close to the investigation, including Chad Landrum and Santo Alvarez, who confessed to the murder and said that Mellen had nothing to do with it.  Armed with this information and testimony from other witnesses, Innocence Matters filed a

habeas petition on Mellen's behalf, which the state court granted in October 2014.

## II.

We now review this evidence to determine whether Detective Winn violated *Brady/Giglio* by failing to disclose Laura's statements that her sister, June Patti, was "the biggest liar" that she had "ever met," and that she did not "believe anything [Patti] says."

### A. *Brady/Giglio* Violation

The elements of a civil *Brady/Giglio* claim against a police officer are: (1) the officer suppressed evidence that was favorable to the accused from the prosecutor and the defense, (2) the suppression harmed the accused, and (3) the officer "acted with deliberate indifference to or reckless disregard for an accused's rights or for the truth in withholding evidence from prosecutors." *Tennison v. City & Cty. of San Francisco*, 570 F.3d 1078, 1087, 1089 (9th Cir. 2009). Although Detective Winn now disputes that she spoke with Laura Patti before Mellen's trial, she concedes that, if the conversation took place, Laura's statements were favorable to Mellen, and were never shared with the prosecutor or the defense. The only questions the parties debate are whether Laura's statements were material and whether Detective Winn was deliberately indifferent not to disclose them. *See Youngblood v. West Virginia*, 547 U.S. 867, 869–70 (2006) (per curiam) ("*Brady* suppression occurs when the government fails to turn over even evidence that is known only to police investigators and not to the prosecutor." (citation and quotation marks omitted)); *United States v. Bagley*, 473 U.S. 667, 676 (1985) ("Impeachment evidence . . . as well as exculpatory evidence, falls within the *Brady* rule.").

### 1. Materiality

We conclude that Laura's statement was material *Brady* evidence as a matter of law. Suppressed evidence is material if "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995). We have recognized that "[i]mpeachment evidence is especially likely to be material when it impugns the testimony of a witness who is critical to the prosecution's case." *Silva v. Brown*, 416 F.3d 980, 987 (9th Cir. 2005) (collecting cases). Indeed, we have concluded that "[t]he recurrent theme . . . is that where the prosecution fails to disclose evidence . . . that would be valuable in impeaching a witness whose testimony is central to the prosecution's case, it violates the due process rights of the accused and undermines confidence in the outcome of the trial." *Horton v. Mayle*, 408 F.3d 570, 581 (9th Cir. 2005).

No one disputes here that June Patti's testimony was crucial to the district attorney's prosecution of Mellen for murder. Although the government offered ten witnesses in its case-in-chief,[9] the prosecutor recognized even at the time that "the bulk of the evidence" in the government's case

---

[9] The witnesses were (1) Jeremy Duncan, (2) June Patti, (3) Ogbonna Chinwaah, (4) Robert Marti, (5) Kenneth Whitehead, (6) Erin Riley, (7) Robert Monson, (8) Felicia Mena, (9) Talbot Terrell, and (10) Marcella Winn. Chinwaah was a deputy medical examiner in the county coroner's office; Riley and Monson were criminalists with the LAPD's serology unit; Duncan, Marti, Whitehead, Terrell, and Winn were homicide detectives and police officers; and Mena testified that on the night of the murder she observed Landrum, accompanied by unknown individuals, drive away from the Mellen Patch in Scott Kimball's BMW, carrying a heavy load in the trunk, and return about an hour later, without the heavy load, accompanied by one other man.

would come from "a conversation between [Mellen] and a People's witness by the name of June Patti." The district attorney's word about the "likely damage" of the suppressed evidence is particularly strong evidence that the testimony was material. *Kyles*, 514 U.S. at 444; *see Silva*, 416 F.3d at 990 ("The prosecutor's actions can speak as loud as his words."). And the prosecutor's assessment has been confirmed many times over. In habeas proceedings, the state court observed that Patti's testimony was "the only evidence of Ms. Mellen's involvement in this crime." And at oral argument in this appeal, Detective Winn conceded that, without Patti's trial testimony, there "would not have been a conviction." Oral Argument at 13:00 ("We're not disputing the fact that her testimony is probably responsible for the conviction.").

The issue of Patti's credibility is made all the more important because Patti testified to what amounted to a confession, to which she claimed to be the only witness. As the Supreme Court has noted, "A confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.'" *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (quoting *Bruton v. United States*, 391 U.S. 123, 139 (1968) (White, J., dissenting)). Patti provided the only "direct" evidence that connected Mellen to the crime. No fingerprints, DNA evidence, or eyewitness testimony placed Mellen at the scene. And because Patti and Mellen were the only people in the room at the time of the alleged confession, the trial turned, as Mellen's defense counsel put it at closing argument, on a decision between Patti's word and Mellen's.

Detective Winn nonetheless contends that Laura's statements were not material because Mellen's defense

counsel had access to other more probative evidence of Patti's credibility. But we have rejected this argument before. "[T]he government cannot satisfy its *Brady* obligation to disclose exculpatory evidence by making some evidence available and claiming the rest would be cumulative. Rather, the government is obligated to disclose *all* material information casting a shadow on a government witness's credibility." *Carriger v. Stewart*, 132 F.3d 463, 481–82 (9th Cir. 1997) (en banc) (citation and internal quotation marks omitted) (emphasis in original). "[A] defendant's conviction in spite of his attempt at impeaching a key government witness demonstrates only the inadequacy of the impeachment material *actually presented*, not that of the suppressed impeachment material; in light of the failure of the impeachment attempt at trial, the suppressed impeachment material may 'take[] on an even greater importance.'" *Silva*, 416 F.3d at 989 (quoting *Benn v. Lambert*, 283 F.3d 1040, 1055 (9th Cir. 2002)) (alteration in *Silva*).

The undisclosed statements were not cumulative of the other impeachment evidence presented at trial; they were of a different kind. *See United States v. Collicott*, 92 F.3d 973, 980 n.5 (9th Cir. 1996) (listing five types of impeachment evidence); *see also Gonzalez v. Wong*, 667 F.3d 965, 984 (9th Cir. 2011) ("Where the withheld evidence opens up new avenues for impeachment, it can be argued that it is still material."). The possibility for the defense to use statements from Laura—an immediate family member, a police officer, and a source unaffiliated with the drug culture of which both Mellen and Patti were a part—"would have provided the defense with a new and different ground of impeachment." *Benn*, 283 F.3d at 1056.

At trial, the best impeachment evidence that the defense could offer were Patti's own statements that she had lied to law-enforcement officers in the past, but even those statements did not have the same probative value as the possibility of hearing from a law-enforcement officer and Patti's immediate family member, who grew up with Patti and could testify to a lifetime, and a lifestyle, of habitual lies. The prosecution's reopening of direct testimony gave Patti the chance to explain away, with success, the inconsistencies in her prior testimony as attempts to protect Mellen's reputation. And doing so, Patti may have even bolstered her own credibility further by also demonstrating a willingness to admit mistakes. *See* 3 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 6:102 (4th ed. 2018) (explaining how witnesses may repair credibility by explaining prior inconsistent statements). As we have recognized before, "[i]t is one thing for a witness to admit that he could lie; everyone can lie"; it is a different thing altogether when hard evidence, which cannot so easily be explained away, provides proof of past lies, deception, and manipulation. *Gonzalez*, 667 F.3d at 985.

Nor would Laura's statements have been duplicative of evidence that the defense possessed about Patti's prior misdemeanor convictions, prior drug use, or rumors that Patti had stolen Mellen's brother's car or stabbed Mellen's ex-boyfriend, all of which the prosecution discussed with defense counsel on the morning of the first day of trial. The defense could not impeach Mellen with her prior misdemeanor convictions because the state trial court determined that the convictions were not admissible impeachment evidence under the California Evidence

Code.[10]  And we have recognized that evidence of prior drug use is not probative of a witness's credibility, absent other evidence linking the drug use to a "motivation, bias, or interest in testifying" or indicating that the witness was "intoxicated while testifying." *United States v. Kizer*, 569 F.2d 504, 505–06 (9th Cir. 1978).  Nor were the rumors about Patti's interactions with Mellen's close associates probative of Patti's truthfulness—they reflected Patti's lack of respect for persons and property, but not Patti's reputation for lying.  At best, the defense could have used Patti's feud with the Mellens to suggest a motive for Patti to lie against Mellen, but even that evidence would have been of minimal probative value, given that Patti's fights were limited to incidents involving Mellen's brother and ex-boyfriend, not Mellen herself.  At worst too, the prosecution could have used the rumors to further link Patti and Mellen to each other, and to a drug culture that impugned both women.

Although Mellen later learned through her own investigation that Patti had been a paid informant for the El Segundo, Redondo Beach, and Torrance police departments, the prosecutor disclaimed any knowledge of Patti's role as a paid informant on the first morning of trial, so this evidence was never introduced.  We think it likely that the government violated *Brady* a second time by failing to obtain and review Patti's status as an informant with other local law-enforcement agencies prior to trial, particularly when Patti was undisputedly the prosecution's star witness; Patti had

---

[10]  The "Truth in Evidence" amendment to the California Constitution, Cal. Const., art. I, § 28, subd. (d), abrogated the felony-convictions-only rule in criminal cases and gave criminal courts "broad discretion to admit or exclude acts of dishonesty or moral turpitude relevant to impeachment."  *See People v. Wheeler*, 841 P.2d 938, 939 (Cal. 1992).  Defense counsel, however, failed to protest on this ground.

previously disclosed to Detective Winn that she had helped another detective with a different homicide investigation; and defense counsel specifically questioned whether Patti was a paid informant. *See Carriger*, 132 F.3d at 479–80 ("Because the prosecution is in the unique position to obtain information known to other agents of the government, it may not be excused from disclosing what it does not know but could have learned."). At a minimum, however, that Patti was a paid informant does not undermine the materiality of Laura's statements to Detective Winn, which the government also did not make available for Mellen's defense.

The only extrinsic evidence attacking Patti's character for truthfulness at trial was Mellen's own testimony that Patti was a liar. But, as the prosecution pointed out at trial, Mellen's obvious interest in the outcome of her case severely undercut the force of her testimony. *See Tennison*, 570 F.3d at 1091 ("[T]he availability of particular statements through the defendant himself does not negate the government's duty to disclose." (citation omitted)); *see also Bailey v. Rae*, 339 F.3d 1107, 1116 (9th Cir. 2003) ("Independent corroboration of the defense's theory of the case by a neutral and disinterested witness is not cumulative of testimony by interested witnesses." (quoting *Boss v. Pierce*, 263 F.3d 734, 735 (7th Cir. 2001)).

Had the defense known to call Laura as a witness, Laura's trial testimony could have highlighted the evidence that demonstrated that Patti was not testifying truthfully. Had Laura testified to Patti's reputation as a liar, the jury would have had an opportunity to evaluate Patti's prior inconsistent statements in a different light, and likely would have given those prior inconsistent statements more weight, particularly given Laura's profession and Laura and Patti's

shared family history.  Moreover, as illustrated by Mellen's habeas proceedings, Laura was the gateway to a whole host of other information about Patti's unreliability as a paid informant and her many, untruthful contacts with law enforcement.  Mellen argued to the district court that, had the defense had the opportunity to question Laura, it might have unraveled earlier that Patti had been an unreliable informant for the Torrance police department, and the defense could have called a number of other witnesses, including Torrance police officers, who would have testified to Patti's reputation as a liar.  The district court dismissed Mellen's arguments, suggesting that they amounted to no more than a "nursery rhyme" that schoolchildren use to teach themselves that "a kingdom might be lost 'all for the want of a horseshoe nail.'"  We do not find Mellen's arguments so fanciful, and conclude that the district court was wrong to dismiss them.

Detective Winn further contends that because Mellen's defense counsel knew that Patti had a sister who was a Torrance police officer and had access to much of the other evidence that could have been used to impeach Patti, this case is analogous to *Raley v. Ylst*, 470 F.3d 792, 804 (9th Cir. 2006), *Rhoades v. Henry*, 598 F.3d 495, 502 (9th Cir. 2010), and *Cunningham v. Wong*, 704 F.3d 1143, 1154 (9th Cir. 2013), where we concluded that a *Brady/Giglio* violation could not lie where the accused is aware of the essential facts to be established by the evidence.  But *Raley*, *Rhoades*, and *Cunningham* are readily distinguishable.  In *Raley*, the evidence suppressed was the defendant's own medical records, 470 F.3d at 803–04; in *Rhoades*, the evidence was the defendant's own statement that he invoked his right to remain silent, 598 F.3d at 502; and, in *Cunningham*, the evidence was the victim's medical records and autopsy report, 704 F.3d at 1154.

In each of those cases, we noted that the defendant was aware of the "existence of the records he claims were withheld," *id.* (quoting *Raley*, 470 F.3d at 804), because the defendant either participated personally in the creation of the records or the records were disputed in the case, *see id.* Thus, it was logical for us to conclude that the defendant "could have sought the documents through discovery." *Id.* (quoting *Raley*, 470 F.3d at 804). But Laura's statement is different than the evidence withheld in *Raley*, *Rhoades*, and *Cunningham* because the defense did not know that the statement existed. At most, the defense knew that Patti and her sister were feuding; it had no reason to know that the sisters' feud was fueled by Patti's reputation as a liar. Based on the limited evidence available to the defense about Patti's relationship with Laura, it was not reasonable to expect that the defense would have requested to depose Laura or would even have prioritized speaking with her without knowing about the statements that Laura made to Detective Winn.

This case is also unlike *Turner v. United States*, where the Supreme Court last year concluded that the withheld evidence was not *Brady* evidence because it was "too little, too weak, or too distant from the main evidentiary points." 137 S. Ct. at 1894. *Turner* involved the brutal rape and murder of Catherine Fuller, in what the government believed had been a group attack. *Id.* at 1889. The withheld evidence in *Turner* was a witness's statement that he had seen two men, James McMillan and Gerald Merkerson, run into the alley where Fuller was murdered and stop near the garage where she had allegedly been raped. *Id.* at 1891. Turner's habeas counsel argued that this statement was material because after Fuller's murder, McMillan assaulted and raped two other women of comparable age in the same neighborhood, and the suppressed statement suggested that McMillan was returning to the scene of the crime to cover

his tracks. *Id.* at 1897 (Kagan, J., dissenting). The Court found the argument unpersuasive, relying on the testimony of seven other government witnesses who affirmed that Fuller had been killed in a group attack, and reasoning that, given the strength of the evidence presented to the jury, the withheld evidence was not sufficient to undermine confidence in the verdict. *Id.* at 1894.

Because the evidence supporting Mellen's conviction was far less extensive than the seven witnesses that the government presented in *Turner*, this case is closer to *Kyles* and *Carriger*, than it is to *Turner*. There is no dispute here that Patti was the prosecution's star witness and the only witness that linked Mellen to Richard Daly's murder. The LAPD and Los Angeles District Attorney concurred in Mellen's habeas petition, and Mellen has been exonerated of any involvement in the crime. *Kyles* considered a similar fact pattern, where the court recognized that "'the essence of the State's case' was the testimony of eyewitnesses," two in particular whose credibility could have been "substantially reduced or destroyed" by the withheld evidence. 514 U.S. at 441. The facts were even more dramatic in *Carriger*, where the sole witness to testify to Carriger's confession was a known habitual liar who himself later confessed to committing the murder for which Carriger was charged. 132 F.3d at 466–68. We are therefore convinced that it is *Kyles* and *Carriger*, not *Turner*, that dictate the outcome here.

In sum, had the jury learned that Laura Patti—the star witness's own sister and a law-enforcement officer— believed that June Patti was "the biggest liar" she had ever met, it would have put the government's critical witness in a new light. Had this evidence been turned over to the defense or pursued by either side, the case may never have even gone

to the jury. Given that the prosecution was so heavily dependent on June Patti's testimony, we conclude that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433 (citations omitted). Laura's statements, if made, were undoubtedly material to Mellen's conviction for murder.

## 2. Deliberate Indifference

We are also convinced that the evidence that Mellen presented at summary judgment raised a genuine dispute of material fact as to whether Detective Winn acted with deliberate indifference to or reckless disregard for Mellen's rights and to the truth by withholding Laura's statement from prosecutors. *See Tennison*, 570 F.3d at 1089; *see also Tatum v. Moody*, 768 F.3d 806, 821 (9th Cir. 2014) (quoting *Gantt v. City of Los Angeles*, 717 F.3d 702, 708 (9th Cir. 2013), for the deliberate indifference standard). Whether a defendant acted with deliberate indifference or reckless disregard "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Lemire v. Cal. Dep't of Corrs. & Rehab.*, 726 F.3d 1062, 1078 (9th Cir. 2013) (citation omitted). Summary judgment should not have been granted unless the district court concluded that "no reasonable jury viewing the summary judgment record could find by a preponderance of the evidence that the plaintiff is entitled to a favorable verdict." *George v. Edholm*, 752 F.3d 1206, 1214 (9th Cir. 2014) (citation and internal quotation marks omitted).

The undisputed evidence demonstrates that Detective Winn knew that Patti's testimony was critical to Mellen's prosecution. Patti was the only witness to incriminate Mellen in the murder. And, as the lead detective who had taken Patti's initial oral and written statements, Detective

Winn was aware of the subject of Patti's statements, where Patti claimed to be the only witness to Mellen's confession. As the lead investigator, Detective Winn also was present during trial, where Patti's credibility was a central issue; Patti's many prior inconsistent statements even forced the prosecution to put Detective Winn on the stand to clarify the testimony. So, Detective Winn no doubt knew that Patti's credibility was of utmost importance.

That the withheld statements came from a particularly credible source makes Detective Winn's failure to disclose them to the prosecutor all the more culpable. Laura Patti was not only an immediate relative who had grown up with June Patti, she was also a law-enforcement officer, aligned with the values of trustworthiness and dependability typically associated with that profession. Because of this, Laura's statements should have carried even more weight with Detective Winn. From the defense's perspective then, a juror could reasonably find that Detective Winn was reckless in withholding a *fellow law-enforcement officer's* opinion, even if that same juror would conclude that withholding a *layperson's* opinion was no more than negligent.

Although Detective Winn now disputes that she spoke with Laura Patti before trial, whether this conversation took place should have been a factual question for the jury to resolve at the § 1983 trial; it is not a question that the district court could resolve at summary judgment. If Laura's statements are to be believed, as they must at summary judgment, then Detective Winn called Laura to investigate Patti's credibility before trial. Laura stated in her deposition that Detective Winn did not inquire further when Laura told Detective Winn that Patti was a habitual liar, and it is undisputed that Detective Winn never communicated Laura's statements to the district attorney. A reasonable

juror could conclude from these facts that Detective Winn
investigated Patti's credibility and communicated only
evidence that favored the government, while willingly
suppressing unfavorable evidence. In fact, Detective Winn's
decision not to inquire further into Laura's claims is the
hallmark of a "deliberate action[] to avoid confirming
suspicions"—an action tantamount to knowledge under the
law. *See United States v. Heredia*, 483 F.3d 913, 917 (9th
Cir. 2007) (en banc); *see also United States v. Jewell*,
532 F.2d 697, 699–700 (9th Cir. 1976) (en banc). These
facts alone, if proven at trial, would have established the
mental state necessary to prove a violation of Mellen's due
process rights.

But, there is more. At the time of the investigation,
Detective Winn was an experienced detective, who had
participated in a hundred homicide investigations, and who
had the training and experience to know the value of Laura's
statements. Detective Winn testified in deposition that she
knew she had an obligation "to report and summarize what
each witness said," and she claimed, based on this
obligation, that if "Laura Patti or anybody told me that June
Patti was not credible or she was a liar, I would have
communicated that to the district attorney's office." And
Detective Winn's own assessment was supported at
summary judgment by Mellen's police practices expert,
Roger Clark, who explained that, "[a]ny reasonably trained
officer or detective would have vetted the credibility of the
key witness in this case." Because Detective Winn
acknowledges that she was obligated to disclose Laura's
statements, if made, and Clark's report would have
demonstrated that any reasonable police officer would have
done the same, a reasonable jury could conclude that
Detective Winn knowingly suppressed the statements to
secure a conviction.

Other evidence suggests that Detective Winn bolstered
Patti's credibility in the early stages of the investigation.
The discrepancies between Patti's oral statement and the
written statement prepared by Detective Winn suggest that
Detective Winn modified Patti's written statement to
conform to the physical evidence the police had found and
to feed Patti information that Patti did not originally offer to
investigators. For example, the written statement added that
Daly's body had been set on fire in San Pedro, a fact that the
coroner's report had suggested but that Patti had not
mentioned in her initial oral statement. The written
statement also added details about when and where the
perpetrators left Daly's body in San Pedro that did not appear
in Patti's oral statement. And, remarkably, even June Patti
questioned the credibility of her own written statement when
she testified at the preliminary hearing that Detective Winn
had forced her to alter the statement to implicate a fourth
person. But no one followed up to investigate these claims.[11]
Detective Winn should have known how important these
details were, particularly when she had also collected
information from various other sources that indicated three
other men had committed the crime.

And still other evidence suggests that Detective Winn
would have taken any means necessary to secure Mellen's
conviction. Mellen's evidence suggests that Detective Winn
knowingly exceeded the scope of a search warrant for
Kimball's car; suppressed the content of her conversation
with another detective, Doral Riggs; spoke with a suspect
without counsel present; and failed to investigate other

---

[11] We also question whether LAPD practices at the time, which
allowed detectives to file the written statement in the murder book but to
file the tape recording of the oral statement elsewhere, facilitated these
discrepancies.

credible witness accounts of Daly's murder.  And Detective Winn's willingness to ignore Mellen's requests for counsel during her initial interrogation is indicative of the aggressive police tactics which Detective Winn used to investigate this case.

That Laura believed that Detective Winn was justified to proceed with Patti as a witness is beside the point.  It is for a jury to determine whether a reasonable officer in Detective Winn's position acted with deliberate indifference to Mellen's due process rights, taking into account the seriousness of the charges levied against Mellen, what was known to Detective Winn at the time, and evidence about what a reasonable police officer would do in the same position.

We conclude that this evidence raised a genuine dispute of material fact that Detective Winn acted with deliberate indifference or reckless disregard of Mellen's due process rights when she failed to disclose Laura's statements about her sister's reputation for honesty to the prosecutor.

## B.  Clearly Established Law

We next must decide whether it was clearly established, in 1997, that police officers had a duty to disclose material impeachment evidence to prosecutors.  This is not an open question in our Circuit.

In *Carrillo v. County of Los Angeles*, we concluded that "[t]he law in 1984 clearly established that police officers were bound to disclose material, exculpatory evidence." 798 F.3d 1210, 1219 (9th Cir. 2015).  *Carrillo* cited approvingly *United States v. Butler*, 567 F.2d 885 (9th Cir. 1978) (per curiam), an even earlier case that concluded that police investigators violate *Brady* when they fail to disclose

material impeachment evidence to prosecutors. *Carrillo*,
798 F.3d at 1220 (citing *Butler*, 567 F.2d at 891); *see also
id.* at 1222 ("[T]he vast majority of circuits to have
considered the question have adopted the view that police
officers were bound by *Brady*."). In *Butler*, we observed that
"[s]ince the investigative officers are part of the prosecution,
the taint on the trial is no less if they, rather than the
prosecutor, were guilty of nondisclosure." 567 F.2d at 891.
There, the impeachment evidence was the officers'
assurances to the witness that he would be treated favorably
by the judge if he testified successfully in the criminal trial—
evidence that could have been used to undermine the
credibility of the witness's testimony. *Carrillo* also relied
on *Kyles*, the case where the Supreme Court expressly
extended *Brady* obligations to police officers. *Carrillo*,
798 F.3d at 1221 (quoting *Kyles*, 514 U.S. at 438). *Kyles*,
decided in 1995, involved police officers' suppression of
prior inconsistent statements that defense counsel could have
used to impeach key eyewitnesses in a homicide trial.
514 U.S. at 441–54. We noted in *Carrillo* that "*Kyles* itself
*rejected* the state's argument that 'it should not be held
accountable under *Bagley* and *Brady* for evidence known
only to police investigators and not to the prosecutor.'"
798 F.3d at 1221 (quoting *Kyles*, 514 U.S. at 438).

Detective Winn offers no meaningful way to distinguish
*Carrillo*, *Butler*, and *Kyles*, and we agree that these cases are
controlling. We therefore reverse the district court's grant
of summary judgment for Detective Winn on Mellen's
§ 1983 claim premised on a violation of her due process
rights, and we remand for further proceedings.

C.  Familial Association Claims

The district court also granted summary judgment on
Mellen's children's claims, which were dependent on

Mellen's due process claim.  Because Mellen's children's associational claims rise and fall with Mellen's due process claim, we must also reverse the grant of summary judgment on these claims and remand for further proceedings.  *See Crowe v. Cty. of San Diego*, 608 F.3d 406, 441–42 (9th Cir. 2010) (concluding that unlawful incarceration due to police misconduct qualifies as "[u]nwarranted state interference with the relationship between parent and child" and violates substantive due process (internal quotation marks and citations omitted)).

## D.  Police Expert Opinion

The district court abused its discretion in striking the declaration of police practices expert, Roger Clark.  *See Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 460 (9th Cir. 2014) (en banc) (standard of review).  The district court mistakenly concluded that a police practices expert cannot assist the jury in making the legal determination about whether an officer's conduct was "reasonable."  But Mellen did not offer Clark's expert declaration for a legal conclusion that Detective Winn's conduct was unreasonable; rather, she offered the report as circumstantial evidence of Detective Winn's state of mind and to show that Detective Winn's failure to disclose Laura's statement deviated far from the norm of what would be expected of a reasonable police officer in Detective Winn's position.  The report should have been admitted to assist the trier of fact in determining whether Detective Winn's conduct deviated so far from institutional norms that the jury could conclude that Detective Winn was reckless or deliberately indifferent to Mellen's constitutional rights.  *See United States v. Christian*, 749 F.3d 806, 811 (9th Cir. 2014); *see also Jimenez v. City of Chicago*, 732 F.3d 710, 721–22 (7th Cir. 2013) (admitting police practices expert testimony in a

§ 1983 civil suit as circumstantial evidence of reckless misconduct).

## III.

Susan Mellen was convicted for murder based solely on the testimony of June Patti.  Mellen's evidence at summary judgment raises a genuine dispute of material fact as to whether Detective Winn knew that June Patti was a liar, and failed to disclose material, exculpatory, evidence of that fact. Summary judgment should not have been granted on this record.  Mellen should have the opportunity to prove, after nearly two decades, whether wrongful conduct played a role in her conviction, and whether she deserves compensation for her wrongful imprisonment.

**REVERSED** and **REMANDED**.