**Exhibit 4 to Declaration of Geoffrey Plowden**
Luis Lorenzo Vargas v. City of L.A., *et al.* CV16-068684SVW
Defendants' Request for Judicial Notice Accompanying Motion for Partial
Summary Judgment of Plaintiff's Municipal Liability Claim

Case 2:16-cv-08684-SVW-AFM Document 112-3 Filed 04/13/18 Page 1 of 54 Page ID #:3989

**JAN STIGLITZ**
State Bar No. 103815
**LAW OFFICE OF JAN STIGLITZ**
225 Cedar St.
San Diego, CA 92101
Tel: (619) 525-1697
Fax: (619) 615-1497

**BRETT BOON**
State Bar No. 283225
**CRAIG BENNER**
State Bar No. 283913
**BENNER & BOON, LLP**
1516 Front St.
San Diego, CA 92101
Tel: (619) 358-9779
Fax: (619) 810-2459

Attorneys for Plaintiff
**LUIS LORENZO VARGAS**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| **LUIS LORENZO VARGAS,** ) | Case No. 2:16-cv-08684-SVW-AFM |
| ) | |
| Plaintiff, ) | **SECOND AMENDED COMPLAINT** |
| ) | **FOR DAMAGES** |
| v. ) | |
| ) | **(1) DEPRIVATION OF CIVIL** |
| **CITY OF LOS ANGELES;** ) | **RIGHTS, 42 U.S.C. § 1983,** *MONELL* |
| **LOS ANGELES POLICE** ) | **VIOLATIONS;** |
| **DEPARTMENT;** ) | |
| ~~COUNTY OF LOS~~ ) | **(2) DEPRIVATION OF CIVIL** |
| ~~ANGELES;~~ ) | **RIGHTS, 42 U.S.C. § 1983,** *BRADY* |
| | **VIOLATIONS; AND** |

Case 2:16-cv-08684-SVW-AFM   Document 200-3   Filed 04/15/18   Page 2 of 34   Page ID #:5590

| | |
|---|---|
| 1  ~~OFFICE OF THE LOS~~ | (3) CLAIM UNDER CALIFORNIA |
| 2  ~~ANGELES DISTRICT~~ | STATE LAW, CAL. GOV. CODE § |
|    ~~ATTORNEY, LOS~~ | 815.2, FOR RESPONDEAT |
| 3  ~~ANGELES SHERIFF'S~~ | SUPERIOR AND VICARIOUS |
| 4  ~~DEPARTMENT;~~ | LIABILITY |
| 5  MONICA QUIJANO; | |
|    ~~RICHARD TAMEZ;~~ | |
| 6  SCOTT SMITH; | |
| 7  and DOES 1-10 INCLUSIVE, | |
| 8  | |
|    Defendants. | |
| 9  _____ | DEMAND FOR JURY TRIAL |

## I.

## JURISDICTION AND VENUE

1. This action is brought by Plaintiff LUIS LORENZO VARGAS ("Vargas" or "Plaintiff") pursuant to 42 U.S.C. § 1983.

2. This Court has jurisdiction under 28 U.S.C. § 1343(4) for violations of the 1871 Civil Rights Enforcement Act, as amended, including 42 U.S.C. § 1983, and under 28 U.S.C. § 1331.

3. The acts and omissions complained of herein commenced on July 21, 1998, and continued until November 23, 2015, within the Central District of California. Therefore, venue lies in this District pursuant to 28 U.S.C. § 1391(b)(2).

## II.

## SUMMARY OF CLAIMS

4. On June 15, 1999, Luis Lorenzo Vargas was wrongfully convicted by jury of sexually assaulting three victims between February 3, 1998 and June 5, 1998. The prosecution's case at trial relied solely on the tentative and shaky eyewitness identifications from each of the victims. No physical evidence ever linked Vargas to these crimes. The victims originally doubted their identifications of Vargas.

SECOND AMENDED COMPLAINT 2

**Plowden Decl - Exh 4, Pg. 10**

1  However, as time went on, and as the victims were repeatedly shown Vargas in

2  either picture or in person, the victims became more confident in their

3  identifications.

4  5.  Although the eyewitness identifications were flawed and faulty, the prosecution

5  had an ace in the hole: all three attacks were identical in their execution, in how

6  they were carried out, and even in the type of victim the perpetrator selected.

7  Thus, the prosecution's theory at trial was simple and straightforward: based on

8  the wealth of similarities between all three crimes, all three attacks had to have

9  been committed by the same perpetrator.  During opening statement, the

10  prosecution repeatedly referenced the similarities between the crimes, and

11  emphasized the similarities between the victims, as the reason the crimes all had

12  to have been committed by one person—Vargas.  In other words, if the jury

13  believed Vargas committed one of the rapes, he had to have committed them all.

14  6.  In closing, the prosecutor explained why the jury had to conclude Vargas was

15  responsible stating, "He strikes three times.  All strikes are in the same spot.  All

16  three of these women identifying the defendant Mr. Vargas."  The prosecution

17  went on to say:

18  Think about the similarities with the victims.  They themselves were
19  similar in terms of targets.  They were all petite women.  They were
   all young.  They were all Hispanic.
20

21  Think about the similarities of these crimes.  They were all alone
22  when they were attacked.  They were all done at approximately 6:00
   a.m.  They were all on the street with the purpose to catch the bus
23  to go to school, to go to work.  They were all distracted by [Vargas]
24  when he came up and asked them directions.  He was able to get
25  into their space.

26  And as soon as he was closer to them, he pulled out a knife.  He
27  threatened them, and he made demands.  He made sexual
   demands in relation to all three women.
28

SECOND AMENDED COMPLAINT 3

**Plowden Decl - Exh 4, Pg. 11**

Case 2:16-cv-08684-SVW-AFM Document 118 Filed 04/19/18 Page 4 of 54 Page ID #:3992

> And all three of these women were able to come to court and tell you that they are now 100 percent certain that this is the man who attacked them.

7.   Based on this theory of the prosecution, the jury convicted Vargas of all three sexual assaults.

8.   At sentencing, Vargas pleaded with the court to reconsider the conviction and his guilt, expressing concern ". . . that [the] individual that really did these crimes might really be raping someone out there. . . ." Vargas's pleas went unheard. The court sentenced him to a term of 55 years to life.

9.   However, despite the prosecution's theory, Vargas was not responsible for the three attacks, and was completely innocent of all charges.

10.  Years later, Vargas sought and obtained DNA testing on clothing from the victims in the case. The DNA testing revealed a profile attributed to an individual commonly known as the Teardrop Rapist. The Teardrop Rapist has been linked to approximately 39 sexual assaults identical to those for which Vargas was convicted. These rapes occurred between 1996 and 2012, some occurring before Vargas was arrested, and some occurring during Vargas's incarceration. The Teardrop Rapist has never been caught.

11.  The subsequent DNA testing in Vargas's case definitively proved the Teardrop Rapist had committed the crimes for which Vargas was in prison. As a result of the testing, Vargas filed a Petition for Writ of Habeas Corpus challenging his conviction and sentence.

12.  In 2015, the Office of the Los Angeles County District Attorney stipulated that the new DNA evidence completely undermined the prosecution's theory and pointed unerringly to Vargas's innocence. In conceding the Petition for Writ of Habeas Corpus, the District Attorney stated:

> The Los Angeles County District Attorney's Office (hereinafter "LADA") has concluded that Teresa R., honestly, but mistakenly,

SECOND AMENDED COMPLAINT 4

identified Vargas at trial as her assailant.  When the results of the DNA tests are considered in light of the three victims' tentative pre-trial identifications, the LADA no longer has confidence in the convictions rendered against Mr. Vargas.  It is the People's position that Mr. Vargas has met the burden required for the granting of habeas corpus relief based upon "newly discovered evidence" which has "undermine[d] the entire prosecution case and point[s] unerringly to innocence." (*In re Clark* (1993) 5 Cal.4th 750, 766.)

In its concession letter, the District Attorney stated, "The LADA does not intend to refile charges against Mr. Vargas after the convictions are vacated."

13. On November 23, 2015, the Los Angeles Superior Court issued an order granting Vargas's petition on the ground that the DNA evidence completely undermined the prosecution's case and pointed unerringly to innocence.  The Los Angeles Superior Court vacated and set aside Vargas's conviction as to all the counts and dismissed the Information.

14. In 2016, Vargas sought an Order from the Los Angeles Superior Court for a finding of factual innocence of all charges relating to the instant case.  The Office of the Los Angeles County District Attorney did not oppose the finding.

15. Thus, on October 5, 2016, the Los Angeles Superior Court entered an Order, pursuant to California Penal Code section 851.86, finding Vargas factually innocent of sexually assaulting all three victims.

16. Vargas served approximately 16 years in prison for crimes he did not commit.  This wrongful conviction and imprisonment was a direct result of the wrongful actions of the Los Angeles Police Department, the City of Los Angeles, and Los Angeles Police Department employees Detectives Monica Quijano and Scott Smith.  These defendants deliberately and intentionally withheld evidence in the case which showed Vargas was innocent, and created and used false evidence against Vargas through the use of improper identification procedures.

17. In addition, the policies and customs of the Los Angeles Police Department

Plowden Decl - Exh 4, Pg. 13

Case 2:16-cv-08684-SVW-AFM Document 113-4 Filed 04/13/18 Page 54 of 25 Page ID #:5594

1   directly contributed to the violations of the rights of Vargas. Specifically, the
2   policies and customs of the Los Angeles Police Department relating to
3   eyewitnesses meant that the officers employing these misleading and suggestive
4   identification procedures caused the victims to falsely identify Vargas as the
5   perpetrator.

6   18.   Further, the Los Angeles Police Department failed to institute administrative
7         policies and practices necessary for ensuring that the office complied with its
8         obligations under *Napue v. Illinois*, 360 U.S. 264 (1959); *Brady v. Maryland*, 373
9         U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972). Specifically,
10        the policies and practices of these defendants meant that its officers and agents
11        withheld evidence from Luis Vargas. This evidence—of other crimes being
12        committed in the same area at the same time period by the Teardrop
13        Rapist—showed Vargas was innocent.

14  19.   As a result of these actions, inactions, policies, and failures, Vargas became,
15        through no fault of his own, a victim of the criminal justice system. He lost his
16        job, educational opportunities, savings, and most important, time with his family,
17        whom he dearly loves.

## III.

## PARTIES

20  20.   Plaintiff Luis Lorenzo Vargas is a resident of the State of California and resided
21        within the state of California at all times herein alleged.

22  21.   At all times herein, Defendant City of Los Angeles was a public entity, organized
23        and existing under the laws of the State of California.

24  22.   At all times herein, Defendant Los Angeles Police Department was a public
25        entity, organized and existing under the laws of the State of California. The Los
26        Angeles Police Department was and is, at all times herein, an agency of the City
27        of Los Angeles.

28  23.   At all times relevant to this lawsuit, Defendant Monica Quijano was employed by

SECOND AMENDED COMPLAINT 6

1   and working on behalf of the Los Angeles Police Department, and resided within
2   the jurisdiction of the State of California.  In her capacity as an employee for the
3   Los Angeles Police Department, she was the lead investigator on the investigation
4   of the crimes against Edith G. and Teresa R., and in the investigation and
5   accusation of Vargas.  Defendant Quijano is sued in her individual capacity.

6   24.   At all times relevant to this lawsuit, Defendant Scott Smith was employed by and
7   working on behalf of the Los Angeles Police Department, and resided within the
8   jurisdiction of the State of California.  In his capacity as an employee for the Los
9   Angeles Police Department, he was the partner of Defendant Monica Quijano
10   during the investigation of the crimes against Edith G. and Teresa R., and in the
11   investigation and accusation of Vargas.  Defendant Smith is sued in his individual
12   capacity.

13   25.   Plaintiff Luis Lorenzo Vargas is informed, believes, and thereon alleges that
14   Defendants sued herein as Does 1 through 10, inclusive, were employees of the
15   Los Angeles Police Department, and were at all relevant times acting in the
16   course and scope of their employment and agency.  Each Defendant is the agent
17   of the other.  Vargas alleges that each of the Defendants named as a "Doe" was
18   in some manner responsible for the acts and omissions alleged herein, and
19   Plaintiff will seek leave of this Court to amend the Complaint to allege such
20   names and responsibility when that information is ascertained.

21   **IV.**

22   **GENERAL ALLEGATIONS**

23   26.   Plaintiff is informed, believes, and thereon alleges, that, at all times herein
24   mentioned, each of the Defendants was the agent and/or employee of each of the
25   remaining Defendants, and in doing the things hereinafter alleged, was acting
26   within the scope of such agency, employment and/or conspiracy, and with the
27   permission and consent of other co-defendants.

28   27.   Each paragraph of this Complaint is expressly incorporated into each cause of

SECOND AMENDED COMPLAINT 7

1    action which is a part of this Complaint.

2    28.    The acts and omissions of all Defendants were engaged in maliciously, callously,

3    oppressively, wantonly, recklessly, and with deliberate indifference to the rights

4    of Plaintiff Luis Vargas.

5                                    **V.**

6                          **FACTUAL ALLEGATIONS**

7    **A.    The Perpetrator Committed Three Sexual Assaults**

8    29.    Three victims—Karen P., Edith G., and Teresa R.—were accosted, attacked, and

9    sexually assaulted between February 1998 and June 1998. The crimes shared

10   undeniable similarities. The victims were all Hispanic women between the ages

11   of fifteen and twenty-four. They were all attacked at or near a bus stop, as each

12   was walking alone down the street at approximately 6:00 a.m. All of these attacks

13   occurred within 1.6 miles of each other. Each victim was approached by a man

14   who held a knife to her body, and all assaults were initiated in a substantially

15   similar manner. Most notably, all victims gave an almost identical description of

16   the perpetrator, and two of the victims identified some sort of tattoo under the

17   perpetrator's eye. It was this description—and because Vargas has a faded

18   teardrop tattoo under his one of his eyes—that caused law enforcement to center

19   their attention on him. The subsequent identification procedures used by law

20   enforcement led the victims to identify Vargas, and it caused the prosecution to

21   focus its attention on Vargas. Vargas's conviction for all three crimes was based

22   almost entirely on the similarities among the crimes and on the prosecution's

23   assertion that these similarities meant the same perpetrator must have committed

24   all three assaults.

25   1.    <u>The Attack of Karen P.</u>

26   30.    At approximately 6:00 a.m. on February 3, 1998, seventeen-year-old Karen P.

27   was on her way to school and walking toward the bus stop located at 40th Street

28   and S. Avalon in Los Angeles, California.

SECOND AMENDED COMPLAINT 8

**Plowden Decl - Exh 4, Pg. 16**

31. A man on foot stopped Karen P. and asked her for details about the bus. Karen P. said she did not know anything about directions and continued to walk away. The man walked behind Karen P. and asked her if she wanted to make $20.00. Karen P. responded "no" and told the man to leave her alone. The man continued to follow Karen P. and said to her, "If you show me your underwear, I will give you $20.00." Karen P. became frightened and continued to walk toward the bus stop.

32. Before Karen P. could get to the bus stop, the man pulled her into a driveway and pushed her back up against a fence. He held a knife to her face and neck and then lowered the knife toward her stomach. Karen P. begged the man to let her go. The man insisted she show him her underwear and continued to threaten her with the knife.

33. Karen P. unbuttoned her jeans and showed him her underwear. The perpetrator then told her to lower her underwear. Karen P. obeyed out of fear. The man touched her vagina, pubic hair, and her breasts with one hand while holding the knife in the other hand. A loud noise caused the man to run away.

34. Karen P. continued to the bus stop and went to school at Washington High School. At school, she told her teacher and the principal what had happened.

35. Karen P. described her attacker to Washington High School Police Officer Fernando Contreras as a Hispanic male, about twenty-five to thirty years old, with black hair and brown eyes, approximately five foot, seven inches tall, medium build, wearing a gray sweatshirt and blue jeans. Karen P. described the perpetrator's height by standing up and putting her hand over her head. Officer Contreras estimated the height at about 5' 7" - 5' 9" tall. Vargas is 5'4" tall. Karen P. did not mention any tattoos on the perpetrator's face.

36. Sometime after the incident, Karen P. met with a sketch artist and provided details about her attacker by viewing various photos and picking out characteristics that fit those of her attacker. The sketch roughly comported with

SECOND AMENDED COMPLAINT 9

1    the description she gave of the perpetrator—Hispanic male, about twenty-five to

2    thirty years old, with black hair and brown eyes.  Karen P. viewed the sketch after

3    it was prepared.

4    2.    The Attack of Edith G.

5    37.    On May 30, 1998 at around 6:00 a.m., twenty-four year old Edith G. was walking

6    down W. 55th Street toward S. Figueroa Street to catch a bus to work.  A man

7    approached her on foot from the opposite direction and asked her about a

8    certain street.  Edith G. said the street was far and recommended the man take

9    a bus.  As Edith G. continued to walk, the man took a couple of steps toward her

10    until he was right by her side.

11    38.    The man pulled out a knife and placed it against her waist.  The man told Edith

12    G. to walk toward a car that was parked in a driveway.  Edith G. obeyed.  Edith

13    G. leaned her back against the car.  The man pointed the blade at her and told

14    her to unzip and unbutton her pants.  Edith G. said "no."  Edith told the man

15    people were watching him, hoping to discourage him from attacking her.  The

16    man decided not to do anything.  Before leaving, he warned Edith G. not to say

17    anything and if she did, he would kill her.

18    39.    Edith G. ran toward Figueroa Street, stopping in the middle of the street and

19    screaming for help, to no avail.  She got on a bus and went to work, where she

20    told her manager she had been mugged.  Edith G.'s father-in-law picked her up

21    from work and took her to his home, where she called the police.

22    40.    Edith G. described her attacker as Hispanic, five foot, seven inches tall with two

23    tattoos of teardrops next to his left eye.  She could not recall if he had a

24    mustache.  Edith G. said her attacker wore a black colored "beanie" cap which

25    made it hard for her to see her attacker's eyes.

26    3.    The Attack on Teresa R.

27    41.    On June 5, 1998, fifteen-year-old Teresa R. and her mother, Juana Corona, spent

28    the night at the home of Teresa's sister, Cecilia Corona.  At approximately 6:00

SECOND AMENDED COMPLAINT 10

a.m., the next morning, Teresa R. was heading toward the bus stop on S. Avalon
and E. 83rd Street in Los Angeles. A man approached Teresa R. at the bus stop
and asked her if a particular bus stopped at that location. Teresa R. said it did
not. The man asked Teresa R. if she spoke Spanish, and she replied that she
did.

42. The man pulled out a knife and told Teresa R. to come with him if she did not
want to die. He placed the knife next to Teresa R.'s neck. Teresa R. turned to
look for a bus, but the man came closer and asked, "Do you want to die?"

43. Still holding the knife to her neck, the man walked Teresa R. down the street,
through a deserted alley, and into a parking lot behind an apartment complex.
The man told Teresa R. to take her clothes off, but Teresa R. said "no" and
began crying. The man took off Teresa R.'s shorts and made her face the wall.
Teresa R. cried and said, "No. Stop." The man told her to shut up if she did not
want to get killed. He pulled her underwear down to her knees and touched her
breasts and "private parts." He tried to put his penis in her rectum but could not.

44. The man put Teresa R. on the ground, face up, got on top of her, and put his
penis in her vagina. Teresa R. said only part of the perpetrator's penis went into
her vagina. She did not know whether the man ejaculated inside of her. A few
minutes later, he got off of Teresa R. and left. Teresa R. got up, put her clothes
on, and hid behind a tree for 20 minutes. She returned to her sister's house.
Her mother, sister, and younger brother were at her sister's house when she
arrived. She was hesitant to tell them what happened, finding it hard to speak.
The family called 9-1-1 and Teresa R. told the operator she had been raped.

45. When the police arrived, Teresa R. told the police officers some of the details
of the attack. The police drove her to the location of the attack and then drove
her back to her sister's house where she took a shower. Later in the afternoon,
on the advice of a neighbor, Teresa R. and her mother went to a private clinic.
The doctor at the clinic called the police, who eventually took her to Daniel

SECOND AMENDED COMPLAINT 11

Freeman Hospital.

46. Before the police took Teresa R. to the hospital to be examined, they drove her to her sister's house to pick up the clothes she was wearing when she was attacked.

4. Teresa R.'s Medical Examination

47. Chris McClung, a sexual assault nurse, examined Teresa R. and found redness, swelling, and tears in her rectal and vaginal areas. McClung noticed blood-tinged secretions in the cervix which could have been caused by a penis hitting the cervix.

48. McClung did not take an external swab from Teresa R.'s vaginal area because Teresa R. said she had showered before coming to the hospital. McClung believed the shower would have eliminated any evidence on the external area. McClung took internal swabs and did a pubic combing.

49. McClung gave the slides and swabs that she recovered from Teresa R. to Officer Callahan of the Los Angeles Police Department (LAPD). Officer Callahan booked the items into evidence.

50. Elizabeth Swanson of the Scientific Investigation Division of the LAPD examined the external genital swabs and slides and vaginal swabs and slides but detected no spermatozoa or semen.

51. At her medical examination, Teresa R. generally described her attacker. Teresa R. told the nurse her attacker was Hispanic, had teardrops near his left eye, was about five foot, six inches tall, between the ages of 30 and 40, and was wearing "some sort of beanie."

52. Teresa R. met with a sketch artist and described her attacker. The sketch created showed a man with tattoos of two teardrops, one underneath the other, at the far end of the left eye. Teresa R. said her attacker had no mustache.

**B. Luis Vargas Was Nowhere Near the Crimes**

53. Between January 19, 1998 and April 31, 1998, Vargas worked as a store manager

SECOND AMENDED COMPLAINT 12

1      at two of the three Manhattan Bagels locations in Los Angeles.  One store was

2      located in Beverly Hills and the other in Hollywood on Sunset Boulevard.

3  54.  Julio Arias  was the manager of the Beverly Hills location where Vargas worked

4      in January and February of 1998.  Vargas was transferred to the Hollywood

5      location where Arias supervised him in May and the first two weeks of June 1998.

6  55.  Enrique Lopez, the Baker at Manhattan Bagel Company, said when he worked

7      with Vargas at the Beverly Hills store, Vargas would open the store around 5:00

8      to 5:30 a.m; Vargas was always there before 6:00 a.m.

9  56.  According to Arias, on Tuesdays, Vargas would normally open the store around

10      5:00 a.m. to get the store ready to be opened at 6:00 a.m.  However, according

11      to Arias's notes, in February of 1998 Vargas was scheduled to work at the Beverly

12      Hills location from noon to 5:30 p.m.  The attack of Karen P. occurred on a

13      Tuesday morning around 6:00 a.m.

14  57.  In May and June of 1998, Vargas worked at the Hollywood location at 5:00 a.m.

15      or earlier every Saturday.  The attacks of Edith G. and Teresa R. occurred on a

16      Saturday morning around 6:00 a.m.

17  **C.**  **LAPD Officers Quijano and Smith Connect Eight Other Sexual Assaults to the**

18      **Assaults of Edith G. and Teresa R.; Investigators Do Not Disclose the**

19      **Connections**

20  58.  During the investigation into the rapes of Edith G. and Teresa R., Detectives

21      Quijano and Smith began researching other rapes in the area to see if any other

22      rapes were connected.  The detectives were looking for similarities in the

23      descriptions of the perpetrators or in the *modus operandi* of the crimes.

24  59.  Ultimately, detectives identified eight other sexual assaults in the Los Angeles

25      area that were similar to the assaults on Edith G. and Teresa R.  These assaults

26      dated back as far as 1996, two years before the Edith G. and Teresa R. assaults.

27      Detective Smith compiled the documents and information relating to these other

28      sexual assaults into a binder titled the "Serial Rapist Book."

SECOND AMENDED COMPLAINT 13

60. Despite the fact the attacks on Karen P., Edith G., and Teresa R. were all substantially similar—either in description, location, or *modus operandi*—to the other rapes detailed in the "Serial Rapist Book," no law enforcement agency or individual actor disclosed the book to Vargas at any time.[1]

**D.    LAPD Officers Quijano and Smith Concluded the Attacks of Karen P., Teresa R., and Edith G. Were Connected**

61. Karen P. was attacked on 40th Street and S. Avalon Boulevard in Los Angeles, California. The Newton Division of the Los Angeles Police Department initially investigated Karen P.'s case.

62. Edith G. was attacked on 55th Street and Figueroa Street in Los Angeles, California. Teresa R. was attacked on Avalon Boulevard and 40th Place in Los Angeles, California. The 77th Division of the Los Angeles Police Department originally investigated these two attacks.

63. The sex crime departments at the Newton Division and the 77th Division met once a month and compared relevant sex crimes information.

64. In May of 1998, Los Angeles Police Department Detective Monica Quijano was working in the Sex Crimes unit at the 77th Street Division, which operates under the major assault crimes unit. Quijano investigated Teresa R.'s case, as well as Edith G.'s case.

65. Los Angeles Police Department Detective Scott Smith was Quijano's partner in May of 1998, and was also assigned to investigate the assaults on Teresa R. and Edith G.

66. Los Angeles Police Department Detective Richard Tamez, assigned to Sex

---

[1]One of the names found in the "Serial Rapist Book"—Deborah H.—appears in the District Attorney's file and was disclosed to the defense. However, the fact LAPD investigators believed this rape was connected to the crimes for which Vargas was convicted, or that investigators believed it was connected to other crimes in the "Serial Rapist Book," was never meaningfully disclosed.

SECOND AMENDED COMPLAINT 14

1    Crimes in the Newton Division, investigated Karen P.'s case.

2    67.   Quijano, Smith, and Tamez concluded the same person committed all three
3          attacks.  This conclusion arose from the undeniable similarities all three crimes
4          shared.  The victims were all women between the ages of fifteen and twenty four.
5          They were all attacked at or near a bus stop, as each was walking down the street
6          alone at 6:00 a.m.  Each victim was approached by a man who initiated a
7          conversation, held a knife to her body, relocated her to a secondary location, and
8          either assaulted or attempted to assault her before being scared off.  Quijano and
9          Tamez were confident all three attacks were committed by the same perpetrator
10         due to the similarities in the attacks and the descriptions of the suspect.

11   68.   After law enforcement concluded all three crimes were committed by the same
12         person, the LAPD consolidated all three assaults in its investigation.

13   **E.   The Detectives Conclude Vargas Was the Perpetrator of the Rapes of Edith G.,**
14   **Karen P., and Teresa R.**

15   69.   Based on the description of the perpetrator given by two of the victims—Hispanic
16         man with a teardrop tattoo—investigators honed in on Vargas as a suspect.
17         Quijano, Smith, and Tamez noted that two of the victims described some sort of
18         tattoo under the perpetrator's eye.  Vargas has a faded teardrop tattoo under his
19         eye.  Because of this, the detectives believed Vargas was the perpetrator.

20   70.   Detective Quijano provided Detective Tamez with a photograph of Vargas.
21         Detective Tamez used that picture in the photo array he showed at least one of
22         the victims, Karen P.

23   **F.   The Detectives Got Edith G., Teresa R., and Karen P. to Identify Vargas**

24         1.   Edith G.'s Identification

25   71.   More than a month and a half after the attack, on July 16, 1998, Detective
26         Quijano showed Edith G. a six-pack photo lineup with Vargas in the lineup.
27         Edith G. identified Vargas, but said that unlike Vargas's photo, her attacker had
28         no hair and was heavier than Vargas.  Specifically, Edith noted number 6 (Vargas)

SECOND AMENDED COMPLAINT 15

"should be without hair and the person is a bit [skinny]."

72. A few days later, on July 21, 1998, Edith identified Vargas in a second photo lineup, but was not 100 percent certain of her identification.

   2. <u>Teresa R.'s Identification</u>

73. More than one month after the crime, on July 16, 1998, Teresa R. identified Vargas from a six-pack photo lineup. She identified him by the one teardrop below his left eye and believed his eyes and mouth were the same as those of her assailant. However, Teresa R. said Vargas's nose was different than her attacker's.

74. On July 21, 1998, Teresa R. identified Vargas as her attacker in a second photo lineup, which depicted a more recent photograph of Vargas. She noted that her attacker looked older than Vargas looked in the photograph.

**G. Based on the Faulty Identifications, Law Enforcement Falsely Arrested Vargas**

75. Based on the tentative identifications of the victims, on July 21, 1998, law enforcement arrested Luis Vargas for these crimes.

**H. Twenty Other Similar Rapes Are Committed In the Area And Investigated by LAPD Detectives; Investigators Did Not Disclose the Connections**

76. Between 1996 and 2012, Los Angeles was terrorized by an unknown perpetrator commonly referred to as the Teardrop Rapist. Through DNA testing, the Teardrop Rapist has been linked to approximately 39 sexual assaults.[2] The sexual assaults for which the Teardrop Rapist is responsible are identical to those for which Vargas was convicted. The Teardrop Rapist has left his DNA on at

_____

[2] Los Angeles Times, LAPD's 19-year Hunt For Serial Rapist Filled With Frustration <http://www.latimes.com/local/california/la-me-0114-serial-rapist-20150114-story.html> (as of January 13, 2015.)

SECOND AMENDED COMPLAINT 16

**Plowden Decl - Exh 4, Pg. 24**

1  least 10 of these attacks.[3]  These attacks began before Vargas was even a suspect

2  in this case, and they continued well after his arrest, conviction, and sentence.

3  77.  Further, and as noted above, Detectives Quijano and Smith were aware of other

4  similar rapes in the area, and collected the information regarding these other

5  rapes into a document entitled the "Serial Rapist Book."

6  78.  In addition, LAPD investigators had information regarding other rapes—similar

7  to the rapes of Edith G., Teresa R., and Karen P., in either geographic location,

8  perpetrator description, or *modus operandi*—and these other rapes were also

9  documented during the time of the Vargas case.

10  79.  The table on the following page documents the attacks committed by the

11  Teardrop Rapist, the attacks found within the "Serial Rapist Book," and other,

12  similar rapes known to LAPD investigators during the Vargas case, along with

13  significant dates occurring in Vargas's case for reference:

14  //

15  //

---

[3] Los Angeles Times, Can You Help Locate the Teardrop Rapist?  LAPD is Out of Leads  <http://www.latimes.com/local/lanow/la-me-ln-teardrop-rapist-los-angeles-20150113-story.html> (as of February 17, 2015.)

SECOND AMENDED COMPLAINT 17

| Date | Event | Victim Info (If Known) | DR # (If Known) | TDR "Attacker Series" | Serial Rapist Book | Other LAPD Discovery | Divison (If Known) |
|------|-------|------------------------|-----------------|----------------------|-------------------|---------------------|--------------------|
| 4/20/1996 | Rape | Maria E. | 96-03-15096 | ✓ | | | Southwest |
| 7/29/1996 | Rape | Luz Q. | 96-12-24163 | | ✓ | | 77th |
| 9/11/1996 | Rape | Justy C. | 96-12-28126 | | ✓ | | 77th |
| 11/2/1996 | Rape | Yanet C. | 96-03-34417 | ✓ | | ✓ | |
| 2/3/1997 | Rape | | 97-03-06865 | | ✓ | | Southwest |
| 6/30/1997 | Rape | Nikki A. | 97-02-23753 | | ✓ | | Rampart |
| 7/2/1997 | Rape | | 97-13-20235 | | ✓ | | Newton |
| 11/12/1997 | Rape | Tiffany C. | 97-12-31516 | | | ✓ | 77th |
| ??/??/1998 | Rape | | 98-13-00607 | | ✓ | | |
| 1/24/1998 | Rape | Debora H. | 98-13-05978 | | ✓ | ✓ | Newton |
| 2/3/1998 | Rape | Karen P. | 98-13-06902 | ✓ | | | Newton |
| 2/5/1998 | Rape | Monica A. | 98-12-07797 | | ✓ | | 77th |
| 4/29/1998 | Rape | Dania V. | 98-06-14590 | | | ✓ | Hollywood |
| 5/30/1998 | Rape | Edith G. | 98-12-17638 | ✓ | | | 77th |
| 6/6/1998 | Rape | Teresa R. | 98-12-18198 | ✓ | | | 77th |
| 6/22/1998 | Rape | Shonte S. | 98-12-19700 | ✓ | | ✓ | 77th |
| 7/14/1998 | Rape | Nancy E. | 98-02-25430 | ✓ | | ✓ | |
| 7/21/1998 | Vargas Arrested | | | | | | |
| 7/24/1998 | Rape | | | ✓ | | | |
| 10/17/1998 | Rape | Ernastine L. | 98-02-33657 | | | ✓ | Rampart |
| 11/6/1998 | Rape | Maria G. | 98-02-35661 | | | ✓ | Rampart |
| 2/13/1999 | Rape | Anaguni N. | 99-12-07939 | ✓ | | ✓ | 77th |
| 5/15/1999 | Rape | Andrea L. | 99-1216105 | ✓ | | ✓ | 77th |
| 7/22/1999 | Vargas Convicted | | | | | | |
| 9/10/1999 | Rape | Maria D. | 99-13-22894 | ✓ | | ✓ | Newton |
| 6/26/2000 | Conviction Affirmed | | | | | | |
| 7/17/2000 | Rape | | | ✓ | | | |
| 8/7/2000 | Rape | | | ✓ | | | |
| 9/25/2000 | Rape | | | ✓ | | | |
| 11/7/2000 | Rape | | | ✓ | | | |
| 11/13/2000 | Rape | | | ✓ | | | |
| 12/29/2000 | Rape | | | ✓ | | | |
| 2/13/2001 | Rape | | | ✓ | | | |
| 3/3/2001 | Rape | | | ✓ | | | |
| 5/14/2001 | Rape | | | ✓ | | | |
| 5/14/2001 | Rape | | | ✓ | | | |
| 7/8/2001 | Rape | | | ✓ | | | |
| 10/13/2001 | Rape | | | ✓ | | | |
| 11/26/2001 | Rape | | | ✓ | | | |
| 1/18/2002 | Rape | | | ✓ | | | |
| 4/13/2002 | Rape | | | ✓ | | | |
| 6/27/2002 | Rape | | | ✓ | | | |
| 8/30/2002 | Rape | | | ✓ | | | |
| 9/7/2002 | Rape | | | ✓ | | | |
| 1/11/2003 | Rape | | | ✓ | | | |
| 1/22/2003 | Rape | | | ✓ | | | |
| 6/20/2003 | Rape | | | ✓ | | | |
| 10/29/2005 | Rape | | | ✓ | | | |
| 11/10/2011 | Rape | | | ✓ | | | |
| 6/25/2012 | Rape | | | ✓ | | | |

SECOND AMENDED COMPLAINT 18

Plowden Decl - Exh 4, Pg. 26

80. As shown in the table, by the time Luis Vargas had been arrested for the sexual assaults in the instant case, the Teardrop Rapist had committed at least four other sexual assaults in the same area, one of which occurred only a week before LAPD investigators arrested Vargas. At least one of these rapes was committed in 77th Division, and was investigated by the same division to which Quijano and Smith were assigned. None of these rapes were ever disclosed to the defense.

81. As noted above, the "Serial Rapist Book," created by Detective Smith and Detective Quijano, also included other similar sexual assaults; by the time Vargas had been arrested, eight other sexual assaults had been committed in the same area. Three of these were committed in 77th Division, and thus were investigated by the same division to which Quijano and Smith were assigned. Quijano and Smith dutifully recorded and documented these other rapes but they never disclosed them to the defense. The other four rapes were known to and investigated by LAPD, but were never disclosed to the defense.

82. Further, as shown in the table, LAPD was aware of and had investigated four other substantially similar sexual assaults by the time Vargas had been arrested. Two of these were committed in 77th Division, and thus were investigated by the same division to which Quijano and Smith were assigned. Confusingly, the two other assaults not committed in 77th Division—the rapes of Debora H. and Dania V.—were the ones disclosed to the defense. Neither of the rapes which occurred in 77th Division were disclosed to the defense.

83. After Vargas was arrested and in custody, and before Vargas was convicted, the Teardrop Rapist committed at least another three rapes, again in the same area, in the same manner as those with which Vargas had been charged. One of the Teardrop Rapist attacks occurred *three days* after Vargas had been arrested. Perhaps most disturbingly, the other two rapes were, again, investigated by 77th Division, the same division to which Detectives Quijano and Smith were assigned. Nobody from the Los Angeles Police Department—including Quijano

SECOND AMENDED COMPLAINT 19

and Smith—disclosed this exculpatory information at any time.

84. Further, LAPD investigators were aware of two other sexual assaults from across Los Angeles—occurring after Vargas's arrest but before his conviction—that had similarities to the crimes for which Vargas was convicted. The information relating to these rapes were collected by the LAPD but never disclosed to the defense.

85. Finally, after Vargas was convicted but before his conviction became final, the Teardrop Rapist committed yet another rape. As with the other rapes, this information was dutifully collected by the LAPD, but never disclosed to the defense.

86. All told, LAPD investigators were aware of at least twenty other rapes with similarities to the crimes for which Vargas was convicted before Vargas's conviction became final.[4] At least seven of these sexual assaults were investigated by 77th Division.

87. Other important information was similarly withheld. According to the FBI's description, the attacks which occurred in Vargas's case matched with the Teardrop Rapist's *modus operandi* perfectly:

> The suspect typically approaches women who are alone and on their way to school or work, or are waiting at a bus stop, between the hours of 5:15 AM and 8:00 AM. The suspect converses with the victim, then threatens to kill the victim with a handgun or a knife. The suspect then forces the victim from the sidewalk to a secondary location, where he sexually assaults her.[5]

---

[4] As noted above, the names of only two of these victims—Debora H. And Dania V.—were ever disclosed to the defense. However, the fact LAPD investigators believed these cases were connected to the crimes for which Vargas was convicted, or that investigators believed they were connected to other crimes in the "Serial Rapist Book," was never meaningfully disclosed.

[5] The Federal Bureau of Investigations, Wanted by the FBI <http://www.fbi.gov/wanted/seeking-info/ unknown-subject/view (as of December 10, 2014.)

SECOND AMENDED COMPLAINT 20

88. The fact the attacks on Karen P., Edith G., and Teresa R. are carbon copies of the Teardrop Rapist's *modus operandi* was a fact never disclosed by any actor or agency in case, including the Los Angeles Police Department, Detective Quijano, or Detective Smith.

89. Further, as can be seen on the chart on the next page—a chart prepared by the Los Angeles Police Department—many of the Teardrop Rapist's attacks occurred in close proximity to the attacks for which Vargas was convicted:

//

//

Plowden Decl - Exh 4, Pg. 29



**Los Angeles Police Department**
**Sexual Assault Series**
**Total = 35 Cases**
**(04/20/96-11/10/11)**

SECOND AMENDED COMPLAINT 22

**Plowden Decl - Exh 4, Pg. 30**

90. The map seen on the following page combines the rapes committed by the Teardrop Rapist, the rapes found in the "Serial Rapist Book" created by Detectives Quijano and Smith, and the other substantially similar rapes investigated by the LAPD during this time period:

//

//

Plowden Decl - Exh 4, Pg. 31

Plowden Decl - Exh 4, Pg. 32