91. Despite the fact the attacks on Karen P., Edith G., and Teresa R. all occurred within miles of the other attacks committed by the Teardrop Rapist, within miles of the other attacks documented in the "Serial Rapist Book," and within miles of the other, substantially similar attacks investigated by law enforcement at the time, no law enforcement agency or individual actor disclosed any information regarding the Teardrop Rapist or the vast majority of the other attacks at any time to Vargas.

I. **Law Enforcement Continued to Improperly Influence the Victims to Falsely Identify Vargas**

92. Almost six months after the attack, and less than a week after arresting Vargas, on July 27, 1998, Detective Tamez sat down with Karen P. to show her a six-pack photo lineup with Vargas's photo included. Tamez had obtained the photo from Detective Quijano. Karen P. identified Luis Vargas from the six-pack photo lineup. She was 85 percent sure Vargas was the perpetrator "because of the bump on his nose."

93. Ten months after the attack, on November 4, 1998, law enforcement brought Karen P. to the station to view Vargas in a live lineup. Karen P. thought her perpetrator was either Vargas or another male.[6] She then rejected her other choice, but was only 70 percent sure about her identification of Vargas. Karen P. said in her 2014 interview that after the live lineup, officers reassured her that she selected the right person.

94. Also at a live lineup, Teresa R. tentatively identified Vargas, but equivocated significantly. This lineup viewing was the third time Teresa R. saw Vargas, either in a photo or in person. To make sure the witnesses selected Vargas, Los Angeles Police Department officers arranged the photo arrays and lineups so that

---

[6] Karen P. said Vargas's mustache was much fuller and darker at the live lineup than in the six pack photo array.

SECOND AMENDED COMPLAINT 25

the only person who was the same person in the lineup or in the arrays was Luis Vargas.

95. On February 16, 1999, law enforcement brought Edith G. to the station to view Vargas in a live lineup. Like Teresa R., this was the third time Edith G. saw Vargas, either in a photo or in person. Each time, Los Angeles Police Department officers had ensured the only person who was the same person in the lineup or in the arrays was Luis Vargas. Even despite the repeated showings, Edith G. could only tentatively identify Vargas in a photograph of a live lineup, stating "I am not too sure, I believe I recognize his face."

J. **After LAPD Repeatedly Exposed Vargas's Image to the Victims, the Prosecution Was Able to Get the Victims to Identify Him at Trial**

96. At trial, Karen P. described her attacker as a Latino male, approximately five foot, six inches tall, approximately 140 pounds, with a medium build. She remembered her attacker's nose having a distinct shape with a bump. She recalled no facial tattoos or a mustache. At trial, with only Vargas sitting in the defendant's chair, she said she was 100 percent sure Vargas was her attacker.

97. In court, after the prosecutor stood behind Vargas, Edith G. identified him as her attacker. Edith G. said it took a long time for her to identify Vargas in court because she was afraid.

98. Teresa R. testified she was more certain of her identification at the live lineup than with the photo lineup. In court, Teresa R. was certain that Vargas was her attacker.

K. **The Defense Presented an Alibi and Inconsistencies in the Prosecution's Case**

99. Vargas presented the testimony of Julio Arias and Enrique Lopez to support and corroborate his alibi that he was at work at the time of the attacks. In addition, Vargas presented witnesses to explain how Vargas did not match the description of the perpetrator.

100. Julio Arias testified he had always noticed a scar on Vargas's face and one

teardrop tattoo under his left eye, which was inconsistent with the descriptions given by all three victims. Enrique Lopez and fellow co-worker Margarita Aparicio also testified they only noticed Vargas had one teardrop tattoo. Arias, Lopez, and Aparicio all testified Vargas had always had facial hair and had facial hair during the period the sexual assaults were committed, which was inconsistent with the descriptions given by the victims.

L. Vargas Was Convicted Based on Identifications and Similarities of Crimes

101. Despite the significant problems with the identifications in the case, the prosecution proceeded with the case, relying on the strength of the in-court identifications and the theory that all of the crimes had to have been committed by the same person. In closing argument, the prosecution reiterated the theme:

> . . . the trademark features of these cases, each one of them are so similar that they were obviously committed by the same individual. The time of day, the location, the type of victim, the manner of attack, the use of the same type of weapon, the language, all of it remarkably similar. They are signature crimes.

102. The jury convicted Vargas on July 22, 1999, one year and one day after he was falsely arrested for the three attacks.

M. Facts Adduced After Vargas's Conviction

1. DNA and Misidentification Statistics

103. DNA testing has become the foremost technique for conclusively identifying and excluding criminal suspects in cases where biological material is left at a crime scene. DNA stands in stark contrast to other kinds of evidence, such as eyewitness identification.[7]

---

[7] In fact, "[e]yewitness misidentification is the greatest contributing factor to wrongful convictions proven by DNA testing, playing a role in more than 70% of convictions overturned through DNA testing nationwide." (Innocence Project, *Understand the Causes: Eyewitness Misidentification*, <http://innocenceproject.org/causes/Eyewitness-Misidentification/> (as of April 2016).)

SECOND AMENDED COMPLAINT 27

104. The use of DNA in the post-conviction context has, to date, led to the exoneration of hundreds of innocent people from the nation's prisons and death rows, including twenty in California alone.[8] Of the first 325 post-conviction DNA exonerations, DNA testing led to the identification of the true perpetrator in approximately half of the cases. DNA testing identified the true perpetrator in 158 of the 325 cases.[9]

2. Post-Conviction DNA Testing in Vargas's Case

105. Pursuant to a joint stipulation between the Los Angeles District Attorney's Office and the California Innocence Project, Orchid Cellmark, Inc. (Cellmark) conducted DNA testing on numerous items of evidence collected in the Teresa R. investigation. The tested items included the vaginal swabs collected from Teresa R., the jean shorts Teresa R. was wearing at the time of the attack, the panties Teresa R. was wearing at the time of the attack, buccal swab samples from Luis Vargas, and buccal swab samples from Teresa R. Because the police did not collect physical evidence relating to the attacks of Karen P. and Edith G., no testing had been performed on anything from these attacks.

106. In April 2014, Cellmark completed its testing on the vaginal swabs and clothing and issued a report. In June 2014, Cellmark completed its testing on the buccal swab samples from Luis Vargas and Teresa R. The results of the testing definitively showed that Luis Vargas was not the perpetrator of the rapes and sexual assaults for which he was convicted, and that the Teardrop Rapist was that actual perpetrator of these crimes.

3. Problems Inherent with the Eyewitness Identifications in Vargas's Case

---

[8] National Rgistry of Exonerations, <http://www.law.umich.edu/special/exoneration/Pages/about.aspx> (as of October 2016).

[9] (Innocence Project, *Know the Cases: National View*, <http://www.innocenceproject.org/know/Search-Profiles.php> (as of December 30, 2014).)

SECOND AMENDED COMPLAINT 28

Plowden Decl - Exh 4, Pg. 36

107. Since the time of Vargas's conviction, significant research and study has been devoted to the science of eyewitness identifications. Thus, research has called into significant question the nature of eyewitness identification testimony, as well as the often misleading relationship between a witness's confidence in the identification and its accuracy.

108. Misidentifications—whether offered in good faith or perjured—are, without a doubt, one of the primary causes of wrongful convictions in the United States criminal justice system.[10] Studies have shown that eyewitnesses select non-suspects from photo and live lineups around 20% of the time.[11] In fact, both the California Supreme Court and the United State Supreme Court have agreed with the numerous studies showing that eyewitness identifications are often unreliable.[12] The United States Supreme Court has stated that "[t]he vagaries of eyewitness identification are well known and the annals of criminal law are rife with instances of mistaken identifications."[13]

109. The courts have recognized many factors that contribute to mistaken identification.[14] Indeed, the New Jersey Supreme Court, in a true step of

---

[10] Rob Warden, *How Mistaken and Perjured Eyewitness Identification Testimony Put 46 Innocent Americans on Death Row: An analysis of wrongful convictions since restoration of the death penalty following Furman v. Georgia*, Northwestern School of Law, Center of Wrongful Convictions (2001).

[11] See Wright & McDaid, *Comparing System & Estimator Variables Using Data from Real Lineups* in Applied Cognitive Psychology (1996) pp. 75-80.)

[12] *People v. Cardenas* (1982) 31 Cal. 3d 897, 908, citing *United States v. Wade*, (1967) 388 U.S. 218, 228 and *People v. Bustamante* (1981) 30 Cal.3d 88, 98; see also *People v. McDonald* (1984) 37 Cal.3d 351, 363-364.

[13] *United States v. Wade, supra*, 388 U.S. at p. 228.

[14] See *People v. McDonald, supra*, 37 Cal.3d at pp. 375-376; *United States v. Wade, supra*, 388 U.S. at p. 228-229.

intellectual courage and integrity, published the revolutionary decision of *State v. Henderson*.[15]

110. The *Henderson* court explored all of the scientific data and research regarding witness perception and memory in order to determine the reliability of eyewitness identification evidence.[16] After a ten day hearing, many exhibits, and numerous published scientific studies, the *Henderson* court found a "troubling lack of reliability in eyewitness identifications" and that the possibility of mistaken identification is a very real problem in our legal system.[17] The current scientific research supports the position that the human memory is malleable and that an array of variables can affect memory and lead to misidentifications.[18]

111. The scientific literature has divided those variables into two categories: (1) system variables (factors such as lineup procedures that are within the control of the criminal justice system); and (2) estimator variables (factors related to the witness, the perpetrator, or the event itself—i.e., distance, lighting, or stress—over which the legal system has no control.)[19]

112. With respect to system variables, the *Henderson* court found, in relevant part, there is an increased likelihood of misidentification where: (1) the eyewitness views more than one photo of the suspect because successive views of the same person can make it difficult to know whether the later identification stems from a memory of the original event or a memory of the earlier identification

---

[15] (N.J. 2011) 27 A.3d 812 [*Henderson*].

[16] *Id.* at p. 877.

[17] *Id.* at pp. 877, 886.

[18] *Id.* at pp. 892, 895.

[19] *Id.* at p. 895.

SECOND AMENDED COMPLAINT 30

procedure;[20] (2) the identification procedure is administered by someone who knows the identity of the suspect because even the best-intentioned, non-blind administrator can act in a way that inadvertently sways an eyewitness trying to identify a suspect;[21] and (3) either pre- or post-identification feedback is given to the witness by administrators because it can falsely enhance the witnesses recollection of the suspect.[22]

113. In Vargas's case, detectives intentionally and deliberately exposed the victims to Vargas's photo multiple times before trial. Edith G. viewed two photo lineups, each displaying Vargas. Edith G. again had an opportunity to see Vargas at the live lineup. It was not until she viewed Vargas three separate times that Edith G. became positive that Vargas was the perpetrator.

114. Similarly, Teresa R. had three opportunities before trial to see Vargas—twice in two separate photo line ups and once in a live lineup. Again, Teresa R.'s confidence increased at trial, after viewing Vargas on three separate occasions.

115. Karen P. viewed one photo lineup and the live line up before testifying at trial that she was certain Vargas was the perpetrator. Karen P. expressed confidence in her identification again in 2014 stating, "going through the proceedings, seeing the individual, it just jarred [her] memory a little bit more."

116. Dr. Kathy Pezdek is a Professor of Psychology at Claremont Graduate University in Claremont, California and is a Fellow of the Association for Psychological Science. Dr. Pezdek's professional background is in experimental psychology with a speciality in memory for real world events. As such, Dr. Pezdek has qualified to testify as an expert witness on eyewitness memory in more than 275

---

[20] *Id.* at p. 900-901.

[21] *Id.* at pp. 896-897.

[22] *Id.* at pp. 899-900.

SECOND AMENDED COMPLAINT 31

cases in federal and state courts throughout California. Dr. Pezdek's research has been in the area of "factors that affect the accuracy of memory." In addition to many of her accomplishments, Dr. Pezdek has been widely published: she has edited four books on cognitive psychology; published dozens of articles and chapters; and presented her research at numerous national and international professional conferences. Dr. Pezdek's research has been funded by a number of federal grants, from the National Institute of Justice, and from the National Science Foundation.

117. Dr. Pezdek identified three phases of memory: (1) the perception or observation phase; (2) the storage phase; and (3) the identification phase. The perception or observation phase occurs at the time the witness is watching the event. The storage phase is the time period in which the information is being held in the memory. The identification phase is when the witness describes his or her memory or when they select a suspect from a lineup.

118. Many factors during these three phases affect the accuracy of an eyewitness's memory. Five are specific to the case against Vargas, including: (1) weapon focus; (2) disguise; (3) stress; (4) time delay; and (5) eyewitness confidence.

- <u>Weapon Focus</u>: "Research suggests that, when a weapon is present during a crime, witnesses tend to focus their attention on the weapon and not on the face of the person holding the weapon." This results in "(a) increased stress and (b) even less time available to focus on the face of the suspect holding the weapon." All three victims testified the perpetrator used a knife when they were attacked, thus making it less likely their identifications were accurate.

- <u>Disguise</u>: "Individuals are perceived less accurately and then recognized less accurately if they are observed wearing a hat, hood or other type of disguise." One study proved a 40% reduction in accuracy when the perpetrator wore a cap. Edith G.'s attacker was wearing a beanie that was

SECOND AMENDED COMPLAINT 32

pulled low on his head; Edith G. could not see her attacker's eyes. Teresa R. also told the nurse and sketch artist that perpetrator was wearing a beanie. Thus, the simple fact that the perpetrator was wearing a cap means there is a likelihood the accuracy of those identifications were significantly decreased.

- <u>Stress</u>: Many recent studies have reported that memory is impaired by high levels of stress. Given the nature of the crimes, Teresa R., Karen P., and Edith G. were under high levels of stress throughout their attacks, decreasing the reliability of those identifications.

- <u>Time Delay</u>: "One of the oldest findings in psychology is the fact that memory declines with the passage of time . . . In a number of more recent studies, it has been reported that after a significant time delay (a) the probability of a correctly identifying a perpetrator decreases, and (b) the probability of incorrectly identifying someone who was not the perpetrator increases." Karen P.'s first identification was made five and a half months after she was attacked; Edith G.'s first identification was made seven weeks after she was attacked; Teresa R.'s first identification was made over a month after she was attacked. Such time delays increase the likelihood of the types of misidentification seen in the victims of this crime.

- <u>Eyewitness Confidence Can Be Deceiving</u>: The confidence expressed by an eyewitness is not generally a good indication of eyewitness identification accuracy, especially when the identifier's confidence increases after a significant time delay. All the victims in this case initially identified Vargas after a significant time delay. The three victims did not become 100% confident in their identifications until trial,[23] which was eleven months after

---

[23] In *State v. Henderson* (N.J. 2011) 27 A.3d 872 [*Henderson*], successive views of the same person during the identification procedure can make it difficult to know whether

SECOND AMENDED COMPLAINT 33

the attack of Karen P., seven months after the attack of Edith G., and six months after the attack of Teresa R. Given the time delays and what the new DNA evidence now proves, the victims' confidence of their identification is not a reliable factor in their accuracy.

V.

PARTICIPATION, STATE OF MIND, AND DAMAGES

A. Participation and State of Mind

119. As will be alleged, the Defendants took actions that were without authorization of law.

120. Each Defendant participated in the violations alleged herein, or directed the violations alleged herein, or knew of the violations alleged herein and failed to act to prevent them. Each defendant ratified, approved, and acquiesced in the violations alleged herein.

121. As joint actors with joint obligations, each defendant was and is responsible for the failures and omissions of the other.

122. Each Defendant acted individually and in concert with the other Defendants and others not named in violating Plaintiff's rights.

123. Each Defendant acted with a deliberate indifference to or reckless disregard for an accused's rights for the truth in withholding evidence from the defense, and/or for the Plaintiff's right to a trial free from constitutional defect, and free of active concealment of material facts, and/or for the Plaintiff's right to due process of law. Their actions were accomplished intentionally strengthen the false identifications against Plaintiff.

1. City of Los Angeles

124. The City of Los Angeles failed to train, supervise, and enact policies regarding

---

the later identification stems from a memory of the original event or a memory of the earlier identification procedure. (*Henderson, supra*, 27 A.3d 872, 900-901.)

SECOND AMENDED COMPLAINT 34

Plowden Decl - Exh 4, Pg. 42

eyewitness identification procedures to ensure suggestive identification procedures did not occur, and to reduce or eliminate the likelihood of irreparable misidentification through those procedures. Policymakers within the City of Los Angeles and individual supervisors enacted improper policies, or failed to enact proper policies, regarding proper eyewitness identification interview procedures. In the alternative, the City of Los Angeles failed to properly train or supervise its employees with regards to these policies.

125. In addition, the City of Los Angeles failed to train, supervise, and enact policies regarding the disclosure of *Brady* material and exculpatory third-party culpability information. Policymakers within the City of Los Angeles and individual supervisors enacted improper policies, or failed to enact proper policies, regarding *Brady* and the disclosure of third-party culpability information. In the alternative, the City of Los Angeles failed to properly train or supervise its employees with regards to these policies. At no point was any information regarding the Teardrop Rapist ever disclosed to the defense.

2. Los Angeles Police Department

126. The Los Angeles Police Department failed to train, supervise, and enact policies regarding eyewitness identification procedures to ensure suggestive identification procedures did not occur, and to reduce or eliminate the likelihood of irreparable misidentification through those procedures. In fact, the Los Angeles Police Department did not train its officers on *Brady* obligations at all until 2000, the year after Vargas's conviction.

127. Policymakers within the Los Angeles Police Department and individual supervisors enacted improper policies, or failed to enact proper policies, regarding proper eyewitness identification interview procedures. In the alternative, the Los Angeles Police Department failed to properly train or supervise its employees with regards to these policies. Policies which relate to this claim include: ensuring eyewitnesses do not view more than one photo of a

SECOND AMENDED COMPLAINT 35

suspect; limiting eyewitnesses' viewing of a suspect; ensuring the identification procedure is administered by someone who does not know the identity of the suspect; and avoiding either pre- or post-identification feedback when interviewing eyewitnesses.

128. In addition, the City of Los Angeles failed to train, supervise, and enact policies regarding the disclosure or *Brady* material and exculpatory third-party culpability information. Policymakers within the City of Los Angeles and individual supervisors enacted improper policies, or failed to enact proper policies, regarding *Brady* and the disclosure of third-party culpability information. In the alternative, the City of Los Angeles failed to properly train or supervise its employees with regards to these policies. At no point was any information regarding the Teardrop Rapist ever disclosed to the defense.

3. Monica Quijano

129. Los Angeles Police Department Detective Monica Quijano investigated Teresa R.'s case, as well as Edith G.'s case, before all cases were consolidated. Quijano deliberately and intentionally withheld information regarding the other rapes found within the "Serial Rapist Book" from Vargas and his defense, despite the fact these other rapes were similar in description, location, and/or *modus operandi* to the rapes of Teresa R. and Edith G.. Further, Quijano deliberately and intentionally withheld information regarding the Teardrop Rapist and other third-party culpability information from Vargas and his defense, even after three separate sexual assaults occurred subsequent to Vargas's arrest, and after five total and separate sexual assaults had occurred in the same area, against the same type of victim, with the same *modus operandi*, by the time of Vargas's conviction.

4. Scott Smith

130. Los Angeles Police Department Detective Scott Smith investigated Teresa R.'s case, as well as Edith G.'s case, before all cases were consolidated. Although Smith compiled a list of nine other, similar rapes occurring in the area, he

deliberately and intentionally withheld information regarding the other rapes found within the "Serial Rapist Book" from Vargas and his defense, despite the fact these other rapes were similar in description, location, and/or *modus operandi* to the rapes of Teresa R. and Edith G.. Further, Smith deliberately and intentionally withheld information regarding the Teardrop Rapist and other third-party culpability information from Vargas and his defense, even after three separate sexual assaults occurred subsequent to Vargas's arrest, and after five total and separate sexual assaults had occurred in the same area, against the same type of victim, with the same *modus operandi*, by the time of Vargas's conviction.

### B. Damages

131. As a direct and proximate result of the aforesaid acts, omissions, customs, practices, policies, and decisions of the Defendants, Plaintiff has suffered great mental and physical pain, suffering, anguish, fright, nervousness, anxiety, shock, humiliation, indignity, embarrassment, harm to reputation, and apprehension, which have caused Plaintiff to sustain damages in a sum to be determined at trial.

132. Due to the acts of the Defendants, Plaintiff has suffered, and continues to suffer, and is likely to suffer in the future, extreme and severe mental anguish as well as mental and physical pain and injury. For such injury, Plaintiff will incur significant damages based on psychological and medical care.

133. As a further result of the conduct of each of these Defendants, Plaintiff has lost past and future earnings in an amount to be determined according to proof at trial.

134. As a further result of the conduct of each of these Defendants, Plaintiff has been deprived of familial relationships, including not being able to maintain a healthy and intimate relationship with his wife, and to raise a family.

135. The aforementioned acts of the Defendants, and each of them, was willful, wanton, malicious, oppressive, in bad faith and done with reckless disregard or with deliberate indifference to the constitutional rights of the Plaintiff entitling

1 | Plaintiff to exemplary and punitive damages from each defendant other than Defendant City of Los Angeles in an amount to be proven at the trial of this matter.

136. By reason of the above described acts and omissions of Defendants, Plaintiff was required to retain an attorney to institute and prosecute the within action, and to render legal assistance to Plaintiff that he might vindicate the loss and impairment of his rights, and by reason thereof, Plaintiff requests payment by Defendants of a reasonable sum for attorney's fees pursuant to 42 U.S.C. § 1988.

# FIRST CLAIM FOR RELIEF
## DEPRIVATION OF CIVIL RIGHTS
### 42 U.S.C.§ 1983
### *BRADY* VIOLATIONS

(Against Defendants Quijano, Smith, Los Angeles Police Department, and Does 1 – 10)

137. Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further allege as follows:

138. Defendants Quijano, Smith, LAPD, and Does 1 – 10, while acting under color of law, deprived Plaintiff of his civil rights by violating his right to have material exculpatory evidence and information turned over to the Vargas defense as required by *Brady*.

139. The failure of the Los Angeles Police Department to provide information regarding the other rapes found in the "Serial Rapist Book" to the prosecution or the defense amounted to a clear and inexcusable violation of its obligations under *Brady*.

140. Further, the failure of the Los Angeles Police Department to disclose information regarding the other rapes committed before Vargas was arrested, after his arrest, and after his conviction amounted to a clear and inexcusable violation of its obligations under *Brady*.

141. Investigators working in the Los Angeles Police Department, and the LAPD itself, had an obligation to turn over information regarding these other assaults, as they would have provided clear exculpatory evidence that at least twenty other rapes had been committed in the area, and that those other rapes were substantially similar in either the descriptions of the perpetrator or in the *modus operandi* of the crime, to the rapes for which Vargas was prosecuted.

142. The information regarding the Teardrop Rapist—and more specifically, the failure of the Los Angeles Police Department and the Los Angeles County