Sheriff's Department to provide that information to the prosecution or the defense—amounted to a clear and inexcusable violation of its obligations under *Brady*. Investigators working in the Los Angeles Police Department and the LAPD itself had an obligation to turn over information regarding these other assaults, as they would have provided clear exculpatory evidence that a third party, the Teardrop Rapist, had committed the rapes for which Vargas was prosecuted.

143. The Teardrop Rapist committed at least 39 sexual assaults identical to the ones for which Vargas was wrongfully convicted. The time, manner, and victims of each attack were so unique as to create a criminal profile that information concerning them were necessarily "material" in the context of Vargas's wrongful conviction and incarceration. The facts surrounding the rapes and attempted rapes for which Vargas was wrongfully convicted were so unique the prosecution, police, and public gave a nickname to the true perpetrator: The Teardrop Rapist. This nickname, and the public outcry that came with it, was due to the fact that each attack from the teardrop rapist was exactly the same *modus operandi*.

144. Vargas is informed and believes and thereupon alleges that the investigations of *all* the rapes found in the "Serial Rapist Book"—investigations performed specifically by Defendants Quijano and Smith, as well as other investigators working for the LAPD, and the LAPD itself—included and encompassed as part of the overall investigation the similar crimes for which Vargas was wrongfully convicted, as well as all other rapes/attempted rapes committed by the Teardrop Rapist. This means that the LAPD knew at the very least that some of the information concerning these other crimes was known during and throughout the initial investigation, and through Vargas' arrest, trial, and ultimately wrongful incarceration, yet both institutions deliberately and intentionally chose *not* to disclose this information to the prosecution to alert them they had convicted the wrong man, or to Vargas himself, to enable him to prove his innocence.

145. The information withheld from Vargas was indeed favorable. Had the jury in Vargas's trial heard that other, similar rapes had been committed in the area, and that these other rapes were so similar that the investigating officers in the case—Defendants Quijano and Smith—had compiled all of them into a book titled "Serial Rapist Book," *but that they concluded Vargas did not commit those other rapes*, this obviously would have greatly impacted the ultimate results of the criminal trial and made Vargas's conviction extremely unlikely. Likewise, had this same information been disclosed to the wrongfully convicted Vargas, his release from incarceration would likely have been much earlier in time.

146. Further, had the jury at trial heard that other rapes had been committed which were so similar that LAPD determined they were all committed by the same person (the Teardrop Rapist), and had the jury further heard rapes committed by the true Teardrop Rapist continued while Vargas was *still in custody*, this obviously would have greatly impacted the ultimate results of the criminal trial and made Vargas's conviction extremely unlikely. Likewise, had this same information been disclosed to the wrongfully convicted Vargas, his release from incarceration would likely have been much earlier in time.

147. Had the information been disclosed to Vargas or the prosecution—that LAPD investigators were aware of other, similar rapes in the area, but that they determined Vargas did not commit those crimes, or that they had other suspects they believed committed them—it would have put Vargas's entire case in such a different light as to undermine confidence in the verdict.

148. Had the information, resultant from the continued and ongoing investigation and attempts to capture the Teardrop rapist, been disclosed to Vargas or the prosecution, it would have put Vargas's whole case in such a different light as to undermine the entire confidence of the verdict.

149. As noted above, by the time Vargas's conviction was final, a serial rapist had committed no fewer than five other rapes in the area and with the same *modus*

*operandi* as occurred in the crimes for which Vargas was convicted. Three of these rapes occurred after Vargas was arrested and incarcerated, when it would have been impossible for Vargas to have committed them.

150. Defendants Quijano, Smith, Does 1 – 10, and the Los Angeles Police Department had actual and constructive knowledge other rapes had been committed in the same area with the same *modus operandi*, and with similar witness statements as those of the victims in Vargas's case. Further, these defendants had an obligation to turn over this exculpatory information to Vargas and/or the prosecution.

151. Defendants Quijano, Smith, Does 1 – 10, and the Los Angeles Police Department had actual and constructive knowledge that another person was committing sexual assaults in the same area with the same *modus operandi*, and committing these attacks against the same types of victims as in Vargas's case. Further, these defendants had an obligation to turn over this exculpatory information to Vargas and/or the prosecution.

152. Despite this knowledge and this obligation, at no point did any defendant disclose the "Serial Rapist Book" or the information regarding the Teardrop Rapist to Vargas, and this failure prevented Vargas from presenting this information before his conviction became final. As a result, his rights were violated and he spent almost two decades in prison for crimes he did not commit.

153. The actions of each defendant in withholding evidence from the defense were done with deliberate indifference to or reckless disregard for Plaintiff's rights or for the truth.

154. The *Brady* violations asserted herein encompass, but are not limited to:
   a. Failing to disclose third-party suspect information regarding other rapes detailed in the "Serial Rapist Book";
   b. Failing to turn over information regarding the rapes detailed in the "Serial Rapist Book" to the defense at any point during the investigation, arrest,

        prosecution, conviction, or post-conviction of Plaintiff Luis Vargas;

    c.    Failing to discover or investigate third-party suspect information regarding the Teardrop Rapist, and connect that information to the crimes for which Plaintiff was accused and convicted; and

    d.    Failing to turn over information regarding the Teardrop Rapist to the defense at any point during the investigation, arrest, prosecution, conviction, or post-conviction of Plaintiff Luis Vargas.

155. The constitutional source of the obligation to provide *Brady* information is primarily the due process clause of the Fifth and Fourteenth Amendments, and Plaintiff's rights to Due Process were violated by the conduct alleged herein. Plaintiff brings this claim as both a procedural and a substantive due process violation. To the extent that any court were to conclude that the source of Plaintiff's right to *Brady* information is a constitutional source other than due process (such as the Fourth Amendment or Sixth Amendment right to a fair trial), this claim is brought on those bases as well.

156. Defendants Quijano, Smith, the Los Angeles Police Department, and the other Doe defendants were each jointly and severally responsible to provide *Brady* information to the defense. Each engaged in, knew of, or should have known of the unconstitutional conduct alleged herein and failed to prevent it, which each had a responsibility to do, and each ratified, approved or acquiesced in it.

157. As a result of the defendants' violations, and each of their violations of Vargas's constitutional rights to have *Brady* information turned over to the defense, Vargas was damaged as alleged above.

## SECOND CLAIM FOR RELIEF
## DEPRIVATION OF CIVIL RIGHTS
## 42 U.S.C. § 1983
## *MONELL* VIOLATIONS

(Against Defendants City of Los Angeles and Los Angeles Police Department)

158. Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further allege as follows:

159. Municipal corporations may be named in a lawsuit for deprivation of Constitutional rights, as this lawsuit claims. *Monell v. Dept of Social Services*, 436 U.S. 658, 701 (1978). A municipality is liable when the constitutional injury to the plaintiff resulted from the implementation or "execution of a government's policy or custom, whether made by its lawmakers or by those . . . said to represent official policy." *Monell, supra*, 436 U.S. at 694. Municipalities may also be liable by failing to create, promote, or promulgate policies and practices which would protect the Constitutional rights of individuals. *City of Canton v. Harris*, 489 U.S. 378 (1989).

A. **Failure to Train, Supervise, and Enact Proper Policies Regarding *Brady* Material**

160. Los Angeles Police Department investigators either received no training, or did not follow relevant training, with regard to the sharing of information regarding other similar crimes occurring in the area. The information regarding the other rapes detailed in the "Serial Rapist Book," as well as those rapes committed by the Teardrop Rapist, was shared among agencies and with investigators, but was not shared with Vargas. The decision of the Los Angeles Police Department to withhold this exculpatory third-party culpability information from Vargas amounted to a clear and inexcusable violation of its obligations under *Brady*. If law enforcement was never trained in this practice, the failure to train directly violated Vargas's rights. In the alternative, if law enforcement had been trained

SECOND AMENDED COMPLAINT 44

in the proper practice of information sharing, but did not do so, the failure to supervise and to ensure that proper training regarding the sharing of information was followed violated Vargas's rights.

161. There are nine rapes detailed in the "Serial Rapist Book" which were identified by Defendants Quijano and Smith as substantially similar—in either location, perpetrator description, or *modus operandi*—to those for which Vargas was convicted. Vargas's conviction was almost entirely based on the prosecution's theory that each rape for which Vargas was accused was committed in nearly identical fashion, and therefore Vargas must have committed each. Notwithstanding this fact, the Los Angeles Police Department refused to investigate whether rapes committed under nearly identical circumstances could have been committed by the same perpetrator of the rapes for which Vargas was at the time serving a prison sentence.

162. Further, the Teardrop Rapist has been linked to approximately 39 sexual assaults identical to those for which Vargas was convicted. Again, despite the fact Vargas's conviction rested on the substantial similarity between the crimes, the Los Angeles Police Department refused to investigate whether subsequent rapes committed under nearly identical circumstances could have been committed by the same perpetrator of the rapes for which Vargas was at the time serving a prison sentence, which was later proved to be true.

163. In addition, before Vargas's conviction became final, LAPD investigators became aware of nine other rapes in the area which were substantially similar—in either geographical location, perpetrator description, or *modus operandi*—to those for which Vargas was convicted. Again, despite the fact Vargas's conviction rested on the substantial similarity between the crimes, the Los Angeles Police Department refused to investigate whether these rapes committed under substantially similar circumstances could have been committed by the same perpetrator of the rapes for which Vargas was at the time serving a prison

SECOND AMENDED COMPLAINT 45

sentence, which was later proved to be true.

164. Vargas is informed and believes and thereupon alleges that there is a chain of command within the Los Angeles Police Department, including one or more policy maker(s) at or near the top of the chain of command who is tasked with deciding whether to reopen and/or investigate previous crimes as potentially linked to ongoing/subsequent crimes. Vargas believes that this allegation will likely have evidentiary support after a reasonable opportunity for further investigation and discovery, but the information currently is within the knowledge and possession of the Los Angeles Police Department.

165. Vargas is informed and believes and thereupon alleges that one or more policy maker(s) at or near the top of the chain of command within the Los Angeles Police Department at the relevant time period made the affirmative decision not to investigate and/or reopen Vargas's case upon learning of and investigating nearly identical crimes after he was arrested but before his conviction.

166. Vargas is informed and believes and thereupon alleges that he Los Angeles Police Department pattern, custom, and practice of deliberate indifference in violating Vargas's constitutional rights and the established an express policy that resulted without correction was a direct and proximate result of the Los Angeles Police Department's failures to train and supervise its employees, specifically a failure to train on connecting identical crimes, perpetrators that commit them, and failures to train when such material constitutes *Brady* material and must be disclosed to the defendant, regardless of whether that defendant is currently under investigation or previously convicted.

167. Vargas is informed and believes and thereupon alleges that the policy maker at or near the top of the chain of command within the Los Angeles Police Department at the relevant time period made the affirmative decision not to provide the prosecution information supporting the link between the rapes Vargas was convicted of and those detailed in the "Serial Rapist Book" and those

1 committed by the Teardrop Rapist. This *Brady* material could have established Vargas's innocence.

168. Vargas is informed and believes and thereupon alleges that the Los Angeles Police Department failed to train as to disclosing information pertaining to crimes identical to previous investigations and/or convictions, such as those Vargas was convicted of, and the Los Angeles Police Department failed to train when such material constitutes *Brady* material and must be provided to the prosecution, regardless of whether that defendant is currently under investigation or previously convicted.

B. **Deprivation of Civil Rights (*Monell*)**

169. The unconstitutional and tortious acts of the officers, employees, and agents were not isolated incidents. Upon information and belief, there was a custom, policy, pattern and practice beginning years before the unjust conviction of Luis Vargas and continuing throughout his incarceration, of condoning, encouraging, ratifying, and acquiescing in the practice of failing to conduct reasonable criminal investigations, conducting unconstitutional interrogations, fabricating evidence including evidence supporting probable cause, committing perjury, failing to disclose exculpatory evidence, and covering up this unconstitutional misconduct. Upon information and belief, Los Angeles policymakers were on notice of—but deliberately indifferent to—these unconstitutional customs, policies and practices.

170. Upon information and belief, the named Defendants, as well as the individual supervisors in this case, failed to train or supervise investigators to ensure they complied with constitutional requirements in refraining from fabricating evidence, using false testimony, or initiating malicious prosecutions; ensuring that identification procedures were fair and are not unduly suggestive or coercive; and disclosing all exculpatory and impeachment evidence.

171. The named Defendants, as well as the individual supervisors in this case, failed to supervise, discipline, and investigate allegations of misconduct against its

employees, officers, detectives, and agents, thereby creating a culture of misconduct and emboldening said employees to engage in misconduct.

172. As law enforcement failed to properly train, supervise, or provide policies and procedures to its employees in this area, the failure of supervision violated Vargas's rights and led to his conviction and wrongful incarceration. Thus, the unconstitutional policies and practices directly and proximately caused Vargas's wrongful arrest, conviction, and incarceration.

173. Plaintiff is informed and believes, and thereon alleges that, at all times herein mentioned, the named Defendants, and Does 1 – 10, with deliberate indifference, and conscious and reckless disregard to the safety, security, and constitutional and statutory rights of Plaintiff, engaged in the unconstitutional conduct and omissions as is specifically elaborated above, which consist of the following customs and/or policies:

   a. The knowing presentation of false evidence by officers;
   b. The deliberately indifferent presentation of false evidence by officers;
   c. The presentation of false evidence by deputies and officers in reckless disregard for the truth or the rights of the accused;
   d. Officers' failure to provide exculpatory evidence to the defense;
   e. Failing to adequately train, supervise and control its officers, employees, and agents in the investigation and questioning of witnesses;
   f. Failing to adequately train, supervise and control its officers, employees, and agents to disclose to the defense all exculpatory and impeachment information, including *Giglio* and *Brady* information, which would include impeachment evidence of witnesses, exculpatory evidence, evidence of third-party culpability, and alternative theories which would support the defense;
   g. Failing to adequately discipline its officers, employees, and agents involved in dishonesty or otherwise abusing their authority;

    h.    Condoning and encouraging its officers, employees, and agents in the belief that they can violate the rights of person such as Vargas with impunity, and that such conduct will not adversely affect their opportunities for promotion and employment benefits; and

    i.    Condoning and encouraging the fabrication of evidence, including but not limited to the filing of materially false police reports, concealing material evidence and improperly influencing witnesses, the use of techniques to influence or shape witness testimony, and/or making false statements to prosecutors to obtain the filing of false charges and obtaining false convictions.

174.  Plaintiff is informed and believes that the named Defendants had no established or clear policy regarding the following issues pertaining to the disclosure of exculpatory evidence pursuant to its obligations under *Brady*:

    a.    Maintaining files and information regarding exculpatory and third-party suspect information;

    b.    Maintaining and preserving evidence of third-party culpability to ensure the information is disseminated and that the failure to distribute the evidence does not compromise the prosecution of the case;

    c.    Properly ensuring that evidence of third-party culpability is both developed and distributed to the defense in the case;

    d.    Properly ensuring the distribution of information regarding exculpatory information to the defense in the case;

    e.    Ensuring that the information discovered by investigators was reliable, and that the testimony they relied on was credible;

    f.    Training its agents in the handling of information and the provision of that information to the defense in the case, and in disclosing third-party suspect information to the defense in the case; and

    g.    Supervising its agents in the obligation to provide exculpatory information

to the defense, regardless of whether the information related to suggestive identification procedures or to third-party culpability.

175. Plaintiff is informed and believes that to the extent the named Defendants created or promulgated policies regarding the issues set out in the foregoing paragraphs, the policies were not known to or implemented by its employees and agents assigned to cases like Plaintiff's.

176. In addition, Plaintiff is informed and believes that the named Defendants had *no* established or clear policy regarding the following issues pertaining to the disclosure of exculpatory evidence and impeachment material:

   a. Ensuring that all personnel complied with the requirements of due process, including those set out in *Brady*;

   b. Ensuring that personnel, whether through inadvertence or design, did not withhold information to the defense which was either exculpatory, impeaching, or pointed to the culpability of third parties;

   c. Fully and completely documenting any interactions with witnesses, particularly witnesses who could have provided information concerning third-party suspects, in the case, and disclosing those documented interactions to the defense;

   d. Training its agents and employees to provide to the defense information that is exculpatory, impeaching, or pointed to the culpability of third parties; and

   e. Supervising its agents and employees in the provision of exculpatory identification information to the defense.

177. Plaintiff is informed and believes that to the extent the Defendants had policies regarding the issues set out in the foregoing paragraph, the policies were not known to or implemented by its employees and deputy district attorneys assigned to cases.

178. Because the policies, practices and customs of the named Defendants set forth

in the foregoing paragraphs meant that certain exculpatory, material information did not reach the defense, and because the information was both exculpatory and pointed to the culpability of third parties, these policies, practices and customs directly deprived Plaintiff Vargas of a fair trial.

179. Defendants had a duty to create a system in which information pertaining to witnesses and third-party suspects—and particularly information pertaining to the other rapes detailed in the "Serial Rapist Book," or those committed by the Teardrop Rapist—would be disseminated to the defense, regardless of whether or in what form the witness was to testify. The actions of specific actors in these agencies demonstrate either the agencies had no systems in place, or that the systems were disregarded completely.

180. The decision of the Defendants to create such a system directly resulted in the defense having no access to vital exculpatory evidence, impeachment evidence, and evidence of third-party culpability.

181. Plaintiff is informed and believes that based on the decision to create a system in which information pertaining to witnesses and third-party suspects—and specifically information regarding the other rapes detailed in the "Serial Rapist Book," or those committed by the Teardrop Rapist—would be accessed by personnel, and would not be shared with the defense, before and during the prosecution of the case, and the failure to train law enforcement personnel to disseminate information pertaining to such witnesses, the named Defendants had a pattern and practice of violating the rights of individuals like Plaintiff.

182. The actions of the Defendants here set forth in the preceding paragraphs were known or should have been known to the policy makers responsible for the City of Los Angeles and occurred with deliberate indifference to either the recurring constitutional violations elaborated above, and/or the strong likelihood that constitutional rights would be violated as a result of failing to train, supervise, or discipline in areas where the need for such training and supervision was obvious.

183. The Los Angeles Police Department policy maker's repeated decisions and related orders—not to investigate whether rapes committed in the same location, and substantially similar in description or *modus operandi*, to those rapes for which Vargas was ultimately convicted—could have been committed by the same perpetrator, and by which would have proven Vargas's innocence, created a pattern, custom, and practice of deliberate indifference within the Los Angeles Police Department of violating Vargas's Constitutional rights. The information found in the "Serial Rapist Book" or relating to the Teardrop Rapist was *Brady* material, as it could potentially, and ultimately did, substantiate and confirm Vargas's exoneration and finding of factual innocence.

184. The Los Angeles Police Department's pattern, custom, and practice of deliberate indifference in withholding *Brady* material and refusing to investigate whether substantially similar rapes committed before and after Vargas's arrest—rapes which were linked to the crimes for which Vargas was ultimately convicted, but which he could did not commit—created and established knowledge, approval, and repeated failures to correct and rectify the wrongful conduct.

185. The Los Angeles Police Department had a strict obligation to disclose any *Brady* material to Vargas, either before, during, or after his prosecution, and no request by Vargas in any scenario is necessary.

186. The Los Angeles Police Department's pattern, custom, and practice of deliberate indifference in violating Vargas's constitutional rights and the established policy that resulted without correction directly harmed Vargas by forcing him to remain in prison for years beyond which this link should reasonably have been made and *Brady* material disclosed to Vargas which would ultimately have exonerated him much earlier.

187. The actions of the named Defendants set forth herein were a motivating force behind the violations of Vargas's constitutional rights as set forth in the Complaint.

188. As a direct and proximate result of Defendants' acts and omissions, condoning, encouraging, ratifying and deliberately ignoring the pattern and practice of Defendants Quijano, Smith, and Does 1 – 10 as previously described, Plaintiff sustained injury and damage.

189. As a result of Defendants' violations of Vargas's constitutional rights as set forth herein, Vargas was damaged as alleged above.

### THIRD CLAIM FOR RELIEF
### CLAIM UNDER CALIFORNIA STATE LAW, CAL. GOV. CODE § 815.2, FOR RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY
(Against Defendants Los Angeles Police Department and City of Los Angeles)

190. Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further allege as follows:

191. Vargas suffered the aforementioned injuries as a proximate result of the misconduct of the individual Officer Defendants.

192. During all relevant times, Defendants were employees of the Los Angeles Police Department and the City of Los Angeles.

193. The acts and omissions of Defendants that proximately caused Vargas's injuries were within the scope of Defendants' employment with the Los Angeles Police Department and the City of Los Angeles.

### JURY DEMAND

Trial by jury of all issues is demanded.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiff Luis Lorenzo Vargas respectfully requests:

a. A trial by jury on each of the Plaintiff's claims;

b. That the Court award compensatory damages to Plaintiff and against Officer Defendants, jointly and severally, in an amount to be determined at trial;

c. That the Court award punitive damages to Plaintiff, and against Defendants, in an amount to be determined at trial, in order to deter such conduct by Officer Defendants in the future;

d. For pre-judgment and post-judgment interest and recovery of costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

e. For any and all other relief to which he may be entitled.

DATED: April 13, 2018

LAW OFFICES OF JAN STIGLITZ

/s/ Jan Stiglitz, Esq.
Jan Stiglitz, Esq.
Attorneys for Plaintiff
LUIS LORENZO VARGAS

DATED: April 13, 2018

BENNER & BOON, LLP

/s/ Craig Benner, Esq.
Brett A. Boon, Esq.
Craig S. Benner, Esq.
Attorneys for Plaintiff
LUIS LORENZO VARGAS

SECOND AMENDED COMPLAINT 54