**MICHAEL N. FEUER,** City Attorney - SBN 111529
**JAMES P. CLARK,** Chief Deputy City Attorney – SBN 64780
**CORY M. BRENTE,** Senior Assistant City Attorney – SBN 115453
**GEOFFREY PLOWDEN,** Deputy City Attorney – SBN 146602
200 North Main Street, 6th Floor, City Hall East
Los Angeles, California 90012
Phone No.: (213) 978-7038
Fax No.:    (213) 978-8785
Email: geoffrey.plowden@lacity.org

*Attorneys for Defendants* **CITY OF LOS ANGELES, LOS ANGELES POLICE DEPARTMENT, MONICA QUIJANO, RICHARD TAMEZ** and **SCOTT SMITH**

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUIS LORENZO VARGAS,<br><br>              *Plaintiff,*<br><br>       v.<br><br>CITY OF LOS ANGELES; LOS ANGELES POLICE DEPARTMENT; COUNTY OF LOS ANGELES; OFFICE OF THE LOS ANGELES DISTRICT ATTORNEY; LOS AGELES SHERIFF'S DEPARTMENT; MONICA QUIJANO; RICHARD TAMEZ; and DOES 1-10 INCLUSIVE,<br><br>              *Defendants.* | **CASE NO. CV16-08684 SVW (AFMx)**<br>*Hon. Stephen V. Wilson, Ctrm. 10A*<br>*Mag. Alexander F. MacKinnon, Ctrm. H, 9th Fl.*<br><br>**DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW**<br><br>Final Pretrial Conference:<br>       June 17, 2019<br>Time:    3:0 p.m.<br>Trial:    June 25, 2019<br>Time:    9:00 a.m.<br>Place:   Courtroom 10A |

**TO THE HONORABLE COURT, PLAINTIFF AND HIS COUNSEL OF RECORD:**

Pursuant to Local Rule 16-4, Defendants CITY OF LOS ANGELES, LOS ANGELES POLICE DEPARTMENT, MONICA QUIJANO, RICHARD TAMEZ[1] and SCOTT SMITH hereby submit the following Memorandum of Contentions of Fact and

---

[1] Plaintiff has abandoned his claims against Richard Tamez, who has not yet been formally dismissed from the case.n

i

Law for the Pre-Trial Conference on June 17, 2019 at 3:00 p.m. in Courtroom 10A of the United States District Court located at 350 West First Street in Los Angeles, California, 90012.

Dated: May 23, 2019

**MICHAEL N. FEUER**, City Attorney
**JAMES P. CLARK,** Chief Deputy City Attorney
**CORY M. BRENTE**, Assistant City Attorney

By: _____/s/ Geoffrey Plowden_____.
**GEOFFREY PLOWDEN**, Deputy City Attorney

Attorneys for Defendants, **CITY OF LOS ANGELES, LOS ANGELES POLICE DEPARTMENT, MONICA QUIJANO, RICHARD TAMEZ** and **SCOTT SMITH**

ii

**TABLE OF CONTENTS**

**TABLE OF AUTHORITIES** ........................................................................ iv

**MEMORANDUM OF POINTS AND AUTHORITIES**..............................1

I.    INTRODUCTION ...............................................................................1

    A.  Parties ........................................................................................1

    B.  Factual Background...................................................................1

    C.  Plaintiffs' Remaining Claims ...................................................4

        1.    Pre-Arrest Incidents. ......................................................4

        2.    Post-Arrest Incidents.....................................................4

II.   FACTUAL CONTENTIONS ............................................................5

III.  LEGAL CONTENTIONS ..................................................................9

    A.  Elements of a *Brady* Claim .............................................9

    B.  Unsolved Crimes are not *Brady* Material......................... 12

    C.  Defendants Quijano and Tamez are Entitled to Qualified Immunity .... 12

        1. The Doctrine of Qualified Immunity ................................. 12

        2. Plaintiff Fails to Identify a "Clearly Established Right".................... 14

        3. Sources of "Clearly Established Law" ................................ 15

    D.  Qualified Immunity and the *Beaman* Opinion ...................... 15

IV.  EVIDENTIARY ISSUES ................................................................ 17

V.   BIFURCATION................................................................................ 17

VI.  JURY DEMAND ............................................................................. 18

VII. ATTORNEY'S FEES ...................................................................... 18

VIII. ABANDONMENT OF ISSUES...................................................... 18

IX.  WITNESS LIST .............................................................................. 18

X.   JOINT EXHIBIT LIST.................................................................... 18

## TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Anderson v. Creighton*
483 U.S. 635, 640, 170 S. Ct. 3034, 97 L. Ed. 2d 523 (1987) .................. 11

*Barker v. Fleming*
423 F.3d 1085, 1094 (9th Cir. 2005) ........................................................ 8

*Beaman v. Freesmeyer*
 2015 U.S. App. LEXIS 527, *1 (7th Cir. 2015) ................................ 14, 15

*Brady v. Maryland*
(1963) 373 U.S. 83, 83 S.Ct. 1194, 10 L. Ed. 2d 215 ............................. 8

*Carrillo v. County of Los Angeles, et al.*
2012 U.S. Dist. LEXIS 199990, *23-28.) ............................................... 9

*City & Cnty of San Francisco v. Sheehan*
 135 S. Ct. 1765, 191 L. Ed. 2d 856 (2015) .......................................... 12

 *City of Alhambra v. Superior Court*
(1988) 205 Cal. App. 3d 1118........................................................... 2

*Clouthier v. County of Contra Costa*
591 F.3D 1232, 1248 (9TH Cir. 2010) .................................................. 8

*Coleman v. Calderon*
 150 F.3d 1105 (9th Cir. 1998) ........................................................... 15

*Estate of Escobedo v. Martin*
702 F.3d 388, 404 (7th Cir.2012) ......................................................... 16

*Farmer v. Brennan*
511 U.S. 825, 835 (1994) ................................................................. 8

*Felder v. Johnson*
180 F.3d 206, 212 n. 7 (5th Cir. 1999) ............................................... 14

*Harper v. City of Los Angeles*
553 F.3d 1010, 1026 (9th Cir. 2008) ................................................... 8

*Hope v. Pelzer*
 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) ................. 15

*Hovey v. Ayers, Jr.*
458 F.3d 892, 916(9th Cir. 2006) ...................................................... 8

*In re Misener*
(1985) 38 Cal. 3d 543 [213 Cal. Rptr. 569, 698 P.2d 637] ...................... 13

*Izazaga v. Superior Court*
(1991) 54 Cal.3d 356 ................................................................................ 7

*Kisela v. Hughes*
138 S.Ct. 1148 (2018) .............................................................................. 14

*Madsen v. Dormire*
137 F.3d 602, 604 (8th Cir. 1998) ........................................................... 14

*Paradis v Arave*
240 F.3d 1169 (9th Cir. 2001) ................................................................. 14

*Pearson v. Callahan*
555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009) ............. 12,14

*People v. Kaurish*
(1990) 52 Cal. 3d 648, 686-687 ......................................................... 2,7,14

*People v. Hall*
(1986) 41 Cal. 3d 826.................................................................................7

*People v. Sandoval*
(1992) 4 Cal.4th 155, 14 Cal.Rptr.2d 342; 841 P.2d 862 ........................... 9

*People v. Littleton*
(1992) 7 Cal. App.4th 906..................................................................2,7,13

*Pickford v. Janda*
660 Fed.Appx. 494 (9th Cir. 2010) .......................................................... 14

*Saucier v. Katz*
533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001) ................... 11,14

*S.B. v. County of San Diego,*
864 F.3d 1010 (9th Cir. 2017) .................................................................. 12

*Smith v. Almada*
640 F.3d 931, 939 (9th Cir. 2011) ....................................................8,10, 11

*Smith v. City of Chicago*
242 F.3d 737, 742 (7th Cir.2001) ............................................................. 15

v

*Steidl v. Fermon*
  494 F.3d 623, 628 (7th Cir.2007) .......................................... 16

*Tennison v. City & County of San Francisco*
570 F.3d 1078, 1087 (9th Cir. 2009 .......................................... 8

*Tortu v. Las Vegas Metro. Police Dep't.*
556 F.3d 1075, 1083 (9th Cir. 2009) ....................................... 12

*United States v. Morales*
  746 F.3d 310 (7th Cir.2014) ............................................... 17

*Walker (Tatum) v. Moody*
68 F.3d 806 (9th Cir. 2014) ................................................. 11

*White v. Pauly*
137 S.Ct. 548, 196 L. Ed. 2d 463 (Jan. 9, 2017) ...................... 12

*Wilson v. Layne*
562 U.S.603 (1999) ........................................................... 17

*Wood v. Ostrander*
879 F.2d 583 (9th Cir. 1989) ............................................... 12

*Wood v. Bartholomew*
516 U.S. 1, 6 (1995) ......................................................... 13

*Wright v. Hopper*
169 F.3d 695, 703 n. 1 (11th Cir. 1999) ................................ 14

## Statutes

Cal. Evidence Code §1040 ...........................................2,13

Cal. Proposition 115 ...............................................2,11,13

Cal. Penal Code §1054.................................................2,13

Cal. Penal Code §1054.1 ............................................... 13

Cal. Penal Code §1054.2................................................ 13

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

### A.       Parties

The parties to this litigation are Plaintiff Luis Lorenzo Vargas and Defendants City of Los Angeles, Monica Quijano and Scott Smith. Plaintiff has abandoned his claims as to Defendant Richard Tamez, who has not yet been formally dismissed from this action.

### B.       Factual Background

Between January and June of 1998, five petite Latina women were attacked by a lone, male Latino (then referred to as "Hispanic") at or near a bus stop during the early morning hours. These incidents occurred as follows:  1) January 24, 1998 (Deborah H.-Newton Division); 2) February 3, 1998 (Karen P.-Newton Division); 3) April 29, 1998 (Dania V.-Hollywood Division); 4) May 30, 1998 (Edith G.-77th Division); 5) June 6, 1998 (Teresa R.-77th Division). Vargas was initially brought to the attention of 77th Division as a result of a gang member who believed Vargas resembled the composite created by an LAPD sketch artist with the assistance of Teresa R.'s statements. Quijano and Smith learned Vargas had a 1992 conviction for forcible rape and had failed to register as a sex offender.

Vargas was later identified by Teresa and Edith from two, separate six-pack photographic folders (on July 16, 1998 and July 21, 1998).[2] Karen P. identified Vargas from a separate six-pack created by Tamez on July 27, 1998. Charges were initially filed against Vargas by DDA Robin Allen on July 23, 1998. The Felony Complaint was later amended to include the Karen P. incident, although she failed to describe an attacker with teardrop tattoos as did Teresa R. and Edith G.

A live line-up took place at the LA County Jail on November 4, 1998, at which time Karen P. and Teresa R. identified Plaintiff, but Dania V. failed to do so. Although two deputy public defenders were present, including Vargas' criminal counsel, Anthony

---

[2] Vargas was detained by LAPD Officers Carty and Lewis on July 21, 1998 for failing to register as a sex offender in violation of Cal. Penal Code §290.1

1

Patti, neither one of them ever made a request to the DA or Superior Court for other LAPD reports regarding similar crimes involving either suspects with teardrops or even women who fit the same victim profile. And despite learning of the Serial Rape Book at the time of the November 17, 1998 preliminary hearing, the defense failed to seek any information about the book or whether other incidents had been identified by the LAPD, Vargas' counsel had the ability to make the request both informally and formally and such was reasonably available through the discovery process, as is required by Proposition 115, California Evidence Code §1040, Cal. Penal Code §1054, and *People v. Kaurish* (1990) 52 Cal. 3d 648, 686-687; *People v. Littleton* (1992) 7 Ca. App. 4th 906, 909-910; *City of Alhambra v. Superior Court* (1988) 205 Cal. App. 3d 1118, 1135. Pursuant to these authorities, the detectives were <u>not</u> obligated to disclose the (confidential) victims' names, or the crime reports (official information) and an *in camera* review by the assigned Superior Court judge would have been required. *Alhambra*, supra, 1134 (outlining the several factors the <u>court must</u> consider in determining whether to disclose crime reports relating to alleged third party culpability evidence.)

The investigation considered other suspects. In fact, Quijano and Smith were successful in eliminating Mario Contreras, a Southwest Division rape suspect, by including his photograph in Six Pack Card "A," position no. 1 (wherein Vargas' photograph was placed in Position No. 6). Neither Teresa nor Edith selected his photograph, although he strongly resembled Vargas and had allegedly raped a young girl on February 3, 1997.[3]

Quijano learned of the Dania V. incident on or about September 1, 1998, as a result of causing a crime alert to be distributed to other LAPD Divisions. Soon after obtaining information about Dania V., the reports were turned over to Deputy District Attorney

---

[3] The Court has included this incident in its list of unrelated incidents in the Minute Order of August 7, 2018 (pp. 8-9), although this information was made known to the prosecutor, Vargas and his three lawyers in the criminal case, and well before the June, 1999 trial. (See MSJ Exhibit No. 12 filed on June 5, 2017).

2

1    Robin Allen. DDA Allen was also made aware of Debra H. report (1/24/98-Newton
2    division), and that who failed to identify Vargas. Thus, three other rapists with similar
3    M.O.'s and physical descriptors were disclosed to the prosecutor and defense.

4         Plaintiff was convicted of forcible rape and two counts of attempted rape following
5    a jury trial in June of 1999. He was sentenced as to the forcible rape incident only
6    wherein the Superior Court imposed a sentence of fifty-five years-to-life due to his prior
7    1992 conviction. The California Court of Appeal affirmed his conviction on June 26,
8    2000. DNA technology at the time of these events was incapable of exonerating Vargas
9    of the Teresa R. rape.

10        In 1998, teardrop tattoos were neither rare nor distinctive during the relevant time
11   period. Vargas, as well as his trial counsel, Frank Rorie, admit the tattoos were common.

12        Quijano and Smith did not dub plaintiff the "Teardrop Rapist." None of the reports
13   prepared by the LAPD refer to Vargas as such a person or perpetrator. The "Teardrop
14   Rapist," as demonstrated by the undisputed evidence in this case, is not a lone sexual
15   predator. The LA Times published at least two articles shortly after Vargas' jury trial
16   wherein it announced the arrest of Matthew Gonzales (a male, Latino, with several facial
17   teardrop tattoos who raped two teenage girls in 1999), referred therein as the "Teardrop
18   Rapist." Rorie admitted during his October, 2017 deposition of having learned of this
19   suspect, but failing to seek relief for Vargas, as he "assumed" the LAPD was
20   investigating other teardrop rapists and did not consider Gonzales' arrest to be
21   "exculpatory."

22        Plaintiff was exonerated as to the forcible rape count following DNA testing in
23   2014. The District Attorney's Office, in the absence of any exonerating physical
24   evidence or recantations from the remaining two victims, agreed to a request that the
25   convictions as to the two counts of attempted rape be vacated. Plaintiff was released
26   from custody in 2015.[4]

27   _____

28        [4] In their initial MSJ moving papers, Defendants provided a transcribed interview
     of Karen P., who claimed she still believed Vargas attacked her in 1998.

### C.       Plaintiffs' Remaining Claims

The remaining claims in this Section 1983 action are the following: 1) Violation of Fourteenth Amendment (*Brady*) as to Defendants Quijano and Smith and 2) *Monell* violations (as to City of Los Angeles only). At issue is whether Quijano and Smith acted with "deliberate indifference" or reckless disregard in allegedly failing to disclose information regarding ten (10) unrelated, unsolved sexual assault incidents to the prosecution[5].

#### 1.       Pre-Arrest Incidents

Eight of the ten incidents pre-date Vargas' arrest, which occurred on July 21, 1998. One of these eight incidents is not documented in the chronological record in the Serial Rape book (Shonte S., June 22, 1998). Detectives Quijano and Smith were unaware of this incident

#### 2.       Post-Arrest Incidents

As for the two unrelated post-arrest incidents, occurring in 77th Division on February 13, 1999 and May 15, 1999, neither Quijano nor Smith had subjective knowledge of these incidents, as they were investigated by another detective, and Quijano left 77th Division in September 1998, which was several months prior.

## II.    FACTUAL CONTENTIONS

At trial, Defendants Quijano and Smith intend to prove the following facts:

1.     Scott Smith was a LAPD Detective who was assigned to investigate the crimes committed against Edith G. and Teresa R.;

2.     Monica Quijano was a LAPD Detective who was assigned to investigate the crimes committed against Edith G. and Teresa R. (which occurred on May 30, 1998 and June 6, 1998);

---

[5] The Court listed 11 incidents on pp 8-9 of the August 7, 2018 Order on Defendants' Motion for Summary Judgment (doc. 142), but then eliminated incident No. 9 (occurring in the Rampart Division) in footnote 13 of the Order (p.12, doc. 142)

3.     Defendant Smith has never been trained that unsolved crimes are *Brady* material, per se;

4.     Defendant Quijano has never been trained that unsolved crimes are *Brady* material, per se;

5.     In an effort to identify other potential victims, Smith learned of seven, unrelated incidents wherein the M.O., victim profile and suspect profile differed from the incidents involving Edith G. and Teresa R.  The corresponding DR# (District Reporting No.) were included in the chronological record of the Serial Rape Book;

      a.  These incidents are dated:  7/29/96; 9/11/96; 2/3/97; 6/30/97; 7/2/97; 2/5/98 and 5/7/98;

6.     During June of 1998, Quijano and Smith learned of two similar incidents which occurred in LAPD's Newton Division on January 24, 1998 (Debra H.) and February 3, 1998 (Karen P.);

7.     Plaintiff was not in custody on the dates of February 3, 1998; May 30, 1998 or June 6, 1998;

8.     During early July of 1998, 77th Division Officers identified Vargas as a result of intelligence from a gang member in that Division who looked at a composite created by a LAPD sketch artist with the assistance of Teresa R. Quijano obtained a booking photograph of Plaintiff soon thereafter;

9.     Smith and Quijano identified a rape suspect out of Southwest Division (February 3, 1997 incident-documented in chronological record of Serial Rape Book) who strongly resembled Vargas who is named Mario Contreras. (Contreras was actually arrested and charged, but the case was dismissed at or following the preliminary hearing);

10.     On July 16, 1998, Edith G. and Teresa R. reviewed a six-pack photographic identification folder wherein Contreras' photographs was included in Position No. 1 and Vargas' photograph was included in Position No. 6. Both women selected Vargas' photograph. As such, Plaintiff cannot argue information about Contreras would have made a difference in the outcome of his 1999 trial;

11.   As a result of the July 16, 1998 identification procedure, the Southwest Division suspect was eliminated as the attacker of Edith and Teresa;

12.   Edith and Teresa identified Vargas from a second six-pack photographic identification folder on July 21, 1998, and Vargas was placed under arrest that day;

13.   Neither Smith nor Quijano were made aware of the June 22, 1998, February 13, 1999 or May 15, 1999 incidents until this lawsuit.  None of these incidents are included in the Serial Rape Book and none were assigned to them;

14.   There is no evidence that the June 22, 1998 incident was ever assigned to any detective at LAPD's 77th Division, or any other division during the relevant time period;

15.   The February 13, 1999 and May 15, 1999 incidents were assigned to and investigated by non-party LAPD Detective Al Contreras, who has testified that he did not know of Vargas until 2017.  Further, he did not discuss his investigations with Smith, Quijano, Tamez or McCauley[6];

16.   Quijano was transferred from 77th Division to Juvenile Division (several miles away in downtown LA) on or about September 27, 1998 (and was not re-assigned to the Juvenile table at 77th Division as stated in the court's minute order of 8/7/18; see also Quijano Declaration filed on 6/5/17, Paragraph 7.) Quijano, therefore, did <u>not</u> remain at 77th Division;

    a.   The 1999 incidents remain unsolved to this day.

17.   Smith was transferred from 77th Division to Hollenbeck Division on or about March 14, 1999;

18.   The Newton Division incident dated 5/17/98 involved a male black, who is identified by name. Absent from the record is any evidence of a suspect having been identified, arrested or indicted/charged in connection with any of the 5 remaining unrelated incidents identified in the chrono. (*See* No. 9 herein re: Southwest Division suspect for 2/3/97 incident);

---

[6] McCauley was Quijano and Smith's supervisor until he was transferred to the Juvenile "table" at 77th Division.

19.   After Vargas was charged in connection with several incidents, Quijano learned of a victim named Dania V. who was attacked in Hollywood Division on April 29, 1998, and provided the related reports given to her to the LA County District Attorney's Office.

20.   Karen P. identified Vargas from a separate six-pack identification folder on July 27, 1998 (Newton Division);

21.   At the live line-up held on November 4, 1998, Vargas' defense counsel (two public defenders) learned that Dania V. could not make an identification and therefore, were on notice of a similar incident wherein the victim could not identify Vargas;

22.   Debra H.'s failure to identify Vargas was documented by Tamez (Newton Division) and the report was provided to the prosecutor, DDA Robin Allen;

23.   Although it is undisputed that the defense knew of two women who could not identify Vargas (Dania V. and Debra H.) and was on notice of similar crimes occurring in other LAPD Divisions (Hollywood Division and Newton Division), they failed to seek copies of other similar crime reports from the Superior Court. They could have done so by way of a motion. *(See People v. Hall* (1986) 41 Cal. 3d 826*; Izazaga v. Superior Court* (1991) 54 Cal.3d 356; *People v. Kaurish* (1990) 52 Cal.3d 648*; People v. Littleton* (1992) 7 Cal. App.4th 906*)*;

24.   Plaintiff was held to answer following a preliminary hearing;

25.   The prosecution had continued access to the Serial Rape Book beginning at the time Quijano and Smith presented the case involving Teresa and Edith to DDA Robin Allen on July 23, 1998;

26.   Although the officers had no duty to produce or disclose exculpatory information directly to the defense, Vargas' counsel were aware of the Serial Rape Book no later than November 17, 1998 when Quijano repeatedly referenced the book during cross-examination during Vargas' preliminary hearing. (R.T. PH, 41:14-28);

27.   Vargas' trial counsel assumed the LAPD was investigating other teardrop rapists;

28.   Vargas and his trial counsel admit that facial teardrop tattoos were not distinctive during the relevant time period;

7

29.   Vargas' trial counsel was aware of a similar teardrop rape suspect having been arrested in August of 1999, two months after Vargas was convicted but did not think it was exculpatory;

30.   The L.A. Times articles re: The Teardrop Rapist from August of 1999 refute any claim that teardrop tattoos are rare or unusual.

## III.   LEGAL CONTENTIONS

Plaintiff claims his rights under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L. Ed. 2d 215 (1963) were violated when Defendants failed to disclose evidence of other crimes which he claims were similar to those for which he was convicted.

### A.      Elements of a *Brady* Claim.

In order to prevail on his Section 1983 Brady claim against Detectives Quijano and Smith, Plaintiff must prove by a preponderance of the evidence that one or more of them (1) withheld evidence which was favorable either because it was exculpatory or could be used for purposes of impeachment; (2) the evidence was suppressed; (3) the defendant acted with "deliberate indifference" or "reckless disregard" and (4) the non-disclosure caused the plaintiff to suffer prejudice. *Smith v. Almada*, 640 F.3d 931, 939 (9th Cir. 2011); *Tennison v. City & County of San Francisco*, 570 F.3d 1078, 1087 (9th Cir. 2009). The burden of proving deliberate indifference is a rigorous standard, and negligence is insufficient. (*Clouthier v. County of Contra Costa*, 591 F.3D 1232, 1248 (9TH Cir. 2010); *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)). Further, the evidence alleged to be "exculpatory" is prejudicial only if its suppression undermines confidence in the verdict. (See *Hovey v. Ayers, Jr.*, 458 F.3d 892 at 916 (9th Cir. 2006)). The suppressed evidence is to be considered collectively and not piecemeal. *Barker v. Fleming*, 423 F.3d 1085, 1094 (9th Cir. 2005) (quoting *Kyles*, 514 U.S. at 436).

In addition to the above-referenced elements, Plaintiff must also prove "causation," which includes both but-for and proximate causation of his alleged constitutional injury. (*Harper v. City of Los Angeles*, 553 F.3d 1010, 1026 (9th Cir.

1  2008)(cited in *Carrillo v. County of Los Angeles, et al.*, 2012 U.S. Dist. LEXIS 199990,
2  *23-28.)

3        Here, Plaintiff cannot meet his burden for a variety of reason.  First, teardrop facial
4  tattoos appear to have been incredibly common tattoos during the relevant time period.
5  Also, there is neither any documentary evidence nor testimony linking the June 22, 1998,
6  February 13, 1998 or May 15, 1999 incidents to the Defendant Officers.

7        Also, the man who attacked Shonte S. (June 22, 1998) is described as a man whose
8  features and ethnicity are strikingly similar to Vargas and the incident took place before
9  Vargas was arrested on July 21, 1998.  She failed to identify a suspect with a teardrop
10  tattoo or any facial tattoo.

11        As for the seven incidents identified in the chronological record, those remain are
12  unsolved with the exception of perhaps, the February 3, 1997 incident out of Southwest
13  Division.  Quijano and Smith eliminated that suspect (Mario Garcia Contreras) from
14  consideration after both Edith G. and Teresa R. failed to select him from Six-pack Card
15  "A" on July 16, 1998.

16        As for the remaining incidents which are identified in the chrono, the
17  corresponding reports and victim information were protected from disclosure by
18  Proposition 115 absent a court order.  Rape victims' names are confidential; and police
19  reports, especially those which are in open investigation, constitute privileged official
20  information. Further, even if the reports were "discoverable," Plaintiff fails to identify
21  any means by which he could have linked those incidents and the charged offenses to
22  an identifiable third party at or during the time of his criminal trial.  As such, the
23  exclusion of those incidents at Vargas' 1999 trial would have been proper pursuant to
24  California Evidence Code Section 352. (*People v. Sandoval* (1992) 4 Cal.4th 155, 14
25  Cal.Rptr.2d 342; 841 P.2d 862.) It is pure speculation to conclude the admission of one
26  or more of the unsolved reports would have rendered a different result. Vargas is a
27  convicted rapist and would not have taken the stand at the time of his trial as he risked
28  being impeachment by evidence of having suffered a felony conviction.

Importantly, the unsolved reports do not bear any degree of consistency as to the suspects' modus operandi, number of perpetrators, victim profile, suspect profile, weapons, suspect descriptors or locations. *(See Smith v. Almada*, 640 F.3d 931 (9th Cir. 2011.) In fact, Vargas lived in 77th Division, and had access to neighboring divisions such as Hollywood, Rampart, and Newton Division by way of bus and/or motor vehicle. Importantly, he failed to produce any documents at the time of his trial which identified his whereabouts at the time of the three charged offenses: February 3, 1998; May 30, 1998 and June 6, 1998.  It is an unreasonable stretch of the imagination that he would be able to verify his whereabouts on 13 different dates had the jury been allowed to consider the reports at issue. Highly problematic for Vargas would have been the fact that he worked in Beverly Hills at the time of his arrest. As such, he would have required him to be on the road during the early morning hours at which time the charged offenses occurred and the detectives knew he failed to register as a sex offender after being released from prison in 1995. They had this information prior to his arrest on July 21, 1998.

Defendants' provided the "book" to the prosecution at the time Quijano and Smith sought the filing of criminal charges against Vargas in relation to both Teresa R. and Karen P.  Further, the "book" was made known to the Court and defense counsel at preliminary hearing which occurred on November 17, 1998.   Within that book is material that plaintiff now alleges was not provided to the prosecutor.

Vargas' theory that the defense was not on notice of a crime spree which refuted the prosecution's "signature" culpability theory is meritless to say the least.  Vargas and his counsel were aware of five strikingly similar crimes which occurred within three LAPD Divisions and miles apart, but only three out of the five women were able to identify Vargas.  These five incidents included the three charged offenses, as well as the Debora H. (January 24, 1998-Newton Division) and Dania V. (April 29, 1998-Hollywood Division). Then-Deputy Public Defender Anthony Patti was present at the November 4, 1998 live line-up when Dania failed to identify Vargas. If a defense

1   attorney truly believed a third-party was responsible for one or more of these five crimes,

2   then he would have used the Dania "no ID" to argue a third party (with similar M.O.

3   and physical descriptors) is out there and/or made a discovery request and motion to

4   compel reports concerning similar, concurrent incidents.

5       However, defense counsel never made any such discovery request or filed a motion

6   to compel the production of the materials for an in camera review which suggests that

7   the defense did not believe that Vargas was mistaken for another perpetrator or that it

8   was concluded that evidence of unsolved crimes was worthless and offered no

9   evidentiary value whatsoever. For these reasons, Plaintiff has no evidence to support

10  any of the elements of the *Brady* claim.

11          **B.    Unsolved Crimes are not *Brady* Material**

12      Plaintiff has failed to identify any authority to support his *Brady* claim. Unsolved

13  crimes are not designated as *Brady* material by California law. (See Proposition 115,

14  Penal Code §§ 1040, 1054, and *People v. Kaurish* (1990) 52 Cal. 3d 648, 686-687;

15  *People v. Littleton* (1992) 7 Ca. App. 4th 906, 909-910; *City of Alhambra v. Superior*

16  *Court* (1988) 205 Ca. App. 3d 1118, 1135.) Further, opinions from the 9th Circuit

17  concerning similar crimes were issued years *after* Vargas' arrest and conviction. (See

18  *Jernigan, supra*; *Walker (Tatum) v. Moody*, 768 F.3d 806 (9th Cir. 2014) and *Smith v.*

19  *Almada*, 640 F.3d 931 (9th Cir. 2011)). As such, Plaintiff' *Brady* material cannot be

20  unsolved crime reports where no suspect has been identified or arrested or convicted.

21          **C.   Defendants Quijano and Smith are Entitled to Qualified Immunity**

22          **1.    The Doctrine of Qualified Immunity**

23      Qualified immunity protects police officer defendants from liability for civil

24  damages when performing discretionary functions, unless such conduct violated a

25  clearly established constitutional or statutory right of which a reasonable officer would

26  have known. *Anderson v. Creighton*, 483 U.S. 635, 640, 170 S. Ct. 3034, 97 L. Ed. 2d

27  523 (1987). In *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)

28  the Court explained that qualified immunity involves a two-step inquiry that the plaintiff

1   must overcome: First, the Court determines whether the facts as the plaintiff alleges
2   constitute a violation of the plaintiff's rights. Second, if yes, the Court must then inquire
3   whether the defendant could nonetheless have reasonably but erroneously believed that
4   his conduct did not violate the plaintiff's rights. See *Pearson v. Callahan*, 555 U.S. 223,
5   236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009) (clarifying that while the "*Saucier*
6   sequence is often appropriate, it [is not] mandatory"). In sum, the doctrine of qualified
7   immunity protects a police officer from federal civil rights liability if a reasonable
8   officer could have believed that his/her actions were constitutional, even if they were
9   not. *Wood v. Ostrander,* 879 F.2d 583 (9th Cir. 1989).

10      Most recently, the Ninth Circuit released its opinion in *S.B. v. County of San Diego*,
11   864 F.3d 1010 (9th Cir. 2017); 2017 U.S. App. LEXIS 8452 (May 12, 2017) which
12   clarified and significantly narrowed the scope of review required for a district court's
13   qualified immunity analysis. The Ninth Circuit recognized the Supreme Court's recent
14   frustration with lower courts' (Ninth Circuit's in particular) tendency to "define clearly
15   established law at a high level of generality" and noted the inquiry required the court to
16   "identify a case where an officer acting under similar circumstances as [defendant] was
17   held to have violated [the constitution.]" (citing to *City & Cnty of San Francisco v.*
18   *Sheehan*, 135 S. Ct. 1765, 191 L. Ed. 2d 856 (2015) and *White v. Pauly*, 137 S.Ct. 548,
19   196 L. Ed. 2d 463 (Jan. 9 2017). In other words, courts must "identify precedent" as of
20   the date of the incident that put defendants on "clear notice" that his or her conduct was
21   unconstitutional.  *S.B. v. County of San Diego, supra,* at *13-14.

22      Plaintiff cannot point to any clear precedent that would have put Defendants
23   Quijano and Smith on "clear notice" that they had any obligation to disclose other
24   "exculpatory" incidents of which they were unaware, nor that they had a continuing
25   obligation to find additional incidents after Plaintiff was convicted (again of which they
26   were unaware) and affirmatively disclose them.

27      Defendants are permitted to raise qualified immunity via a Rule 50(a) motion in
28   light of the evidence produced at trial. *Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d

1075, 1083 (9th Cir. 2009) Such a motion preserves defendants' right to file a 50(b) motion. Defendants raised this defense in their answer to the operative complaint.

### 2.     Plaintiff Fails to Identify a "Clearly Established Right".

Defendants never violated Plaintiff's constitutional rights, including but not limited to the right to discover exculpatory evidence provided by the Fourteenth Amendment. Plaintiff has failed to identify any case law which provides that the unsolved crime reports at issue are 'exculpatory' or *Brady* material. A reference to *Brady* and *Giglio* does not help here. Nether holding even discusses uncharged, unsolved similar crime reports as being exculpatory. Here, the so-called right to discover privileged information regarding ongoing criminal investigations absent a court order was not clearly established in 1998-2000.

Indeed, in California, the detectives were on notice such material was *not* discoverable. (*See People v. Littleton*, (1992) 7 Cal.App. 4th, 906, 911.) No such right exists today as Defendants understand current California law.

Further, even if said information was discoverable prior to Vargas 1999 trial, it would not have made a "difference in the outcome of the criminal case," because it was inadmissible under California law. Proposition 115 limited discovery, establishing reciprocal discovery between prosecution and defense. (See, Cal. Penal Code §§1054.1, 1054.2). Also, victims' identities and other unsolved, open rape reports were deemed as privileged, inadmissible evidence (Cal. Evidence Code §1040).[7]

The law was pretty clear that inadmissible evidence does not constitute *Brady* material. The United States Supreme Court reversed the Ninth Circuit wherein it concluded inadmissible polygraph results were *Brady* material in *Wood v. Bartholomew*,

---

[7] Proposition 115 repealed several discovery provisions, including former Penal Code section 1102.5 (previously declared unconstitutional in *In re Misener* (1985) 38 Cal. 3d 543 [213 Cal. Rptr. 569, 698 P.2d 637), and Penal Code former section 1430 (requiring prosecutor to furnish defendant with police and arrest reports). Furthermore, Proposition 115 repealed the provisions in Penal Code section 859 requiring prosecutors to furnish defendants with police and arrest reports.

516 U.S. 1, 6 (1995). Further, the federal courts are not in uniformity whether 'inadmissible' evidence can form the basis of a *Brady* claim. (See *Pickford v. Janda*, 660 Fed.Appx. 494 (9th Cir. 2010); *Paradis v Arave*, 240 F.3d 1169 (9th Cir. 2001)(recognizing there was no uniform approach in the federal courts to the treatment of 'inadmissible' evidence as the basis of *Brady* claims, citing *Felder v. Johnson*, 180 F.3d 206, 212 n. 7 (5th Cir. 1999); *Wright v. Hopper*, 169 F.3d 695, 703 n. 1 (11th Cir. 1999); *Madsen v. Dormire*, 137 F.3d 602, 604 (8th Cir. 1998); *Beaman v. Freesmeyer*, 2015 U.S. App. LEXIS 527, *1 (7th Cir. 2015).)

The qualified immunity issue must be examined in light of the specific facts of this case, as required by *Kisela v. Hughes*, 138 S.Ct. 1148 (2018); *White v. Pauley*, 137 S.Ct. 548 (2017) and *Smith, supra*.

### 3.    Sources of "Clearly Established Law"

In analyzing whether qualified immunity applies, this Court may immediately address prong 2 (i.e. whether the right at issue was clearly established), rather than undertake the two-step analysis. (See *Saucier v. Katz*, 533 U.S. 294, 201 (2001); *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)(holding that *Saucier's* sequence is not mandatory and gave court's discretion to grant qualified immunity on the basis of clearly established prong alone, without deciding in the first instance whether any right has been violated).)

Even if this Court disagrees with the Defendants' analysis on 'materiality,' 'prejudice,' and 'causation,' based on *Smith*, supra, qualified immunity applies.  It was not clearly established or 'beyond debate' in 1999 that law enforcement officers were required to automatically disclose to the prosecution the existence of so-called similar, but unsolved crimes wherein said information was neither discoverable (absent a court order) or even admissible.

The most analogous *Brady* claim in the Ninth Circuit was addressed in 2010 and 2011 by the panels in *Smith, supra*, wherein the Court rejected the so-called 'material' nature of unsolved, similar arson crimes. Plaintiff fails to demonstrate that the applicable

1   2011 Smith opinion has been overturned or vacated. Defendants are not aware of any

2   such subsequent, negative history. (See also *People v. Hall* (1986), 41 Cal.3d 826, 833;

3   *People v. Littleton* (1992) 7 Cal.App.4th 906, 911.)

4      Vargas cannot point to any 'identifiable' suspect known to him in 1999 because

5   there was no such person. In fact, the Ninth Circuit rejected an arguably more convincing

6   *Brady* claim in *Coleman v. Calderon*, 150 F.3d 1105 (9th Cir. 1998), wherein four,

7   identifiable 'suspects' were not charged and the prosecution allegedly withheld such

8   evidence. *Coleman* was decided weeks before Vargas' arrest on July 21, 1998.

9      **D.      Qualified Immunity and the *Beaman* Opinion**

10     The analysis of *Smith* by the Ninth Circuit is in fact consistent with that of the

11  Seventh Circuit in *Beaman v. Freesmeyer*, 2015 U.S. App. LEXIS 527, *1 (7th Cir.

12  2015). *Beaman* involved both a Section 1983 *Brady* claim and the determination of

13  qualified immunity. The claim was based on 'inadmissible' evidence, similar to this

14  case. In its analysis, the Court properly framed the qualified immunity question and

15  stated,

16          ". . . The second question in the qualified immunity analysis is whether

17          the right at issue was clearly established at the time and under the

18          circumstances presented. A plaintiff can show that a right is "clearly

19          established" by statute or constitution in at least two ways: (1) he can

20          point to a clearly analogous case establishing the right to be free from

21          the conduct at issue; or (2) he can show that the conduct was "so

22          egregious that no reasonable person could have believed that it would

23          not violate established rights." *Smith v. City of Chicago*, 242 F.3d 737,

24          742 (7th Cir.2001). Even if factual circumstances are novel, a right can

25          still be clearly established so long as the state of the law at the time gave

26          the defendants fair warning that their conduct was unconstitutional.

27          *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666

28          (2002). "A constitutional right is clearly established when 'it would be

1    clear to a reasonable officer that his conduct was unlawful in the
2    situation he confronted.' " *Estate of Escobedo v. Martin*, 702 F.3d 388,
3    404 (7th Cir.2012) (quoting *Saucier v. Katz*, 533 U.S. 194, 202, 121
4    S.Ct. 2151, 150 L.Ed.2d 272 (2001))."

Vargas' argument against qualified immunity actually violates the degree of specificity required by the United States Supreme Court in *Kisela* and *White*. The *Beaman* Court rejected the same overly broad legal contentions Vargas makes about qualified immunity in this action, wherein it stated,

"Beaman argues that *Brady* "has been on the books since 1963 and easily qualifies as clearly established law." *Steidl v. Fermon*, 494 F.3d 623, 628 (7th Cir.2007). The withholding of materially exculpatory evidence violates the Due Process Clause. *Id*. He contends that the novelty of the factual circumstance cannot excuse the *Brady* violation where it is well-established that investigators who withhold exculpatory evidence violate the defendant's constitutional due process right. While it is true that the idea that police officers must turn over materially exculpatory evidence has been on the books since 1963, it certainly has not been on the books since 1963 that polygraph reports are materially exculpatory evidence. That is because in most states, polygraph reports are inadmissible at trial. See e.g., *Jefferson*, 235 Ill.Dec. 443, 705 N.E.2d at 60 ("[T]he general rule in Illinois is to preclude introduction of evidence regarding polygraph examinations and the results of those tests.")."

" . . . Beaman also argues that it was clearly established in 1995 that evidence inculpating another suspect was *Brady* material. While that is true as a general matter, Beaman forms the question too broadly. In its broadest form, the relevant inquiry is whether inadmissible information inculpating another suspect could be *Brady* material. Again, Beaman

points to no pre–1995 case from Illinois or the Supreme Court, and we are unable to find one, establishing that inadmissible evidence inculpating another suspect (to frame it broadly) or polygraph tests (to frame it narrowly) is *Brady* material."

During the relevant time period, there was no clearly established legal precedent which provided that the officers were required to affirmatively produce their chrono, the unsolved crime reports or any related information based on California law. **It is not beyond debate that any such information would have been discoverable or admissible.** Once again, the question of whether and when inadmissible evidence can be *Brady* material remains an open question in many jurisdictions today. (*See also United States v. Morales*, 746 F.3d 310 (7th Cir.2014)).

Qualified immunity must be applied here because officers are not penalized for failing to act or acting in situations wherein judges cannot themselves reach a consensus. Officers are not penalized for selecting the so-called losing side of a legal controversy. As such, qualified immunity applies and a Rule 50(a) motion should be granted (See *Wilson v. Layne*, 562 U.S.603 (1999).)

## IV.    EVIDENTIARY ISSUES

Plaintiff have filed the following motions *in limine*:

1. To Allow Evidence of the Reversal of Plaintiff's Conviction and Finding of Factual Innocence;

2. To Exclude Evidence of Prior Bad Acts;

3. To Exclude Evidence of Plaintiff's Immigration Status.

Defendants opposed these motions.  The parties have reached an agreement that The attacker series/teardrop rapist investigation by LAPD, occurring after 2000, will not be mentioned at trial. Defendants also seek clarification from the Court prior to trial as to incident No. 9, (Rampart Division rape report), discussed above.

## V.    BIFURCATION

The court previously trifurcated the issues of liability, damages and *Monell*.

17

1    **VI.**    **JURY DEMAND**

2         The parties have demanded a trial by jury.

3    **VII.**  **ATTORNEY'S FEES**

4         Defendants reserve the right to seek attorneys' fees in this action as allowed by

5  law and this Court.

6    **VII.**  **ABANDONMENT OF ISSUES**

7         Plaintiff has abandoned his claims as to Defendant Richard Tamez, who has not

8  yet been formally dismissed from this action.

9    **IX.**   **WITNESS LIST**

10        The defendants will file their Witness List under separate cover.

11    **X.**    **JOINT EXHIBIT LIST**

12        Plaintiff will file a Joint Exhibit List.

13

14    Dated: May 24, 2019      **MICHAEL N. FEUER,** City Attorney

15                             **JAMES P. CLARK,** Chief Deputy City Attorney
                                   **CORY M. BRENTE,** Assistant City Attorney

16

17                       By: _____*/s/ Geoffrey Plowden*_____
                         **GEOFFREY PLOWDEN,** Deputy City Attorney

18                       Attorneys for Defendants, **CITY OF LOS ANGELES,**
                     **LOS ANGELES POLICE DEPARTMENT, MONICA**

19                       **QUIJANO, RICHARD TAMEZ** and **SCOTT SMITH**

20

21

22

23

24

25

26

27

28