**JAN STIGLITZ (SBN 103815)**
**LAW OFFICE OF JAN STIGLITZ**
14462 Garden Trail
San Diego, CA 92127
Tel.: (619) 525-1697
Fax: (619) 615-1497

**BRETT A. BOON (SBN 283225)**
brett@boonlawoffice.com
**BOON LAW**
411 Camino Del Rio S, Suite 106
San Diego, CA 92108
T: (619) 358-9949
F: (619) 365-4926

**CRAIG S. BENNER (SBN 283913)**
craig@bennerlawfirm.com
**BENNER LAW FIRM**
411 Camino Del Rio S, Suite 106
San Diego, CA 92108
T: (619) 595-6795
F: (619) 595-6796

**ALEXANDER J. SIMPSON**
**(SBN 235533)**
ajs@cwsl.edu
225 Cedar St.
San Diego, CA 92101
T: (619) 515-1525
F: (619) 615-1425

Attorneys for Plaintiff LUIS LORENZO VARGAS

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| **LUIS LORENZO VARGAS**, <br><br> Plaintiff, <br><br> v. <br><br> **CITY OF LOS ANGELES; LOS ANGELES POLICE DEPARTMENT;** ~~COUNTY OF LOS ANGELES; OFFICE OF THE LOS ANGELES DISTRICT ATTORNEY; LOS ANGELES SHERIFF'S DEPARTMENT;~~ **MONICA QUIJANO;** ~~RICHARD TAMEZ;~~ **SCOTT SMITH; AND DOES 1-10 INCLUSIVE,** <br><br> Defendants. | Case No.  2:16-cv-08684-SVW-AFM <br><br> **DECLARATION OF BRETT BOON, Esq. IN SUPPOT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' SUMMARY JUDGMENT MOTION** <br><br> **HON. STEPHEN V. WILSON** <br> CTRM 10A <br><br> **Date:**             **June 17, 2019** <br> **Time:**           **3:30 pm** <br> **Complaint Filed:** November 12, 2016 <br> **Trial Date:** June 25, 2019 |

**I, BRETT A. BOON, declare and state as follows:**

1. I am over the age of 21 and not a party to this action. I am one of the attorneys of record representing Plaintiff LUIS LORENZO VARGAS.

2. I make this declaration based on my personal knowledge. For those matters which I lack personal knowledge, I make them based on information and belief. If called to testify, I would competently testify to each matter set forth herein.

3. I personally attended the deposition of Los Angeles Police Departments FRCP, R. 30(b)(6) designee in this case, Detective Dan Jenks. Attached as Exhibit 1 is a true and correct copy of the transcript from his deposition.

4. Upon receipt of Defendants' Motion for Summary Judgment, I reached out to Mr. Geoffrey Plowden, counsel for Defendants to request that the Motion be rescheduled because the minimum 28-day notice requirement as prescribed by Local Rule had not been met. Mr. Plowden refused. A true and correct copy of my email is attached hereto as Exhibit 2.

///
///
///
///
///
///
///
///
///
///

5. Thereafter, Mr. Plowden reiterated Defendants' position that Plaintiff's Opposition to the instant Motion was due by May 22nd. In response, I explained Plaintiff's position in light of Court Orders and Local Rule, and which is further set forth in the instant Opposition. A true and correct copy of my aforementioned email is attached hereto as Exhibit 3. Mr. Plowden did not respond.

I declare under penalty of perjury under the laws of the state of California that the foregoing is true and correct.  Executed on May 27, 2019 in San Diego, California.

/s/ Brett A. Boon
Brett A. Boon, Esq.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

LUIS LORENZO VARGAS,              )
                                  )
          PLAINTIFF,              )
                                  )
     VS.                          )  NO. 2:16-CV-08684-
                                  )      SVW-AFM
CITY OF LOS ANGELES; LOS          )
ANGELES POLICE DEPARTMENT;        )
MONICA QUIJANO; RICHARD           )
TAMEZ; AND DOES 1-10,             )
INCLUSIVE,                        )
          DEFENDANTS.             )
_____)

VIDEOTAPED DEPOSITION OF DETECTIVE DAN JENKS

THURSDAY, OCTOBER 12, 2017

JOB NO. 112749

REPORTED BY:  SAMANTHA AVENAIM, CSR 10627

# YOUR ELECTRONIC FILES HAVE ARRIVED



IN THE MATTER OF:

LUIS LORENZO VARGAS

VS.

CITY OF LOS ANGELES

DETECTIVE DAN JENKS

OCTOBER 12, 2017

JOB # 112749

Features:

Provides full-sized and condensed transcripts in PDF format.

Includes hyperlinked exhibits to easily reference key information with one click.

Use copy and pasting features while maintaining transcript formatting.

Search transcripts and exhibit files with a single query.

Hyperlinked word index allows easy viewing of the occurrence in the transcript.

Easy to view on mobile devices.

Adobe Reader is all you need.



**COURT REPORTERS, INC.**

800-43-DEPOS (800)433-3767

production@personalcourtreporters.com

www.personalcourtreporters.com

"We don't buy your business, we earn it"

1  DEPOSITION OF DETECTIVE DAN JENKS, TAKEN ON BEHALF

2  OF THE PLAINTIFF AT 316 WEST 2ND STREET, SUITE 200,

3  LOS ANGELES, CALIFORNIA, COMMENCING AT 9:57 A.M.,

4  ON THURSDAY, OCTOBER 12, 2017, BEFORE SAMANTHA

5  AVENAIM, CSR 10627.

6

7  APPEARANCES OF COUNSEL:

8      FOR THE PLAINTIFFS:

9          LAW OFFICE OF JAN STIGLITZ
           BY:  JAN STIGLITZ, ESQ.
10         225 CEDAR STREET
           SAN DIEGO, CALIFORNIA 92101
11         (619) 525-1697
           JSTIGLITZ@CWSL.EDU
12
               --AND--
13
           BENNER & BOON, LLP
14         BY:  BRETT A. BOON, ESQ.
           542 15TH STREET
15         SAN DIEGO, CALIFORNIA 92101
           (619) 358-9779
16         BRETT@BENNERBOON.COM

17
       FOR THE DEFENDANTS:
18
           DEPUTY CITY ATTORNEY
19         POLICE LITIGATION UNIT
           BY:  SUREKHA A. PESSIS, ESQ.
20         CITY HALL EAST
           200 NORTH MAIN STREET
21         ROOM 600
           LOS ANGELES, CALIFORNIA 90012
22         (213) 978-7036
           SUREKHA.PESSIS@LACITY.ORG
23

24     ALSO PRESENT:

25         SAM LEE, VIDEOGRAPHER

DETECTIVE DAN JENKS - 10/12/2018

```
 1                      I N D E X

 2

 3  WITNESS              EXAMINATION              PAGE

 4  DETECTIVE DAN JENKS

 5                       MR. BOON                 5

 6                       MS. PESSIS               64

 7

 8

 9                      E X H I B I T S

10  NO.      PAGE      DESCRIPTION

11  EX 31    9         PLAINTIFF'S SECOND AMENDED NOTICE

12  EX 32    63        DEFENDANT'S OBJECTIONS TO
                       PLAINTIFF'S SECOND AMENDED NOTICE
13                     OF DEPOSITION

14  EX 33    65        DEFENDANT LOS ANGELES POLICE
                       DEPARTMENT'S SUPPLEMENTAL
15                     RESPONSES AND OBJECTIONS

16  EX 34    67        DETECTIVE OPERATION MANUAL

17  EX 35    69        MEMORANDUM NUMBER 1

18

19

20              QUESTIONS INSTRUCTED NOT TO ANSWER:

21                          (NONE)

22

23                  INFORMATION REQUESTED:

24                          (NONE)

25
```

```
 1                    LOS ANGELES, CALIFORNIA

 2             THURSDAY, OCTOBER 12, 2017; 9:57 A.M.

 3

 4

 5             THE VIDEOGRAPHER:  Good morning.  We are on

 6   the record at 9:57 A.M.

 7             Today's date is October 12, 2017.  My name

 8   is Sam Lee.  I'm the video technician with Personal

 9   Court Reporters, located in Van Nuys, California.

10             We are recording this proceeding at 316

11   West 2nd Street, Los Angeles, California.  This is

12   Media One for the video deposition of Detective Dan

13   Jenks in the action entitled "Louis Lorenzo Vargas

14   versus the City of Los Angeles."

15             This deposition is being taken on behalf of

16   the plaintiffs.  The case number is

17   2:16-ED-08684-SVW-AFM.

18             May I please have introductions for the

19   record, beginning with counsel.

20             MR. BOON:  Good morning.  My name is Brett

21   Boon.  I represent the plaintiff in this action.

22             MS. PESSIS:  Good morning.  Deputy City

23   Attorney Surekha Pessis, counsel for the defendant

24   and for nonparty Detective Jenks.

25             THE WITNESS:  Detective Dan Jenks,
```

1   Los Angeles Police Department.

2              THE VIDEOGRAPHER:  Thank you.

3              Ms. Reporter, would you now swear in the

4   witness.

5

6                    DETECTIVE DAN JENKS,

7               CALLED AS A DEPONENT AND SWORN IN BY

8           THE DEPOSITION OFFICER, WAS EXAMINED

9                 AND TESTIFIED AS FOLLOWS:

10

11             DEPOSITION OFFICER:  WILL YOU RAISE YOUR

12  RIGHT HAND, PLEASE.

13             DO YOU SOLEMNLY AFFIRM THAT THE TESTIMONY

14  YOU SHALL GIVE IN THE CAUSE NOW PENDING WILL BE THE

15  TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH,

16  SO HELP YOU GOD?

17             THE WITNESS:  I DO.

18

19                    EXAMINATION

09:58 20  BY MR. BOON:

21     Q.   Good morning, Detective Jenks.

22     A.   Good morning.

23     Q.   My name is Brett Boon.  I'm one of the

24  attorneys who represent the plaintiff in this

09:58 25  action, Mr. Vargas.

DETECTIVE DAN JENKS - 10/12/2018

```
 1              And off the record, you had mentioned that
 2   you were recently deposed.  If I could ask you how
 3   many times have you been deposed?
 4        A.   As a city attorney expert or throughout --
09:58 5        Q.   Generally.
 6        A.   -- my career?
 7        Q.   Just generally, how many times have you sat
 8   for a deposition?
 9        A.   I think three times, maybe four.
09:58 10       Q.   Okay.  When was the most recent?
11        A.   About a year or two ago.
12        Q.   Okay.  I'll quickly go through just some
13   ground rules for today.
14              The objective is to make today as efficient
09:59 15   as possible.  And to do so, allow me, please, to
16   finish my question before you respond, and I will
17   allow you to finish your response before I ask
18   another one.
19              Understood?
09:59 20       A.   Understood.
21        Q.   And our court reporter here today has
22   difficulty picking up things like head nods or
23   "mm-hmms" or gestures that we use in normal
24   day-to-day conversation.
09:59 25             So if you could please answer with "yeses,"
```

DETECTIVE DAN JENKS - 10/12/2018

```
 1   "noes," or affirmative responses, it makes for a

 2   better transcript?

 3          Understood?

 4   A.   Understood.

09:59  5   Q.   Okay.  And you understand today, Detective

 6   Jenks, you're here to give your best testimony.

 7          Is there any reason today why you can't

 8   give your best testimony?  Any medications you're

 9   under or any other reason why you won't be able to

09:59 10   give your best testimony today?

11   A.   No.

12   Q.   Okay.  Following today's deposition --

13          DEPOSITION OFFICER:  I'm Sorry.

14          Do all counsel stipulate to waive the

15   reporter on her read on and read off since this is a

16   Federal case?

17          MS. PESSIS:  That's fine.  We waive that on

18   all of the --

19          MR. BOON:  So stipulated.

10:00 20          MS. PESSIS:  -- on all of the depositions.

21          DEPOSITION OFFICER:  Thank you.  Sorry to

22   interrupt you.

23          THE VIDEOGRAPHER:  Also, Ms. Surekha, could

24   I have you get the mic, reverse it because it's

10:00 25   rubbing against the cloth there?   Thank you.
```

DETECTIVE DAN JENKS - 10/12/2017

```
  1 │ BY MR. BOON:
  2 │    Q.   Detective Jenks, following today's
  3 │ deposition, you're going to receive a transcript.
  4 │          You're going to have an opportunity review
10:00  5 │ that transcript, make any changes that you deem
  6 │ appropriate, corrections, edits.
  7 │          Just understand that any changes you do
  8 │ make, myself or any other attorneys in this case, if
  9 │ this matter proceeds to an evidentiary hearing such
10:00 10 │ as trial, will have an opportunity to point out
 11 │ those changes, point out those corrections, and ask
 12 │ you to verify or confirm why you made such
 13 │ corrections.
 14 │          Do you understand that?
10:01 15 │    A.   Yes.
 16 │    Q.   Now, I try to take a break at least once
 17 │ every hour.  But if at any time today you need a
 18 │ break, feel free to let me know and we will take
 19 │ one.  My only caveat is that you respond fully to
10:01 20 │ the question posed before taking a break.
 21 │          Do you understand?
 22 │    A.   Yes.
 23 │    Q.   Do you have any other questions for me
 24 │ before we get started?
10:01 25 │    A.   No.
```

1      Q.   What I'm going to do now is enter into

2  Exhibit 1 the notice for today's deposition.  And

3  actually this is Exhibit 31 in the record for this

4  case, and then give you a copy.

10:01  5           (Whereupon, Plaintiff's Exhibit 31

6                was marked for identification by

7                the Court Reporter.)

8  BY MR. BOON:

9      Q.   And we'll get to that in a minute.  I'm

10:02 10  going to enter it now as more of a formality and I'm

11  going to ask you some more questions on that.

12           And as another background item, Detective

13  Jenks, if I ever give you a document throughout

14  today's deposition, feel free to take however long

10:02 15  you need to review that document and become familiar

16  with it, and I will pause my questioning until

17  you're ready.

18           Understood?

19      A.   Yes.

10:02 20      Q.   Now, we're here today in the matter of

21  "Louis Lorenzo Vargas v. City of Los Angeles," and

22  we're going to refer throughout today's deposition

23  to the Los Angeles Police Department.

24           And we all understand if I say "L.A.P.D."

10:02 25  who I'm referring to; correct?

1     A.   Yes.

2     Q.   Okay.  In addition, we're going to be

3   referencing a specific time period in today's

4   deposition.  That time period is from 1994 through

10:03   5   the year 2000, and you can see that on Page 2 of

6   this document towards the bottom.

7         But if there's any point in time during

8   today's deposition where you are not -- where you

9   have any question about the time period as it

10:03 10   pertains to the questions I'm asking, please feel

11   free to ask me to clarify.

12         Understood?

13     A.   Yes.

14     Q.   You have been designated, Detective Jenks,

10:03 15   as the person most knowledgeable for the L.A.P.D.

16         Do you understand that?

17     A.   Yes.

18     Q.   Have you ever been -- excuse me.

19         Have you ever been designated as the person

10:03 20   most knowledgeable for the L.A.P.D. before?

21     A.   Yes.

22     Q.   How many times?

23     A.   I believe twice.

24     Q.   Have either of those cases proceeded to

10:03 25   trial?

```
 1         A.    No.

 2         Q.    Were you deposed in both of those cases?

 3         A.    I think just one.

 4         Q.    How long ago was that?

10:04 5    A.    The last year or two.

 6         Q.    Generally, what was that case about?  What

 7  were the allegations in that case, I guess is a much

 8  better question, as you understood them?

 9         MS. PESSIS:  I'm just going to object that

10:04 10 he may not have had an understanding of the

11  allegations because, to me, that's sometimes

12  irrelevant to his status as a P.M.K.

13         But you can answer.

14         THE WITNESS:  It had to do with a wrongful

10:04 15 conviction.

16  BY MR. BOON:

17         Q.    Do you remember the plaintiff's name in

18  that case?

19         A.    I believe one of them was Cole, I think.

10:04 20   Q.    Reggie Cole?

21         A.    I believe he was one of them or was joined

22  to that case, I believe.

23         Q.    One last background clarification,

24  Detective Jenks.  If at any point in time you need

10:04 25 to have a conversation with counsel, you are
```

1  absolutely within your rights to do so.  Again, I

2  just ask that you respond to the question posed

3  before taking a break.

4           Understood?

10:05  5      A.   Before taking a break, but I can talk to

6  her before I answer the question.

7      Q.   I ask --

8      A.   Before the break or --

9      Q.   Same rules.  I ask that you respond to the

10:05 10  question and then if you need to confer with

11  counsel, you can do so.

12           MS. PESSIS:  Well, my --

13  BY MR. BOON:

14      Q.   Unless she instructs you otherwise.

10:05 15           MS. PESSIS:  Well, I believe the rules

16  allow -- he is allowed to confer with me if he's

17  concerned about the attorney-client privilege before

18  answering your question.

19           MR. BOON:  Of course.

10:05 20  BY MR. BOON:

21      Q.   Have you seen this notice before today,

22  Detective Jenks?

23      A.   I believe so.

24      Q.   Have you reviewed the categories on this

10:05 25  notice?

DETECTIVE DAN JENKS - 10/12/2018

1      A.   Yes.

2      Q.   Are you aware of and do you have a basic

3  understanding of a person most knowledgeable's

4  obligations to become familiar with categories that

10:05  5  he or she may be designated as a person most

6  knowledgeable?

7           MS. PESSIS:  Objection.  Lacks foundation.

8  I'll just represent for the record that the City has

9  designated Detective Jenks as the P.M.K. on Brady

10:06 10  training for the period of the mid '90s to the end

11  of June of 2000, and that's stated in our

12  objections, which I have in front of me.

13           THE WITNESS:  I'm not aware of any specific

14  material as to the definition of a P.M.K.  I only

10:06 15  know that I've been designated, and I tried to

16  review the relevant materials.

17  BY MR. BOON:

18      Q.   What materials did you review, when you say

19  "review the relevant materials," in preparation for

10:06 20  today's deposition?

21      A.   I reviewed the current Brady material that

22  are available to the department search engine.

23      Q.   Did you also review any of those Brady

24  materials as it pertained to the time period we're

10:07 25  talking about, 1994 to 2000?

1        A.    Yes.

2        Q.    About how much time did you spend preparing

3    for today's deposition, reviewing those materials or

4    anything else you did to prepare?

10:07  5        A.    Oh, I would imagine four to six hours

6    maybe.   Maybe eight total.

7        Q.    Before we get into any substance, Detective

8    Jenks, if I could just get a brief background on

9    you.

10:07 10        What is your current position?

11        A.    I'm a homicide detective at

12    Robbery-Homicide, a Detective III supervising expert

13    detective in the Gang Homicide Unit.

14        Q.    How long have you held those positions?

10:07 15        A.    I've been a Detective III since 2005?

16        Q.    How long have you been with the L.A.P.D.?

17        A.    33 years.

18        Q.    That's a long period of time, but if you

19    can just give me the reader's digest version of your

10:07 20    history at the L.A.P.D.

21        And, again, you're not a defendant or a

22    witness in this case personally; so counsel may

23    object to relevance, but I would just like to

24    understand your background.

10:08 25        MS. PESSIS:  No.  That's fine.  I'm more

DETECTIVE DAN JENKS - 10/12/2018

1   than happy for him to do that to the extent he

2   remembers the approximate dates and positions.  Do

3   you want him to start with when he began the

4   academy?

10:08  5   BY MR. BOON:

6       Q.   Whatever -- the reader's digest version of

7   your history with the L.A.P.D. for all of our

8   benefit in the room so we can know a little bit more

9   about you as we go through today.

10:08 10       A.   I attended the Los Angeles Police Academy

11   in 1984, graduated in March of '85, worked a year in

12   Hollywood Division, and then did a short time

13   working in Undercover Narcotics for three months,

14   and then went to Southeast Patrol Division.

10:08 15            I worked there approximately three years

16   until I made training officer.  I then went to

17   Narcotics, I believe, in 1990 again as an

18   investigator.

19            I made detective, I believe, in '93.  And

10:09 20   then I went to South Bureau Homicide where I became

21   a homicide detective in '94.

22            I made sergeant in 1997.  I believe it was

23   '98 I became a supervisor of a gang unit as a

24   sergeant.  And then I reverted to detective at

10:09 25   Robbery-Homicide in August of '99, where I've been

         1  ever since.

         2      Q.    And --

         3            MS. PESSIS:  That was the reader's digest

         4  version.

10:09    5            MR. BOON:  Yes.

         6  BY MR. BOON:

         7      Q.    And I promise I'm almost done with the

         8  background material before we get into substance,

         9  detective.

10:09   10            But, finally, throughout today's

        11  deposition, I may refer to the 77th Division within

        12  the L.A.P.D. or the Newton Division within the

        13  L.A.P.D., and I just want to make sure if I make

        14  those references, we're all on the same page and you

10:09   15  understand what I'm referring to.

        16            Yes.

        17      Q.    Okay.  I promised I had one more.  I have

        18  one more.  Did you bring any documents with you for

        19  today's deposition?

10:10   20      A.    Yes.

        21      Q.    Did you bring any documents with you to

        22  produce to me for today's deposition?

        23      A.    No.

        24            MS. PESSIS:  No.

10:10   25            MR. BOON:  Those are privileged documents?

DETECTIVE DAN JENKS - 10/12/2018

1        MS. PESSIS:  Well, they might be copies of

2  documents you already have.  We've produced the

3  policies that he's looked at that I've provided to

4  the detective, you have from discovery and

10:10  5  disclosures.

6        MR. BOON:  So those are not documents to

7  produce?

8        MS. PESSIS:  Correct.

9  BY MR. BOON:

10:10  10    Q.  For purposes of today's deposition, we're

11  going to be talking about Brady, and you've already

12  referenced it.

13        I've referenced it in passing.  But to

14  clarify for the record, when we make that reference,

10:10  15  we're talking about the supreme court case of "Brady

16  v. Maryland."

17        Understood?

18    A.  Understood.

19    Q.  And specifically, we're going to be talking

10:10  20  about the affirmative obligations that that case

21  imposed upon government entities such as the

22  L.A.P.D. or the district attorney, whomever it may

23  be.

24        Understood?

10:11  25    A.  Yes.

DETECTIVE DAN JENKS - 10/12/2018

1      Q.   And again, I'm going to ask for a reader's

2   digest version because you could give me probably a

3   three-day narrative.  But what is your basic

4   understanding of a government entity's obligations,

10:11  5   affirmative obligations, as set forth in the "Brady

6   v. Maryland" case.

7           MS. PESSIS:  I'm going to ask that you

8   narrow the term "governmental entity" to a police

9   department based on his training and understanding

10:11 10   of Brady --

11           MR. BOON:  That's fine.

12           MS. PESSIS:  -- as to the L.A.P.D. and not

13   as to a prosecutor.

14   BY MR. BOON:

10:11 15   Q.   We can narrow it to the L.A.P.D., same

16   question.

17      A.   My understanding is that we're required to

18   turn -- we, as the investigators, are required to

19   turn over any exculpatory evidence as it relates to

10:11 20   an investigation.

21      Q.   Any exculpatory evidence to a criminal

22   defendant?

23      A.   Yes.  Through the prosecutor.

24      Q.   Through the prosecutor?

10:12 25   A.   Yes.

DETECTIVE DAN JENKS - 10/12/2018

1      Q.   So your understanding is that the

2   L.A.P.D.'s obligation is to disclose or produce that

3   information to the prosecutor?

4      A.   Yes.

10:12  5      Q.   And your understanding is then that the

6   prosecutor -- correct me if I'm wrong -- has then an

7   obligation to disclose that information to the

8   criminal defendant?

9           MS. PESSIS:  Are you asking him if the

10:12 10   prosecutor determines that that information is Brady

11   material?

12           MR. BOON:  No.  Simply the chain, so to

13   speak, of documents.

14   BY MR. BOON:

10:12 15      Q.   The L.A.P.D. has an obligation, as you

16   said, to turn this information over to the

17   prosecutor.

18           Is it your understanding, as you sit here

19   today, that the prosecutor's obligation is to

10:12 20   disclose that information to the criminal defendant?

21           MS. PESSIS:  May call for speculation.  May

22   call for a legal conclusion.

23           You can answer.

24           THE WITNESS:  In our training material, it

10:12 25   explains that it's the prosecutor's obligation to

DETECTIVE DAN JENKS - 10/12/2018

1  turn it over to the defendant's counsel.

2  BY MR. BOON:

3      Q.   So I guess for purposes of today, I don't

4  want to talk about the D.A.'s obligations.  You

10:13  5  don't work for the D.A.  I want to talk about the

6  L.A.P.D.'s obligations, then, as you understand

7  them.

8          And I guess the follow-up question is,

9  then:  As you sit here today, do you understand that

10:13 10  at any point in time that obligation ends?  And, for

11  instance, is there a triggering event such as a

12  prosecution, a conviction, an appeal, or any

13  triggering event in which the L.A.P.D.'s obligation

14  to turn that information over to the D.A. ends?

10:13 15          MS. PESSIS:  I'm going to object to the

16  question based on the court's ruling on the summary

17  judgment and to the extent that it calls for a legal

18  conclusion.

19          You can answer, if you know.

10:13 20          THE WITNESS:  You have to give me the

21  question one more time.  I think you said at the

22  time that it ends?

23  BY MR. BOON:

24      Q.   Do you have an understanding -- and one

10:13 25  more piece of background as we go through today:

1  Counsel will make plenty of objections to the form

2  of my questions.

3          We don't have a judge at the end of the

4  table here today.  When we're in court, there's a

10:14 5  judge who will sustain or will overrule objections

6  and will tell you to answer or not to answer based

7  on the judge's ruling.

8          Because we don't have a judge, maybe it'll

9  work out later.  So counsel may lodge objections,

10:14 10  but as long as she doesn't instruct you specifically

11  not to answer, you should still answer the question.

12          Understood?

13      A.   Understood.

14      Q.   So the question was:  Do you have an

10:14 15  understanding of if and when the L.A.P.D.'s Brady

16  obligations end, and more specifically, is there a

17  triggering event which ends those obligations?

18      A.   Yes.

19      Q.   What is your understanding of that?

10:14 20      A.   The training material says through trial,

21  through the end of trial.

22      Q.   Through the end of trial.

23          Okay.  Peel that back.  What if there is an

24  appeal?  Is your understanding that during the

10:15 25  pending appeal, the L.A.P.D. did not have those same

1  obligations?

2     A.   The material does not discuss appeals.  It

3  says through the end of trial.

4        MS. PESSIS:  It might help if you clarify

10:15  5  what material he's referring to because my problem

6  with the question is the judge has already framed

7  the time period.

8        So I don't think it's a proper question for

9  a P.M.K., and there have been developments in the

10:15 10  law since the time period.  That's why I have a

11  problem with the question.

12  BY MR. BOON:

13     Q.   Let me ask you this:  Have Brady

14  obligations imposed on the L.A.P.D., as you

10:15 15  understand them, changed at all or significantly

16  since the year 2000?

17     A.   Yes.

18     Q.   How so?

19     A.   There's been additional training material.

10:15 20  The first piece of training material was in March of

21  2000, which discussed the '98 Brady case and what

22  our obligations were.

23     Q.   What do you mean -- can you clarify the '98

24  Brady case?

10:16 25     A.   That's what's referenced in the materials,

DETECTIVE DAN JENKS - 10/12/2018

1  Brady versus Maryland 1998.

2         MS. PESSIS:  It's in a memo that we've

3  produced.  I think it's a memorandum, counsel.

4         THE WITNESS:  Memorandum Number 1.

10:16  5         MS. PESSIS:  Right.  March of 2000.  You

6  should have that in the discovery materials.

7  BY MR. BOON:

8      Q.   I'm just trying to clarify the date, 1998.

9  Is that an internal date -- the date of the memo?

10:16 10  That's not the date of the case; correct?

11     A.   The memo was March 2000.

12     Q.   Okay.  How in your understanding have,

13  then, the L.A.P.D.'s Brady obligations changed since

14  2000?

10:16 15     A.   There's been additional orders put out more

16  specific to officer's conduct and obligations and

17  the ramifications of the Brady decision on officer's

18  testimony and their field assignments.

19     Q.   So I think you gave a couple things that I

10:17 20  want to ask follow-ups.  What do you mean

21  specifically by "officer's conduct"?  You said one

22  of the areas change since the year 2000 is officer's

23  conduct.  Can you elaborate on that?

24     A.   Yes.  To discus the officer's personal

10:17 25  conduct, their personnel histories, Pitchess

 1  motions, and how that could affect their ability to

 2  testify in court, and that could affect their

 3  assignments.

 4      Q.   You also mentioned ramifications.  Can you

10:17  5  elaborate on that?

 6      A.   Yes.  It could affect your employability by

 7  the City if you're not -- if you're found -- it also

 8  discussed the district attorney's Brady policy, and

 9  then there was a follow-up memo which changed the

10:17 10  term from a Brady letter to a different, more

 11  generic term because the department can still put

 12  you into an assignment that does not require field

 13  contact or arrests or testimony without the

 14  letter -- the quote, unquote, Brady letter, from the

10:18 15  district attorney's office.

 16      Q.   Is that Brady letter -- would that be

 17  issued in a response to a -- we're talking about

 18  ramifications; so I'm making an assumption here, and

 19  I just want to make sure it's a correct one.

10:18 20          Is that Brady letter in response to a

 21  failure to uphold those Brady obligations or a

 22  falling short of the Brady obligations?  Can you

 23  just elaborate on that?

 24      A.   I don't know what the impetus for the order

10:18 25  was.  I just reviewed the order, and it's my

1    understanding, yeah.

2        Q.   Does the L.A.P.D. maintain a record of

3    officers, detective, or employees that have been

4    reprimanded for Brady failures?

10:18  5        MS. PESSIS:  I'm just going to object that

6    it is outside his purview.  That's an internal

7    affairs question.  I think it calls for speculation.

8    It also assumes facts that the department uses the

9    term "Brady" in disciplinary proceedings.

10:19 10        You can answer, if you know.

11        THE WITNESS:  The memo, I believe it's in

12   2009 or later, discussed changing the term from

13   "Brady letter" to another legal term.

14        So to answer your question, I don't know if

10:19 15   they maintain a Brady file, but there is a -- the

16   acronym, I believe, is REMAC where they discuss an

17   officer's viability for a field assignment, and then

18   a letter will be produced and maintained by internal

19   affairs or legal affairs or some entity within the

10:19 20   department.

21   BY MR. BOON:

22        Q.   What does REMAC stand for, for the record?

23   Do you know?

24        A.   I don't remember offhand, to be honest with

10:19 25   you.

1      Q.   That's fine.

2      A.   I'm not good at acronyms.

3      Q.   Have additional Brady obligations -- you

4  talked about this 2000 memo.  Have additional Brady

10:19  5  obligations been imposed on the L.A.P.D. between

6  1994 and 2000?

7           MS. PESSIS:  Other than what he's talked

8  about?

9           MR. BOON:  What he's talked about is since

10:20 10  the year 2000.

11  BY MR. BOON:

12     Q.   Now I'm going back a little bit from 1994

13  to 2000.  And that -- go ahead.

14     A.   The first document I'm aware of is from

10:20 15  March of 2000.  I could not locate any other

16  documents.  I don't recall any training prior to

17  2000 that ever addressed the term "Brady."

18     Q.   To clarify, prior to the year 2000, the

19  L.A.P.D. had no training on Brady?

10:20 20          MS. PESSIS:  Objection; misstates the

21  testimony.

22          MR. BOON:  I'm asking for a clarification.

23          THE WITNESS:  I'm not aware of any specific

24  documents on Brady before 2000.

10:20 25  ///

DETECTIVE DAN JENKS - 10/12/2018

 1  BY MR. BOON:

 2      Q.   So as the P.M.K. designated on Brady

 3  material, you're not aware of any Brady training

 4  that the L.A.P.D. undertook prior to the year 2000?

10:20  5          MS. PESSIS:  Objection; vague as to the

 6  word "training," misstates the testimony.

 7          You may answer.

 8          THE WITNESS:  I am not aware of any

 9  documents before 2000 relating -- that specifically

10:21 10  used the term "Brady."

11  BY MR. BOON:

12      Q.   Did the L.A.P.D. conduct any course

13  training?  And I understand that's a vague term, but

14  by "course training," I mean classes, lectures,

10:21 15  course training.  I think we can all understand what

16  I mean.

17          Did the L.A.P.D. conduct any course

18  training on Brady with its officers or detectives

19  prior to the year 2000?

10:21 20      A.   I am not familiar with all course training

21  for the department.  I'm not aware of any specific

22  instructional blocks on the term "Brady" before

23  2000.

24      Q.   Can you just clarify what you mean by

10:21 25  "instructional blocks"?

1       A.    Well, training is -- usually, there's a

2   course syllabus which is required by the peace

3   officers standard testing POST, and in that course

4   syllabus usually it will give an instructor's name

10:21 5   and what that portion of the course would be about.

6   They're broken up into blocks, a couple hours, a day

7   maybe.

8             I'm not aware of a course block prior to

9   2000 that specifically mentions Brady.

10:22 10       Q.    And I think -- and I'm just going to unwrap

11   that.  Were you talking about a course block within

12   the L.A.P.D. or a course block within POST training?

13       A.    Several of our courses are L.A.P.D.

14   training, certified by POST.

10:22 15       Q.    Do you know if prior to the year 2000 POST

16   had within its curriculum Brady training?

17       A.    I do not know the answer to that question.

18       Q.    Do you know if prior to the year 2000 --

19   and I may have already asked this -- prior to the

10:22 20   year 2000, if anywhere in L.A.P.D.'s training

21   curriculum there was training on Brady?

22       A.    Not that I'm aware of.

23       Q.    And that includes all of L.A.P.D., and I'm

24   talking Officer I to commanding officer and anywhere

10:23 25   in between; is that correct?

1              MS. PESSIS:  Vague as phrased.

2              THE WITNESS:  I'm basing my opinion based

3     on my knowledge at the time, and of the materials

4     that I've reviewed I'm not aware of any.  But I

10:23  5     don't know what training command gets that I'm not

6     privy to.

7     BY MR. BOON:

8         Q.   I understand.  Let me ask a better

9     question.

10:23 10              Were there any Brady policies -- and I know

11    that's a vague term -- in place prior to the year

12    2000 in which -- let me peel that back.

13              You talked about since the year 2000

14    there's a memo which instructs L.A.P.D. officers to

10:23 15    turn over Brady material to the D.A.; correct?

16        A.   Prosecutor.

17        Q.   Prosecutor; correct?

18        A.   Yes.

19        Q.   Okay.  And if I said "D.A.," "prosecutor,"

10:24 20    I'm using those interchangeably.

21        A.   They're -- well, for us there's also a city

22    attorney that prosecutes our cases.  So that's why

23    we -- we turn over material to the city attorney and

24    the district attorney depending if the case is a

10:24 25    misdemeanor or a felony.  So --

1        Q.    Okay.

2        A.    -- "prosecutor's" a more general term for

3    us.

4        Q.    So I'll use "prosecutor," then.

10:24  5        So we talked about a memo in the year 2000

6    in which the L.A.P.D. detailed or set forth their

7    obligations to turn over the Brady material to a

8    prosecutor; correct?

9        A.    Correct.

10:24  10        Q.    Was there any similar memo on that topic

11    prior to the year 2000?

12        A.    Not that I'm aware of.

13        Q.    Was there any instruction prior to the year

14    2000 --

10:24  15        MS. PESSIS:  Vague --

16    BY MR. BOON:

17        Q.    -- on that issue?

18        MS. PESSIS:  I'm sorry.  Vague as to

19    "instruction."

10:24  20        But can you answer, if you can.

21        THE WITNESS:  Well, you're saying Brady

22    issue, which is discovery.  We've always had

23    training on discovery but not specific to Brady that

24    I'm aware of.  And in the memo it says any recent

10:25  25    decision, then the discussion begins about the

DETECTIVE DAN JENKS - 10/12/2018

```
 1   obligations of Brady.
 2          So to answer your question, we've always
 3   had discovery training and obligations in discovery,
 4   but I'm not aware until '98 that we discussed Brady
10:25 5   as it related.  So as an issue, discovery, yes.  An
 6   issue if you're saying Brady only and its decision,
 7   then that's separate.
 8          MS. PESSIS:  It might help if you -- if you
 9   drop the term "Brady" and expand it to "discovery,"
10:25 10   and then I think it would go much faster for you.
11          MR. BOON:  It might, but that's not what
12   I'm getting at.
13   BY MR. BOON:
14       Q.   You've a couple of times referenced the
10:25 15   year 1998, and I'm just trying to understand where
16   you're getting that reference from.
17          Is it your understanding that the "Brady v.
18   Maryland" case was issued in 1998?
19       A.   I believe that's what it said in the memo.
10:26 20       Q.   So it's your understanding that prior to
21   1998, there were no Brady obligations because that
22   case had not yet been issued?
23          MS. PESSIS:  Do you want him to look at the
24   memo?
10:26 25          MR. BOON:  No.  I want him to answer the
```

```
 1    question.

 2            MS. PESSIS:  Because he's not expected to

 3    memorize a memo of that length.

 4            But you can answer, if you know the answer.

10:26  5            THE WITNESS:  We've always had discovery

 6    obligations.  But the term "Brady" was not -- I'm

 7    not aware of it being a department document until

 8    2000.

 9            And I believe -- I don't know if it's

10:26 10   the -- the cite says 1998 in the cite material.  I'm

11    not sure if that's the appellate decision or -- you

12    know, I'm not an attorney.  I'm not sure -- I just

13    noticed that in the -- in the document.

14    BY MR. BOON:

10:27 15       Q.   So as far as a L.A.P.D. designated P.M.K.

16    on Brady issues, is it your understanding -- is it

17    L.A.P.D.'s understanding that prior to 1998 there

18    were not obligations under Brady based on your

19    understanding that before 1998 the Brady case had

10:27 20   not yet been issued?

21            MS. PESSIS:  Objection; misstates the

22    testimony.

23            THE WITNESS:  You're still using the term

24    "Brady," and I'm not sure if we're talking about

10:27 25   Brady as any different than discovery.
```

1    We've always had discovery obligations I

2  think since 1976.  So if you're saying -- we have

3  had discovery obligations, but I'm not sure that the

4  term "Brady" was implied or mentioned prior to that

10:27  5  memo in 2000.

6  BY MR. BOON:

7    Q.   Let's go back to a background question I

8  asked when we talked about your understanding of

9  Brady obligations.  And feel free to correct me if

10:28 10  I'm wrong, but you said something to the effect of

11  to disclose exculpatory material to the prosecutor.

12    Is that a fair assumption?

13    A.   Yes.

14    Q.   Fair characterization?  Okay.

10:28 15    That obligation under Brady to disclose

16  exculpatory material to the prosecutor as far as the

17  L.A.P.D. Brady training is concerned, did that not

18  begin until 1998?

19    A.   No.  I think that in 19 -- in 2000 when the

10:28 20  order came out, it expanded or more specifically

21  explained what obligations we had related to Brady.

22    Where before it was reciprocal discovery

23  because the law had changed in, I believe, 1976, and

24  then it went on to add that the categories of the

10:29 25  exculpatory evidence under Brady had to do with

 1  prior inconsistent statements, issues -- it further

 2  defined what discovery obligations we had.

 3          But we had reciprocal discovery, I believe,

 4  again in 1976, before I came on to the department,

10:29  5  and that was the training up until 2000.  And then

 6  in 2000 under the Brady decision, it was more -- the

 7  definition was a little more specific.

 8          MS. PESSIS:  And again, I'll just state

 9  that the document to which he's referring has been

10:29 10  produced in discovery.  And it speaks for itself.

11  BY MR. BOON:

12      Q.   So now we're talking about in that response

13  you mentioned, the 2000 memo.

14          Prior to the 2000 memo, did the L.A.P.D.

10:29 15  have any training on the officer's affirmative

16  obligations to disclose exculpatory material, as you

17  understand that decision under Brady?

18      A.   Yes.

19      Q.   Talk to me about that training prior to the

10:30 20  year 2000.

21      A.   Prior to --

22          MS. PESSIS:  Well, how far are we going

23  back?  Because we're not going to back to 1950

24  because he was not around and not working for the

10:30 25  department.  So --

1          MR. BOON:  1994 to 2000.

2          MS. PESSIS:  Okay.

3          THE WITNESS:  Our obligations from 1994 to

4   2000 was that the investigating officer's

10:30  5   responsible to turn over materials related to the

6   case for discovery to the prosecutor on felony

7   findings.

8          The definition of "exculpatory" or, more

9   specific, Brady information about the veracity of

10:30 10   the statement was in -- when that order came out in

11   2000 to make sure that's inclusive where before it

12   was more you turned over all the relevant documents

13   to your investigation.

14          That was what was taught, I believe, in

10:30 15   detective school.  That was department policy, is

16   that it's the detective investigating officer's

17   responsibility to turn it over and not the discovery

18   unit within the district -- the D.A.'s -- I'm

19   sorry -- the city's policy was discovery on civil

10:31 20   matters.

21          It goes out to the discovery unit and

22   discovery from a criminal investigation comes from

23   the investigating detective.

24   BY MR. BOON:

10:31 25      Q.   When we're talking about discovery for the

DETECTIVE DAN JENKS - 10/12/2018

1  purposes of these next few questions, I want to

2  differentiate here between a discovery request and

3  responding to it versus an affirmative obligation to

4  turn over material whether there's a discovery

10:31  5  request or not.

6           Is your understanding under Brady that the

7  L.A.P.D.'s obligation is to turn over exculpatory

8  material in response to a discovery request or is it

9  to affirmatively turn over that material whether

10:31  10  there's a discovery request pending or not?

11           MS. PESSIS:  Correct.  No.  It was vague.

12  Thank you, sir.

13           THE WITNESS:  Well, we have -- we entered

14  into in the discussion in the training materials

10:32  15  that we are involved in informal discovery, and that

16  we should provide all discovery available and that

17  it says we have an affirmative obligation once the

18  information becomes known up until trial to make

19  sure that we turn over any materials that could be

10:32  20  considered exculpatory.

21  BY MR. BOON:

22      Q.   And is that, whatever you're going to

23  phrase it as, a guidance or instruction or -- in

24  that 2000 memo, is that affirmative obligation --

10:32  25  strike that.

DETECTIVE DAN JENKS - 10/12/2018

1      Did that affirmative obligation you just

2  discussed begin in the year 2000 for the L.A.P.D.?

3      A.   No.

4      Q.   When did that begin, if you know?

10:32  5      A.   I'm aware that in 1976 there was a

6  published document that apparently the rules of

7  discovery had been ruled on and changed and that it

8  was the department's obligation now to turn over all

9  evidence related to the case.  Apparently, before

10:33 10  that that was not the requirement or the state of

11  law.

12      MS. PESSIS:  And for the record, that

13  document was produced by the City beginning at Page

14  236.

10:33 15  BY MR. BOON:

16      Q.   Prior -- let's talk about 1994 to 2000.

17  Let's talk about officer training.  Can you just

18  talk to me about what within the curriculum for

19  officer training the L.A.P.D. from the years 1994 to

10:33 20  2000, as the P.M.K. on Brady training, how much

21  training is there on Brady?  That's a bad question,

22  I know, but I think you understand it.

23      What is the general emphasis of the Brady

24  training for officers from '94 to 2000?  And I'm

10:33 25  sure I'll have follow-ups, and we'll get more

1   specific.

2          MS. PESSIS:  Okay.  So here's my objection:

3   It's overly broad as stated in reference to

4   officers.  That question could be interpreted to

10:34  5   mean the officers in the academy who haven't even

6   graduated.

7          So are you going to narrow it to detective

8   school and working detectives being trained by elder

9   detectives?

10:34 10   BY MR. BOON:

11     Q.   If you understand the question, and then

12   I'll narrow it as we go, but we're going to start

13   broad.

14     A.   The only training I'm aware of related to

10:34 15   Brady, as you phrased the question, was the 2000

16   document, which would have been served upon each

17   officer, and they would sign and acknowledge that,

18   and there would probably have been rollcall

19   discussion about it for the officers, detective

10:34 20   squad meetings for the detectives, and any

21   instructional blocks in detective schools may have

22   included that.

23          But I'm not -- I have not reviewed those

24   course curriculums to see if they mentioned Brady

10:34 25   specifically.

1        Q.    And again, you've referenced the 2000 memo

2    in that response.

3              My follow-up question is:  Was there any

4    specific training on Brady prior to that 2000 memo

10:35  5    within the L.A.P.D.?

6              MS. PESSIS:  Vague as to the term "Brady"

7    based on his testimony.

8              You can answer.

9              THE WITNESS:  I'm not aware of a reference

10:35 10   to Brady as you mentioned it.  I am of discovery.

11   BY MR. BOON:

12       Q.    Does training insofar as it pertains to --

13   we'll talk discovery now.  That's the more general

14   term.  Discovery obligations, is that differentiated

10:35 15   between levels of an L.A.P.D. employee?  And by

16   "employee" I mean is that differentiated between,

17   say, an officer versus a detective?

18       A.    Yes.

19       Q.    Is there a heightened training on discovery

10:35 20   for a detective versus an officer?

21       A.    Yes.

22       Q.    Can you tell me about, then, the

23   differentiation between an officer's training versus

24   a detective's training on discovery obligations

10:36 25   between '94 and 2000?

1    A.   Yes.  An officer's requirements were to

2  provide all reports, all statements in their arrest

3  report at the time of booking, and they generally

4  have to sign -- I believe at that time they'd

10:36  5  already instituted a policy of signing a discovery

6  disclosure statement at the end of that report

7  saying that they had provided all material.

8         The detective's responsibilities are

9  different in that the department policy is that an

10:36 10  investigating officer provides all discovery,

11  including the officer's statement, and any of the

12  detective's follow-up investigation to the

13  prosecutor at the time of filing and up until the

14  time of trial if any new information is developed.

10:36 15    Q.   You've referenced a discovery disclosure

16  statement?

17    A.   Yes.

18    Q.   What is that?

19    A.   It's a form -- I believe it's actually a

10:37 20  city attorney form at the end of an arrest report

21  that requires the officer to sign a form that they

22  had provided all documents, photographs, any

23  evidence that they developed during their initial

24  investigation.

10:37 25    Q.   Was that form in place between the years

DETECTIVE DAN JENKS - 10/12/2018

1    '94 to 2000 inclusively?

2        A.   Yes.

3        Q.   And is that form a requirement for both

4    officers and detectives?

10:37  5        A.   If it's been completed by the officer at

6    the end of the arrest report.  Now, if I as a

7    detective make an -- make my own arrest, a

8    detective-initiated arrest when I did the arrest

9    report, then I would be required to do the

10:37 10   disclosure forms.

11            There's also the detective, when he files

12   the case with the district attorney's office,

13   sometimes an officer is required to sign a

14   disclosure -- a discovery form as well,

10:37 15   acknowledgment that they have provided all

16   discovery.

17       Q.   So after the year 2000 -- you talked about

18   this 2000 memo in which Brady allegations were set

19   forth.

10:38 20           Fair characterization?

21       A.   Yes.

22       Q.   How was that determination made?  And more

23   specifically, how was it determined whether a piece

24   of information within the L.A.P.D. is, in fact,

10:38 25   Brady material that they're obligated to disclose?

DETECTIVE DAN JENKS - 10/12/2017

1        MS. PESSIS:  Objection; overly broad,

2   incomplete hypothetical, may call for speculation

3   and a legal conclusion.

4        You can answer.

10:38   5        THE WITNESS:  Can you repeat the question,

6   please.

7   BY MR. BOON:

8      Q.   Sure.

9           Since the 2000 memo, you said that there

10:38 10   are Brady obligations since the year 2000 to

11   affirmatively disclose material; correct?

12      A.   Correct.

13      Q.   And that's to affirmatively disclose

14   exculpatory material; correct?

10:38 15      A.   That's part of it, yes.

16      Q.   How is that determination made?  In other

17   words, if I have a piece of information as an

18   L.A.P.D. detective --

19      A.   Yes.

10:39 20      Q.   -- since the year 2000, how do I decide if

21   that material is, in fact, exculpatory and,

22   therefore, I'm required to disclose it?

23        MS. PESSIS:  Objection; lacks foundation.

24        THE WITNESS:  We turn over generally all

10:39 25   materials we have.  And that decision as to what is

```
 1   exculpatory is made by the prosecutor.

 2          The Brady memo broadened, I think, the

 3   definition of what could potentially be discoverable

 4   as in the veracity of a witness statement or

 5   something about their moral turpitude or background

 6   before we produce reports.

 7          Now we're talking more about the personal

 8   characterization of a witness or information known

 9   to us about a witness, an officer, the veracity of

10   his statement.

11   BY MR. BOON:

12      Q.   So that's a little bit different, then.  We

13   talked earlier about disclosing exculpatory

14   material, and you've just phrased it as producing

15   all materials to the prosecutor.

16          MS. PESSIS:  Misstates the testimony.  He

17   didn't say "all."

18          MR. BOON:  I'm asking for clarification.

19          THE WITNESS:  Generally, a detective is

20   going to produce their case book with their -- all

21   information that's relevant to that investigation.

22   BY MR. BOON:

23      Q.   And that's since the year 2000?

24      A.   Yes.

25      Q.   Prior to the year 2000, how were those
```

1 obligations different, prior to that 2000 memo?

2     A.    I don't think they were different. I just

3 don't think that prior to that it wasn't as clear

4 the detectives needed to discuss the veracity of the

10:40 5 witnesses or -- and that's what the memo discussed.

6 That needs to be included.

7     Q.    Is there any training on whether an officer

8 or a detective since the year 2000 is obligated to

9 turn over internal notes or memorandum pertaining to

10:41 10 a criminal defendant?

11     MS. PESSIS:   I'm going to object to the

12 time period since 2000, and it's vague. It also may

13 call for a legal conclusion.

14     THE WITNESS:   Since 2000, were any -- our

10:41 15 notes or memorandums -- all notes need to be

16 turned -- are to be turned over as part of regular

17 discovery, including Brady.

18     But that's always been an obligation, that

19 we turn over notes relevant to a case. I'm not

10:41 20 aware of what a memorandum will be. We don't write

21 memorandums on cases.

22 BY MR. BOON:

23     Q.    That's a broad term.

24     A.    Okay.

10:41 25     Q.    Prior to the year 2000, was that obligation

1    in place within the L.A.P.D.?

2        A.    Yes.

3        Q.    How did that obligation change in the year

4    2000 based on this 2000 memo?

10:41  5          MS. PESSIS:  I'm just going to object; the

6    memo speaks for itself.  And it's been asked and

7    answered.

8          THE WITNESS:  Again, it didn't change the

9    initial discovery.  It just further defined what

10:42 10   could be considered discovery and what our

11   obligations were.

12   BY MR. BOON:

13       Q.    But how was the determination made as to

14   what is considered discovery?  And that goes back to

10:42 15   my question, if I'm a detective and I have a piece

16   of information, how do I determine if that piece of

17   information is, in fact, discovery that I'm

18   obligated to disclose?

19       A.    Based on its relevance to the case, you

10:42 20   make that decision.  If you run up a suspect, for

21   instance, and you're looking at a suspect and he was

22   in custody at the time of the crime and you've ruled

23   him out, it wouldn't necessarily be every single

24   computer check you did that didn't work out.

10:42 25   Although you worked it on a case, that wouldn't be

1  exculpatory.  It would be -- you wouldn't include it

2  in the discovery.

3          If it was relevant to your information, you

4  would provide it in your discovery to the

10:43  5  prosecutor.

6      Q.   And again, you're getting to the essence of

7  my question.  You're talking about if it's relevant.

8  If it's relevant, we turn it over to the prosecutor.

9  How do I make that determination as an L.A.P.D.

10:43 10  detective if it's irrelevant?  Is it each detective

11  makes the decision on their own?  Is there some

12  supervisor who they go seek out and say, "Hey, help

13  me with this decision"?

14          How is that decision made?

10:43 15     A.   Well, we all have a basic understanding of

16  the law from our training and experience.  And if

17  it's relative -- relevant to the criminal

18  investigation, you would include it.  If it's

19  something that's been completely eliminated, then

10:43 20  you eliminate it.

21          You may make a note about it in your chrono

22  or something like that or you may not.  At every

23  single run you do is -- it's just not possible to

24  document every single thing you've thought about in

10:43 25  your head.

1          Relevance, you may go to a supervisor if

2  you're not sure.  That's what the supervisor is

3  there for.  You can go to that supervisor and ask

4  questions, find out what their opinion would be

10:44  5  about it.

6      Q.   As the L.A.P.D. P.M.K. on Brady training,

7  what is your understanding of relevance?  That's a

8  term you used throughout that answer.  What's your

9  understanding of what is relevant and what's not

10:44 10  relevant?

11          MS. PESSIS:  You mean to a case and to be

12  turned over?  Is that a "yes"?  I'm not sure.  It's

13  vague.

14  BY MR. BOON:

10:44 15     Q.   As you phrased it within your response, you

16  used to the term "relevant" periodically.  What's

17  your understanding of what is relevant?

18     A.   It has a direct correlation to the

19  investigation.

10:44 20     Q.   Could potential third-party culpability be

21  relevant to a case?

22     A.   Absolutely.

23     Q.   Could potential similar crimes be

24  conducted -- being committed with a similar M.O. be

10:44 25  relevant to a case?

1      A.   Yes.

2      Q.   So now we're talking about relevance, and

3  that's another legal term.  You're not a lawyer, but

4  I want to ask:  Is there training on what is

10:45  5  relevant within the L.A.P.D. prior to the year 2000?

6           MS. PESSIS:  Objection; overly broad,

7  incomplete hypothetical.

8           THE WITNESS:  Not that I'm aware of.

9  BY MR. BOON:

10:45 10     Q.   So the L.A.P.D. had no training prior to

11  the year 2000 on what is considered relevant

12  information to a criminal case?

13     A.   Training was that we -- actually, the

14  training we provided is that we turn over all

10:45 15  materials.  I don't believe it has the term

16  "relevant" in it.  I'm just giving that as my

17  example.

18     Q.   Do you know -- this may very well be

19  outside the scope of the question -- how many times

10:45 20  the L.A.P.D. has been sued civilly for violating

21  Brady -- for allegations of violating Brady, if you

22  know?

23           MS. PESSIS:  That's a better question.

24           THE WITNESS:  I do not know.

10:46 25  ///

DETECTIVE DAN JENKS - 10/12/2018

```
 1   BY MR. BOON:
 2       Q.   You talked about officer academy earlier.
 3   Is there a different set of curriculum course
 4   training that detectives go to during their training
10:46  5   process before becoming an L.A.P.D. detective that
 6   is different than officer academy?
 7       A.   Yes.
 8       Q.   How long -- what is that called?
 9       A.   There's a detective school.
10:46 10       Q.   How long is detective school?
11       A.   I believe it's changed over the years, but
12   I think in most periods it's been two weeks.
13       Q.   Prior to the year 2000, 1994 to 2000, was
14   detective school, a fair characterization, about two
10:46 15   weeks?
16       A.   I believe so.
17       Q.   And that's in addition to officer training
18   or in lieu of officer training?
19           MS. PESSIS:  Vague as to "officer
10:47 20   training."  Are you talking about patrol training or
21   academy training, or both?
22           THE WITNESS:  Every detective has been to
23   patrol training to make it to detective.  So that's
24   inclusive of a detective.
10:47 25           Training is an ongoing requirement by the
```

DETECTIVE DAN JENKS - 10/12/2017

1  state.  So to answer your question, everybody gets a

2  certain amount of training to maintain their POST

3  certificate, and then a detective gets more training

4  at detective school and generally has to either work

10:47  5  in an investigative assignment where they get direct

6  training from a supervisor and then likely review

7  the relevant material before taking the examination

8  to make detective, which I would also consider

9  training and reviewing of materials.

10:47 10  BY MR. BOON:

11      Q.  So there is an examination you have to pass

12  on after your two weeks of training to become a

13  detective?

14      A.  No.

10:47 15      Q.  You referenced examination.  I'm just

16  trying to clarify what you meant by that.

17      A.  You take the examination.  If you pass the

18  examination, you then take an oral interview.  You

19  take an oral interview.  You're placed on a list

10:48 20  when the opportunities present.  If you are

21  promoted, then generally at that point you're

22  assigned to detective school.

23          However, sometimes people sign up and go to

24  detective school before they ever take the test.

10:48 25      Q.  So since the year 2000, you've got this

DETECTIVE DAN JENKS - 10/12/2018

1   2000 memo which talks about Brady.  There's this

2   two-week detective school.  Is Brady discussed or

3   taught during the two-week detective school since

4   the year 2000?

10:48 5            MS. PESSIS:  You mean the word "Brady"?

6   BY MR. BOON:

7        Q.   The obligations under Brady.

8            MS. PESSIS:  Okay.  That's a different

9   question, then.

10:48 10           THE WITNESS:  Discovery, I'm sure, is an

11  instructional block.  But I don't know if they used

12  the specific term "Brady," and that if and when it

13  got inserted into the curriculum because the memo

14  didn't come out until 2000.

10:49 15  BY MR. BOON:

16       Q.   But based on your understanding of the fact

17  that the memo came out in the year 2000, it would be

18  a fair assumption to make, then, that prior to the

19  year 2000 there was no reference to Brady in

10:49 20  detective school; is that correct?

21           MS. PESSIS:  Objection; irrelevant.  And it

22  also calls for speculation as you've phrased it.

23           THE WITNESS:  Is it fair to say -- I don't

24  know what an instructor said in the class, if he

10:49 25  mentioned the term "Brady."  He may have.  I didn't

1  sit through each and every class.  So I only went

2  through it once, and it was much earlier.

3  BY MR. BOON:

4      Q.   When did you go through detective school?

10:49  5      A.   I believe it was probably around in the

6  '90s.  'Early '90s.

7      Q.   But based on your understanding that this

8  memo came out in the year 2000 in the L.A.P.D.

9  discussing Brady obligations, based on that

10:49 10  understanding and as you sit here today as the

11  P.M.K. on Brady training for the L.A.P.D., is it a

12  fair assumption to make that prior to the year 2000,

13  Brady obligations were not taught at detective

14  school?

10:50 15          MS. PESSIS:  Misstates the testimony.

16          THE WITNESS:  I believe discovery

17  obligations were taught in the -- in the school, but

18  I don't know if the term "Brady" at what point, if

19  ever, it was added to the curriculum prior to 2000.

10:50 20  BY MR. BOON:

21      Q.   You said "if ever."  Is Brady in the

22  current curriculum for detective school?

23      A.   I would have to look at the course outline.

24  Like I said, I have not been back to the school, and

10:50 25  I don't know if they discussed it as Brady or if

 1  it's under an instructional block as discovery.  The

 2  course evolves and changes over different periods of

 3  time.

 4     Q.   And just for clarification -- because I

10:51  5  feel I'm coming down with something; so we're going

 6  to take a break here in a minute.  I need some

 7  water.  It's been a long month.

 8        We've talked a lot in this deposition about

 9  time frames.  And I'm talking about the years '94 to

10:51 10  2000, and you're talking about this 2000 memo.  Bear

11  with me.

12        Is it a fair characterization that between

13  '94 and 2000, the L.A.P.D. had no training on Brady

14  because that memo did not come out until the year

10:51 15  2000?

16     A.   No.

17        MS. PESSIS:  I'm sorry.  It misstates the

18  testimony.

19        MR. BOON:  It's asking for clarification.

10:51 20        MS. PESSIS:  I don't think so.

21        But you can repeat your answer, but that

22  should be the last time.  It's been asked many

23  times.

24        THE WITNESS:  I believe the term "Brady" in

10:51 25  department training material was first referenced in

DETECTIVE DAN JENKS - 10/12/2017

 1  2000.

 2  BY MR. BOON:

 3      Q.    So it was not referenced in L.A.P.D.

 4  training prior to the year 2000?

10:52  5      A.    Training materials, published materials

 6  that I'm aware of, correct, prior to 2000.

 7      Q.    Would it surprise you if I told you that

 8  the Brady decision came down in 1963?

 9          MS. PESSIS:  Objection; the memorandum

10:52 10  speaks for itself.  He's not here to challenge you

11  on what year Brady was issued.  The Court is well

12  aware of when Brady was issued, and that's all that

13  matters.

14          THE WITNESS:  It surprises me that it was

10:52 15  that far along before we had a memo on it, but I'm

16  not sure what changed.

17  BY MR. BOON:

18      Q.    So it surprises you that between 1963 and

19  the year 2000 the L.A.P.D. had no training on Brady

10:52 20  even though that decision had been in place for

21  nearly 40 years?

22          MS. PESSIS:  Objection; misstates the

23  testimony and it also misstates the documents my

24  office has produced.

10:53 25          THE WITNESS:  There are many court

1   decisions, and until they became relevant to the

2   department or become training material, the genesis

3   of when they were created and when the decisions

4   were made, it does not surprise me, no.

10:53  5   BY MR. BOON:

6       Q.   So from the L.A.P.D.'s perspective, then,

7   the Brady decision did not become relevant to

8   training material until the year 2000; is that a

9   fair characterization?

10:53  10          MS. PESSIS:  Misstates the testimony.

11          THE WITNESS:  Brady material -- discovery

12   has always been a requirement dating back to '76.

13   The actual decision or reference to the decision or

14   as it's defined in the memo didn't become relevant

10:53  15   until 2000.

16   BY MR. BOON:

17      Q.   So Brady obligations weren't relevant to

18   curriculum training within the L.A.P.D. prior to the

19   year 2000; is that correct?

10:53  20          MS. PESSIS:  Objection; misstates the

21   testimony.  It also lacks foundation as to the time

22   period before he joined the department.

23          THE WITNESS:  Discovery has always been a

24   requirement, but the term "Brady" I'm not aware of

10:54  25   being utilized in training material before 2000.

DETECTIVE DAN JENKS - 10/12/2017

1   BY MR. BOON:

2       Q.   And I'm not talking specifically about the

3   term "Brady."  I'm talking about the obligations

4   under Brady, which when we went through that

10:54  5   background introductory phase, you described as

6   disclosing exculpatory material.

7           So did that Brady obligation to disclose

8   exculpatory material not become relevant to the

9   L.A.P.D.'s curriculum and training until the year

10:54 10   2000?

11      A.   No, that's not my testimony.  We've always

12   had reciprocal discoveries since 1976 which would

13   include exculpatory evidence.  You asked me for a

14   quick definition of what Brady was, and Brady more

10:54 15   defined what could be considered exculpatory

16   including the veracity of witnesses and prior

17   inconsistent statements and things to that -- in

18   that nature.

19      Q.   You said Brady more defined, what could be

10:54 20   considered discovery or discovery material; right?

21      A.   Yes.

22      Q.   How did Brady more define that?  And I

23   guess a better question is:  If Brady more defined

24   what could be considered, you know, exculpatory or

10:55 25   discovery material, how was what was considered

DETECTIVE DAN JENKS - 10/12/2017

 1  discovery material prior to Brady different from

 2  what was considered discovery material after Brady?

 3          MS. PESSIS:  Objection; the memorandum

 4  speaks for itself.  It's Page 298 in discovery.

10:55 5          MR. BOON:  I don't think I've asked one

 6  question on the memorandum.

 7  BY MR. BOON:

 8      Q.   You can answer.

 9      A.   I just think it further defined and made it

10:55 10  clear what could be considered exculpatory material

 11  over and above written statements and documents

 12  produced in discovery, more about individuals'

 13  backgrounds.

 14      Q.   And I just ask for clarification.  You said

10:55 15  a few times "further defined."  What do you mean by

 16  that?

 17          MS. PESSIS:  Objection; asked and answered.

 18          So here's my problem with the line of

 19  questioning:  He's been referring to this memo.  For

10:56 20  some reason you're not showing it to him.

 21          As soon as you're done questioning him, I'm

 22  going to show it to him.  I think we should just get

 23  to the point.  The memo speaks for itself about the

 24  case law.

10:56 25          So I'm just trying to help you out and

1   speed this along because I think we're wasting time.

2   We're not getting anywhere.  And you've asked him

3   the same questions, counsel, about five times each.

4           MR. BOON:  Can I have the question

10:56  5   repeated, please.

6           (The record was read as follows:

7           Q  And I just ask for clarification.

8           You said a few times "further

9           defined."  What do you mean by that?)

10:56  10          THE WITNESS:  Again, it discussed more

11   about the veracity of a witness than it discussed

12   actual written documents and materials.

13   BY MR. BOON:

14      Q.   So those things weren't considered

10:56  15   discovery material back to that 2000 memo?

16           MS. PESSIS:  Considered by whom?  Vague.

17           THE WITNESS:  I think -- I'm sorry.  Repeat

18   the question one more time.

19           (The record was read as follows:

10:56  20           Q  So those things weren't considered

21            discovery material back to that

22            2000 memo?)

23           THE WITNESS:  Discovery prior to that was

24   all written documents and case files relevant to the

10:57  25   investigation and they were provided.  I don't think

1  at that point that they were doing -- memo clarifies

2  that the individual's veracity and prior

3  inconsistent statements and even officer's personnel

4  packages were now part -- subject to part of the

10:57  5  discovery that the Pitchess motion was brought

6  against an officer.

7  BY MR. BOON:

8      Q.   We talked a lot about this 2000 memo.

9  Prior to the year 2000, is there any documentation

10:58 10  the L.A.P.D. has for training on Brady obligations?

11      A.   Again, you're referring to Brady

12  obligations.  We -- inclusive in Brady is discovery.

13  We've always had discovery policy all the way back

14  to 1976 and within our manual as far as who's

10:58 15  responsible for it.  So we've always had a policy on

16  discovery.

17          MR. BOON:  Could you read back the

18  question, please.

19          (The record was read as follows:

10:57 20           Q   We talked a lot about this 2000

21           memo.  Prior to the year 2000, is there

22           any documentation the L.A.P.D. has for

23           training on Brady obligations?)

24          THE WITNESS:  I believe I've answered that.

10:58 25          MS. PESSIS:  He answered the question.

1   He's not going to answer it again.  He's answered it

2   about five times, Counsel.  This is really just

3   ridiculous.

4   BY MR. BOON:

10:59  5      Q.   I'm not talking about discovery.  I'm

6   talking about Brady obligations.

7           Is there any documentation that the

8   L.A.P.D. had for training its detectives on

9   Brady-specific obligations prior to the year 2000?

10:59 10          MS. PESSIS:  He's answered the question.

11  Brady includes discovery.  He stated it perfectly.

12          Has your answer changed?

13          THE WITNESS:  I believe Brady and discovery

14  are inseparable at this point.  It's just a -- when

10:59 15  you say "Brady obligations," it rounded out what the

16  -- what the definition was of discovery.

17          Can we take that break now?

18          MR. BOON:  Yes.  I need some water.

19          THE VIDEOGRAPHER:  We're going off the

10:59 20  record.  The time is 10:59 A.M.

21          (Whereupon, a recess was held

22          from 10:59 to 11:16 A.M.)

23          THE VIDEOGRAPHER:  We're going back on the

24  record.  The time is 11:16 A.M.

11:16 25  ///

DETECTIVE DAN JENKS - 10/12/2018

1    BY MR. BOON:

2        Q.   Thank you, detective.  I promised you I'd

3    be efficient.  We're going to go back to the

4    background phrase real quick.

11:16  5            Prior to today's deposition, did you review

6    the L.A.P.D.'s training materials from the year 1994

7    to 2000?

8        A.   I reviewed some of the materials.

9        Q.   But you understand you're the designated

11:17 10    P.M.K. on Brady training from '94 to 2000?

11       A.   Yes.

12       Q.   Did you review detective school training

13    from '94 to 2000?

14       A.   No.

11:17 15       Q.   Did you review -- what did you review?

16       A.   I reviewed the 2000 document, the 1976

17    document for discovery.  I reviewed the 1995, I

18    believe it's department legal bulletin regarding

19    discovery obligations, and then some documents

11:17 20    post-2000 related to Brady.

21       Q.   Do you believe that you've met your

22    obligations as the P.M.K. on Brady training for the

23    L.A.P.D. from '94 to 2000?

24       A.   I've never been given a set of guidelines

11:17 25    of what the obligations were; so I don't know if

DETECTIVE DAN JENKS - 10/12/2018

1    I've met them.

2        Q.   But you believe you adequately prepared to

3    testify on that issue?

4        A.   Yes.

11:18  5        Q.   And you believe you've adequately testified

6    on that issue on behalf of the department today?

7        A.   No.

8        Q.   "No"?

9        A.   No.

11:18 10        Q.   Why not?

11        A.   Because I made an error.

12        Q.   Okay.   What's that error?

13        A.   I reviewed a March 2000 bulletin, and in

14    that bulletin it says 1998, but I didn't realize

11:18 15    that was regarding the Brown decision, which is also

16    quoted right after the -- the Brady decision, which

17    was 1963.

18        Q.   But the memorandum --

19        A.   I didn't read it carefully enough.   So I

11:18 20    just wanted that -- I didn't get that accurate.

21        Q.   Thank you for clarifying that.   But the

22    memorandum was the year 2000; correct?

23        A.   Yes.

24        MR. BOON:   I don't think I have anything

11:18 25    further.

1          MS. PESSIS:  Okay.  I have some questions.

2    I'm going to be brief.  I'm going to attach some

3    items to the transcript.

4          Did we place a number on this one,

11:18  5    Mr. Boon?

6          MR. BOON:  31.

7          MS. PESSIS:  That's 31?  Okay.  No.

8    Actually, yes.  To help you out, I will take

9    pictures.  Thank you.  Okay.  So we're going to

11:19 10    start with Number 32.  These are the --

11          DEPOSITION OFFICER:  This was Number 1?

12          MS. PESSIS:  I think we started at --

13          MR. BOON:  31.

14          DEPOSITION OFFICER:  31.

11:19 15          MS. PESSIS:  It should be 31.

16          DEPOSITION OFFICER: Thank you.

17          MS. PESSIS:  This is Number 32, and I'm

18    going to mark it.  These are the objections prepared

19    by me, served by my office to the P.M.K. deposition

11:19 20    notice.  I'm just going to show them to the witness.

21    The proof of service is dated September 29, 2017.

22          (Whereupon, Defendant's Exhibit 32

23          was marked for identification by

24          the Court Reporter.)

25    ///

```
 1                    EXAMINATION
 2  BY MS. PESSIS:
 3      Q.   Please take a look at those, detective, and
 4  let us know if you recognize them and, if so, how do
11:19  5  you recognize them.
 6           (Document reviewed by the witness.)
 7           THE WITNESS:  I have reviewed these prior
 8  to today's deposition.  So, yes, I do recognize
 9  them.
11:20 10  BY MS. PESSIS:
11      Q.   Okay.  Thank you.
12           Would you kindly hand those to the court
13  reporter to your right-hand side.
14           Next I am going to attach for the record as
11:20 15  Exhibit Number 33...
16           MR. BOON:  Do you have copies for me,
17  Counsel, of the documents here attached to the
18  record?
19           MS. PESSIS:  I don't because I thought you
11:21 20  were going to bring them.  So I did not make copies,
21  but I'll hand it to you before I hand it to the
22  witness.
23           Exhibit 33 for today's deposition is the
24  following document:  "Defendant Los Angeles Police
11:21 25  Department's Supplemental Responses and Objections
```

1  to Plaintiff Louis Lorenzo Vargas's Demand For

2  Inspection and Production of Documents."

3        Below in parens is "Request Number 40,"

4  served by my office on September 14, 2017.  Attached

11:21  5  to the responses are documents Bates labeled "Vargas

6  L.A.P.D." Pages 234 through 237.

7        I'm going to hand them to Mr. Boon so he

8  can just look at them and then I'm going to show it

9  to the witness.

11:21  10            (Whereupon, Defendant's Exhibit 33

11               was marked for identification by

12               the Court Reporter.)

13            (Documents reviewed by the witness.)

14  BY MS. PESSIS:

11:21  15    Q.   Directing your attention, detective, to

16  Pages 234 through 237, please take a look at those

17  and let me know if you recognize the documents.

18    A.   Yes, I recognize the documents.

19    Q.   How do you recognize those documents?

11:22  20    A.   These are the two documents I reviewed --

21  two of the documents I reviewed in preparation for

22  today's testimony.

23    Q.   Directing your attention to Page 234,

24  please read into the record the title of the

11:22  25  document including any dates that you see there.

DETECTIVE DAN JENKS - 10/12/2018

1   A.   "Los Angeles Police Department Legal

2   Affairs Division Newsletter," dated -- stamped --

3   well, it's actually got a date of May 1995.  It says

4   "Issue Number 4" and then it says "Received," stamp

11:22   5   on it, "May 31st, 1995, Planning" and I believe it's

6   supposed to say Research Division.  That's

7   R-e-s-e-a.

8   Q.   And in essence, what does the document

9   speak to, sir, as you understand it?

11:23  10   A.   This discusses the obligations of discovery

11   and whose responsibilities discovery is under

12   various circumstances.

13   Q.   Thank you.

14        Next I would like to direct your attention,

11:23  15   sir, to Page 236.  Could you please read into the

16   record the title of that document and include the

17   date as well?

18   A.   "Legal Bulletin Los Angeles Police

19   Department Legal Systems Section, Volume I, Issue 4,

11:23  20   Criminal Discovery, February 9th, 1976."

21   Q.   What is your understanding of the content

22   of that document, sir?

23   A.   It's the document I reviewed in preparation

24   for today, and I believe this was the status of

11:23  25   discovery requirements through the period we're

DETECTIVE DAN JENKS - 10/12/2018

1  talking about today, 1994 through 2000.

2      Q.   Thank you.  Kindly hand that to the

3  reporter.

4           MR. BOON:  For clarification, Counsel,

11:23 5  these have all been produced in discovery?

6           MS. PESSIS:  Yes.  They're all Bates.

7           Next is Exhibit 34 --

8           MR. BOON:  I'd just add that when

9  referencing them, can you reference them by the

11:24 10  Bates stamp just for the record so we --

11           MS. PESSIS:  No.  He did.

12           MR. BOON:  Okay.

13           MS. PESSIS:  Those are all the Bates

14  numbers.

11:24 15           MR. BOON:  Thanks.

16  BY MS. PESSIS:

17      Q.   Next I'm going to direct your attention to

18  an additional set of documents.  Those are marked

19  Exhibit 34.  Please take a look at those.

11:24 20           (Whereupon, Defendant's Exhibit 34

21           was marked for identification by

22           the Court Reporter.)

23           (Document reviewed by the witness.)

24  BY MS. PESSIS:

11:24 25      Q.   Do you recognize those two pages?

1        A.   I do.

2        Q.   And how do you recognize them?

3        A.   This was another piece of material that I

4   reviewed in preparation for today.  It's "Detective

11:24  5   Operations Manual" on the front, prepared by

6   Investigative Analysis Section, Detective Services

7   Group, Operation Headquarters Bureau, dated

8   September 15th, 1986, Bates stamped Vargas-L.A.P.D.

9   290.

11:24 10        Q.   And based on your background, education,

11   training, and experience, is it your recollection at

12   this time that the Detective Operations Manual

13   published on or about September 15, 1986, was in

14   effect until approximately the year 1999 and 2000?

11:25 15        A.   Yes.

16        Q.   Okay.  And directing your attention to Page

17   291 and to Section 132 of Volume I, do you see that,

18   sir?

19        A.   Yes, I do.

11:25 20        Q.   What is the title of that section?

21        A.   "Factually Innocent."

22        Q.   And can you please tell us what that

23   directs an officer, or I should say a detective, to

24   do if he or she discovers or believes that an

11:25 25   individual may be innocent?

DETECTIVE DAN JENKS - 10/12/2017

1      A.   It says "if determined that an arrestee is

2   factually innocent, then the detective shall

3   generate a 314 follow-up report to an arrest report

4   and crime report (if any)," in parentheses, "and

11:25  5   shall record the information supporting the

6   determination of factual innocence."

7      Q.   Thank you --

8      A.   And sent -- I'm sorry.

9      Q.   Thank you.  Go ahead and please hand that

11:25 10   to the court reporter.

11        The next exhibit is Exhibit 35.  Let me

12   just ask Madam Reporter a question.  There does not

13   appear to be enough room for the sticker on the

14   bottom.  Should I put it on the top?  Is that okay?

11:26 15        DEPOSITION OFFICER:  Yes. Thank you.

16        MS. PESSIS:  All right.  Thank you.

17          (Whereupon, Defendant's Exhibit 35

18           was marked for identification by

19           the Court Reporter.)

11:26 20        MS. PESSIS:  I'm now showing Detective

21   Jenks Exhibit 35.

22   BY MS. PESSIS:

23      Q.   Please take a look at that, sir.

24          (Document reviewed by the witness.)

11:26 25        THE WITNESS:  I've reviewed it.

DETECTIVE DAN JENKS - 10/12/201¾

```
        1   BY MS. PESSIS:

        2        Q.   Do you recognize that document?

        3        A.   I do.

        4        Q.   Did you see that document before today?

11:26   5        A.   Yes, I did.

        6        Q.   Did you review that document in addition to

        7   other materials in order to prepare for today's

        8   deposition?

        9        A.   I did.

11:26  10        Q.   Please read into the record, sir, the title

       11   of the document, including the date.

       12        A.   "Office of the Chief of Police,

       13             Memorandum Number 1," dated March

       14             1st, 2000.  "Subject:  Impact of

11:26  15             employee conduct on credibility as

       16             a witness."

       17        Q.   I'm going to ask you to read further into

       18   the record, beginning at the word, "A series of case

       19   decisions" all the way down to the word "biased,"

11:27  20   where I am now pointing.  Go ahead and read at your

       21   own pace and try to err on the side of being more

       22   slow for the court reporter.

       23             MR. BOON:  I'd just lodge that the document

       24   speaks for itself.  Improper reading of documents on

11:27  25   the record but --
```

DETECTIVE DAN JENKS - 10/12/2018

1              MS. PESSIS:  No --

2              MR. BOON:  -- go ahead.

3              Ms. PESSIS:  -- I want him to go ahead and

4      read it.  Go ahead.

11:27 5              THE WITNESS:  "A series of case

6                      decisions beginning with Brady v.

7                      Maryland 373 U.S. 83 (1963) and

8                      including in re. Brown 17 Cal.

9                      4th 873" -- parentheses -- "(1998)

11:27 10                      require the prosecution to reveal

11                      to the defense information that

12                      may be exculpatory in nature,

13                      including potential impeachment

14                      information.

11:27 15                          "Potential impeachment information

16                      may include, but is not strictly

17                      limited to, specific instances of

18                      conduct of a witness for the purpose

19                      of attacking a witness's credibility

11:27 20                      or character for truthfulness,

21                      evidence in the form of opinion or

22                      reputation as to the witness's

23                      character for truthfulness, prior

24                      inconsistent statements and

11:28 25                      information that may be used to

 1          suggest that a witness is biased."

 2    BY MS. PESSIS:

 3        Q.   Thank you.  I may just have a few more

 4    questions here.

11:28 5          Based on the content of the memo, was it

 6    your understanding that discovery, meaning the

 7    production of written materials, was expanded as to

 8    the scope to include possibly information which

 9    would impeach a detective or other involved

11:29 10   officers' credibility?

 11       A.   Yes.

 12          MS. PESSIS:  All right.  That's all I have

 13   for now.  Go ahead and pass that back for the

 14   reporter.

11:29 15          Thank you for your stickers.

 16          MR. BOON:  I think -- correct me if I'm

 17   wrong because we didn't clarify it fully yesterday.

 18   The stipulation, is it a two-week turnaround on the

 19   court reporter's generation of the transcript and a

11:29 20   three-week turnaround for the witness to review,

 21   analyze, make any corrections and sign the

 22   transcript?

 23          MS. PESSIS:  The stipulation does not

 24   usually include the reporter's turnaround.  The

11:29 25   industry standard, as I've understood it from almost

1   20 years of practicing, is two weeks.  If you opt to

2   expedite that, that would be at the plaintiff's

3   expense.  I am not asking for any such expedited

4   copy.

11:29  5          So the stipulation would only pertain to

6   the time within which Detective Jenks will have the

7   opportunity to review and sign the transcript.  And

8   then it would also speak to the retention of the

9   original, the making available of the original and

11:30 10   the lodging of the original.

11          So the court reporter's turnaround is

12   between the two of you.  I have no involvement in

13   that.

14          MR. BOON:  I understand that.  The primary

11:30 15   emphasis of my question was the turnaround from the

16   witness.  Is that stipulation three weeks from the

17   witness's receipt of the transcript?

18          MS. PESSIS:  It's usually my receipt.

19   Technically -- to be technical, it's my receipt, and

11:30 20   then I contact him --

21          MR. BOON:  That's fine.

22          MS. PESSIS:  And then if I find out, let's

23   say, he was -- because he handles high-profile cases

24   as well, he could be called out of the country, who

11:30 25   knows.  So that's when I would contact you and say

1   that time window will not work.

2          But three weeks is fine for us.  So do you

3   want me to propose the stipulation?

4          MR. BOON:  I think I've tried asking a

11:30 5   couple times.  Is the stipulation three weeks from

6   your office's receipt of the transcript to

7   turnaround?

8          MS. PESSIS:  I can stipulate to that, but

9   we need to state it a little more artfully for the

11:31 10   record.

11          MR. BOON:  Go ahead, Counsel.

12          MS. PESSIS:  Okay.  At this time, the

13   parties agree to relieve the videographer and the

14   court reporter of their duties pursuant to the

11:31 15   Federal rules of Civil Procedure.

16          The original transcript will be delivered

17   to my office to my attention.  I will then make it

18   available to Detective Jenks as soon as possible and

19   subject to his availability.

11:31 20          He will have three weeks from the date I

21   receive the transcript to review the same absent any

22   unforeseen circumstances of which I will make

23   counsel aware at the earliest opportunity.

24          I will then advise all counsel in writing

11:31 25   that the deposition has been signed and of any

1   changes that the witness may make if that occurs.

2           My office will then retain the original

3   deposition transcript.  It will be made available

4   upon reasonable request, and if there is a trial in

11:31 5   this matter, the deposition transcript will be

6   lodged in accordance with the trial date at the

7   appropriate time.

8           I further propose that we stipulate that in

9   the event that the original transcript from this

11:32 10   deposition is lost, misplaced, destroyed, or

11   otherwise cannot be located, that a certified copy

12   is served in its place for any and all purposes.

13           So stipulated?

14           MR. BOON:  So stipulated.

11:32 15           DEPOSITION OFFICER:  Would you like to

16   order a certified copy?

17           MS. PESSIS:  I would.  Thank you so much,

18   ma'am.

19           THE VIDEOGRAPHER:  This is the end of Media

11:32 20   Number One with the conclusion of today's deposition

21   of Detective Dan Jenks.  Going off the record.  The

22   time is 11:32 A.M.

23           (Whereupon the deposition proceedings

24               were concluded at 11:32 a.m.)

25                   -oOo-

DETECTIVE DAN JENKS - 10/12/2017

```
1   STATE OF CALIFORNIA      )
                             ) ss.
2   COUNTY OF LOS ANGELES    )

3

4

5              I, DETECTIVE DAN JENKS, declare under

6   penalty of perjury that the foregoing testimony is

7   true and correct to the best of my knowledge and

8   belief.

9

10             Dated this ___ day of _____, 2017.

11

12

13                  _____

14                       (DETECTIVE DAN JENKS)

15

16

17

18

19

20

21

22

23

24

25
```

DETECTIVE DAN JENKS - 10/12/2017

```
 1   STATE OF CALIFORNIA    )

 2   COUNTY OF LOS ANGELES ) ss.

 3

 4         I, Samantha Avenaim, C.S.R. No. 10627 in

 5   and for the State of California, do hereby certify:

 6         That prior to being examined, the witness

 7   named in the foregoing deposition was by me duly

 8   sworn to testify to the truth, the whole truth, and

 9   nothing but the truth;

10         That said deposition was taken down by me

11   in shorthand at the time and place therein named and

12   thereafter reduced to typewriting under my

13   direction, and the same is a true, correct, and

14   complete transcript of  said proceedings;

15         That if the foregoing pertains to the

16   original transcript of a deposition in a Federal

17   Case, before completion of the proceedings, review

18   of the transcript {X} was { } was not required.

19         I further certify that I am not interested

20   in the  event of the action.

21         Witness my hand this 31st day of October,

22   2017.

23                    _____

24                    Certified Shorthand Reporter
                      For the State of California
25
```

**brett@bennerboon.com**

| | |
|---|---|
| **From:** | brett@boonlawoffice.com |
| **Sent:** | Wednesday, May 15, 2019 3:43 PM |
| **To:** | 'Geoff Plowden' |
| **Cc:** | 'Stiglitz, Jan'; 'Simpson, Alex'; 'Craig Benner' |
| **Subject:** | RE: MIL's |

Geoff,

Thanks for reaching out as I was just about to contact you on the scheduling issues. The primary reason I was going to reach out was that Defendants scheduled their Summary Judgment Motion for June 10th. Based on today's filing, this is less than the requisite 28-day notice requirement.  As such, please re-notice Defendants' Summary Judgment Motion for June 17th, otherwise Plaintiff will not be afforded the aforementioned, requisite 28-day notice period. If you disagree, please advise your reasoning and authority.

As an additional note, Defendants' conclusions of law numbers 6 and 7 state that Plaintiff failed to provide a notice of claim prior to filing. This is patently untrue after a cursory review of the record. Please review and file a Notice of Errata.

As far as the MILs, we understand that perhaps they are "usually" heard at the times you suggest. However, the federal and local rules allow for filing and hearing MILs anytime at or before the pretrial conference. As such, Plaintiff is permitted to schedule his motions to be heard as currently scheduled, and unless you provide authority otherwise, would prefer to leave them as scheduled for a variety of reasons. Given the importance of these motions for all parties as discussed at yesterday's meeting, it is unclear why Defendants would seek to delay them. Further, and in contrast to Defendants' MSJ, Plaintiff provided the full 28-day notice for the MILs, so we see no reason to move them.

Please advise on the MSJ issues. If you'd like to discuss, feel free to give me a call on my cell.

Kind regards,

Brett A. Boon, Esq.
411 Camino Del Rio South, Suite 106
San Diego, CA 92108
P: (619) 358-9949 || F: (619) 365-4926

Confidentiality Notice: This email is intended for the sole use of the intended recipient(s) and may contain confidential, proprietary or privileged information. If you are not the intended recipient, you are notified that any use, review, dissemination, copying or action taken based on this message or its attachments, if any, is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy or delete all copies of the original message and any attachments. Thank you.

**From:** Geoff Plowden <geoffrey.plowden@lacity.org>
**Sent:** Wednesday, May 15, 2019 3:14 PM
**To:** Brett Boon <brett@boonlawoffice.com>
**Subject:** MIL's

Can we stipulate and agree the MILS will be calendared/renoticed and heard at the Final Pretrial Conference (6/17 at 3 pm)?  Only the Motion for summary adjudication of the Monell claim was calendared for 6/10.  That is usually how its done, if not heard at first day of trial.

The plaintiff's  motion to permit experts can remain for 6/10.

Let me know.


--
Geoffrey Plowden
Deputy City Attorney
Police Litigation Section
200 N. Main Street #600
Los Angeles, CA 90012
213-978-7038 ph.
213-978-8785 fx.

*****************Confidentiality Notice *************************
This electronic message transmission contains information
from the Office of the Los Angeles City Attorney, which may be confidential or protected by the attorney-client privilege and/or the work product doctrine. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the content of this information is prohibited. If you have received this communication in error, please notify us immediately by e-mail and delete the original message and any attachments without reading or saving in any manner.
*****************************************************************

**brett@bennerboon.com**

| | |
|---|---|
| **From:** | brett@boonlawoffice.com |
| **Sent:** | Wednesday, May 22, 2019 4:41 PM |
| **To:** | 'Geoff Plowden'; 'Stiglitz, Jan'; 'Craig Benner'; 'Simpson, Alex' |
| **Subject:** | RE: Vargas |

Geoff,

We understand that the Court has ruled that three are no post-conviction *Brady* obligations in this case. That said, we strongly believe that this issue is ripe for appeal and therefore preserved the appellate record in MSJ briefings subsequent to this ruling. Pursuant to this Order, plaintiff does not intend to introduce evidence of post-conviction sexual assaults or the teardrop rapist investigation during the *Brady* phases of trial.

As far as the briefing schedule for Defendants' MSJ, we disagree. At the 4/15 hearing, Judge Wilson ordered Defendants to file their MSJ by 5/15 but did not order a briefing schedule. Although the clerk may have discussed this informally and after the hearing concluded, Judge Wilson made no such order and likewise did not include any such order in his minutes following the hearing in which Defendants' 5/15 deadline was memorialized. See Dkt. No. 188.

Further, following Defendants' filing of their MSJ and likely due to it being done so without affording Plaintiff the requisite 28-day notice period, the Court reset the MSJ hearing for 6/17. See Dkt. No. 201. As a result and pursuant to Local Rule 7-9, Plaintiff's opposition is due 21 days prior to the hearing date, which falls on Monday May 27th and Defendants' reply due the following Monday. Had the Court intended to set an alternative briefing schedule, this certainly would have made it into one of the two minute orders on the issue and any informal conversation with the clerk following the 4/15 hearing does not qualify as a court order. Also, as previously stated, although this Monday is a holiday electronic filing via Pacer can still be accomplished.

As far as the therapist deposition, we will touch base with her on scheduling. We have not been given authority to accept service on her behalf but will inquire about this as we have with the other damage witnesses in an effort to expedite the process. We will reach out to her regarding charts as well, and although I can't make that promise right now if you provide a form HIPAA release for our review tomorrow that would be a good starting point.

Kind regards,

Brett A. Boon, Esq.
411 Camino Del Rio South, Suite 106
San Diego, CA 92108
P: (619) 358-9949 || F: (619) 365-4926

Confidentiality Notice: This email is intended for the sole use of the intended recipient(s) and may contain confidential, proprietary or privileged information. If you are not the intended recipient, you are notified that any use, review, dissemination, copying or action taken based on this message or its attachments, if any, is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy or delete all copies of the original message and any attachments. Thank you.

**From:** Geoff Plowden <geoffrey.plowden@lacity.org>
**Sent:** Wednesday, May 22, 2019 2:49 PM
**To:** Brett Boon <brett@boonlawoffice.com>; Stiglitz, Jan <js@cwsl.edu>; Craig Benner <Craig@bennerlawfirm.com>; Simpson, Alex <ajs@cwsl.edu>
**Subject:** Re: Vargas

Attached is Exhibit 200, previously produced in discovery, but now in binder format.The blank pages correspond to numbered index tabs. Any description of this as withheld discovery is  baseless and counterproductive.

**This is the question I posed that I was hoping for a response to**:  "At our meeting last week, I mentioned that my understanding was that the evidence plaintiff intended to rely on to establish his brady claim were the 10 or 11 unrelated crime reports in the 1996-1999 time period, that Judge Wilson enumerated in his 8/7/18 order. Jan agreed. However, in reading the expert reports, it seems to me there is an argument that the evidence plaintiff relies on also includes the LAPD's attacker series rape book and DNA associated with a "teardrop rapist."  As those matters were not considered or known to defendants Quijano and Smith, and that the attacker series book was created in 2001 by other LAPD personnel, well after the relevant time period in this case, I'd like to be certain we're on the same page for trial and preparation of pretrial documents.  There is no repondeat superior liability on behalf of the City, so the conduct of these two detectives is what is at issue.

Please confirm the evidence which will be discussed involves the limitations we discussed at the meeting. If not, please tell me how I've misstated the position of plaintiff."

SO, I'll ask again (with all of plaintiff's counsel on this thread), will the plaintiff be limiting the evidence of withheld Brady material to the 10-11 reports id'd by Judge Wilson in the 8/7/18 order?  If not, I will advise the Court in a motion in limine that you intend to contravene his orders and discuss matters beyond what he has ruled on in three written opinions as relevant evidence of a Brady claim. IF I have this wrong, please let me know what I'm missing here.

I will depose the treater in Santa Maria (2 hours tops), with a request for a copy of her chart in advance. Please advise when that can happen and I'll send notice (I have 6/5 - 6/7  open). IF she needs to be subpoenaed, it will likely be on a date in that time frame.

Finally, attached is the separate statement in word. Per the clerk's briefing schedule, the opp is due 5/22 and the reply 5/29

200.pdf

On Wed, May 22, 2019 at 12:48 PM <brett@boonlawoffice.com> wrote:

Geoff,

We will pass along the exhibit and witness lists for you to insert Defendants' information. I believe we can still file Monday because it is Pacer / electronic filing, but we will work towards getting this on docket Friday.

With respect to the MIL, we disagree but will review Defendants' MIL in good faith and if there is an opportunity for a stipulation at that time we will touch base with you. As far as a motion to exclude the doctor, Defendants have not yet started discovery into damages issues, there is no discovery cutoff in this case, and trial is still more than thirty days

away.  There is no prejudice to Defendants and no scheduling order has been violated. For your convenience, we will be removing Dr. Stein from Plaintiff's witness list and inserting a therapist with whom Mr. Vargas has visited in the past and continues to do so. Her information is as follows:

**Denys Medel**, LMFT

Phone: (805) 623-4007

Address:          920 South Broadway, Suite B

                          Santa Maria, CA

Additionally, your email and multiple discussions over the past week indicate that Defendants are providing additional discovery this week which has been inexplicably delayed. Importantly, the documents you have described relate directly to Plaintiff's *Brady* claim and Defendants' contended defenses thereto. With that in mind, any motion as you describe below will be opposed and is not well taken.

As far as Defendants' exhibit 200, please provide this electronically today as we previously discussed would be done as soon as the document was finalized. If for some reason this is not an available option, and I am not sure why it would not be, please bring a copy for me to tomorrow's deposition and send via courier to Messrs. Benner and Mr. Stiglitz. Mr. Stiglitz's correct mailing address is as follows:

Law Offices of Jan Stiglitz

14462 Garden Trail

San Diego, CA 92127

We are all set for depositions tomorrow. On a related topic, you will receive a notice shortly for Robin Allen's deposition on 5/28, as you and I previously discussed.

Finally, please provide Defendants' separate statement in support of their pending MSJ in Microsoft Word / non-PDF format.

Feel free to give me a call if you want to discuss any of these issues further. I will be available after 2 pm through the remainder of the day.

Thanks,


Brett A. Boon, Esq.

411 Camino Del Rio South, Suite 106

San Diego, CA 92108

P: (619) 358-9949 || F: (619) 365-4926


Confidentiality Notice: This email is intended for the sole use of the intended recipient(s) and may contain confidential, proprietary or privileged information. If you are not the intended recipient, you are notified that any use, review, dissemination, copying or action taken based on this message or its attachments, if any, is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy or delete all copies of the original message and any attachments. Thank you.


**From:** Geoff Plowden <geoffrey.plowden@lacity.org>
**Sent:** Wednesday, May 22, 2019 11:40 AM
**To:** Brett Boon <brett@boonlawoffice.com>
**Subject:** Vargas


Did you start the joint exhibit list? The pretrial documents are due Friday. We can do it if you send me your portion in word.


Did not hear back from you on the subsequently created materials/Attacker series subject matter MIL. Please let me know your position. Also, I will move to exclude doctors, per Rule 37, as those still not have been disclosed to defendants.


The serial rapist book (Exh. 200) is done and a copy is in my office for pick up. I can send it today, via ground delivery but that will get there late Thursday. There was screw up with pagination of each page within the book, but that will be fixed for trial.


The stipulated facts for phase 2 you were gonna work on.  I will work on stipulated facts for the criminal trial.

Depos are going forward tomorrow here at my office.


Thanks.


--

Geoffrey Plowden

Deputy City Attorney

Police Litigation Section

200 N. Main Street #600

Los Angeles, CA 90012

213-978-7038 ph.

213-978-8785 fx.


*****************Confidentiality Notice *************************
This electronic message transmission contains information
from the Office of the Los Angeles City Attorney, which may be confidential or protected by the attorney-client privilege and/or the work product doctrine. If you are not the intended recipient, be aware that any disclosure, copying,
distribution or use of the content of this information is prohibited. If you have received this communication in error, please notify us immediately by e-mail and delete the original message and any attachments without reading or saving in any manner.
*****************************************************************


--
Geoffrey Plowden
Deputy City Attorney
Police Litigation Section
200 N. Main Street #600
Los Angeles, CA 90012
213-978-7038 ph.
213-978-8785 fx.

*****************Confidentiality Notice *************************
This electronic message transmission contains information
from the Office of the Los Angeles City Attorney, which may be confidential or protected by the attorney-client privilege and/or the work product doctrine. If you are not the intended recipient, be aware that any disclosure, copying,

distribution or use of the content of this information is prohibited. If you have received this communication in error, please notify us immediately by e-mail and delete the original message and any attachments without reading or saving in any manner.

******************************************************************